No. 24-3304

IN THE UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

---

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

v.

JOÃO RICARDO DEBORBA,

Defendant-Appellant.

---

On Appeal from United States District Court
Western District of Washington at Tacoma
District Court Case No. 3:22-cr-05139-DGE-1

The Honorable David G. Estudillo
United States District Judge

---

**DEFENDANT-APPELLANT'S OPENING BRIEF**

---

REBECCA FISH
Attorney for João DeBorba
Federal Public Defender's Office
1331 Broadway, Suite 400
Tacoma, WA 98402
Phone: (253) 593-6710
Email: Becky_Fish@fd.org

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................ iii

INTRODUCTION ................................................................... 1

JURISDICTIONAL STATEMENT ............................................... 2

STATUTORY AUTHORITIES .................................................... 3

ISSUES PRESENTED................................................................ 3

STATEMENT OF THE CASE .................................................... 4

SUMMARY OF THE ARGUMENT ............................................ 10

STANDARD OF REVIEW ....................................................... 12

ARGUMENT .......................................................................... 13

I.      The Second Amendment only allows regulation of firearms that is consistent with the United States' historical tradition of firearm regulation. .......................................................................... 13

II.     The district court erred in denying Mr. DeBorba's motion to dismiss and convicting him of possessing a firearm as an undocumented immigrant under 18 U.S.C. § 922(g)(5). ......................................................... 14

        A.      The district court erred in relying on political complaints and non-enacted proposals to find a historical tradition of disarming those who are not "law-abiding," peaceable, or responsible. .................................. 15

        B.      The district court erred in placing undocumented immigrants generally, and Mr. DeBorba specifically, within this category of people who could be disarmed. ............................................................. 25

        C.      The Supreme Court has squarely rejected justifying disarmament laws on broad and vague categories. ................................................. 32

III.    The District Court erred in convicting Mr. DeBorba of possessing a firearm while subject to a domestic violence protection order under 18

U.S.C. § 922(g)(8) because the application of the statute here was not consistent with historical firearm regulation. ..................................................35

    A.    The Supreme Court in *Rahimi* allowed convictions under § 922(g)(8) in some, but not all, situations covered by the statute.............................36

    B.    The protection orders underlying Count 1 contain no finding that Mr. DeBorba represented a credible threat to the physical safety of another person. .........................................................................................40

    C.    The protection order underlying Count 2 contains only a form finding of a credible threat with no evidence that any threat was based on prior misuse of weapons.........................................................................41

IV.    The District Court erred in convicting Mr. DeBorba of false statement charges because the statements were not material to his lawful possession of firearms.....................................................................................................44

V.    The district court erred in convicting Mr. DeBorba of unlawful possession of a silencer because the statute violates the Second and Fifth Amendments. ...............................................................................................49

    A.    The NFA's registration, taxation, and criminalization scheme violates the Second Amendment.............................................................................50

        1.    The Second Amendment protects possession of silencers.............50

        2.    The government has not demonstrated a sufficiently similar historic tradition of regulation to justify the NFA's restrictions on silencers....................................................................................52

    B.    The district court erred in holding it could not consider a facial challenge and the NFA's definition of "silencer" fails a facial vagueness challenge. ....................................................................................55

CONCLUSION...........................................................................................................59

STATEMENT OF RELATED CASES...................................................................61

CERTIFICATE OF COMPLIANCE.....................................................................62

# TABLE OF AUTHORITIES

**Cases**                                                       **Pages**

*Abramski v. United States*,
573 U.S. 169 (2014) ............................................................ 45, 46, 48

*Barrett v. United States*,
423 U.S. 212 (1976) ........................................................................ 25

*Bryson v. United States*,
396 U.S. 64 (1969) ......................................................................... 47

*Calvary Chapel Bible Fellowship v. County of Riverside*,
948 F.3d 1172 (9th Cir. 2020) ........................................................ 31

*City of Chicago v. Morales*,
527 U.S. 41 (1999) ......................................................................... 57

*District of Columbia v. Heller*,
554 U.S. 570 (2008) ......................................... 16, 20, 30, 33, 34, 51, 54

*Hotel & Motel Ass'n of Oakland v. City of Oakland*,
344 F.3d 959 (9th Cir. 2003) .......................................................... 31

*Jackson v. City & County. of San Francisco*,
746 F.3d 953 (9th Cir. 2014) .............................................. 50, 51, 52

*Johnson v. United States*,
576 U.S. 591 (2015) ....................................................................... 55

*Kanter v. Barr*,
919 F.3d 437 (7th Cir. 2019) ................................... 16, 22, 24, 25, 34

*Kolbe v. Hogan*,
813 F.3d 160 (4th Cir. 2016),
*vacated on reh'g en banc*, 849 F.3d 114 (4th Cir. 2017). ...........50, 51

*Kolender v. Lawson*,
461 U.S. 352 (1983) ....................................................................... 57

*Mock v. Garland*,
75 F.4th 563 (5th Cir. 2023)............................................................ 52

iii

*New York State Rifle & Pistol Ass'n, Inc. v. Bruen*,
   597 U.S. 1 (2022) ......................................................................... *passim*

*New York State Rifle & Pistol Ass'n, Inc. v. City of New York*,
   590 U.S. 336 (2020) ........................................................................ 16

*Rodriguez Diaz v. Garland*,
   53 F.4th 1189 (9th Cir. 2022) ........................................................ 31

*Sessions v. Dimaya*,
   584 U.S. 148 (2018) ........................................................................ 55

*Shuttlesworth v. City of Birmingham*,
   382 U.S. 87 (1965) .......................................................................... 56

*Staples v. United States*,
   511 U.S. 600 (1994) ........................................................................ 58

*Teixeira v. Cnty. of Alameda*,
   873 F.3d 670 (9th Cir. 2017) ..........................................................53

*Teter v. Lopez*,
   76 F.4th 938 (9th Cir. 2023) .......................................................... 14

*United States v. Endicott*,
   803 F.2d 506 (1986) ........................................................................ 57

*United States v. Escobar-Temal*,
   No. 3:22-CR-00393, 2023 WL 4112762 (M.D. Tenn. June 21, 2023) ............. 33

*United States v. Esparza-Ponce*,
   193 F.3d 1133 (9th Cir. 1999) ................................................... 46, 49

*United States v. Freed*,
   401 U.S. 601 (1971) ........................................................................ 58

*United States v. Holden*,
   70 F.4th 1015 (7th Cir. 2023) ........................................................ 48

*United States v. Jackson*,
   No. 22-2870, 69 F.4th 495 (8th Cir. 2023),
   *cert. granted, judgment vacated*, 144 S.Ct. 2710 (2024),
   *and vacated*, 2024 WL 3768055 (8th Cir. Aug. 8, 2024) ............................ 22, 23

iv

*United States v. Jae Gab Kim*,
    449 F.3d 933 (9th Cir. 2006) ................................................ 56

*United States v. Kelly*,
    874 F.3d 1037 (9th Cir. 2017) ....................................... 12, 13

*United States v. Kimbrew*,
    944 F.3d 810 (9th Cir. 2019) ................................................ 13

*United States v. Knox*,
    396 U.S. 77 (1969) ................................................................ 47

*United States v. Manney*,
    114 F.4th 1048 (9th Cir. 2024) ........................................... 46

*United States v. McCalla*,
    545 F.3d 750 (9th Cir. 2008) ............................................... 12

*United States v. McCartney*,
    357 F. App'x 73 (9th Cir. 2009) .......................................... 51

*United States v. Meza-Rodriguez*,
    798 F.3d 664 (7th Cir. 2015) ............................................... 29

*United States v. Miller*,
    307 U.S. 174 (1939) .............................................................. 51

*United States v. Rahimi*,
    144 S.Ct. 1889 (2024) .................................................. *passim*

*United States v. Rogers*,
    270 F.3d 1076 (7th Cir. 2001) ............................................. 58

*United States v. Rose*,
    522 F.3d 710 (6th Cir. 2008) ............................................... 58

*United States v. Salerno*,
    481 U.S. 739 (1987) .............................................................. 47

*United States v. Summers*,
    268 F.3d 683 (9th Cir. 2001) ............................................... 58

*United States v. Vongxay*,
    594 F.3d 1111 (9th Cir. 2010) ............................................. 34

*United States v. Williams*,
    553 U.S. 285 (2008) ......................................................................... 56

*Wolford v. Lopez*,
    No. 23-16164, --- F.4th ---, 2024 WL 4097462
    (9th Cir. Sept. 6, 2024)......................................................26, 27, 28, 54

**Statutes and Regulations**

U.S. Const. amend. I ...........................................................................4, 56

U.S. Const. amend. II...................................................................... *passim*

U.S. Const. amend. V........................................................... 12, 47, 49, 56

U.S. Const. amend. XIV .................................................................. 14, 57

8 U.S.C. § 1182 ................................................................................ 30, 31

8 U.S.C. § 1227 ................................................................................ 30, 31

8 U.S.C. § 1325 ...................................................................................... 28

8 U.S.C. § 1326 ...................................................................................... 28

18 U.S.C. § 911 ................................................................... 3, 11, 46, 49

18 U.S.C. § 921 ....................................................................... 4, 51, 57

18 U.S.C. § 922 ............................................................................. *passim*

18 U.S.C. § 924 ...................................................................................... 30

18 U.S.C. § 1001 .................................................................................... 47

18 U.S.C. § 3231 ...................................................................................... 2

26 U.S.C. § 5845 .................................................................................... 51

26 U.S.C. § 5861 .............................................................................. 12, 54

26 U.S.C. § 5871 .................................................................................... 54

26 U.S.C. § 6651 .................................................................................... 29

28 U.S.C. § 1291 ...................................................................................... 2

29 C.F.R. § 1910.95 ............................................................................... 58

U.S. Statutes at Large, 73 Cong. Ch. 757, June 26, 1934, 48 Stat. 1236 ...............53

Wash. Rev. Code § 9.41.040 ....................................................... 47

Wash. Rev. Code § 9.41.070 ................................................ 46, 47

Wash. Rev. Code § 9.41.173 ................................................ 46, 47

Wash. Rev. Code § 10.99.040 .............................................. 6, 42

## Historical Statutes and Regulations

1745 Acts of the N.C. General Assembly ch. III, 218-19 ...............................22, 24

1795 Mass. Acts, ch. 2, in Acts and Resolves of Massachusetts, 1794-1795
     (1896) ................................................................................37, 43

An Act to Establish an Uniform Rule of Naturalization, ch. 3, § 1, 1 Stat. 103
     (1790) ...........................................................................27

Mass. Rev. Stat., ch. 134, § 16 (1836) ...................................................38

Ordinance of the Director and Council of New Netherland Against Firing at
     Partridges or Other Game Within the Limits of New Amsterdam, N.Y.
     Col. MSS. XVI. 31 (Oct. 9, 1652)......................................22, 23, 24

## Other

2 Bernard Schwartz, *The Bill of Rights: A Documentary History* (1971) ..............22

2 *The Works of James Wilson* (James DeWitt Andrews ed., 1896) .......................24

4 W. Blackstone, Commentaries on the Laws of England
     (10th ed. 1787)......................................................37, 38, 39

6 Nathan Dane, *Digest of American Law* (1823).....................................24

132 Cong. Rec. H1646-01, 1986 WL 780589 (Apr. 9, 1986) ........................ 25, 26

Alex Nowrasteh, Criminal Immigrants in Texas in 2019, Illegal Immigrant
     Conviction Rates and Arrest Rates for Homicide, Sex Crimes, Larceny, and
     Other Crimes, CATO Institute, 2021,
     https://www.cato.org/sites/cato.org/files/2021-05/IRPB-19.pdf........................48

ATF, Firearms Commerce in the United States: Annual Statistical Update, 2021, https://www.atf.gov/firearms/docs/report/2021-firearms-commerce-report/download ...................................................................................52

*National Firearms Act*, ATF (Apr. 7, 2020), https://www.atf.gov/rules-and-regulations/national-firearms-act ..........................................................53

ATF, Technical Bulletin 17-02: Solvent Traps, Apr. 20, 2017 ...............59

Brief for the United States, *United States v. Rahimi*, No. 22-915, 2023 WL 5322645 (U.S. Aug. 14, 2023).................................22, 23, 33

Cong. Globe App., 34th Cong., 1st Sess., 1090 (1856).........................18

Cong. Globe, 40th Cong., 2d Sess., 1967 (1868) ..................................32

David Yassky, *The Second Amendment: Structure, History, and Constitutional Change*, 99 Mich. L. Rev. 588 (2000) ........................................ 19, 20

Defendant-Appellant's Opening Brief, *United States v. Vazquez-Ramirez*, No. 24-3544 (9th Cir. Sep. 27, 2024) ............................................. 28

*Dorr Rebellion Timeline*, Rhode Island Dep't of State, Sec. of State (2024), https://www.sos.ri.gov/divisions/civics-and-education/for-educators/themed-collections/dorr-rebellion-timeline#:~:text=July%201841,suffrage%20to%20non%2Dland%20holders ..................................................................................17, 18

Glenn Harlan Reynolds, *A Critical Guide to the Second Amendment*, 62 Tenn. L. Rev. 461 (1995)........................................................... 20

*High-Handed Outrage in Kansas*, Holmes County Republican, Oct. 30, 1856......18

*Inflation Calculator*, B. of Labor Statistics, https://www.bls.gov/data/inflation_calculator.htm (last accessed Oct. 11, 2024)...........................................................54

Jeffrey S. Passel & D'Vera Cohn, *Homeland Security Produces First Estimate of Foreign Visitors to U.S. Who Overstay Deadline to Leave*, Pew Research Center, Feb. 3, 2016 ....................................................29

John D. Bessler, *Cruel & Unusual* (2012) ......................................... 24

John D. Bessler, *Foreword: The Death Penalty in Decline: From Colonial America to the Present*, 50 Crim. L. Bull. 245 (2014) ...................... 26

Joseph Gales, *Prevention of Crime, in O.H. Smith, Early Indiana Trials and Sketches* (1858) .................................................................................18

John Holmes, *The Statesman, or Principles of Legislation and Law* (1840) ..........17

Lawrence M. Friedman, *Crime and Punishment in American History* (1993) .......24

Marie Basile McDaniel, *Immigration and Migration (Colonial Era),* Encyclopedia of Greater Philadelphia (Rutgers University, 2014), https://philadelphiaencyclopedia.org/essays/immigration-and-migration-colonial-era/..........................................................................................27

Matthew Varisco, ATF, Open Letter to All Federal Firearms Licensees (Nov. 20, 2023) ...........................................................................................59

Michael Stewart, *Audiology Information Series: Recreational Firearm Noise Exposure*, Am. Speech- Language-Hearing Ass'n (2017) ................................58

Randolph Roth & Cornelia Hughes Dayton, The Ohio State University, Criminal J. Research Ctr., *Homicide Among Adults in Colonial and Revolutionary New England, 1630-1797* (2009), https://cjrc.osu.edu/research/interdisciplinary/hvd/united-states/colonial-revolutionary-new-england ....................................................................26

*State Convention of the Suffrage Men of Rhode Island*, Vermont Gazette (Dec. 13, 1842) ....................................................................................17

*The Popular Sources of Political Authority: Documents on the Massachusetts Constitution of 1780* (Oscar Handlin & Mary Handlin eds., 1966) ..................21

*Untitled*, New-York Daily Tribune, Oct. 2, 1856 ...................................................18

# INTRODUCTION

Courts have faced difficult questions in the wake of *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 597 U.S. 1 (2022), which eliminated any means-ends scrutiny from Second Amendment analysis and required the government to justify current firearms restrictions with a relevantly similar historical tradition of firearm regulation. The Supreme Court recently clarified that *Bruen* and its predecessors do not require "a law trapped in amber." *United States v. Rahimi*, 144 S.Ct. 1889, 1897 (2024). But the Court made equally clear that its precedent does not allow short-cuts to avoid the historical analysis required by *Bruen*, and rejected the proposition that the government could justify gun regulations on supposed traditions of firearms regulations based on broad and vague classifications. *Id*. at 1903 ("'Responsible' is a vague term. It is unclear what such a rule would entail. Nor does such a line derive from our case law.").

The district court here convicted Mr. DeBorba of multiple gun-related charges without the benefit of this clarification. The court found the government met its burden to justify the laws used to prosecute Mr. DeBorba. In doing so, the court relied on a vague supposed historical tradition of regulating firearms access by the non-law-abiding, broad readings of historic analogues, and statements that did not lead to actual regulations.

1

With *Bruen* correctly applied, the government falls short of its burden to justify its prosecutions of Mr. DeBorba. Correct application affirms that the government may not indefinitely disarm undocumented immigrants, like Mr. DeBorba, who committed no crime in entering or remaining in this country. And the government may not disarm people subject to protection orders when those orders are not supported by a relevant, evidence-based finding that the individual presents a credible danger to others if armed. This Court should reverse Mr. DeBorba's convictions.

## JURISDICTIONAL STATEMENT

This is an appeal from a final judgment of conviction and sentence in a criminal case following a bench trial. The district court, which had jurisdiction under 18 U.S.C. § 3231, entered its judgment and imposed sentence on May 17, 2024. The Court convicted Mr. DeBorba of Counts 1-7 of the Superseding Indictment and sentenced him to 30 months in custody followed by three years of supervised release on each count, all concurrent. 1-ER-2-8. Mr. DeBorba timely filed his Notice of Appeal on May 23, 2024. 3-ER-614. This Court has jurisdiction under 28 U.S.C. § 1291. Mr. DeBorba is no longer in the custody of the Bureau of Prisons, having completed his custodial sentence in this case. He is currently in the custody of the Department of Homeland Security pursuant to removal proceedings, with his release date unknown.

## STATUTORY AUTHORITIES

Relevant constitutional, statutory, and regulatory authorities appear in the Addendum to this brief.

## ISSUES PRESENTED

1. Whether 18 U.S.C. § 922(g)(5)'s indefinite disarmament of all undocumented immigrants and people with non-immigrant visas is ever "relevantly similar" to historic laws providing for forfeiture of a firearm if it was used to commit a hunting violation or penalizing some serious felonies with death, such that the law is consistent with the Second Amendment.

2. Whether, under the Second Amendment, the same historical laws justify § 922(g)(5)'s application to Mr. DeBorba, who committed no crime in overstaying a visitor visa and has lived in the United States for over 20 years contributing to his community and supporting his family.

3. Whether 18 U.S.C. § 922(g)(8) can, consistent with the Second Amendment, be applied beyond the facts of *Rahimi* to cases where a protection order did not issue due to misuse of guns, no facts are known about the evidentiary proceedings underlying the order, or the order contains no finding that the individual represents a credible threat to the safety of another person.

4. Whether false statements about citizenship and immigration status are material to a gun purchase under 18 U.S.C. § 922(a)(6) and made to an entity with a right or adequate reason to inquire under § 911 when the Second Amendment

3

does not allow a person's right to bear arms to be restricted based on citizenship or immigration status.

5. Whether silencers are protected by the Second Amendment as arms or accessories necessary to effectively use arms and whether the National Firearms Act (NFA)'s system of onerous regulations, disproportionate taxation, and prison penalties is justified under the Second Amendment by historic colonial trade limits, taxes, or inspection requirements.

6. Whether a facial vagueness challenge can be considered when a statute risks chilling protected Second Amendment activity as it could for First Amendment activity and whether the NFA's definition of silencer, which includes any item or combination of parts for "diminishing the report" of a firearm in any way, § 921(a)(25), is unconstitutionally vague.

## STATEMENT OF THE CASE

Mr. DeBorba is one of the estimated 10 or 11 million people who live in the United States without documented immigration status. 3-ER-563-64, 607. He came as a young man on a visitor's visa but overstayed that visa. 2-ER-73-74. Mr. DeBorba got married and had four children, all of whom are U.S. citizens. For two decades, Mr. DeBorba worked to support his family and engaged with his community. 3-ER-561.

In February 2019, Mr. DeBorba applied for a concealed carry permit. In this application, he checked a box indicating he was a U.S. citizen. 2-ER-74, 90-91. In April and May of 2019, Mr. DeBorba purchased firearms through federally licensed dealers. In the paperwork for these purchases, he checked boxes indicating he was a U.S. citizen and was not "an alien illegally or unlawfully in the United States." 2-ER-74-75, 94-95, 102-03. The other personal information in those forms—Mr. DeBorba's date of birth, place of birth, residence, and ID number—was correct. *See id*. Also in 2019, Mr. DeBorba was found with a pistol during police contact related to a minor single-car collision. 2-ER-76-77.

Mr. DeBorba and his wife separated in 2019. On November 10 of that year, Mr. DeBorba was arrested for misdemeanor assault against his wife, with no firearm involved. 3-ER-498-99.[1] A court issued protection orders (an initial order, and a replacement a few days later allowing certain contact with their children) when releasing Mr. DeBorba on bond in that case. *See* 2-ER-77-78, 112-13, 115-16. The protection orders contained a finding—part of the standard form:

> Based upon the record both written and oral, the court finds that the defendant has been charged with, arrested for, or convicted of a domestic violence offense, that the defendant represents a credible threat to the physical safety of the protected person, and the court

---

[1] The government presented no evidence of a firearm being involved in its motions or at trial. The Pre-Sentence Report (PSR) confirms the absence of any firearm. PSR-10.

issues this Domestic Violence No-Contact Order under chapter 10.99
RCW to prevent possible recurrence of violence.

2-ER-113, 116. Each order further instructed Mr. DeBorba: "do not cause, attempt,

or threaten to cause bodily injury to, assault, sexually assault, harass, stalk, or keep

under surveillance the protected person." 2-ER-112, 115. In the instant case, the

government introduced no evidence about the hearings that led to the orders,

except that Mr. DeBorba was present and signed each order. 2-ER-77-78, 113, 116.

A couple of days later, on November 16, 2019, Mr. DeBorba's wife reported

that he had called and messaged her on her phone several times, asking to see their

children. 2-ER-78, 118. Police went to speak with Mr. DeBorba at his own

apartment, where he explained that he thought he was allowed to call his wife to

speak with their children. 2-ER-119. Police asked whether Mr. DeBorba had any

firearms. He explained that he did, that he had tried to turn them in at a local police

precinct, but was told he had to return during normal business hours. *Id*.

Mr. DeBorba told police the firearms were in his apartment and allowed them to

enter to remove them. Police removed numerous firearms and accessories from the

apartment. 2-ER-78-80, 119-32.

In June 2020, new domestic violence-related charges were filed against

Mr. DeBorba, and new protection orders issued. 2-ER-80, 134-35. In October,

Mr. DeBorba resolved the pending charges and a post-conviction protection order

issued. 2-ER-80-81, 137-38. Several months later Mr. DeBorba was charged once

more with domestic violence-related crimes, resulting in the issuance of a pretrial protection order in 2021, and a post-conviction order in 2022. 2-ER-81-82, 140-44. Again, none of these charges involved firearms.[2]

The protection orders issued from 2020-2022 all used the same form. Each included pre-typed findings that "the defendant has been charged with, arrested for, or convicted of a domestic violence offense," and that "to prevent possible recurrence of violence, the Domestic Violence No-Contact Order shall be entered[.]" 2-ER-134, 137, 140, 143. The orders restrained Mr. DeBorba from threatening or using physical force against his wife. *Id*. However, none contained any finding that Mr. DeBorba represented a credible threat to the safety of another person. *Id*.

After these orders issued, law enforcement received a tip that Mr. DeBorba was in possession of firearms. 2-ER-72. Investigation indicated that Mr. DeBorba possessed a rifle in his home and had posted videos of himself safely target shooting a rifle outdoors. 2-ER-83. Police obtained and executed a search warrant for Mr. DeBorba's apartment and found firearms, ammunition, and accessories. *Id*. In a workbench in Mr. DeBorba's apartment, police found an item with a note reading "tick suppressor." 2-ER-83-84.

---

[2] *Supra* note 1, PSR-10-12.

This item was an unmarked metal cylinder with inner and outer chambers. One end had a cap with a circular opening, and the other had a closed cap. 2-ER-84, 180-83. Bureau of Alcohol, Tobacco, and Firearms (ATF) Agent Jason Armstrong examined the item and opined it was consistent with items advertised as automotive filters or solvent traps, but functioning as firearms silencers. 2-ER-176-78. Agent Armstrong tested the item on a gun and found it reduced the sound of a shot on average from 152.80 decibels to 140.32 decibels. 2-ER-178.

The government charged Mr. DeBorba with several firearms-related crimes: Two counts of unlawful possession of firearms and ammunition on May 6, 2022, and November 16, 2021, unlawful because he was both an undocumented immigrant and was subject to domestic violence protective orders; one count of unlawful possession of a firearm on April 14, 2019, unlawful only because he was an undocumented immigrant; two counts of making a false statement during the purchase of a firearm on May 8, 2019, and April 4, 2019; one count of making a false claim to U.S. citizenship in the February 25, 2019, concealed carry permit; and one count of unlawful possession of an unregistered firearm silencer on May 6, 2022. 3-ER-552-58.

Mr. DeBorba pled not guilty and moved to dismiss all charges against him, rooting his arguments in *Bruen*. First, he argued that the unlawful possession of firearms charges under § 922(g)(5) and § 922(g)(8) violated the Second

Amendment both facially and as applied. 3-ER-390-418, 560-602. Second, he argued that the false statement-related counts failed to allege the materiality element of each crime charged because the Second Amendment did not allow the government to block gun possession based on a person's citizenship or immigration status. 3-ER-418-22, 560-63, 602-06. And third, he argued that the statute underlying the silencer count violated the Second Amendment and was unconstitutionally vague. 2-ER-212-20, 313-44.

The district court denied Mr. DeBorba's motions. The court held the unlawful possession of firearms and silencer charges did not violate the Second Amendment. Applying the *Bruen* test, the court reasoned the § 922(g)(8) (protection order) charges were justified by similar historic surety laws. 1-ER-43-51. The court approved the § 922(g)(5) charge by finding a historic tradition of regulating the firearms rights of non-"law-abiding" people. 1-ER-57-59. The court denied Mr. DeBorba's challenge to the silencer charge by finding silencers were not arms protected by the Second Amendment. 1-ER-62 n.6.

The court also denied Mr. DeBorba's motion to dismiss the silencer count on vagueness grounds. The court declined to consider Mr. DeBorba's facial challenge, finding no exceptional circumstances that would warrant doing so. 1-ER-62-64. And it denied his vagueness challenge as applied because the item in question was found near guns and with a note reading "suppressor," reduced the sound emitted

9

from a firearm when tested by the ATF, and had a threaded opening on one end that would allow attachment to a firearm. 1-ER-64-67.

The district court finally denied Mr. DeBorba's challenges to the false statement counts, finding that because it had decided the government *could* disarm undocumented immigrants based on their non-"law-abiding" status, Mr. DeBorba's statements about his citizenship and immigration status were material under the charged statutes. 1-ER-67-69.

After these motions were denied, Mr. DeBorba agreed to a stipulated facts and evidence bench trial. 2-ER-72-193. At the conclusion of evidence, Mr. DeBorba, through counsel, moved for judgment of acquittal. 1-ER-26. The district court denied that motion, adopted the stipulated facts as its findings of fact, and convicted Mr. DeBorba on all counts. 1-ER-27-29. The court later sentenced Mr. DeBorba to 30 months in custody followed by three years of supervised release. 1-ER-2-8.

## SUMMARY OF THE ARGUMENT

Mr. DeBorba asks the Court to reverse his convictions because they were entered in violation of, or depended on rulings denying, his constitutional rights.

First, Mr. DeBorba's convictions under 18 U.S.C. § 922(g)(5) should be reversed because the statute violates the Second Amendment both facially and as applied. The district court convicted Mr. DeBorba under the statute on the finding

10

that a historical tradition of regulating firearms possession by the non-"law-abiding" justified the statute completely and permanently disarming all undocumented immigrants and permitted non-immigrants. This error should be reversed because historic analogues do not support such a tradition, § 922(g)(5) and its application to Mr. DeBorba would not fit into this tradition even if it existed, and the Supreme Court has now rejected the use of such broad categories of historic regulations to justify disarmament laws.

Second Mr. DeBorba's convictions under 18 U.S.C. § 922(g)(8) should be reversed because the application of the statute here violates the Second Amendment. Although the Supreme Court upheld the application of the statute in *Rahimi*, 144 S.Ct. 1889, the facts here do not fall within the identified historical tradition of regulation that the facts of *Rahimi* did. Here, the protection orders at issue did not arise due to misuse of firearms, were not shown to have issued after actual consideration of evidence, and, for one count, did not contain a finding that Mr. DeBorba represented a credible threat to the safety of another person.

Third, Mr. DeBorba's convictions under §§ 922(a)(6) and 911 should be reversed because the government failed to satisfy the materiality elements of the statutes. Because neither citizenship nor immigration status is a constitutional basis to deny someone the right to bear arms, Mr. DeBorba's false statements on these

topics were not material to his application for a concealed carry permit nor to purchase firearms.

Finally, Mr. DeBorba's conviction under 26 U.S.C. § 5861 should be reversed because this regulation on silencers violates both the Second and Fifth Amendments. Silencers are protected by the Second Amendment either as arms or accessories necessary for the safe and effective use of arms. The statute's onerous regulation, taxation, and criminalization scheme is dissimilar in both its "why" and "how" to historic laws providing for basic taxation, inspection, and trade restrictions on firearms. It is thus not justified under the Second Amendment. Furthermore, the Court should consider Mr. DeBorba's facial challenge to the vagueness of the statute because it impacts the exercise of a core constitutional right. The Court should find the statute impermissibly vague because it both fails to inform the public of what items are "silencers" and fails to provide sufficient guidance to prevent arbitrary enforcement.

## STANDARD OF REVIEW

This Court reviews denials of motions to dismiss on constitutional grounds de novo. *United States v. McCalla*, 545 F.3d 750, 753 (9th Cir. 2008). This Court also reviews the sufficiency of an indictment and denial of dismissal of an indictment based on statutory interpretation de novo. *United States v. Kelly*, 874

12

F.3d 1037, 1046 (9th Cir. 2017). The Court reviews the sufficiency of the evidence

de novo. *United States v. Kimbrew*, 944 F.3d 810, 813 (9th Cir. 2019).

## ARGUMENT

I.    **The Second Amendment only allows regulation of firearms that is consistent with the United States' historical tradition of firearm regulation.**

This Court, and federal courts around the country, must bring fresh eyes to

Second Amendment challenges following *Bruen*, 597 U.S. 1. There, the Supreme

Court made clear that means-ends scrutiny has no role in Second Amendment

analysis because "a constitutional guarantee subject to future judges' assessments

of its usefulness is no constitutional guarantee at all." *Id*. at 23 (quotations

omitted).

The Court established that the "standard for applying the Second

Amendment" now requires courts to: (1) determine if the Second Amendment's

"plain text" covers an individual's conduct, and, if so, presume the Constitution

"protects that conduct"; and (2) decide whether the government has demonstrated

that the restriction in question is "consistent with the Nation's historical tradition

of firearm regulation[.]" *Id*. at 24 (quotations omitted). It is the government's

burden to "affirmatively prove that its firearm regulation is part of the historical

tradition that delimits the outer bounds of the right to keep and bear arms." *Id*. at

19. Because "constitutional rights are enshrined with the scope they were

understood to have when the people adopted them," this analysis is tethered to the

historical tradition in place when "[t]he Second Amendment was adopted in 1791; [or when] the Fourteenth [Amendment was adopted] in 1868." *Id*. at 34; *accord Teter v. Lopez*, 76 F.4th 938, 948 (9th Cir. 2023).

Furthermore, to determine whether a historical tradition of regulation is sufficiently similar to the challenged modern one, courts "must look to the '***how*** and ***why***' of the two regulations—that is, 'whether modern and historical regulations impose a comparable burden on the right of armed self-defense and whether that burden is comparably justified are central considerations when engaging in an analogical inquiry.'" *Teter*, 76 F.4th at 951 (quoting *Bruen*, 597 U.S. at 29, cleaned up by *Teter*) (emphasis added); *accord Rahimi*, 144 S.Ct. at 1898. "A court must ascertain whether the new law is 'relevantly similar' to laws that our tradition is understood to permit, 'apply[ing] faithfully the balance struck by the founding generation to modern circumstances.'" *Rahimi*, 144 S.Ct. at 1898 (quoting *Bruen*, 597 U.S. at 29).

## II.    The district court erred in denying Mr. DeBorba's motion to dismiss and convicting him of possessing a firearm as an undocumented immigrant under 18 U.S.C. § 922(g)(5).

The district court denied Mr. DeBorba's motion to dismiss the § 922(g)(5) charges against him by concluding, at *Bruen*'s second step,[3] that the Second

---

[3] At *Bruen*'s first step, the district court correctly concluded that Mr. DeBorba and the conduct criminalized here are covered by the plain text of the Second Amendment. 1-ER-36-40.

Amendment allows the government to indefinitely disarm anyone who is not law-abiding. 1-ER-56-62.[4] The court found a broad tradition of restricting the Second Amendment's protections for those who were not law-abiding, relying on phrasing in modern caselaw and proposed language for early colonial constitutions. *Id*. The court then denied Mr. DeBorba's Rule 29 motion and convicted him at trial. 1-ER-26-29.

This was error because (1) the district court did not identify relevantly similar enacted historical analogues, (2) the district court did not relevantly apply the supposed tradition of regulation to the bounds of § 922(g)(5) and the facts of Mr. DeBorba's case, and (3) the Supreme Court has now rejected a finding as broad as disarming the non-"law-abiding" as justifying modern regulations. This court should reverse Mr. DeBorba's convictions under § 922(g)(5) in Counts 1-3.

### A. The district court erred in relying on political complaints and non-enacted proposals to find a historical tradition of disarming those who are not "law-abiding," peaceable, or responsible.

The district court's conclusion that this nation's historical tradition of firearm regulation includes the disarmament of anyone not "law-abiding" was not based on analogous enacted regulations. Instead, it was based primarily on dicta in modern caselaw, rejected legislation, and individual commentaries or requests not

---

[4] At step 1, the court assumed without deciding that Mr. DeBorba was among "the people" protected by the Second Amendment, and easily concluded that his conduct was protected by the Second Amendment. 1-ER-36-40.

resulting in action. None of these sources demonstrate a tradition of disarming

those who are not "law-abiding."

First, modern judicial opinions are not evidence of a historical tradition. The

district court pointed to broad statements, in dicta and non-majority opinions,

suggesting that laws disarming dangerous people are allowed under the Second

Amendment. 1-ER-43 (citing *Bruen*, 597 U.S. at 81 (Kavanaugh, J., concurring);

*New York State Rifle & Pistol Ass'n, Inc. v. City of New York*, 590 U.S. 336, 364

(2020) (Alito, J., dissenting); *District of Columbia v. Heller*, 554 U.S. 570, 626

(2008); *Kanter v. Barr*, 919 F.3d 437, 454 (7th Cir. 2019) (Barrett, J., dissenting),

*abrogated by Bruen*, 597 U.S. 1). The court further relied on the frequent use of

phrase "law-abiding" people in the Supreme Court's decision in *Bruen*. 1-ER-59.

None of these statements indicate who was actually subject to disarmament

at the founding nor why. They are statements of modern jurists, usually simply

limiting their analysis to the facts presented in the case at hand. The Supreme

Court has now rejected reliance on such statements to avoid *Bruen*'s required

historical analysis:

> In *Heller* and *Bruen*, we used the term "responsible" to describe the
> class of ordinary citizens who undoubtedly enjoy the Second
> Amendment right. *See, e.g., Heller*, 554 U.S., at 635 []; *Bruen*, 597
> U.S., at 70 []. But those decisions did not define the term and said
> nothing about the status of citizens who were not "responsible." The
> question was simply not presented.

*Rahimi*, 144 S.Ct. at 1903. Language in modern judicial opinions addressing different questions than those presented here does not define "this Nation's historical tradition of firearm regulation." *Bruen*, 597 U.S. at 17.

Second, historic opinions and comments that did not translate to legislation do not demonstrate a historical tradition of disarming the non-law-abiding. The primary historic sources the district court relied on to find a tradition of disarming non-law-abiding people were not laws or regulations, but political statements and writings.

The district court cited to statements by politicians in the mid-1800s, before the Civil War, either affirming the right of those who are "peaceable" to bear arms, or questioning why people who are violent cannot be disarmed. The court relied on the writings of an individual politician in 1840 opining the peaceable should not be disarmed[5]; the resolution of a state political group condemning government officials who took "from peaceable citizens their arms" in 1842[6]; a mayor's

---

[5] 1-ER-47, *citing* John Holmes, *The Statesman, or Principles of Legislation and Law* 186 (1840).

[6] 1-ER-47, *citing State Convention of the Suffrage men of Rhode Island*, Vermont Gazette, Dec. 13, 1842, at 1. The convening group was focused on expanding suffrage to non-land-owning white men, and the convention in 1842 followed a violent rebellion where members of this movement to expand suffrage attacked the sitting government, then the government retaliated by attacking and arresting members of the group. *See Dorr Rebellion Timeline*, Rhode Island Dep't of State, Sec. of State (2024), https://www.sos.ri.gov/divisions/civics-and-education/for-

questioning "why should not the lawless ruffian be disarmed and deprived of the power of executing the promptings of his depraved passions?" while recognizing the right of the peaceable to bear arms[7]; and complaints by politicians in Kansas both decrying the disarmament of "peaceable" free state settlers and calling for disarmament of "lawless bands" and "armed bandits" who entered Kansas for "unlawful" purposes" in 1856.[8] None of these statements or opinions resulted in legislation.

These statements, first and foremost, are not regulations. In some instances, they are complaints about the *lack* of regulation and *requests* to enact regulations. But when these entreaties led to no action, they demonstrate simply that U.S. communities were previously aware of a problem but declined to solve it through disarmament. As the Supreme Court recognized, *rejected* legislation may instead indicate that a proposed restriction is **not** part of the historical tradition of regulation than that it is. *See Bruen*, 597 U.S. at 27.

---

educators/themed-collections/dorr-rebellion-
timeline#:~:text=July%201841,suffrage%20to%20non%2Dland%20holders.

[7] 1-ER-47, *citing* Joseph Gales, *Prevention of Crime, in O.H. Smith, Early Indiana Trials and Sketches* 466-67 (1858).

[8] 1-ER-47-48, *citing* Cong. Globe App., 34th Cong., 1st Sess., 1090, 1091 (Aug. 7, 1856); *Untitled*, New-York Daily Tribune, Oct. 2, 1856, at 4; *High-Handed Outrage in Kansas*, Holmes County Republican, Oct. 30, 1856, at 1.

In addition, these statements are not primarily from a period deemed persuasive in the Second Amendment's interpretation. Courts may look to the tradition of firearms regulation "before . . . and even after the founding" period, but should do so with care. *Bruen*, 597 U.S. at 27. While evidence "of how the Second Amendment was interpreted from immediately after its ratification through the end of the 19th century represent[s] a critical tool of constitutional interpretation," historical evidence becomes less probative the farther forward in time one goes from 1791. *Id*. at 35-36. Courts therefore should credit such later history to the extent it is consistent with prior practice but should otherwise afford it little weight. *See id*. at 36-37 ("The belated innovations of the mid- to late-19th-century courts come too late to provide insight into the meaning of the Constitution in 1787") (cleaned up).

The opinions of contemporary historians also do not carry the day, particularly when not based on regulations disarming those who are not "law-abiding." Yet, the district court relied on various articles related to the Second Amendment's history to find that the historical tradition allows the government to disarm the "unvirtuous." 1-ER-57-58.

The articles cited by the court do not appear to rely on regulations disarming the law-breaking. Rather, they speak to broad ideas of virtue in civic participation, such as voting or participation in a militia. *See, e.g.*, David Yassky, *The Second*

19

*Amendment: Structure, History, and Constitutional Change*, 99 Mich. L. Rev. 588, 626-27 (2000) ("The average citizen whom the Founders wished to see armed was a man of republican virtue—a man shaped by his myriad ties to his community, the most important for this purpose being the militia."); Glenn Harlan Reynolds, *A Critical Guide to the Second Amendment*, 62 Tenn. L. Rev. 461, 480-81 (1995) (tying virtue to "defensive use of arms against criminals, oppressive officials, and foreign enemies alike.") ("Thus, felons, children, and the insane were excluded from the right to arms precisely as (and for the same reasons) they were excluded from the franchise . . . the franchise and the right to arms were 'intimately linked' in the minds of the Framers and of prior and subsequent republican thinkers.")

Notably, the articles the district court relied on all pre-dated even *Heller*. The idea of "virtue" according to those scholars was tied to the idea of civic participation and the exercise of a political right. But *Heller* made clear that the Second Amendment enshrines an *individual* right, not dependent on one's participation in a militia. 554 U.S. at 595. Similarly, in *Rahimi*, the Supreme Court made clear that it does not find a supposed tradition of disarming a category as broad as the "irresponsible" sufficient to justify modern regulations, as discussed further below. *Rahimi*, 144 S.Ct. at 1903. The same is true for any claimed tradition of disarming the "unvirtuous."

20

Third, the district court identified very few arguably analogous historic regulations. Notably, the sources relied upon are the same sources the government argued established a tradition of disarming the irresponsible—an argument the Supreme Court rejected. *See id*. The district court pointed to *non*-adopted language proposed prior to the passage of the Second Amendment; two laws enacted well before ratification that forfeited firearms for certain non-violent hunting offenses; and the broad proposition that certain felonies were punishable by death or estate forfeiture at the time of the founding. 1-ER-46, 58-59. But these analogues neither establish a tradition of regulation nor relate to the denial of arms to people who failed to abide *any* law.

The court relied on two statements made by groups during the ratification period supporting a constitutional right to bear arms. One Massachusetts town supported including the right in the state constitution commenting, "we esteem it an essential priviledge to keep Arms in Our houses for Our Own Defence and while we Continue honest and Law-full Subjects of Government we Ought Never to be deprived of them." 1-ER-46 (ultimately quoting *The Popular Sources of Political Authority: Documents on the Massachusetts Constitution of 1780* 624 (Oscar Handlin & Mary Handlin eds., 1966)). And a minority contingent from the Pennsylvania constitutional convention published the "Dissent of the Minority" paper in 1787, which proposed legislative language that was not adopted. 1-ER-58

21

(citing 2 Bernard Schwartz, *The Bill of Rights: A Documentary History* 665

(1971)). That paper proposed a right to bear arms that included "no law shall be

passed for disarming the people or any of them, unless for crimes committed, or

real danger of public injury from individuals[.]" *Id*. As above, these rejected

proposals do not indicate a tradition of regulation, but rather a decision by the

majority of those ratifying these constitutions to omit the proposed language.

*Cf. Kanter,* 919 F.3d at 455 (Barrett, J., dissenting) ("none of the relevant limiting

language made its way into the Second Amendment.").

The court finally relied on certain dissimilar historic penalties. The court

identified two laws providing for forfeiture of firearms as a penalty for certain

hunting offenses,[9] as well as the broadly recognized fact that many felony offenses

were punishable by death or estate forfeiture at the time of the founding. 1-ER-58-

59 (citing the now-withdrawn *United States v. Jackson*, No. 22-2870, 69 F.4th 495,

503 (8th Cir. 2023), *cert. granted, judgment vacated*, 144 S.Ct. 2710 (2024), *and

vacated*, 2024 WL 3768055 (8th Cir. Aug. 8, 2024)).

These sources were similarly urged by the government in *Rahimi* as

evidence that "the Second Amendment allows Congress to disarm persons who are

---

[9] 1-ER-58 (citing Ordinance of the Director and Council of New Netherland
Against Firing at Partridges or Other Game Within the Limits of New Amsterdam,
N.Y. Col. MSS. XVI. 31 (Oct. 9, 1652); 1745 Acts of the N.C. General Assembly
ch. III, 218-19).

not law-abiding, responsible citizens[,]" Brief for the United States, *United States v. Rahimi*, No. 22-915, 2023 WL 5322645, at \*6, \*23–24 (U.S. Aug. 14, 2023). The Eighth Circuit too relied on them to uphold broad disarmament of people with modern felony convictions. *Jackson*, 69 F.4th at 502-03.[10] In both instances, the Supreme Court rejected the proposed analogy. In *Rahimi* the Court specifically declined to find such a broad tradition of regulation from the historical record presented. 144 S.Ct. at 1903. And in *Jackson*, the Court vacated the Eighth Circuit's decision and remanded for the Eighth Circuit to reconsider the case in light of *Rahimi*. 144 S.Ct. 2710.

This Court should follow the Supreme Court's lead and find that these proposed analogues do not establish a historical tradition of disarming anyone not law-abiding. Neither type of regulation shares a "why" and "how," *Rahimi*, 144 S.Ct. at 1898, with § 922(g)(5), let alone the even broader proposition of complete and permanent disarmament of anyone who fails to comply with any law.

The hunting laws that allowed for forfeiture of a gun did so when that gun was misused and did not prohibit violators from possessing other guns.[11] The

---

[10] Wisely, the district court here did not adopt the government's or Eighth Circuit's view that laws limiting firearms to certain racial or religious groups, or people refusing to take an oath, demonstrated a tradition of disarming the "untrustworthy" that could broadly justify modern laws. 1-ER-56-57.

[11] The 1652 law from New Netherland (modern-day New York area) provided for the forfeiture of a gun if a person fired that gun in the vicinity of the Fort where

23

"why" of these regulations was plainly to prevent harmful misuse of guns, and the "how" was the forfeiture of the particular gun that was misused.

Laws punishing certain felonies with death or estate forfeiture also lack relevant similarities. For one, these laws did not punish all or even most felonies so harshly by the ratification era:

> During the period leading up to the founding, the connection between felonies and capital punishment started to fray . . . Throughout the seventeenth and eighteenth centuries, capital punishment in the colonies was used "sparingly," and property crimes including variations on theft, burglary, and robbery "were, on the whole, not capital." Lawrence M. Friedman, *Crime and Punishment in American History* 42 (1993). By the time the Constitution was ratified, James Wilson observed that while the term "felony" was once "very strongly connected with capital punishment," that was no longer true. John D. Bessler, *Cruel & Unusual* 52-53 (2012) (quoting 2 *The Works of James Wilson* 348 (James DeWitt Andrews ed., 1896)); *see also* 6 Nathan Dane, *Digest of American Law* 715 (1823) ("[W]e have many felonies, not one punished with forfeiture of estate, and but a very few with death.").

*Kanter*, 919 F.3d at 459 (Barrett, J., dissenting) (cleaned up). Furthermore, "[f]elons serving a term of years did not suffer civil death; their rights were suspended but not destroyed. In sum, a felony conviction and the loss of all rights

---

people or cattle could be injured. Ordinance of the Director and Council of New Netherland Against Firing at Partridges or Other Game Within the Limits of New Amsterdam, N.Y. Col. MSS. XVI. 31 (Oct. 9, 1652). The 1745 North Carolina law provided primarily for fines for people who hunted deer off-season, noting past abuses and use of such hunting as a pretext for other crimes. It provided for forfeiture of only the gun used to illegally hunt deer and only for certain non-residents who could not demonstrate that they had planted a substantial crop the preceding year. 1745 Acts of the N.C. General Assembly ch. III, 218-19.

did not necessarily go hand-in-hand." *Id*. at 461. As now-Justice Barrett concluded, the potential for severe punishment for some felonies does not mean the founders understood anyone convicted of any felony, let alone to have failed to abide by any law, to have lost their Second Amendment rights. *Id*. This proposed analogue too did not demonstrate a tradition of disarming anyone not law-abiding.

### B. The district court erred in placing undocumented immigrants generally, and Mr. DeBorba specifically, within this category of people who could be disarmed.

Were some historical tradition of regulation to be surmised from this record, it would pertain only to people convicted of serious crimes and/or people misusing guns. Undocumented immigrants are neither. The proposed analogues share neither the "why" nor "how" with § 922(g)(5).

First, the supposed historical tradition has a different purpose than § 922(g)(5). As discussed above, the cited laws aimed to curb misuse of firearms or to punish serious crimes seriously. By contrast, § 922(g)(5) was enacted for general crime control purposes. *Barrett v. United States*, 423 U.S. 212, 218 (1976) (Gun Control Act of 1968 "sought broadly to keep firearms away from the persons Congress classified as potentially irresponsible and dangerous."); 132 Cong. Rec. H1646-01, 1986 WL 780589 (Apr. 9, 1986) (amendment proponent noting the purpose to "strengthen the controls on selling firearms to criminals, mental

25

incompetents, drug addicts, and illegal aliens."). Though loosely related, these are not the same aims.

Even if a high-level abstraction may indicate a shared public safety purpose, such purpose is a perennial problem,[12] so a regulation addressing it must be justified by distinctly similar historic analogues. This Court recently affirmed that the government must show a heightened level of similarity when a modern law is intended to address a problem in existence at the founding.[13] "[T]he Court required a different showing depending on whether the government's regulation addresses a societal problem that has persisted since the Founding or one that is more modern[.]" *Wolford v. Lopez*, No. 23-16164, --- F.4th ---, 2024 WL 4097462, at *8

---

[12] *See, e.g.*, Randolph Roth & Cornelia Hughes Dayton, The Ohio State University, Criminal J. Research Ctr., *Homicide Among Adults in Colonial and Revolutionary New England, 1630-1797*, 2009, https://cjrc.osu.edu/research/interdisciplinary/hvd/united-states/colonial-revolutionary-new-england (compiling data regarding hundreds of homicides in early American colonies leading up to and including the Second Amendment's enactment); John D. Bessler, *Foreword: The Death Penalty in Decline: From Colonial America to the Present*, 50 Crim. L. Bull. 245 (2014) (detailing a variety of crimes, criminal codes, and punishments in U.S. colonies prior to enactment of the Second Amendment).

[13] The Supreme Court did not discuss this aspect of the rule overtly in *Rahimi*, but did explain the *Bruen* analysis in a consistent manner: "For example, if laws at the founding regulated firearm use to address particular problems, that will be a strong indicator that contemporary laws imposing similar restrictions for similar reasons fall within a permissible category of regulations. Even when a law regulates arms-bearing for a permissible reason, though, it may not be compatible with the right if it does so to an extent beyond what was done at the founding." *Rahimi*, 144 S.Ct. at 1898.

(9th Cir. Sept. 6, 2024). When a challenged regulation addresses "unprecedented societal concerns or dramatic technological changes[,]" the government must demonstrate a "relevantly similar" historical tradition of regulation. *Bruen*, 597 U.S. at 27, 28-29; *Wolford*, 2024 WL 4097462, at *9 (quoting same). However, "when a challenged regulation addresses a general societal problem that has persisted since the 18th century," the government must demonstrate a "distinctly similar" historical tradition of regulation. *Bruen*, 597 U.S. at 26; *Wolford*, 2024 WL 4097462, at *8 (quoting same).

Public safety is a perennial problem and immigrants were indeed part of the community at the founding. Immigration, including untracked immigration and non-citizen residents or visitors of the United States, is not a new phenomenon. In 1791, U.S. citizenship was only conferred to a "free white person" who had lived in the United States for two years and could prove that "he [was] a person of good character." An Act to Establish an [sic] Uniform Rule of Naturalization, ch. 3, § 1, 1 Stat. 103 (1790). Colonies experienced significant immigration leading up to the American Revolution, accompanied by societal anti-immigrant prejudice and modest regulation.[14] Because § 922(g)(5) addresses both a problem and a

---

[14] *See* Marie Basile McDaniel, *Immigration and Migration (Colonial Era),* Encyclopedia of Greater Philadelphia (Rutgers University, 2014), https://philadelphiaencyclopedia.org/essays/immigration-and-migration-colonial-era/ ("In 1718, James Logan (1674-1751) resolved that 'we are resolved to receive no more of them [(certain immigrants from Europe)].' In 1727, the Pennsylvania

circumstance present at the founding, the government must demonstrate a "distinctly similar" historical tradition of regulation to justify § 922(g)(5). *Bruen*, 597 U.S. at 26; *Wolford*, 2024 WL 4097462, at *8.[15] It has not done so here.

Second, the "how" of § 922(g)(5) both differs from and exceeds the restrictions imposed by the historic analogues. It targets people based on a status, not a criminal act. As the district court itself recognized, most undocumented immigrants "do not resemble criminals at all." 1-ER-57. Although *some* undocumented immigrants may have committed a modern crime to get to the United States, *see* 8 U.S.C. § 1326 (felony to reenter the United States without permission after a deportation); 8 U.S.C. § 1325 (misdemeanor to cross the U.S. border without proper authorization), § 922(g)(5) does not require a conviction for any such crime to disarm people. Even if someone were convicted, those crimes do

---

Assembly asserted that 'the great Importation of Foreigners into this Province… who are subjects of a foreign Prince, and who keep up amongst themselves a different Language, may, in Time, prove of dangerous Consequence to the Peace.' . . . In 1717, the Provincial Council [of Pennsylvania] imposed a tax on all incoming Palatines. In 1718, the Provincial Council requested that ship merchants list their passengers, and that all foreigners swear an oath to the King—a requirement not always faithfully observed."). *See also* Defendant-Appellant's Opening Brief, *United States v. Vazquez-Ramirez*, No. 24-3544, at 14-15 (9th Cir. Sep. 27, 2024) (detailing a short-lived 1798-1801 federal law enabling deportation of certain immigrants).

[15] In *Rahimi*, the Court specifically recognized that surety laws in the founding era had been used to address domestic violence and misuse of guns, rendering them sufficiently similar to the modern § 922(g)(8). 144 S.Ct. at 1900.

28

not involve misuse of guns, or guns at all. And the district court cited no historic

analogue allowing for disarmament or capital punishment for such a simple

trespass.

Furthermore, many people disarmed by § 922(g)(5) have committed no

crime at all. As courts have recognized, people brought to the United States as

children likely lack the *mens rea* required to make any border crossing criminal. 1-

ER-57; *United States v. Meza-Rodriguez*, 798 F.3d 664, 673 (7th Cir. 2015). And

an estimated over 400 thousand people live in the United States undocumented

after overstaying a visa,[16] like Mr. DeBorba. Furthermore § 922(g)(5) also disarms

people formally admitted to the United States in non-immigrant status. *See*

§ 922(g)(5)(B). Indeed, the district court questioned whether the government could

show any analogue justifying the disarmament of this final group. 1-ER-53 n.5.

Even the prior groups disarmed by § 922(g)(5) are disarmed because of a

supposed civil violation, not a criminal violation. Similar to the failure to timely

file a tax return, *see* 26 U.S.C. § 6651, a person's failure to timely depart pursuant

to a visa or because they lack documented immigration status is met with a civil

---

[16] Jeffrey S. Passel & D'Vera Cohn*, Homeland Security Produces First Estimate of Foreign Visitors to U.S. Who Overstay Deadline to Leave*, Pew Research Center, Feb. 3, 2016, http://www.pewresearch.org/fact-tank/2016/02/03/homeland-security-produces-first-estimate-of-foreign-visitors-to-u-s-who-overstay-deadline-to-leave/.

response, not a criminal one. *See, e.g.*, 8 U.S.C. §§ 1182, 1227 (providing for removal or denial of admission).

The proffered historical analogues target misuse of firearms (the hunting violations discussed above) or serious criminal convictions (severe penalties for certain felonies). They do not target civil law violations or violations arising from failure to act.

And the process and penalties also lack similarities. People sentenced to death for a serious felony must first be convicted after a trial. No such process exists to test the citizenship or immigration status of a person disarmed by § 922(g)(5). And people who forfeited arms under the cited hunting-related laws potentially forfeited only the gun they had been found to misuse. This was a mild penalty for a mild violation. By contrast, § 922(g)(5) indefinitely disarms a person based on their failure to leave the country and punishes an attempt to exercise their Second Amendment rights with imprisonment. 18 U.S.C. § 924(a)(8). These penalties exceed, so are not justified by, the proposed analogues. *See Bruen*, 597 U.S. at 57 (historic regulations providing for fines or bonds as penalties were not relevantly similar to current law with prison as a penalty); *Heller*, 554 U.S. at 633-34 (historic regulations that punished violations "with a small fine and forfeiture of the weapon . . . , not with significant criminal penalties," were not equivalent to a modern law punishing violation with jail or prison time).

Even looking only to the text of the statute, *Calvary Chapel Bible Fellowship v. County of Riverside*, 948 F.3d 1172, 1177 (9th Cir. 2020), it is clear that "no set of circumstances exists under which the [statute] would be valid," *Hotel & Motel Ass'n of Oakland v. City of Oakland*, 344 F.3d 959, 971 (9th Cir. 2003). Therefore, the Court should hold § 922(g)(5) facially unconstitutional. *Id*.

In the alternative, the Court should find the statute unconstitutional as applied to Mr. DeBorba. "An as-applied challenge [] focuses on the statute's application to the [challenger], and requires the court to only assess the circumstances of the case at hand." *Rodriguez Diaz v. Garland*, 53 F.4th 1189, 1203 (9th Cir. 2022) (quotations omitted).

Mr. DeBorba was admitted to the United States on a non-immigrant visa, but failed to leave by the date indicated. This is the basis for his disarmament under § 922(g)(5). 1-ER-53 n.5. In the over two decades that he lived in the United States, Mr. DeBorba got married, had four children, worked to support his family, and was active in his church. 3-ER-607.

At *most* the legal basis for Mr. DeBorba's disarmament and prosecution indicates a violation of a civil rule, punishable only by the civil penalty of removal. 8 U.S.C. §§ 1182, 1227. Mr. DeBorba's undocumented status was not the result of a crime. Nor was Mr. DeBorba a passing visitor. The proposed analogues do not

support such a broad category of regulating the "non-law-abiding" with such a harsh penalty.

The result of § 922(g)(5) is the denial of a fundamental right to a disfavored group. Such a result is entirely inconsistent with the Second Amendment's purpose. The Supreme Court affirmed that it was British disarmament of colonists that sparked the American Revolution and the need for the Second Amendment. *Rahimi*, 144 S.Ct. at 1897, 1899 (discussing concern about disarmament of disfavored groups as the backdrop for the Second Amendment). The Second Amendment was similarly vital to Reconstruction and the pursuit of emancipation of African Americans. *Id*. at 1897 ("Disarm a community and you rob them of the means of defending life. Take away their weapons of defense and you take away the inalienable right of defending liberty.") (quoting Cong. Globe, 40th Cong., 2d Sess., 1967 (1868) (statement of Rep. Stevens)). Section 922(g)(5)'s application to Mr. DeBorba disarms and imprisons him because of his membership in a disfavored group, not as punishment for a serious crime nor because of any misconduct with guns.

### C. The Supreme Court has squarely rejected justifying disarmament laws on broad and vague categories.

The district court had to define an extremely broad category of firearms regulation to find § 922(g)(5) constitutional. This necessity arose from the reality that § 922(g)(5) lacks any sufficiently similar analogues. But the Supreme Court

has now made clear that such broad categories of supposed historical regulations do not pass muster under *Bruen*. *Rahimi*, 144 S.Ct. at 1903.

The government tried a similar approach in *Rahimi*. Although *Rahimi* involved § 922(g)(8) (disarming people subject to a protective order), the government sought to use that case to establish a broad rule that the Second Amendment permits "disarming persons whom legislatures have found are not law-abiding, responsible citizens." Brief for the United States, *United States v. Rahimi*, 2023 WL 5322645, at *13, 22, 26-28. It raised the same references to "law-abiding, responsible citizens" in *Heller* and *Bruen* to try to limit the Second Amendment's reach without finding actual historical regulations. *Id*. at *11-12 (citations omitted). And it cited the same failed constitutional proposals and the same assortment of disjointed laws it cited here limiting firearms access by loyalists, those who had "gone armed," minors, unhoused people, and the intoxicated. *See id*. at *13-14, 17-18, 22-26.[17]

The Court unanimously rejected the government's proposed "responsib[ility]" principle. *See Rahimi*, 144 S.Ct. at 1903; *see also id*. at 1944

---

[17] The district court here correctly rejected supposed danger- or loyalty-based analogues, including restrictions based on race, religion and political affiliation, for lacking a similar purpose to § 922(g)(5) and raising further constitutional problems. ER 176-78, 183-84 (Such laws "would be unconstitutional on grounds other than the Second Amendment.") (quoting *United States v. Escobar-Temal*, No. 3:22-CR-00393, 2023 WL 4112762, at *4 (M.D. Tenn. June 21, 2023)).

(Thomas, J., dissenting) ("Not a single Member of the Court adopts the Government's theory."). It explained that "responsible" was "a vague term" of "unclear" scope. *Id*. at 1903 (opinion of the Court). And in any case, "such a line [did not] derive from [its] case law": *Heller* and *Bruen* had used that terminology only as short-hand for "ordinary citizens who undoubtedly enjoy the Second Amendment right." *Id*. Those cases "said nothing" about the Second Amendment rights of other citizens: "The question was simply not presented." *Id.*[18]

Justices who joined the Court's opinion also made clear that they did not understand *Rahimi* to allow the government to legislate based on broad and generalized principles. Justice Barrett explained that courts "must be careful not to read a principle at such a high level of generality that it waters down the right." *Id*. at 1926 (Barrett, J., concurring).[19] And Justice Gorsuch similarly warned courts against "extrapolat[ing] their own broad principles from [historical] sources," or seeking "overarching 'policies,' 'purposes,' or 'values,'" rather than doing the fine-grained work of historical analysis focused on a particular regulation. *Id*. at 1908-

---

[18] The Supreme Court made clear that this Court's prior holding in *United States v. Vongxay*, 594 F.3d 1111, 1115 (9th Cir. 2010)—that the language in *Heller* indeed held that Second Amendment protections are limited to law-abiding citizens and exclude people like felons—is no longer good law.

[19] As Justice Barrett previously warned, "[t]he government could quickly swallow the [Second Amendment] right if it had broad power to designate any group as dangerous and thereby disqualify its members from having a gun." *Kanter*, 919 F.3d at 465 (Barrett, J., dissenting).

09 (Gorsuch, J., concurring). To do otherwise would be to "risk gaming away" the Second Amendment. *Id.* at 1908.

Categories of regulation as broad and vague as who is "responsible" or "law-abiding" are insufficient to justify restrictions on a person's Second Amendment rights. To hold otherwise would impermissibly return unrestrained policy considerations to Second Amendment analysis. The § 922(g)(5) convictions against Mr. DeBorba violated the Second Amendment and should be reversed.

**III. The District Court erred in convicting Mr. DeBorba of possessing a firearm while subject to a domestic violence protection order under 18 U.S.C. § 922(g)(8) because the application of the statute here was not consistent with historical firearm regulation.**

The application of § 922(g)(8) in Mr. DeBorba's case was not sufficiently similar to the historic surety and "going armed" laws that justify the statute's application in some cases. The district court here reasoned otherwise, denying Mr. DeBorba's motion to dismiss and Rule 29 motion, and convicting him at trial. 1-ER-26-29, 62. This Court should reverse his convictions under § 922(g)(8) in Counts 1 and 2.

In *Rahimi*, the Supreme Court upheld § 922(g)(8) as applied there—where a court issued a protection order after finding Mr. represented a credible threat of danger to his ex-girlfriend based on her affidavit that he dangerously misused a gun. 144 S.Ct. at 1903. However, the protection orders underlying Count 1 contained no individualized finding that Mr. DeBorba presented a danger to

another person. The order underlying Count 2 contained only a form finding that appears to result from a legislative directive, and was not based on Mr. DeBorba's misuse of firearms.

### A. The Supreme Court in *Rahimi* allowed convictions under § 922(g)(8) in some, but not all, situations covered by the statute.

The Supreme Court applied *Bruen*'s analysis and upheld the application of § 922(g)(8) to the facts in *Rahimi*. In doing so, it declined to analyze whether other applications of the statute were constitutional. *See* 144 S.Ct. at 1898-99. The Court identified two analogous historical traditions of firearm regulation that were sufficiently similar to the application of § 922(g)(8) to Mr. Rahimi to uphold his conviction.

Mr. Rahimi's ex-girlfriend sought a protection order after he misused a firearm. While in public, Mr. Rahimi began assaulting his ex-girlfriend. A bystander witnessed this, and Mr. Rahimi retrieved his gun. His ex-girlfriend ran away and Mr. Rahimi shot his gun in the direction of her and/or the bystander. He later called her and warned her he would "shoot her" if she reported the incident. *Id*. at 1894-95.

Mr. Rahimi's ex-girlfriend applied for a protection order. In doing so, she submitted an affidavit where she described this incident with Mr. Rahimi. *Id*. at 1895. The court reviewing this application found that Mr. Rahimi "posed 'a credible threat' to the 'physical safety'" to his ex-girlfriend and her child. The

36

court issued a protection order that prohibited Mr. Rahimi from threatening or contacting his ex-girlfriend, with limited exceptions, for two years. *Id*. Mr. Rahimi was ultimately arrested and charged under § 922(g)(8)(C)(i), which prohibited him from possessing a firearm while subject to a restraining order that includes a finding that he poses "a credible threat to the physical safety" of a protected person. *Id*. at 1898.

The Court identified two types of historical firearms regulations that were "relevantly similar" to the application of § 922(g)(8) to Mr. Rahimi. The Court identified a long history of "ordinary criminal laws and civil actions" that targeted "individuals who physically threatened others[.]" *Rahimi*, 144 S.Ct. at 1899 (citing 4 W. Blackstone, Commentaries on the Laws of England 145-46, 149-50 (10th ed. 1787) (Blackstone)). But it narrowed in on "two distinct legal regimes [that] had developed ***that specifically addressed firearms violence***" in the founding era. *Id*. (emphasis added).

The first regime was preventative: surety laws. "Well entrenched in the common law, the surety laws could be invoked to prevent all forms of violence, including spousal abuse. . . . [and] the misuse of firearms." *Id*. at 1900. The Court emphasized the focus of such surety laws on firearm misuse and violence:

> In 1795, for example, Massachusetts enacted a law authorizing justices of the peace to "arrest" all who "go armed offensively [and] require of the offender to find sureties for his keeping the peace." 1795 Mass. Acts ch. 2, in Acts and Resolves of Massachusetts, 1794-

37

> 1795, ch. 26, pp. 66-67 (1896). Later, Massachusetts amended its
> surety laws to be even more specific, authorizing the imposition of
> bonds from individuals "[who went] armed with a dirk, dagger,
> sword, pistol, or other offensive and dangerous weapon." Mass. Rev.
> Stat., ch. 134, § 16 [(1836)]; *see ibid.* []. At least nine other
> jurisdictions did the same."

*Id*. These laws thus aimed to prevent future firearm violence based on incidence of

past firearm violence or misuse.

"These laws often offered the accused significant procedural protections."

*Id*. Before a person could be compelled to post a bond for "going armed," a

petitioner with a "reasonable cause to fear" that the person would do them harm or

breach the peace would file a complaint with a judge. *Id*. The judge would receive

evidence to determine whether there was sufficient cause. Then the judge would

summon the person accused to respond. *Id*. (citations omitted). Ultimately, surety

bonds were allowed for limited periods, and exceptions could be granted to allow

the person to possess arms for self-defense or other legitimate reasons. *Id*.

The second regime was punitive: "going armed" laws. Versions of these

laws dated back centuries, originally targeting public fights but eventually

encompassing "'arm[ing]' oneself 'to the Terror of the People[.]'" *Id*. at 1901

(citing T. Barlow, *The Justice of the Peace: A Treatise* 11 (1745)). These laws

"prohibited 'riding or going armed, with dangerous or unusual weapons, [to] terrify

[] the good people of the land.'" *Id.* (citing 4 Blackstone 149 (emphasis deleted)).

The punishment for this conduct was "'forfeiture of the arms . . . and imprisonment.'" *Id.* (quoting 4 Blackstone 149).

The Court found the "how" and "why" of these two regulatory regimes sufficient to justify § 922(g)(8)'s application to Mr. Rahimi. The Court held that § 922(g)(8)'s "prohibition on the possession of firearms by those found by a court to present a threat to others fits neatly within the tradition the surety and going armed laws represent." *Id.* at 1901.

The historic analogs had the same "why" as § 922(g)(8)(C)(i)'s application in *Rahimi*. "Section 922(g)(8) restricts gun use to mitigate demonstrated threats of physical violence, just as the surety and going armed laws do." *Id.*

And the historic analogs had the same "how" as § 922(g)(8)(C)(i). "Like the surety and going armed laws, Section 922(g)(8)(C)(i) applies to individuals found to threaten the physical safety of another." *Id.* "Section 922(g)(8) restricts gun use to mitigate demonstrated threats of physical violence, just as the surety and going armed laws do." *Id.* And its restrictions apply "only once a court has found that the defendant 'represents a credible threat to the physical safety' of another." *Id.* at 1901-02 (quoting § 922(g)(8)(C)(i)). In both the historic laws and the modern law, this is an individualized finding. *Id.* at 1902. In addition, § 922(g)(8)'s penalties are similar to those of the historic analogues. In each instance, the prohibition on

39

firearm possession is temporary, and at least the "going armed" laws also allowed for imprisonment as a penalty. *Id*.

**B.    The protection orders underlying Count 1 contain no finding that Mr. DeBorba represented a credible threat to the physical safety of another person.**

The Court in *Rahimi* held that "[w]hen a restraining order contains a finding that an individual poses a credible threat to the physical safety of an intimate partner, that individual may—consistent with the Second Amendment—be banned from possessing firearms while the order is in effect." *Id*. at 1896. It declined to decide whether § 922(g)(8) could be sustained on its alternate basis—a protection order that "prohibits the use, attempted use, or threatened use of physical force." *Id*. at 1898. This latter clause is not justified by the historic analogues in *Rahimi* because it requires no individualized finding of an actual risk of danger.

The protection orders underlying the § 922(g)(8) charge in Count 1 satisfy only this second prong of the statute. These orders[20] indeed prohibited Mr. DeBorba from "[c]ausing or attempting to cause physical harm, bodily injury, assault, including sexual assault, and from molesting, harassing, threatening or stalking the protected person[,]" 2-ER-137, 143, satisfying the latter prong of § 922(g)(8). However neither contains a finding that Mr. DeBorba individually represents a credible threat of harm to another person. Instead, each contains only a

---

[20] 3-ER-552-53 (superseding indictment specifying two protection orders).

40

statement "that the defendant has been charged with, arrested for, or convicted of a domestic violence offense, and further finds that to prevent possible recurrence of violence, this Domestic Violence No-Contact Order shall be entered[.]" *Id*. Thus the order was issued without any clear individualized finding and simply as a measure to prevent *possible*, rather than likely or demonstrated, danger.

*Rahimi* made clear that the historic analogues' "how" included an individualized finding, based on evidence, that the person represented a credible threat of danger to another person. *Rahimi*, 144 S.Ct. at 1900-02. This was crucial to the Court's approval of § 922(g)(8)'s application in *Rahimi*. *Id*. But Count 1 is supported by no such finding or process. 2-ER-137, 143. As such, the "how" of § 922(g)(8) as applied in Count 1 is not relevantly similar to the historic analogues. The government has thus failed to meet its burden to justify the application of § 922(g)(8) here.

### C. The protection order underlying Count 2 contains only a form finding of a credible threat with no evidence that any threat was based on prior misuse of weapons.

The protection order underlying Count 2[21] contained a form finding that Mr. DeBorba "represents a credible threat to the physical safety of the protected person" 2-ER-116. This tracks the finding relied upon by the Court in *Rahimi*. 144

---

[21] 3-ER-553 (superseding indictment specifying order).

S.Ct. at 1894. But other crucial facts that supported the constitutionality of § 922(g)(8) as applied in *Rahimi* are missing from Count 2.

First, no evidence was presented about the nature or content of the hearing preceding the issuance of the protection order except that Mr. DeBorba was present. 2-ER-78, 115-16. In *Rahimi*, Mr. Rahimi's ex-girlfriend presented an affidavit detailing his threats and misuse of a firearm against her. The judge considered this before issuing the protection order. 144 S.Ct. at 1894-95. But here, the only basis indicated for the issuance of the protection order was the filing of criminal—indeed misdemeanor—charges. There is no evidence that the issuing court considered any testimony, affidavit, or similar factual evidence. 2-ER-78, 115-16.

Though it falls short of mandating the issuance of protection orders, Washington law pushes courts to issue protection orders in any domestic violence case. In a statute labeled "Duties of court—No-contact order—Emergency orders[,]" Washington law asserts that "repeated violence" is likely to be directed at "those who have been victims of domestic violence in the past[.]" Wash. Rev. Code § 10.99.040(2)(a). Furthermore, the Washington courts created form protection orders that included pre-typed findings that "the defendant represents a credible threat to the physical safety of the protected person," which findings were used here. 2-ER-115.

42

The evidence here indicates not an individualized finding based on case-specific evidence, but a presumption that courts will issue protection orders whenever releasing a person on bond following a domestic violence-related arrest. This is inconsistent with the "how" of the historic analogues that supported the application of § 922(g)(8) in *Rahimi*.

Second, the protection order in *Rahimi* was based on Mr. Rahimi's misconduct with guns. The order was issued after his ex-girlfriend reported he dragged her into his car, threatened a bystander with a gun, fired the gun as his ex-girlfriend fled, then called her and threatened to shoot her if she reported the incident. *Rahimi*, 144 S.Ct. at 1894-95. This is important because the justifying historic analogues were based on misconduct with guns.

The Court in *Rahimi* emphasized that the surety laws "targeted the misuse of firearms[,]" 144 S.Ct. at 1900, and detailed such laws that depended on a finding that the person restrained had "go[ne] armed offensively," requiring intervention. *Id*. (quoting 1795 Mass. Acts ch. 2, in Acts and Resolves of Massachusetts, 1794-1795, ch. 26, pp. 66-67 (1896)). And before a person could be restrained for "going armed," a court at had to find sufficient cause based on evidence. *Id*. Similarly, "going armed" laws explicitly penalized people with disarmament because of their misuse of firearms. *Id.* at 1901.

43

Thus, the application of § 922(g)(8) to Mr. Rahimi—whose protection order was based on his dangerous misuse of a firearm—involved a similar how and why as the historic analogues. Here, however, the protection order underlying Count 2—and in fact all protection orders against Mr. DeBorba—were *not* based on his misuse of firearms. 2-ER-78, 115-16, 3-ER-498-99.[22] The facts underlying Count 2 (as well as Count 1) therefore lack a similar "why" as the historic analogues, because the disarmament was not because of Mr. DeBorba's misuse of firearms.

This Court should find § 922(g)(8) unconstitutional as applied here because historic analogues lack a relevantly similar "how" and "why." Unlike historic regulations, § 922(g)(8)'s application here was based on an order that did not involve an evidence-based individualized finding of danger and that was not issued because of Mr. DeBorba's misuse of firearms. The Court should reverse these convictions.

## IV. The District Court erred in convicting Mr. DeBorba of false statement charges because the statements were not material to his lawful possession of firearms.

The district court denied Mr. DeBorba's motion to dismiss Counts 4-6 by simply relying on its ruling that § 922(g)(5) was constitutional. 1-ER-67-69. As

---

[22] No protection order filed against Mr. DeBorba was based on an allegation that he had misused firearms, and he has never been charged with threatening or harming anyone with firearms. 2-ER-112-16, 134-44; PSR-9-12.

discussed above, this conclusion was error. The court then denied Mr. DeBorba's

Rule 29 motion and convicted him at trial on evidence indicating he made false

statements only about his citizenship and immigration status. 1-ER-26-29.

This Court should reverse these decisions because, recognizing that the

Second Amendment does not allow disarmament based on citizenship or

immigration status, the government failed to either plead facts or introduce

sufficient evidence at trial that false statements about Mr. DeBorba's citizenship

and immigration status were material.

To convict Mr. DeBorba of counts 4 and 5, false statement during the

purchase of a firearm under 18 U.S.C. § 922(a)(6), the government had to prove

that any false statement was "with respect to any fact material to the lawfulness of

the sale or other disposition of such firearm or ammunition under the provisions of

this chapter[.]" 18 U.S.C. § 922(a)(6). The Supreme Court held that the standard

for materiality is whether the gun sale could have proceeded had the true

information been provided. *Abramski v. United States*, 573 U.S. 169, 189 (2014)

(In a straw purchaser case, "had he revealed that he was purchasing the gun on [the

true purchaser]'s behalf, the sale could not have proceeded under the law—even

though [the true purchaser] turned out to be an eligible gun owner. The sale, as an

initial matter, would not have complied with § 922(c)'s restrictions on absentee

purchases.").

45

Recently, this Court held that § 922(a)(6) regulates false statements rather than firearms, so is not itself impacted by *Bruen*. *United States v. Manney*, 114 F.4th 1048, 1052-53 (9th Cir. 2024). This Court had no problem finding that the straw purchaser in that case had violated the statute by lying about the true purchaser of the firearm, as in *Abramski*. *Id*. at 1053-54.

The false statements here, however, were not about the true purchaser of the firearms. The only false statements at issue in the gun purchase forms pertained to Mr. DeBorba's citizenship and immigration status. 1-ER-74-76. He provided true information about his name, address, and identity as the true purchaser of the guns. 2-ER-94-95, 102-03.

Similarly, to sustain Count 6, false claim to U.S. citizenship under 18 U.S.C. § 911, the government had to prove the claim was "made to a person having some right to inquire or adequate reason for ascertaining a defendant's citizenship[.]" *United States v. Esparza-Ponce*, 193 F.3d 1133, 1137-38 (9th Cir. 1999). And the only false statement at issue for this count is Mr. DeBorba's citizenship. *See* § 911.

The government failed to prove these materiality elements. As discussed above, the Second Amendment does not permit disarmament based on citizenship or immigration status. Section 922(g)(5) and any similar restrictions[23] are thus

---

[23] Relevant to Count 6—false claim to U.S. citizenship under 18 U.S.C. § 911—evidence was presented that the Department of Licensing made this inquiry additionally to comply with Wash. Rev. Code §§ 9.41.070 and 9.41.173. Section

invalid. *See United States v. Salerno*, 481 U.S. 739, 745 (1987) (a law that is facially unconstitutional is invalid in all circumstances).

The government below argued that subsequent invalidation of a law cannot render false statements proscribed by it legal. 3-ER-546 (citing *United States v. Knox*, 396 U.S. 77, 79 (1969), *Bryson v. United States*, 396 U.S. 64, 72 (1969) ("'it cannot be thought that as a general principle of law a citizen has a privilege to answer fraudulently a question that the Government should not have asked.'")).

However, the cases cited examined elements *other* than materiality, under the general false statement statute: 18 U.S.C. § 1001. *See Knox*, 396 U.S. at 82 (ruling that violation of Mr. Knox's Fifth Amendment rights in compelling the statement at issue did not invalidate his conviction for answering falsely); *Bryson*, 396 U.S. at 68-69, 71 (addressing the jurisdictional element, holding the statement at issue was within "any matter within the jurisdiction of any department or agency of the United States" even though the law compelling the statement was later

---

9.41.070(4) provides for questions about citizenship and immigration status to comply with federal restrictions on firearm possession (Washington does not criminalize possession based on citizenship or immigration status, *see* Wash. Rev. Code § 9.41.040). Section 9.41.173 provides that Washington *shall* issue certain firearm licenses to noncitizens in non-immigrant status. As discussed above, the Second Amendment does not allow restriction of the right to bear arms based on a person's citizenship or immigration status. Therefore, Washington law gives no more valid reason to inquire into these matters than does federal law.

deemed invalid). These cases have no bearing on whether Mr. DeBorba's statements were material under different statutes.

The Seventh Circuit, in *United States v. Holden*, recently upheld a § 922(a)(6) conviction where the false statement at issue was whether the purchaser was under indictment. 70 F.4th 1015, 1018 (7th Cir. 2023). That court upheld that conviction for the same reason the district court did here—because it found that *Bruen* allowed disarmament based on the relevant factor. *Id*. In dicta, the Seventh Circuit found additional reasons the particular answer was material to the gun sale: namely, the nature of the indictment or charge could reveal other grounds for denial of a gun sale. *Id*. at 1018.

But questions about citizenship and immigration status, unlike questions about pending indictments, are unlikely to reveal *other* bases for declining a gun sale. Indeed, undocumented immigrants are substantially less likely to commit crimes than U.S. citizens. *See* Alex Nowrasteh, Criminal Immigrants in Texas in 2019, Illegal Immigrant Conviction Rates and Arrest Rates for Homicide, Sex Crimes, Larceny, and Other Crimes, CATO Institute, 2021, https://www.cato.org/sites/cato.org/files/2021-05/IRPB-19.pdf. Such information is also irrelevant to furthering the government's purpose of keeping track of guns for future law enforcement needs, unlike a person's name or address. *See Abramski*, 573 U.S. at 180.

48

Instead, because § 922(g)(5) is facially unconstitutional, an answer to a question about citizenship or immigration status is not "material to the lawfulness of the sale or other disposition of such firearm[.]" 18 U.S.C. § 922(a)(6). Similarly, the government did not prove that the Washington Department of Licensing had a "right to inquire or adequate reason for ascertaining [Mr. DeBorba's] citizenship[,]" *Esparza-Ponce*, 193 F.3d at 1138, to sustain the § 911 charge. This Court should reverse these convictions in Counts 4-6.

## V.    The district court erred in convicting Mr. DeBorba of unlawful possession of a silencer because the statute violates the Second and Fifth Amendments.

The district court denied Mr. DeBorba's motion to dismiss the charge for possession of an unregistered silencer and later denied his Rule 29 motion and convicted him. 1-ER-28-29. The court denied the Second Amendment challenge by finding silencers were not arms, and denied his vagueness challenge by finding no "exceptional circumstances" to allow a facial challenge and finding that the definition of silencer was sufficiently clear as applied in this case. 1-ER-62-69.

The district court erred because possession of silencers is protected by the Second Amendment and the NFA's restrictions are not justified by historic analogues. Further, the statute's chilling effect on the exercise of Second Amendment-protected conduct warrants consideration of a facial challenge and the

definition of silencer fails that challenge. This Court should reverse Mr. DeBorba's conviction in Count 7.

### A. The NFA's registration, taxation, and criminalization scheme violates the Second Amendment.

Applying *Bruen*, the NFA's restriction on silencers violates the Second Amendment. At step 1, the conduct here is covered by the plain text of the Second Amendment both because silencers are "arms" and because they are firearms accessories analogous to those historically considered "arms." At step 2, the government did not demonstrate a sufficiently similar historical tradition of regulation to justify the NFA's registration, taxation, and criminalization restrictions on silencers.

### 1. The Second Amendment protects possession of silencers.

Silencers qualify as "Arms" under the Second Amendment because their capabilities make them necessary for the safe and effective use of firearms. Items that are necessary to use weapons effectively are protected by the Second Amendment. *Kolbe v. Hogan*, 813 F.3d 160, 175 (4th Cir. 2016), *vacated on reh'g en banc on other grounds*, 849 F.3d 114 (4th Cir. 2017). Even if silencers were not themselves "Arms," the Second Amendment "implies a corresponding right" to obtain items necessary to exercise the right to armed self-defense the Amendment protects. *Jackson v. City & County. of San Francisco*, 746 F.3d 953, 958 (9th Cir. 2014).

Silencers are themselves "arms" because they are "weapons of offence, or armour of defence[.]" *Heller*, 554 U.S. at 581. Silencers are used in the same way as the guns they are attached to, because a bullet must pass through an attached silencer to arrive at its intended target. Thus, silencers are "[w]eapons of offence" protected by the Second Amendment. *See id*. at 582; *but see United States v. McCartney*, 357 F. App'x 73, 76 (9th Cir. 2009) (unpublished) (summarily concluding that silencers are not protected by the Second Amendment). Federal law recognizes this fact by defining "firearms" to include silencers. 26 U.S.C. § 5845(a)(7); 18 U.S.C. § 921(a)(3)(C).

Even if silencers were not protected arms themselves, they are protected by the Second Amendment as accessories necessary to effectively use arms. The history of the right to bear arms indicates that "arms" included "all those items necessary to use the weapons effectively." *Kolbe*, 813 F.3d at 175. In the founding era, "arms" included firearms and the "proper accoutrements" that made them useful. *United States v. Miller*, 307 U.S. 174, 182 (1939). For example, "[t]he possession of arms also implied the possession of ammunition" when the Second Amendment was adopted. *Id*. at 180; *see also Jackson*, 746 F.3d at 967 ("the right

51

to possess firearms for protection implies a corresponding right to obtain the

bullets necessary to use them.") (quotation omitted).[24]

Furthermore, silencers are not dangerous and unusual. As of May 2021,

there were over 2.6 million silencers registered with the federal government. ATF,

Firearms Commerce in the United States: Annual Statistical Update 2021, at 16,

2021, https://www.atf.gov/firearms/docs/report/2021-firearms-commerce-

report/download. Silencers are protected by the Second Amendment.

### 2. The government has not demonstrated a sufficiently similar historic tradition of regulation to justify the NFA's restrictions on silencers.

In support of the NFA's restrictions, the government proposed historic

analogues (many without detail) that regulated the sale or transfer of firearms,

particularly beyond each colony. *See* 2-ER-229-30. The government presented no

evidence that any of these laws were enacted with the purpose ("why") of

***restricting*** access to firearms or suppressing violent crime. Rather, the function of

the cited regulations indicates a purpose of ordinary commodity control—to ensure

basic product safety and functionality. *See* 2-ER-284 (and regulations cited

---

[24] One Fifth Circuit judge has further posited that modification of firearms is also
conduct protected by the Second Amendment. *Mock v. Garland*, 75 F.4th 563, 588
(5th Cir. 2023) (Willett, J., concurring) ("In my view, protected Second
Amendment 'conduct' likely includes making common, safety-improving
modifications to otherwise lawfully bearable arms."). As argued below, silencers
are such modifications that make firearms safer for the user. *See* 2-ER-321-23.

therein). Or, as this Court has noted, the cited trade regulations generally intended to ensure *more* colonists were armed, but to restrict gun sales to Native Americans out of fears of rebellion. *Teixeira v. Cnty. of Alameda*, 873 F.3d 670, 685 (9th Cir. 2017) ("[t]he emphasis of the colonial governments was on ensuring that the populace was well armed, not on restricting individual stocks of weapons."). Furthermore, the government presented no evidence that the "how" of any of these regulations included imprisonment or other criminal penalties, nor that the restrictions or taxation on sales or manufacturing were prohibitively onerous. *See id*.

By contrast, the NFA was not enacted with the purpose ("why") of commodity control or rebellion quashing, but to *restrict* access to certain firearms to reduce domestic violent crime. As the ATF itself acknowledges, the NFA's "underlying purpose was to curtail, if not prohibit, transactions in NFA firearms[,]" not to raise revenue. *National Firearms Act*, ATF (Apr. 7, 2020), https://www.atf.gov/rules-and-regulations/national-firearms-act. Namely, the Act aimed to restrict access to certain weapons to address the problem of violent crime. *See* U.S. Statutes at Large, 73 Cong. Ch. 757, June 26, 1934, 48 Stat. 1236.

Similarly, the "how" of the NFA is not *only* taxation and registration, but also criminal penalties. Indeed, the NFA created an onerous taxation and registration scheme, intended to make possession of regulated items extremely

difficult.[25] And the NFA imposes harsh criminal penalties for failure to navigate this maze: a person who possesses an NFA firearm, including a silencer, without compliant registration and taxation may be punished by up to 10 years in prison and a $10,000 fine. *See* 26 U.S.C. §§ 5861(d), 5871.

The historic analogues proposed by the government are not relevantly similar and don't carry weight in the *Bruen* analysis "because they differ from [the NFA] in 'how' and 'why' they burden the right to bear arms." *Wolford*, 2024 WL 4097462, at *25 (quoting *Bruen*, 597 U.S. at 29); *Rahimi*, 144 S.Ct. at 1891 ("Why and how the regulation burdens the right are central to this inquiry.").

The historic regulations aimed to afford ordinary controls of a commodity—firearms—and to prevent arming political antagonists. Those laws aimed to ensure plenty of arms for the colonists. But the NFA aimed to severely restrict domestic access to certain firearms. The historic laws provided only for taxation, inspection, and limitations on trade, while the NFA imposes deliberately onerous regulations and punishes noncompliance with imprisonment. *See Bruen*, 597 U.S. at 57; *Heller*, 554 U.S. at 633-34 (penalty exceeding historic analogue is not relevantly

---

[25] Congress set the tax at a prohibitive amount—$200 in 1934 dollars, which would be the equivalent of approximately $4,637 per firearm in today's dollars. *See Inflation Calculator*, B. of Labor Statistics, https://www.bls.gov/data/inflation_calculator.htm (last accessed Oct. 11, 2024); ATF, "National Firearms Act," *supra* ("The $200 making and transfer taxes on most NFA firearms were considered quite severe and adequate to carry out Congress' purpose to discourage or eliminate transactions in these firearms.").

similar). Mr. DeBorba's conviction in Count 7 thus violated the Second

Amendment and should be reversed.

**B.    The district court erred in holding it could not consider a facial challenge and the NFA's definition of "silencer" fails a facial vagueness challenge.**

The district court also denied Mr. DeBorba's vagueness challenge to

Count 7. It found the definition of "silencer" was not unconstitutionally vague as

applied in Mr. DeBorba's case. 1-ER-62-69. The court reasoned this was so

because the item in question was found among other guns and gun accessories and

had a note with the word "suppressor" on it. 1-ER-65-66. And the court declined to

consider a facial challenge because it did not find "exceptional circumstances" in

this case. 1-ER-62-64.

However, a facial vagueness challenge should be considered because the

statute's vagueness chills the exercise of a core constitutional right. The district

court concluded that Mr. DeBorba's vagueness challenge did not involve

exceptional circumstances warranting a facial challenge because the vagueness at

issue did not involve the layers of abstraction present in *Johnson v. United States*,

576 U.S. 591 (2015), and *Sessions v. Dimaya*, 584 U.S. 148 (2018). 1-ER-62-64.

But this ruling misses the point.

A facial vagueness challenge should be considered here, as argued below, 2-

ER-339-40, because the NFA effects and risks chilling the exercise of a core

55

constitutional right. All vagueness challenges under the Fifth Amendment are concerned about two harms: "(1) they do not give a person of ordinary intelligence a reasonable opportunity to know what is prohibited, so that he may act accordingly; and (2) they encourage arbitrary and discriminatory enforcement by not providing explicit standards for policemen, judges, and juries." *United States v. Jae Gab Kim*, 449 F.3d 933, 941-42 (9th Cir. 2006) (quotation omitted).

When a vague statute implicates First Amendment-protected activities, these concerns are extended and heightened because their impact risks chilling conduct that is constitutionally protected. As such, even litigants who may lose an as-applied challenge are able to challenge the facial vagueness of such statutes. This is "because it is unclear whether [a vague statute] regulates a substantial amount of protected speech." *United States v. Williams*, 553 U.S. 285, 304 (2008). Additionally, the potential for bias in enforcement is of greater concern when constitutionally protected activities are involved: "Instinct with its ever-present potential for arbitrarily suppressing First Amendment liberties, that kind of law bears the hallmark of a police state." *Shuttlesworth v. City of Birmingham*, 382 U.S. 87, 90-91 (1965).

The same concerns are present here where the challenged statute threatens Second Amendment-protected activity. Indeed, the Supreme Court has invalidated statutes in non-First Amendment cases where the statutes chilled other core

constitutional freedoms. *See City of Chicago v. Morales*, 527 U.S. 41, 53 (1999) (invalidating a loitering ordinance that impacted the right to "liberty" under the Fourteenth Amendment); *Kolender v. Lawson*, 461 U.S. 352, 358 (1983) (invalidating a law prohibiting loitering without "credible" identification that implicated "the constitutional right to freedom of movement"). The vagueness of the statute here risks infringement of the Second Amendment right to keep and bear arms. As discussed above, this right necessarily includes the right to maintain arms, and to improve their safe usage. Yet the definition of silencer here is so vague that it threatens harsh criminal penalties for possession of items that function to clean guns or make them safer to shoot and operate.

The definition of "silencer" is too vague to put ordinary people on notice of what items qualify as "silencers" subject to the NFA's taxation and registration. Under the plain language of 18 U.S.C. § 921(a)(25), a "silencer" is "any device ***for*** silencing, muffling, or diminishing the report of a portable firearm, including any combination of parts, designed or redesigned, and intended for use in assembling or fabricating a firearm silencer or firearm muffler, and any part intended only for use in such assembly or fabrication." (emphasis added). This Court has previously held that a combination of parts from which a person could make a silencer is sufficient. *See United States v. Endicott*, 803 F.2d 506 (1986). And other Circuits have held that the item in question need not actually function to reduce the sound

of a firearm's report. *See, e.g.*, *United States v. Rose*, 522 F.3d 710 (6th Cir. 2008);

*United States v. Rogers*, 270 F.3d 1076 (7th Cir.2001).

Furthermore, there is no indication of the extent to which an item must

reduce (or be intended to reduce) the sound of a report to qualify as a silencer.

Indeed, even here the item as tested by an ATF agent reduced the report only to a

threshold where it was less likely to harm a shooter's hearing, not to a level that

would be inaudible or realistically difficult to hear.[26]

The statute likewise contains murky-at-best scienter requirements. *Compare*

*United States v. Freed*, 401 U.S. 601, 607 (1971) (holding that there is no mens rea

requirement for the failure-to-register element) *with Staples v. United States*, 511

U.S. 600, 619 (1994) (holding that the government must prove knowledge of the

firearm's specific characteristics that render it criminal to possess). And knowledge

that possession of the item is unlawful is not required. *United States v. Summers*,

268 F.3d 683, 688 (9th Cir. 2001). The statute does not inform an ordinary person

of average intelligence of what constitutes a "silencer."

---

[26] 2-ER-178 (indicating the item reduced the sound of the report on average from
152.80 decibels to 140.32 decibels); Michael Stewart, *Audiology Information
Series: Recreational Firearm Noise Exposure*, Am. Speech- Language-Hearing
Ass'n (2017), https://www.asha.org/siteassets/ais/ais-recreational-firearm-noise-
exposure.pdf; 29 C.F.R. § 1910.95 (Table G-16 n.1) (indicating 140 decibels as the
limit beyond which noise can be harmful to one's hearing).

The statute similarly fails to give reasonable guidance to law enforcement. Even the ATF has recognized that items it would consider to be "silencers" may actually have or be advertised as having other functions. *See, e.g.*, Matthew Varisco, ATF, Open Letter to All Federal Firearms Licensees, Nov. 20, 2023, https://www.atf.gov/file/186521/download (recognizing solvent traps are advertised as devices used "to catch excess solvent used when cleaning firearms" but also may be considered silencers by the ATF regardless of the manufacturer's label); ATF, Technical Bulletin 17-02: "Solvent Traps," Apr. 20, 2017, https://www.gunowners.com/images/pdf/ATF_Tech_Bulletin_17-02_Solvent_Traps.pdf ("Many unmodified oil filters are recognized as having a legitimate purpose as 'solvent traps' and are <u>not</u> generally classified as firearm silencers unless used as a firearm silencer."). The shifting and unclear information published by the ATF itself demonstrate the lack of statutory parameters guiding enforcement of restrictions on silencers.

This Court should consider Mr. DeBorba's facial challenge, find the statute unconstitutionally vague, and reverse Mr. DeBorba's conviction in Count 7.

## CONCLUSION

Mr. DeBorba asks this Court to reverse all counts of convictions. This Court should apply Supreme Court precedent, as recently clarified, and correct errors by

the district court. Reversal of Mr. DeBorba's convictions here is important to protect his core constitutional rights.

Dated this 15th day of October 2024.

s/ *Rebecca Fish*
Assistant Federal Public Defender
Attorney for João DeBorba

## STATEMENT OF RELATED CASES

I am that attorney of record and am aware of one or more related cases currently pending in this Court: *United States v. Vazquez-Ramirez*, No. 24-3544, presents the question of whether 18 U.S.C. § 922(g)(5) is constitutional under the Second Amendment as applied in that case.

Dated this 15th day of October 2024.

s/ *Rebecca Fish*
Assistant Federal Public Defender
Attorney for João DeBorba

61

## CERTIFICATE OF COMPLIANCE

I am the attorney of record. This brief contains 13,987 words, excluding the items exempted by Fed. R. App. P. 32(f). The brief's type size and typeface comply with Fed. R. App. P. 32(a)(5) and (6).

I certify this brief complies with the word limit of Cir. R. 32-1.

Dated this 15th day of October 2024.

s/ *Rebecca Fish*
Assistant Federal Public Defender
Attorney for João DeBorba