No. 24-3304
[NO. 3:22-cr-05139-DGE, USDC, W.D. Washington]

_____

# IN THE UNITED STATES COURT OF APPEALS

# FOR THE NINTH CIRCUIT

_____

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

v.

JOAO RICARDO DEBORBA,

Defendant-Appellant.

_____

## ANSWERING BRIEF OF UNITED STATES

_____

Appeal from the United States District Court
for the Western District of Washington at Tacoma
The Honorable David G. Estudillo
United States District Judge

_____

TESSA M. GORMAN
United States Attorney
Western District of Washington

JONAS LERMAN
TANIA M. CULBERTSON
Assistant United States Attorneys
700 Stewart Street, Suite 5220
Seattle, Washington 98101
Telephone: 206-553-7970

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................................ vi

INTRODUCTION ................................................................................... 1

ISSUES PRESENTED ............................................................................. 2

I.      As an unlawfully present alien, is DeBorba part of "the people" to whom the Second Amendment applies? If he is, do Counts 1, 2, 3, or 7 violate the Second Amendment? ..................... 2

        A.      Counts 1 through 3 charged DeBorba with possessing firearms and ammunition as an unlawfully present alien. Does 18 U.S.C. § 922(g)(5)(A) violate the Second Amendment on its face or as applied to him? ........................ 2

        B.      Counts 1 and 2 also charged DeBorba with possessing firearms and ammunition while under domestic-violence restraining orders. Does 18 U.S.C. § 922(g)(8) violate the Second Amendment as applied to him? ............... 2

        C.      Count 7 charged DeBorba with possessing an unregistered silencer. Does 26 U.S.C. § 5861(d) facially violate the Second Amendment? ............................ 2

II.     Counts 4 through 6 charged DeBorba with falsely claiming to be a U.S. citizen when he bought two guns and applied for a concealed-pistol license, in violation of 18 U.S.C. §§ 922(a)(6) and 911. Were his lies "material"? ................................... 2

III.    On Count 7, is the definition of "silencer" void for vagueness? ....... 2

JURISDICTION, TIMELINESS, AND BAIL STATUS ........................... 2

STATEMENT OF THE CASE ................................................................. 3

I.     Facts ................................................................................3

    A.     DeBorba is an unlawfully present alien.................................3

    B.     DeBorba lies about his citizenship to obtain a
        concealed-pistol license and buy guns (Counts 4
        through 6) ................................................................3

    C.     DeBorba illegally possesses a pistol during a
        traffic stop (Count 3) ................................................5

    D.     DeBorba abuses his ex-wife, and state courts
        impose domestic-violence restraining orders .........................6

    E.     DeBorba possesses scores of guns, ammunition,
        and an unregistered silencer (Counts 1, 2, 3,
        and 7) ................................................................7

        1.     After DeBorba violates a November 2019
            restraining order, police find 20 guns in his
            apartment (Count 2) ....................................7

        2.     In May 2022, agents find six more guns and
            an unregistered silencer at DeBorba's
            apartment (Counts 1 and 7) ...........................8

II.    DeBorba moves to dismiss .............................................12

III.   The district court denies DeBorba's motion ...................................13

IV.    After a bench trial on stipulated facts, the district court
    convicts DeBorba on all seven counts .........................................13

V.     DeBorba accepts "full responsibility" for his crimes ....................14

SUMMARY OF ARGUMENT ................................................................ 14

STANDARD OF REVIEW ................................................................ 16

ARGUMENT ................................................................................ 16

I.  On Counts 1, 2, 3, and 7, the district court correctly
    rejected DeBorba's Second Amendment claims ........................... 16

    A.  The *Bruen-Rahimi* standard ................................................ 17

    B.  DeBorba's Second Amendment claims fail at the
        threshold stage ................................................................ 18

    C.  Even if the Second Amendment applies to
        unlawfully present aliens, DeBorba's claims fail
        under the history-and-tradition analysis ............................ 26

    D.  Facially and as applied to DeBorba, 18 U.S.C.
        § 922(g)(5)(A) satisfies the Second Amendment .................. 27

        1.  Statutory background ................................................ 27

        2.  History and tradition show that Congress
            may disarm unlawfully present aliens ........................ 28

            a.  England ............................................................ 30

            b.  Colonial America ............................................ 32

            c.  Revolutionary War ............................................ 33

            d.  Ratification debates ........................................ 35

        3.  Section 922(g)(5)(A) fits within the
            historical traditions of disarming persons
            outside the political community or who are
            legally untrustworthy ............................................ 36

iii

4.     Section 922(g)(5)(A) is constitutional as applied to DeBorba, who has repeatedly proven himself untrustworthy and dangerous ................................................... 42

E.    As applied to DeBorba, 18 U.S.C. § 922(g)(8) satisfies the Second Amendment ........................................... 45

     1.     Statutory background ................................................. 45

     2.     DeBorba's restraining orders satisfy section 922(g)(8)(C)(i), so *Rahimi* forecloses his claim ........................................................................ 46

     3.     DeBorba's restraining orders also satisfy section 922(g)(8)(C)(ii) ........................................... 51

     4.     Even if an individualized dangerousness analysis were required, DeBorba's as-applied challenge fails ........................................... 53

F.    The unregistered-silencer statute facially satisfies the Second Amendment ........................................... 53

     1.     Statutory background ................................................. 54

     2.     Silencers are not "arms" under the Second Amendment ................................................................ 54

     3.     Even if silencers were "arms," history and tradition show that Congress may require their registration ..................................................... 59

         a.     Regulating dangerous and unusual devices ....................................................... 60

         b.     Regulating commerce in firearms ...................... 68

4.  At a minimum, the unregistered-silencer statute has several constitutional applications that preclude facial invalidation ................................ 72

II.  On Counts 4 through 6, the district court correctly rejected DeBorba's "materiality" challenge to the false-statement charges ........................... 74

A.  Statutory background ......................... 74

B.  DeBorba had no right to lie about his citizenship when buying guns or applying for a concealed-pistol license ................................ 75

C.  Nothing about 18 U.S.C. §§ 922(a)(6) or 911 supports a different result ................... 78

D.  DeBorba's lies were material because truthful answers would have barred the gun sales and the concealed-pistol application .................. 81

III.  On Count 7, the district court correctly rejected DeBorba's vagueness challenge to the statutory definition of "silencer" ........................ 84

A.  DeBorba may assert only an as-applied vagueness claim ................................ 84

B.  As applied to DeBorba's admitted conduct, the definition of "silencer" is anything but vague ...................... 86

CONCLUSION ......................................... 90

STATEMENT OF RELATED CASES

CERTIFICATE OF COMPLIANCE

# TABLE OF AUTHORITIES

## Federal Cases

*Abramski v. United States,*
573 U.S. 169 (2014) ................................................................... 81, 82, 83

*Atkinson v. Garland,*
70 F.4th 1018 (7th Cir. 2023) ........................................... 23, 31, 32, 43

*Bryson v. United States,*
396 U.S. 64 (1969) .......................................................... 77, 78, 79, 82

*Cabell v. Chavez-Salido,*
454 U.S. 432 (1982) .............................................................................. 20

*Cespedes v. Lynch,*
805 F.3d 1274 (10th Cir. 2015) ........................................................... 49

*Dennis v. United States,*
384 U.S. 855 (1966) ................................................................ 77, 78, 79

*District of Columbia v. Heller,*
554 U.S. 570 (2008) ..................................................................... passim

*Elk v. Wilkins,*
112 U.S. 94 (1884) ............................................................................... 22

*Friedman v. City of Highland Park,*
577 U.S. 1039, 136 S. Ct. 447 (2015) .................................................. 65

*Greenlaw v. United States,*
554 U.S. 237 (2008) .............................................................................. 16

*Hampton v. Mow Sun Wong,*
426 U.S. 88 (1976) ............................................................................... 42

*Huddleston v. United States,*
   415 U.S. 814 (1974)................................................................27, 38

*Jackson v. City & Cty. of San Francisco,*
   746 F.3d 953 (9th Cir. 2014)............................................................58

*Johnson v. United States,*
   576 U.S. 591 (2015)........................................................................85

*Kanter v. Barr,*
   919 F.3d 437 (7th Cir. 2019)....................................................31, 43

*Kashem v. Barr,*
   941 F.3d 358 (9th Cir. 2019)....................................................85, 86

*Kay v. United States,*
   303 U.S. 1 (1938).......................................................................77, 78

*Kolbe v. Hogan,*
   813 F.3d 160 (4th Cir. 2016),
   *vacated on reh'g en banc,* 849 F.3d 114 (4th Cir. 2017)...............56, 57

*LaChance v. Erickson,*
   522 U.S. 262 (1998)........................................................................77

*Lewis v. United States,*
   445 U.S. 55 (1980)..........................................................................27

*Maldonado v. Morales,*
   556 F.3d 1037 (9th Cir. 2009)........................................................87

*Mathews v. Diaz,*
   426 U.S. 67 (1976)....................................................................41, 42

*McDonald v. City of Chicago,*
   561 U.S. 742 (2010)..................................................................21, 24

*Medina v. Whitaker,*
   913 F.3d 152 (D.C. Cir. 2019) ........................................ 36

*Nat'l Fed'n of Indep. Bus. v. Sebelius,*
   567 U.S. 519 (2012) .............................................. 57, 58

*Neder v. United States,*
   527 U.S. 1 (1999) ..................................................... 75

*New York State Rifle & Pistol Ass'n, Inc. v. Bruen,*
   597 U.S. 1 (2022) .............................................. passim

*Range v. Att'y Gen.,*
   __ F.4th __, 2024 WL 5199447 (3d Cir. Dec. 23, 2024) ..... 23, 31, 32, 33

*Rose v. Locke,*
   423 U.S. 48 (1975) ................................................... 88

*Sessions v. Dimaya,*
   584 U.S. 148 (2018) ................................................. 85

*Shaughnessy v. United States ex rel. Mezei,*
   345 U.S. 206 (1953) ................................................. 42

*Smith v. United States,*
   508 U.S. 223 (1993) ................................................. 74

*Teixiera v. Cty. of Alameda,*
   873 F.3d 670 (9th Cir. 2017) ........................................ 80

*Teter v. Lopez,*
   76 F.4th 938 (9th Cir. 2023),
   *vacated*, 93 F.4th 1150 (9th Cir. 2024) ........................ 18

*Teter v. Lopez,*
   93 F.4th 1150 (9th Cir. 2024) ...................................... 18

*United States ex rel. Robinson Rancheria Cit. Council v. Borneo, Inc.*,
  971 F.2d 244 (9th Cir. 1992) ............................................................. 52

*United States v. Alaniz*,
  69 F.4th 1124 (9th Cir. 2023) ................................................ 17, 19, 21

*United States v. Alexander*,
  480 F. Supp. 3d 988 (N.D. Cal. 2020) .............................................. 88

*United States v. Briones*,
  35 F.4th 1150 (9th Cir. 2021) ........................................................... 87

*United States v. Castleman*,
  572 U.S. 157 (2014) .......................................................................... 45

*United States v. Chan*,
  No. 22-CR-109, 2024 WL 4028019 (D. Hawaii Sept. 3, 2024) ............ 68

*United States v. Combs*,
  No. 23-5121, 2024 WL 4512533 (6th Cir. Oct. 17, 2024) ................... 52

*United States v. Cox*,
  7 F.3d 1458, (9th Cir. 1993) ............................................................. 72

*United States v. Cox*,
  906 F.3d 1170 (10th Cir. 2018) ........................................................ 55

*United States v. Dang*,
  488 F.3d 1135 (9th Cir. 2007) .......................................................... 88

*United States v. Diaz*,
  116 F.4th 458 (5th Cir. 2024) ........................................................... 73

*United States v. Escobar-Temal*,
  No. 22-CR-393, 2023 WL 4112762 (M.D. Tenn. June 21, 2023) ......... 40

*United States v. Gay*,
  98 F.4th 843 (7th Cir. 2024) ............................................................. 44

*United States v. Henry,*
   688 F.3d 637 (9th Cir. 2012)................................................................68

*United States v. Holden,*
   70 F.4th 1015 (7th Cir. 2023) ..................................................... passim

*United States v. Hudson,*
   986 F.3d 1206 (9th Cir. 2021)...........................................................88

*United States v. Huitron-Guizar,*
   678 F.3d 1164 (10th Cir. 2012)........................................................39

*United States v. Jackson,*
   110 F.4th 1120 (8th Cir. 2024) .................................................. passim

*United States v. Jernigan,*
   __ F. Supp. 3d __, 2024 WL 4294648
   (E.D. Va. Sept. 25, 2024)........................................... 55, 57, 59

*United States v. Jimenez-Shilon,*
   34 F.4th 1042 (11th Cir. 2022) ....................................... 19, 22, 24, 25

*United States v. Kapp,*
   302 U.S. 214 (1937)................................................................78, 82

*United States v. Knox,*
   396 U.S. 77 (1969)................................................................76, 77

*United States v. Kuzma,*
   967 F.3d 959 (9th Cir. 2020)........................................................86, 89

*United States v. Latu,*
   479 F.3d 1153 (9th Cir. 2007).................................................3, 28, 39

*United States v. Lawton,*
   366 F.3d 550 (7th Cir. 2004)...........................................................78

*United States v. Lucero,*
  989 F.3d 1088 (9th Cir. 2021)...........................................87

*United States v. Mandujano,*
  425 U.S. 564 (1976)...........................................................78

*United States v. Manney,*
  114 F.4th 1048 (9th Cir. 2024) ................................... passim

*United States v. McCartney,*
  357 F. App'x 73 (9th Cir. 2009)........................................68

*United States v. Medina-Cantu,*
  113 F.4th 537 (5th Cir. 2024) (per curiam) ............ 19, 28, 73

*United States v. Meza-Rodriguez,*
  798 F.3d 664 (7th Cir. 2015)........................................39, 40

*United States v. Miller,*
  307 U.S. 174 (1939).............................................58, 59, 60

*United States v. Muñoz-De La O,*
  586 F. Supp. 3d 1032 (E.D. Wash. 2022),
  *aff'd,* No. 22-30100, 2024 WL 1873006 (9th Cir. Apr. 20, 2024)........38

*United States v. Nichols,*
  464 F.3d 1117 (9th Cir. 2006)..........................................16

*United States v. Perez,*
  6 F.4th 448 (2d Cir. 2021)...............................23, 24, 25, 30

*United States v. Perez-Garcia,*
  96 F.4th 1166 (9th Cir. 2024) ................................... passim

*United States v. Perez-Silvan,*
  861 F.3d 935 (9th Cir. 2017).......................................52, 72

*United States v. Pope,*
  613 F.3d 1255 (10th Cir. 2010) ........................................... 44

*United States v. Purdy,*
  264 F.3d 809 (9th Cir. 2001) ............................................... 85

*United States v. Rahimi,*
  61 F.4th 443 (5th Cir. 2023)
  *rev'd*, 602 U.S. 680 (2024) .................................................. 12

*United States v. Rahimi,*
  602 U.S. 680 (2024) ................................................... passim

*United States v. Ramirez,*
  No. 22-14297, 2024 WL 3757080 (11th Cir. Aug. 12, 2024) ......... 19, 28

*United States v. Rangel-Tapia,*
  No. 23-1220, 2024 WL 966385 (6th Cir. Mar. 6, 2024) ................ 20, 28

*United States v. Romero-Avila,*
  210 F.3d 1017 (9th Cir. 2000) ....................................... 75, 81

*United States v. Royce,*
  No. 22-CR-130, 2023 WL 2163677 (D.N.D. Feb. 22, 2023) ................ 57

*United States v. Saleem,*
  659 F. Supp. 3d 683 (W.D.N.C. 2023) ................................ 56, 57, 65, 72

*United States v. Serrano,*
  651 F. Supp. 3d 1192 (S.D. Cal. 2023) ................................. 72

*United States v. Singh,*
  979 F.3d 697 (9th Cir. 2020) ....................................... 19, 28

*United States v. Sitladeen,*
  64 F.4th 978 (8th Cir. 2023) ....................................... 20, 28

*United States v. Szabo,*
  760 F.3d 997 (9th Cir. 2014) ....................................... 85, 88

*United States v. Thompson / Ctr. Arms Co.,*
  504 U.S. 505 (1992) ...................................................... 61

*United States v. Toner,*
  728 F.2d 115 (2d Cir. 1984) ......................................... 39

*United States v. Torres,*
  911 F.3d 1253 (9th Cir. 2019) .................................. 19, 28

*United States v. Torres-Rosario,*
  658 F.3d 110 (1st Cir. 2011) ......................................... 43

*United States v. Williams,*
  553 U.S. 285 (2008) ................................................ 85, 88

*Wolford v. Lopez,*
  116 F.4th 959 (9th Cir. 2024) ...................................... 38

**State Cases**

*Aymette v. State,*
  2 Hum. 154 (Tenn. 1840) ............................................. 62

*Cockrum v. State,*
  24 Tex. 394 (1859) ...................................................... 62

*State v. Langford,*
  3 Hawks 381 (N.C. 1824) ............................................. 62

*State v. Mitchell,*
  3 Blackf. 229 (Ind. 1833) ............................................. 62

*State v. Reid,*
  1 Ala. 612 (1840) ........................................................ 62

## Federal Statutes and United States Constitution

U.S. Const. amend. II ...................................................... passim

Title 18, United States Code.
    Section 911 ........................................................ passim
    Section 921 ............................................................54
    Section 921(a)(3)(C) ........................................57, 81
    Section 921(a)(25) ........................................ 11, 54
    Section 922(g)(2) ....................................................40
    Section 922(g)(5) ................................................ passim
    Section 922(g)(5)(A) .......................................... passim
    Section 922(g)(5)(B) ..............................................28
    Section 922(a)(6) ................................................ passim
    Section 922(g)(8) ................................................ passim
    Section 922(g)(8)(A) ..............................................46
    Section 922(g)(8)(B) ..............................................46
    Section 922(g)(8)(C) ..............................................46
    Section 922(g)(8)(C)(i) ...................................... passim
    Section 922(g)(8)(C)(ii) ...................... 47, 50, 51, 52
    Section 922(y)(2) ............................................ 41, 46
    Section 922(y)(3) ....................................................41
    Section 3231 ..........................................................2

Title 26, United States Code,
    Section 845(a)(7) ....................................................54
    Section 5841 ..........................................................54
    Section 5845(a)(7) ................................. 11, 54, 57
    Section 5845(a) ......................................................58
    Section 5845(b) ......................................................58
    Section 5845(e) ......................................................58
    Section 5845(f) ......................................................58
    Section 5861(d) ................................................ passim
    Section 5871 ................................................... 54, 61

Title 28, United States Code,
    Section 1291 ..........................................................2

## Federal Rules

Federal Rules of Criminal Procedure,
  Rule 12 ................................................................................ 43
  Rule 12(b)(3)........................................................................ 44

## Other Authorities

1 The Public Acts of the General Assembly of North Carolina (1804)
  (1777 N.C. Law) .................................................................. 34

1 Richard Burn, The Justice of the Pease, and Parish Officer,
  (2d ed. 1756)....................................................................... 62

1 William Hawkins, *A Treatise of the Pleas of the Crown*,
  (1716)................................................................................. 62

1935 Ala. Laws 441 ................................................................ 63, 66

1939 Iowa Acts, Section 12950, Chapter 564
  1939 Iowa Acts 1928 ........................................................... 63

2 Bernard Schwartz, The Bill of Rights: A Documentary History,
  (1971)............................................................................. 24, 36

3 Laws of the Commonwealth of Pennsylvania from the Fourteenth
  Day ofr October, One Thousand Seven Hundred (1810) ................... 69

4 Journals of the Continental Congress 1774-1789 (1906) (resolution of
  March 14, 1776) .................................................................. 34

4 William Blackstone, Commentaries on the Laws of England,
  (10th ed. 1787) ................................................................... 61

5 The Acts and Resolves, Public and Private, of the Province of the
  Massachusetts Bay (1886) (1776 Mass. Law) ............................... 34

7 Records of the Colony of Rhode Island and Providence Plantations in
  New England (1862) (1776 R.I. Law) ....................................... 34

9 The Statutes at Large of Pennsylvania from 1682 to 1801 (1903) (1777 Pa. Law) ............................................................................34

9 The Statutes at Large; Being a Collection of All the Laws of Virginia (1821) (1777 Va. Law).................................................................34

Aaron Leaming & Jacob Spicer*, An Act Against Wearing Swords, ch. 9, Grants, Concessions, and Original Constitution of the Provice of New Jersey (2d ed. 1881) ..............................................................62

Act of January 30, 1835,
    1835 Fla. Laws 36 ............................................................70

Act of June 30, 1837,
    1837 Ala. Laws 7............................................................70

Act of February 6, 1841, Chapter 1, Section 1,
    1841 Miss. Laws 51..........................................................70

Act of March 12, 1909, Chapter 122,
    1909 N.D. Laws 130..........................................................63

Act of March 24, 1909, Chapter 129,
    1909 Me. Laws 141 ..........................................................63

Act of July 6, 1910, Chapter 142, Section 6,
    1910 La. Acts 218...........................................................63

Act of April 7, 1911, Chapter 128,
    1911 N.J. Laws 185..........................................................63

Act of November 14, 1912, Number 237,
    1912 Vt. Acts & Resolves 310 ...............................................63

Act of May 7, 1913, Number 250,
    1913 Mich. Pub. Acts 472 ...............................................63, 66

Act of March 13, 1913, Chapter 64,
   1913 Minn. Laws 55 ........................................................63

Act of April 6, 1916, Chapter 137,
   1916 N.Y. Laws 338 ........................................................63

Act of April 10, 1917, Chapter 105,
   1917 Conn. Pub Acts 2301 ...............................................63

Act of February 20, 1918, Chapter 6,
   1918 Mont. Laws 13 ........................................................63

Act of June 6, 1919, Section 3,
   1919 Ohio Laws 577 ........................................................63

Act of February 18, 1921, Section 97, Chapter 83,
   1921 Wyo. Sess. Laws 86 .................................................63

Act of May 5, 1921, Number 173, Section 5,
   1921 Pa. Laws 353 ..........................................................63

Act of March 7, 1925, Chapter 460, Section 4,
   1925 N.C. Sess. Laws 529 ................................................63

Act of April 16, 1926, Chapter 261,
   1926 Mass. Acts 256 .......................................................63

Act of March 29, 1927, Chapter 169,
   1927 Del. Laws 516 .........................................................63

Act of April 22, 1927, Chapter 1052, Section 8,
   1927 R.I. Pub. Laws 256 ..................................................63

Act of March 18, 1929, Chapter 84, Section 14,
   1929 Ariz. Sess. Laws 235 ...............................................63

Act of March 11, 1931, Chapter 370, Section 19,
   1931 Or. Laws 684 ..........................................................63

Act of March 27, 1933, Chapter 39,
1933 Cal. Stat. 329................................................................63

Act of January 9, 1934, Act 26, Section 7,
1934 Haw. Sess. Laws 35 ..................................................63

Acts of the General Assembly of the State of New-Jersey at a Session
Begun on the 27th Day of August, 1776 (1777) ...................34

Akhil Reed Amar, The Bill of Rights: Creation and Reconstruction
(1998)....................................................................................23

*Arms,* 1 A New and Complete Law Dictionary (1771)...........................*55*

*Arms*, 1 Dictionary of the English Language (4th ed. 1773).................55

*Arms*, N. Webster, American Dictionary of the English Language
(1828).....................................................................................55

Colonial Laws of Massachusetts Reprinted from the Edition of
1672 (1890)...........................................................................71

David B. Kopel & Joseph G.S. Greenlee, *The Second Amendment Rights
of Young Adults*, 43 S. Ill. U. L.J. 495 (2019).......................59

Harmeet Kauer, *What studies reveal about fun ownership in the US*,
CNN, June 2, 2022................................................................67

H.R. Rep. No. 1337, 83d Cong., 2d Sess. A395 (1954) ...........................61

H.R. 9066, 73rd Cing,, 2d Sess, 111 (1934)..........................................64

Jennifer Mascia & Chip Brownlee, *How Many Guns Are Circulating in
the U.S.?*, The Trace, Mar. 6, 2023 ...................................67

Joseph Blocher & Catie Carberry, *Historical Gun Laws Targeting "Dangerous" Groups and Outsiders*, in New Histories of Gun Rights and Regulation: Essays on the Place of Guns in American Law and Society (forthcoming, Oxford Univ. Press) ........................................... 23

Joseph G.S. Greenlee, *The Historical Justification for Prohibiting Dangerous Persons from Possessing Firearms*, 20 Wyo. L. Rev. 249 (2020) .................................................... 33

Laws of the Commonwealth of Massachusetts from November 28, 1780 to February 28, 1807 (1807) .................................................. 70

Laws of the State of Maine (1830) ........................................ 70

Lisa Marie Pane*, Did 'Silencer' Make a Difference in Virginia Beach Carnage?,* Associated Press, June 1, 2019 ........................................ 30

N.C. Declaration of Rights of 1776 § XVII, in *The Complete Bill of Rights: The Drafts, Debates, Sources, and Origins*, (Neil Cogan ed., 2d ed. 2014) ............................................ 35

Ordinance of the Director and Council of New Netherland Against Trade in Powder, Lead and Guns in New Netherland by Private Persons, 1652 N.Y. Laws 128 ............................................. 69

Pa. Declaration of Rights of 1776 § XIII, in The Complete Bill of Rights: The Drafts, Debates, Sources, and Origins, (Neil Cogan ed., 2d ed. 2014) ............................................ 35

Robert H. Churchill, *Gune Regulation, the Police Power, and the Right to Keep Arms in Early America: The Legal Context of the Second Amendment*, 25 L. & Hist. Rev. 139 (2007) ....................... 22, 23, 24, 40

Robert J. Spitzer*, Gun Accessories and the Second Amendment: Assault Weapons, Magazines, and Silencers*, 83 Law & Contemp. Probs. 231 (2020) ........................................ 63, 64

Robert J. Spitzer, *Gun Law History in the United States and Second Amendment Rights*, 80 Law & Contemp. Probs. 55 (2017)................69

Robert J. Spitzer*, Understanding Gun Law History after* Bruen*: Moving Forward by Looking Back,* 51 Fordham Urb. L.J. 57 (2023) ...................................................62, 63

Saul Cornell & Nathan DeDino, *A Well Regulated Right: The Early American Origins of Gun Control,* 73 Fordham L. Rev. 487 ......................................................................24

*Silent Gun Kills a Family of Four,* N.Y. Times, February 1, 1915 ........64

Supplement V The Code of The District of Columbia (to March 4, 1929) 43 (1939).........................................................................................63

Texas Family Code,
Section 85.001 ..................................................................................49
Section 85.021 ..................................................................................49
Section 85.022 ..................................................................................49

The Charger and Ordinances of the City of Providence, with General Assembly Relating to the City (1835) (1821 law)...............................71

The Public Records of the Colony of Connecticut from May, 1775 to June, 1776 (1890) (1775 Conn. Law)...........................................34, 71

The Statutes of the Realm 71-73, 1 W. & M., Sess. 1, c. 15, in 6 (1688) ...................................................30

The Statutes of the Realm 143, 1 W. & M., Sess. 2, c. 2, in 6 (1688) .....................................................31

Title 12, Rhode Island General Laws, Section 12-29-4(a)(1) ...........................................................................49

Virginia Act of February 27, 1631m Act LVI, reprinted in I The Statues at Large; Being a Collection of All The Laws of Virginia, From The First Session Of The Legislature (William Waller Henning ed., 1823)....................................................49

Washington Revised Codes,
Section 9.41.070 ................................................................4
Section 9.41.173 ................................................................4
Section 10.99.040(2)(a) .....................................................49

## INTRODUCTION

João Ricardo DeBorba, a Brazilian national, possessed more than 20 guns while unlawfully present in this country and while under domestic-violence restraining orders. He also possessed an unregistered silencer. And he repeatedly lied about his citizenship when buying guns and applying for a concealed-pistol license. Indicted on seven counts, he was convicted after a bench trial on stipulated facts. At sentencing, he claimed to feel "terribly guilty" and to accept "full responsibility" for his crimes.

Yet DeBorba now asks this Court to find he committed no crimes. He wants the Court to hold that unlawfully present aliens[1] subject to domestic-violence restraining orders have a constitutional right to possess guns, ammunition, and unregistered silencers—and to lie about their citizenship when buying guns and applying for concealed-carry licenses. But DeBorba's claims are groundless. The district court rightly rejected them. This Court should affirm his seven convictions.

---

[1] This brief uses the phrase "unlawfully present aliens" to match the terminology in 18 U.S.C. § 922(g)(5)(A).

## ISSUES PRESENTED

I.   As an unlawfully present alien, is DeBorba part of "the people" to whom the Second Amendment applies? If he is, do Counts 1, 2, 3, or 7 violate the Second Amendment?

    A.   Counts 1 through 3 charged DeBorba with possessing firearms and ammunition as an unlawfully present alien. Does 18 U.S.C. § 922(g)(5)(A) violate the Second Amendment on its face or as applied to him?

    B.   Counts 1 and 2 also charged DeBorba with possessing firearms and ammunition while under domestic-violence restraining orders. Does 18 U.S.C. § 922(g)(8) violate the Second Amendment as applied to him?

    C.   Count 7 charged DeBorba with possessing an unregistered silencer. Does 26 U.S.C. § 5861(d) facially violate the Second Amendment?

II.  Counts 4 through 6 charged DeBorba with falsely claiming to be a U.S. citizen when he bought two guns and applied for a concealed-pistol license, in violation of 18 U.S.C. §§ 922(a)(6) and 911. Were his lies "material"?

III. On Count 7, is the definition of "silencer" void for vagueness?

## JURISDICTION, TIMELINESS, AND BAIL STATUS

The district court had jurisdiction under 18 U.S.C. § 3231 and entered judgment in May 2024. 1-ER-2. DeBorba timely noticed his appeal. 3-ER-614. This Court's jurisdiction rests on 28 U.S.C. § 1291. DeBorba has finished his 30-month sentence and is now in immigration detention awaiting deportation to Brazil. *See* SER-30, 52-56; PSR¶73.

**STATEMENT OF THE CASE**

**I.    Facts**[2]

    ***A.    DeBorba is an unlawfully present alien***

DeBorba entered the United States from Brazil in 1999 on a nonimmigrant B2 visitor visa that allowed him to stay here for up to six months—no later than May 2000. 1-ER-32; 2-ER-73; PSR¶9. But he never left and never obtained permission to stay. 1-ER-32; 2-ER-73-74; PSR¶9. He avoided detection for two decades by using fraudulent immigration and Social Security documents, which means his claim that he "committed no crime by . . . remaining in this country" (AOB-2, 29-31) is wrong or at least misleading. 2-ER-187-188; PSR¶9; SER-62-63. He has been "illegally or unlawfully in the United States" for years. *United States v. Latu*, 479 F.3d 1153, 1158-59 (9th Cir. 2007).

    ***B.    DeBorba lies about his citizenship to obtain a concealed-pistol license and buy guns (Counts 4 through 6)***

In February 2019, DeBorba applied for a concealed-pistol license from a Washington State agency. 1-ER-32; 2-ER-74; PSR¶10. On that application, which he completed under penalty of perjury, he falsely

---

[2] These facts come from the district court's pretrial findings (1-ER-31-70), the trial stipulations (1-ER-19-23, 27), and the sentencing record.

3

claimed to be a U.S. citizen. Next to the question "Are you a U.S. citizen?" he checked "Yes." 2-ER-90. Next to the questions "Are you a permanent resident alien?" and "Are you a legal alien temporarily residing in Washington?" he checked "No." *Id.* And next to the question "Are you an alien illegally in the United States?" he again checked "No." *Id.*; 1-ER-32; 2-ER-74. He left blank the boxes provided for an applicant's permanent-resident-card number and alien-registration number. 2-ER-74, 90.

DeBorba stipulates that he "knew that his answers to these questions about his citizenship and his legal status in the United States were false, and thus made the misrepresentations voluntarily and deliberately." 2-ER-74. And the state agency posed these questions "for the purpose of ensuring that the Concealed Pistol License could be issued to DeBorba in compliance with Revised Code of Washington 9.41.070 and 9.41.173 and that DeBorba's possession of a firearm would comply with [18 U.S.C. §] 922(g)(5)." *Id.*

In April and May 2019, DeBorba lied on two Form 4473 Firearms Transaction Records forms submitted to the federal Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF). 1-ER-32; 2-ER-74-76, 93-99, 101-110; PSR¶11. On both ATF forms, DeBorba lied about his citizenship

and immigration status, checking "United States" in response to a question about his citizenship and checking "no" on questions asking whether he was "an alien illegally or unlawfully in the United States." 2-ER-74-76, 94, 102; 1-ER-32; PSR¶11. The first form related to a SIG Sauer .45-caliber handgun he bought in April 2019 from a Washington dealer; the second form related to a Rock Island Armory .38 Special handgun he bought in May 2019 from another Washington dealer. 2-ER-74-76, 94, 102; PSR¶11.

DeBorba stipulates that the ATF forms asked these questions because federal law prohibits transferring a firearm to a noncitizen unlawfully in this country and requires dealers to document firearm sales using this form. 2-ER-74-76. Each form warned DeBorba that false statements are federal felonies. 2-ER-75-76, 94-99, 102-104. As he admits, his false statements influenced both dealers into believing that these guns could be legally sold to him. 2-ER-75-76.

## C. DeBorba illegally possesses a pistol during a traffic stop (Count 3)

In April 2019—just a few days after he bought the SIG Sauer pistol—DeBorba got into a single-vehicle highway collision. 2-ER-76;

PSR¶12. Arrested for driving under the influence, he was later convicted of negligent driving. PSR¶50; SER-67.

During that traffic stop, DeBorba told a state trooper that he had a concealed-pistol license with him. An inventory search of DeBorba's SUV turned up a black tactical backpack on the floorboard behind the passenger seat. DeBorba said his Glock pistol was in the backpack, which he permitted the trooper to open. The trooper found the Glock inside. 2-ER-76-77; PSR¶12; SER-67.

After that DUI arrest, DeBorba kept illegally acquiring guns. Less than a week later, he bought a rifle from an Oregon dealer. About two weeks after that, he bought the Rock Island revolver mentioned above by again lying about his citizenship. PSR¶11; SER-67.

### D. DeBorba abuses his ex-wife, and state courts impose domestic-violence restraining orders

DeBorba has a history of abusing his ex-wife, including in front of the couple's children. SER-63-66, 79-90; PSR¶¶13-16, 51, 53, 71. In November 2019, DeBorba's 12-year-old son called 911. He reported that his father had attacked the boy's mother by punching and slapping her multiple times in the arms, legs, and face. She confirmed these facts to

6

police. DeBorba assaulted her because she would not tell him the password to her cellphone. SER-63-64, 79-90.

As a result of DeBorba's offenses, state courts in multiple cases subjected him to domestic-violence restraining orders between November 2019 and January 2022. 2-ER-77-83, 112-144; 1-ER-32-33; PSR¶13. Among other things, the orders barred DeBorba from contacting or physically harming his ex-wife and from possessing guns. *Id.* But despite those orders, DeBorba's abuse and harassment of his ex-wife continued, earning him convictions in October 2020 and January 2022 for assaults and violations of restraining orders. SER-63-66; 2-ER-78, 80-82; PSR¶¶13-16, 51, 53, 71.

### E. *DeBorba possesses scores of guns, ammunition, and an unregistered silencer (Counts 1, 2, 3, and 7)*

#### 1. *After DeBorba violates a November 2019 restraining order, police find 20 guns in his apartment (Count 2)*

In November 2019—while DeBorba was subject to a November 14, 2019 domestic-violence restraining order—his ex-wife called the police to report a violation. 2-ER-78, 118-132; SER-64. Police soon found DeBorba at his apartment and arrested him. 2-ER-78. He waived his *Miranda* rights and voluntarily agreed to speak with police. 2-ER-78-79. He

admitted that he had firearms in his apartment and consented to a search. 2-ER-78-79; PSR¶14. Inside, police found 20 handguns and rifles, plus ammunition. 2-ER-79; PSR¶¶14, 51; SER-12-14. Some of those guns are pictured here:



SER-68.

2.   *In May 2022, agents find six more guns and an unregistered silencer at DeBorba's apartment (Counts 1 and 7)*

In October 2020, a state court convicted DeBorba of assault and violating domestic-violence restraining orders. PSR¶15. The court issued another restraining order to protect DeBorba's ex-wife. 2-ER-80-81, 137-

138; PSR¶15. Similar restraining orders followed, with the last extending through January 2027. 2-ER-81-82, 140-144.

But DeBorba kept possessing firearms in violation of those orders. In April 2021, police responded to an assault report from DeBorba's roommates. They said that DeBorba still had firearms, despite the restraining orders. SER-68, 102-103; PSR¶¶16, 52; 2-ER-83. During an argument over rent, DeBorba reportedly pushed one roommate in the chest, then locked the apartment door and told the roommates, "You're not going anywhere." PSR¶52; SER-68, 102-103. The other roommate was terrified that DeBorba would attack her and began crying in fear. *Id.* A state court later convicted DeBorba of disorderly conduct. PSR¶52.

A few months after that incident, law enforcement received more tips about DeBorba's continued gun possession. A May 2020 video posted to his Instagram account showed him firing an AR-15-type rifle. 2-ER-83; SER-69. And a video posted to his YouTube channel showed him operating a rifle at a firing range. 2-ER-83; SER-69.

In May 2022, agents executed a federal search warrant at DeBorba's apartment. There, they found six more guns—three AR-15-

type rifles and three 9mm-caliber handguns—along with ammunition, high-capacity magazines, and handcuffs. A sample:



2-ER-146-165; 2-ER-83-84; 1-ER-33; PSR¶¶17-18. Agents also found gun parts, accessories, tools, and a workbench at which DeBorba worked on his guns. 2-ER-83-84, 146-165; PSR¶¶17-19.

Inside that workbench was a completed firearm silencer— commonly called a suppressor—in a box labeled "Tick Suppressor":



2-ER-83-84, 156, 165; PSR¶19. An ATF expert later determined—and DeBorba stipulates—that this device met the "silencer" definition in 18 U.S.C. § 921(a)(25) and was thus a "firearm" under 26 U.S.C. § 5845(a)(7). 2-ER-84, 173-185; PSR¶19. DeBorba's silencer was not registered in the National Firearms Registration and Transfer Record, as required. 2-ER-84, 173-185; PSR¶19; *see* 26 U.S.C. § 5861(d).

In DeBorba's apartment, agents also found his Brazilian birth certificate and his Washington concealed-pistol license. 2-ER-85. After

11

waiving his *Miranda* rights, DeBorba admitted that he knew he could not lawfully have guns because of his immigration status and domestic-violence convictions. 2-ER-85, 187-189; PSR¶20. He also admitted that he was a Brazilian citizen who came to the United States in 1999 on a tourist visa; that he never sought or obtained authorization to stay; that he paid for counterfeit Social Security cards; and that the seized guns were his guns. *Id.*

## II. DeBorba moves to dismiss

A grand jury indicted DeBorba on seven firearms, unregistered-silencer, and false-statement counts under 18 U.S.C. §§ 922(g)(5), 922(g)(8), 922(a)(6), 911, and 26 U.S.C. § 5861(d). 3-ER-552-558.

DeBorba moved to dismiss all seven counts. 2-ER-212-220, 313-344; 3-ER-346-422, 560-607. He challenged the firearms and unregistered-silencer counts on Second Amendment grounds, based on *New York State Rifle & Pistol Association, Inc. v. Bruen*, 597 U.S. 1 (2022). For example, he relied heavily[3] on *United States v. Rahimi*, 61 F.4th 443 (5th Cir. 2023)—a decision later reversed by the Supreme Court, *United States v.*

---

[3] 3-ER-404, 410-412, 435, 440, 466, 579-580, 584, 594, 598-599; *see* 1-ER-44 n.3.

12

*Rahimi*, 602 U.S. 680 (2024). DeBorba challenged the unregistered-silencer count by attacking the statutory definition of "silencer" as vague, and he challenged the false-statement counts by claiming that his lies about his citizenship were not "material."

The government opposed each claim. 2-ER-221-298; 3-ER-496-551.

### III. The district court denies DeBorba's motion

In a 40-page pretrial order, the district court rejected DeBorba's claims. 1-ER-31-70. On the firearms and unregistered-silencer counts, the court ruled that each charge satisfies the Second Amendment. 1-ER-31-62. On the unregistered-silencer count, the court found that the definition of "silencer" was not vague as applied. 1-ER-62-67. And on the false-statement counts, the court rejected DeBorba's "materiality" defense. 1-ER-67-69.

### IV. After a bench trial on stipulated facts, the district court convicts DeBorba on all seven counts

After a bench trial on stipulated facts (2-ER-72-193), the district court convicted DeBorba on all counts. 1-ER-2, 9, 11-30. The court adopted the parties' stipulations as its findings of fact. 1-ER-27.[4]

---

[4] The court also denied DeBorba's *pro forma* motion for acquittal, which mirrored his pretrial arguments for dismissal. 1-ER-17, 26, 28.

**V.    DeBorba accepts "full responsibility" for his crimes**

At sentencing, DeBorba claimed to feel "terribly sorry" and "terribly guilty" for his "serious[]" crimes and to "understand" that he "frightened people." SER-61. He purported to accept "full responsibility." SER-48, 53; PSR¶23. The district court sentenced DeBorba to 30 months in prison, describing his conduct as dangerous. SER-41-43; 1-ER-2-4.

## SUMMARY OF ARGUMENT

I.    Each of DeBorba's Second Amendment claims fails for the same threshold reason: As an unlawfully present alien, he is not part of "the people" covered by the Second Amendment. He therefore cannot get past *Bruen* and *Rahimi*'s first step. But even if he could, each of his claims fails under the history-and-tradition analysis.

On Counts 1 through 3, the district court correctly denied DeBorba's motion to dismiss the 18 U.S.C. § 922(g)(5) charges. The Second Amendment protects gun possession by "law-abiding citizens." *Bruen*, 597 U.S. at 9. DeBorba is neither a citizen nor law-abiding. Section 922(g)(5)(A) fits comfortably into the nation's history and tradition of disarming categories of persons thought by a legislature to present a special danger of firearm misuse. The statute is constitutional on its face and as applied to DeBorba.

14

On Counts 1 and 2, the district court correctly denied DeBorba's motion to dismiss the 18 U.S.C. § 922(g)(8) charges. DeBorba possessed more than 20 guns while under domestic-violence restraining orders and while committing new offenses. Those orders satisfied the requirements recently upheld by the Supreme Court in *Rahimi*. DeBorba's efforts to narrow *Rahimi*'s holding—so it applies only to those offenders with records just like Rahimi's—finds no support in the opinion. Section 922(g)(8) is constitutional as applied to DeBorba, a domestic abuser who has repeatedly proven himself untrustworthy and dangerous.

On Count 7, the district court correctly denied DeBorba's motion to dismiss the 26 U.S.C. § 5861(d) unregistered-silencer charge. Silencers are not "arms" covered by the Second Amendment. But even if they were, their regulation is justified on two independent historical bases: the tradition of regulating and prohibiting the possession of dangerous and unusual weapons, and the tradition of regulating commerce in firearms.

II.    On Counts 4 through 6, the district court correctly rejected DeBorba's "materiality" challenge to the false-statement charges under 18 U.S.C. §§ 922(a)(6) and 911. Regardless of the merits of his Second Amendment challenge to another statute charged in other counts,

15

DeBorba had no right to lie about his citizenship when buying guns or applying for a concealed-pistol license. And his lies were no doubt material: Truthful responses would have barred the gun sales and concealed-pistol application from going forward.

III.    Finally, on Count 7, the district court correctly rejected DeBorba's due-process challenge to the statutory definition of "silencer." As applied to DeBorba's conduct, that definition is not vague.

## STANDARD OF REVIEW

A statute's constitutionality is reviewed de novo. *United States v. Perez-Garcia*, 96 F.4th 1166, 1172 (9th Cir. 2024). This Court may affirm on any ground supported by the record, even if it differs from the district court's rationale. *United States v. Nichols*, 464 F.3d 1117, 1122 (9th Cir. 2006). The appellee may defend the district court's ruling on any ground, including one "not earlier aired." *Greenlaw v. United States*, 554 U.S. 237, 250 n.5 (2008).

## ARGUMENT

## I.    On Counts 1, 2, 3, and 7, the district court correctly rejected DeBorba's Second Amendment claims

As an unlawfully present alien, DeBorba is not part of "the people" under the Second Amendment. So he has no right to invoke the

Amendment's protections. All his Second Amendment challenges—to Counts 1, 2, 3, and 7—fail for this threshold reason. The Court therefore need not engage in *Bruen* and *Rahimi*'s history-and-tradition analysis. But if the Court engages in that analysis, DeBorba's claims also fail.

### A.  *The* Bruen-Rahimi *standard*

Under the Second Amendment, "[a] well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. Const. amend. II. The Amendment protects the right of "law-abiding, responsible" citizens to possess arms for the "lawful purpose of self-defense." *District of Columbia v. Heller*, 554 U.S. 570, 630, 635 (2008).

When considering whether a firearm regulation is constitutional, the appropriate test is based on "the Second Amendment's text, as informed by history." *Bruen*, 597 U.S. at 19. The Court's analysis begins with "a threshold inquiry"—whether the challenger is part of "the people" whom the Second Amendment protects, whether the weapon at issue is in common use today for self-defense, and whether the "proposed course of conduct" falls within the Second Amendment. *United States v. Alaniz*, 69 F.4th 1124, 1127-28 (9th Cir. 2023); *see Bruen*, 597 U.S. at 31-33.

If the challenger can clear that threshold, the Court next considers whether the regulation is "consistent with this Nation's historical tradition of firearm regulation." *Bruen*, 597 U.S. at 17. But "the Second Amendment permits more than just those regulations identical to ones that could be found in 1791." *Rahimi*, 602 U.S. at 691-92. Instead, the modern law "must comport with the principles underlying the Second Amendment." *Id.* at 692. The Court considers "whether the challenged regulation is consistent with the principles that underpin our regulatory tradition" by determining "whether the new law is 'relevantly similar' to laws that our tradition is understood to permit." *Id.* at 692 (quoting *Bruen*, 597 U.S. at 29).[5]

## B.   *DeBorba's Second Amendment claims fail at the threshold stage*

When DeBorba possessed his guns, ammunition, and unregistered silencer, he was unlawfully present in this country. He therefore had no Second Amendment rights. Supreme Court precedent shows that "the

---

[5] DeBorba cites *Teter v. Lopez*, 76 F.4th 938 (9th Cir. 2023). AOB-14. But this Court vacated that decision in February 2024—months before DeBorba filed his October 2024 opening brief—and ordered the case reheard en banc. *Teter v. Lopez*, 93 F.4th 1150 (9th Cir. 2024). The en banc argument took place in June 2024; a decision is pending.

people" in the Second Amendment does not include unlawfully present aliens—let alone unlawfully present aliens who repeatedly violate domestic-violence laws while in this country, as DeBorba did. His Second Amendment claims thus fail at the "threshold" stage. *Alaniz*, 69 F.4th at 1128; *see Bruen*, 597 U.S. at 31-33. The Second Amendment does not apply to him.

The district court assumed without deciding that unlawfully present aliens are covered by the Second Amendment. 1-ER-36-40. Before *Bruen*, this Court took a similar approach. *United States v. Singh*, 979 F.3d 697, 724-25 (9th Cir. 2020); *United States v. Torres*, 911 F.3d 1253, 1261 (9th Cir. 2019). But this Court should no longer sidestep that threshold question after *Bruen* and *Rahimi*. Unlawfully present aliens "are not 'members of the political community' covered by the Second Amendment." *United States v. Medina-Cantu*, 113 F.4th 537, 542 (5th Cir. 2024) (per curiam) (citations omitted).

Since *Bruen*, every court of appeals to reach the question has drawn the same conclusion. *See Medina-Cantu*, 113 F.4th at 538-42; *United States v. Ramirez*, No. 22-14297, 2024 WL 3757080, at *4 (11th Cir. Aug. 12, 2024) (citing *United States v. Jimenez-Shilon*, 34 F.4th 1042, 1050

19

(11th Cir. 2022)); *United States v. Sitladeen*, 64 F.4th 978, 985-87 (8th Cir. 2023); *see also United States v. Rangel-Tapia*, No. 23-1220, 2024 WL 966385, at *3 (6th Cir. Mar. 6, 2024). This Court should join those courts in holding—consistent with the Second Amendment's text and history—that unlawfully present aliens have no right to keep and bear arms.

This conclusion flows directly from precedent. In *Heller*, the Supreme Court explained that the term "the people" in the Second Amendment "unambiguously refers to . . . members of the political community." 554 U.S. at 580. And the Court has observed elsewhere that "citizenship" is a required part of "membership in the political community" and that "[a]liens are by definition . . . outside of this community." *Cabell v. Chavez-Salido*, 454 U.S. 432, 438-40 (1982). Thus, after analyzing the phrase "right of the people," *Heller* determined that "the Second Amendment right is exercised individually and belongs to . . . *Americans*." 554 U.S. at 581 (emphasis added). The rest of the opinion likewise reflects the understanding that the right to keep and bear arms belongs only to citizens. *See id.* at 595, 603, 608, 625, 635.

Later decisions reflect the same understanding. The Supreme Court has repeatedly used the words "citizens" or "Americans" when

20

describing the right to bear arms. *E.g.*, *Rahimi*, 602 U.S. at 691, 700-02; *id.* at 709 (Gorsuch, J., concurring); *id.* at 752 (Thomas, J., dissenting); *Bruen*, 597 U.S. at 8-9, 26, 29, 31-32, 38, 70, 71; *id.* at 78 (Alito, J., concurring); *McDonald v. City of Chicago*, 561 U.S. 742, 768, 770, 774, 776 (2010). This Court has likewise described the right to bear arms since *Bruen* as belonging to "law-abiding citizens." *Perez-Garcia*, 96 F.4th at 1177; *Alaniz*, 69 F.4th at 1127.

DeBorba is not an American citizen, much less a law-abiding one. He is an unlawfully present alien who came to this country on a nonimmigrant visa, never received permission to stay, bought and used fraudulent papers to avoid detection, and never left. He committed domestic-violence offenses while here. And he amassed an arsenal of guns that he knew he could not legally possess. Under the Second Amendment's plain text as interpreted by the Supreme Court, he is not part of "the people." His possession of guns and ammunition receives no constitutional protection.

This limited meaning of "the people" in the Second Amendment finds ample support in history. Under the English Bill of Rights, the right to keep and bear arms was not "available to the whole population" but

was expressly limited to "'Subjects.'" *Heller*, 554 U.S. at 593 (citation omitted). In 18th-century England, only "landed gentry" had the right to own guns—and "aliens" under English common law were "incapacitated to hold lands.'" *Jimenez-Shilon*, 34 F.4th at 1046 (citation omitted).

That English view "carried across the Atlantic, where it was well understood that the right to bear arms 'did not extend to all New World residents.'" *Id.* at 1047 (citation omitted). Colonial-era statutes thus did not extend the right to bear arms to persons considered to fall outside the political community. Most colonies prohibited the sale of arms to, and the ownership of arms by, Native Americans, who were traditionally not regarded as citizens because of their membership in sovereign tribes. *See United States v. Jackson*, 110 F.4th 1120, 1126 (8th Cir. 2024); *Elk v. Wilkins*, 112 U.S. 94 (1884).

Similarly, "[r]eligious minorities, such as Catholics in Maryland, Virginia, and Pennsylvania, were subject to disarmament." *Jackson*, 110 F.4th at 1126; *see* 1-ER-55; *Perez-Garcia*, 96 F.4th at 1187, 1190-91; Robert H. Churchill, *Gun Regulation, the Police Power, and the Right to Keep Arms in Early America: The Legal Context of the Second*

22

*Amendment*, 25 L. & Hist. Rev. 139, 157 (2007).[6] And while "[a]lien men" in colonial America "could speak, print, worship, enter into contracts, hold personal property in their own name, sue and be sued, and exercise sundry other civil rights," they "typically could not vote, hold public office, or serve on juries" and did not have "the right to bear arms" because these "were rights of members of the polity." Akhil Reed Amar, The Bill of Rights: Creation and Reconstruction 48 (1998); *see United States v. Perez*, 6 F.4th 448, 462 (2d Cir. 2021) (Menashi, J., concurring in judgment).

Colonial governments during the American Revolution likewise disarmed those who "refused to declare an oath of loyalty." *Jackson*, 110 F.4th at 1126-27; *see* 1-ER-55-56; *Perez-Garcia*, 96 F.4th at 1187-88,

---

[6] Although some of the categorical prohibitions cited here are abhorrent and "would be impermissible today under other constitutional provisions," these prohibitions remain "relevant . . . in determining the historical understanding of the right to keep and bear arms." *Jackson*, 110 F.4th at 1127; *see also* Joseph Blocher & Catie Carberry, *Historical Gun Laws Targeting "Dangerous" Groups and Outsiders* at 11-13, in New Histories of Gun Rights and Regulation: Essays on the Place of Guns in American Law and Society (forthcoming, Oxford Univ. Press), https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3702696; *Range v. Att'y Gen.*, __ F.4th __, 2024 WL 5199447, at *35-*36 (3d Cir. Dec. 23, 2024) (Krause, J., concurring); *Atkinson v. Garland*, 70 F.4th 1018, 1035-36 (7th Cir. 2023) (Wood, J., dissenting).

23

1191.[7] And during ratification debates, the New Hampshire ratification convention proposed an amendment stating that "Congress shall never disarm any *Citizen* unless such as are or have been in Actual Rebellion," while delegates urged the Massachusetts convention to propose a similar amendment guaranteeing "peaceable *citizens*" the right to keep arms. 2 Bernard Schwartz, The Bill of Rights: A Documentary History 681, 760-61 (1971) (emphasis added); *see Heller*, 554 U.S. at 603-04 (describing ratification conventions' proposals as "Second Amendment precursors"); *Perez-Garcia*, 96 F.4th at 1187-88. Membership in the political community has long been a prerequisite for the right to bear arms.

The Bill of Rights codified that principle. *See McDonald*, 561 U.S. at 769-70. Indeed, "Framing-era sources 'refer to arms-bearing as a citizen's right' that was closely associated with national fealty and membership in the body politic." *Jimenez-Shilon*, 34 F.4th at 1048 (collecting sources). Accordingly, "many early state constitutions . . . expressly limited the right to keep and bear arms to 'citizens.'" *Id.* at 1049 (collecting Alabama, Connecticut, Kentucky, Maine, Mississippi, and

---

[7] *See* also Saul Cornell & Nathan DeDino, *A Well Regulated Right: The Early American Origins of Gun Control*, 73 Fordham L. Rev. 487, 506 & nn.128-29 (2004); Churchill, *supra*, 25 L. & Hist. Rev. at 159.

Pennsylvania constitutions); *Perez*, 6 F.4th at 463 & n.6 (Menashi, J., concurring) (discussing same); *see Heller*, 554 U.S. at 600-01 (considering "analogous arms-bearing rights in state constitutions that preceded and immediately followed adoption of the Second Amendment").

This understanding of "the people" also finds support in the Second Amendment's reference to "a well regulated militia." At the time of the Second Amendment's ratification, "the conception of the militia . . . was the body of all *citizens* capable of military service." *Heller*, 554 U.S. at 628 (emphasis added). Noncitizens were neither expected nor usually allowed to participate in the militia. *Perez*, 6 F.4th at 462 (Menashi, J., concurring); *Jimenez-Shilon*, 34 F.4th at 1047-48. And there was no suggestion at the time that states lacked authority to exclude noncitizens from the right to bear arms—strong evidence that such prohibitions are "consistent with the Second Amendment." *Bruen*, 597 U.S. at 30.

Set against this historical background, DeBorba cannot show that an unlawfully present alien like him falls within the class of persons to whom the Second Amendment applies. It makes no constitutional difference whether DeBorba might have more substantial connections with the United States than some other undocumented immigrants. Nor

does it matter to the constitutional analysis that DeBorba is in the United States illegally because he overstayed a tourist visa—rather than, say, illegally crossing a border.

DeBorba's Second Amendment challenges to sections 925(g)(5)(A), 922(g)(8), and the unregistered-silencer statute thus fail at the threshold stage. The Court need not and should not engage in the full history-and-tradition analysis under *Bruen* and *Rahimi*, because DeBorba is not part of "the people" whom the Second Amendment protects.

### C. Even if the Second Amendment applies to unlawfully present aliens, DeBorba's claims fail under the history-and-tradition analysis

Even if unlawfully present aliens were part of "the people," each of DeBorba's Second Amendment claims fails under *Bruen* and *Rahimi*'s history-and-tradition analysis.

The Second Amendment, as discussed, protects the right of self-defense by "law-abiding citizens." *Bruen*, 597 U.S. at 9, 29, 38, 60, 71; *Heller*, 554 U.S. at 635; *Perez-Garcia*, 96 F.4th at 1177, 1179 & n.9, 1181, 1186-87, 1190. But DeBorba falls well outside that group: He is an unlawfully present alien who lied about his citizenship when buying guns and applying for a concealed-pistol permit, and who repeatedly abused

26

his ex-wife and flouted domestic-violence restraining orders meant to protect her. Because DeBorba has repeatedly proven himself to be a dangerous, dishonest, and lawbreaking noncitizen—not a law-abiding citizen—the Second Amendment permits his disarmament. Each statute charged in Counts 1, 2, 3, and 7 satisfies the history-and-tradition test.

### D. Facially and as applied to DeBorba, 18 U.S.C. § 922(g)(5)(A) satisfies the Second Amendment

Our nation has a long "history of barring people or groups deemed dangerous or unlikely to respect the sovereign's authority from possessing firearms." *Perez-Garcia*, 96 F.4th at 1186. As the district court correctly concluded, section 922(g)(5)(A) fits within that tradition.

#### 1. Statutory background

In 1968, Congress passed the Omnibus Crime Control and Safe Streets Act in response to a rise in "political assassinations, riots, and other violent crimes involving firearms" in the 1960s. *Lewis v. United States*, 445 U.S. 55, 63 (1980). Congress sought "to keep guns out of the hands of those who have demonstrated that 'they may not be trusted to possess a firearm without becoming a threat to society.'" *Id.* (citation omitted); *see Huddleston v. United States*, 415 U.S. 814, 824 (1974). Title VII of the Gun Control Act of 1968 added 18 U.S.C. § 922(g)(5)(A), which

prohibits firearm or ammunition possession by an "alien" who "is illegally or unlawfully in the United States." An alien is illegally or unlawfully here if his authorized stay has expired. *Latu*, 479 F.3d at 1158-59.[8]

### 2. History and tradition show that Congress may disarm unlawfully present aliens

Before *Bruen*, this Court held that section 922(g)(5)(A) satisfies the Second Amendment. *Torres*, 911 F.3d at 1257-65; *see Singh*, 979 F.3d at 724 (same as to section 922(g)(5)(B)). Although this Court's decision employed the tiers-of-scrutiny analysis that *Bruen* later rejected, the bottom-line conclusion remains correct. Section 922(g)(5)(A) satisfies the Second Amendment.

Since *Bruen*, the Fifth, Sixth, Eighth, and Eleventh Circuits have held that the statute is constitutional. *Medina-Cantu*, 113 F.4th at 538-42; *Sitladeen*, 64 F.4th at 985-87; *Ramirez*, 2024 WL 3757080, at *4; *Rangel-Tapia*, 2024 WL 966385, at *3. As far as the government is aware, no court of appeals has held otherwise.

---

[8] The statute also includes a subpart (B), 18 U.S.C. § 922(g)(5)(B), which the district court found inapplicable and did not analyze. 1-ER-53 n.5. The government follows the same approach here.

These courts are correct. The right to keep and bear arms belongs only to "law-abiding citizens." *Bruen*, 597 U.S. at 9, 29, 38, 60, 71; *see also Heller*, 554 U.S. at 635 ("law-abiding, responsible citizens"); *Perez-Garcia*, 96 F.4th at 1177, 1179 & n.9, 1181, 1186-87, 1190 (same). But unlawfully present aliens are, by definition, neither "citizens" nor "law-abiding." And the nation has a long history of disarming groups believed to present special risks of noncompliance.

*Bruen* and *Rahimi*'s historical inquiry, as noted, requires courts to consider "whether the challenged regulation is consistent with the *principles* that underpin our regulatory tradition" by determining "whether the new law is 'relevantly similar' to laws that our tradition is understood to permit." *Rahimi*, 602 U.S. at 691 (quoting *Bruen*, 597 U.S. at 29) (emphasis added). "[C]entral to this inquiry" is "[w]hy and how the regulation burdens the right." *Id.*; *see Bruen*, 597 U.S. at 29. But even "when a challenged regulation does not precisely match its historical precursors, 'it still may be analogous enough to pass constitutional muster,'" so long as the law "comport[s] with the principles underlying the Second Amendment." *Rahimi*, 602 U.S. at 692 (quoting *Bruen*, 597 U.S. at 30); *see also id.* at 739 (Barrett, J., concurring).

29

Historical traditions confirm section 922(g)(5)'s constitutionality. First, examples abound from before, during, and after the American Revolution of legislatures disarming persons who were not members of the political community. *See* pp. 18-26, *supra*; *Perez*, 6 F.4th at 462 n.4 (Menashi, J., concurring). Second, historical traditions permitted the categorical disarmament of persons who lawmakers believed could not be trusted to adhere to the law. *See* 1-ER-46-49; *Perez-Garcia*, 96 F.4th at 1186-91. These traditions bear directly on the constitutionality of section 922(g)(5), which disarms persons who have failed to adhere to the rule of law in entering or remaining in this country.

a. *England*

The tradition of disarming groups believed to present special risks of noncompliance with the law began (in relevant part) in early England. In 1689, for example, an English law disarmed Catholics who refused to make declarations renouncing their faith and, in so refusing, conveyed to the sovereign their unwillingness to adhere to English law. 1 W. & M., Sess. 1, c. 15, in 6, The Statutes of the Realm 71-73 (1688); *see Jackson*, 110 F.4th at 1126; *Perez-Garcia*, 96 F.4th at 1186-87.

30

That prohibition did not rest on a theory that all Catholics were in fact dangerous. *See Range v. Att'y Gen.*, __ F.4th __, 2024 WL 5199447, at \*26 (3d Cir. Dec. 23, 2024) (Krause, J., concurring). Instead, the categorical disarmament stemmed from concerns about a group's propensity to disobey the sovereign and the risk that such disobedience presented to the social order. *See id.*; *Perez-Garcia*, 96 F.4th at 1186-87; *Kanter v. Barr*, 919 F.3d 437, 457 (7th Cir. 2019) (Barrett, J., dissenting).

Such untrustworthiness as a reason for categorical disarmament has other roots in English history, including early laws that disarmed pacifist denominations like the Quakers. *Range*, 2024 WL 5199447, at \*26 (Krause, J., concurring); *Jackson*, 110 F.4th at 1128.

Finally, the 1689 English Bill of Rights—the Second Amendment's predecessor—"enshrined basic civil liberties" but also Parliament's right to limit them. *Atkinson v. Garland*, 70 F.4th 1018, 1031 (7th Cir. 2023) (Wood, J., dissenting); *see Bruen*, 597 U.S. at 44-45; *Range*, 2024 WL 5199447, at \*26 (Krause, J., concurring). It specified that "Protestants may have Arms for their Defence suitable to their Conditions and as allowed by Law." 1 W. & M., Sess. 2, c. 2, in 6 The Statutes of the Realm 143 (1688); *see Jackson*, 110 F.4th at 1126, 1128.

31

"Englishmen had never before claimed the right of the individual to arms." *Bruen*, 597 U.S. at 44-45 (quotation marks and citation omitted). Yet when they first formally claimed that right, the English ensured that the Parliament retained the power—which it in fact exercised—to arm one class of the population and to disarm another based on concerns that the members of that latter class would not abide by the law. *Range*, 2024 WL 5199447, at *27 (Krause, J., concurring); *Perez-Garcia*, 96 F.4th at 1186-87; *Atkinson*, 70 F.4th at 1031 (Wood, J., dissenting).

b.   *Colonial America*

The American colonies also disarmed classes of people who the authorities thought could not be trusted to obey the law. *Range*, 2024 WL 5199447, at *27-*28 (Krause, J., concurring); *Perez-Garcia*, 96 F.4th at 1187-88; *Jackson*, 110 F.4th at 1126-27. Examples include:

- the Virginia Company's 1624 disarmament of Richard Barnes, who disrespected authorities through "opprobrious" and "base and detracting speeches concerning the Governor," *Range*, 2024 WL 5199447, at *28 (Krause, J., concurring);

- Massachusetts' 1630s disarmament of an outspoken preacher's supporters, "not because those supporters had demonstrated a propensity for violence" but because "authorities concluded their conduct evinced a willingness to disobey the law," *id.*;

32

- Virginia's 1640s disarmament of "nonconformist Protestants . . . due to their rejection of the King's sovereign power over religion," *id.*; and

- the colonies' disarmament (in 1696 and during the Seven Years' War of 1756-1763) of Catholics and Moravians, "a group of nonconformist Protestants from modern-day Germany," *id.* at *29 & n.39.

Decisions to disarm those groups came "not in response to violence" but based on their apparent willingness to disobey the law. *Range*, 2024 WL 5199447, at *29 (Krause, J., concurring) (citation omitted); *see also Perez-Garcia*, 96 F.4th at 1187-88; Joseph G.S. Greenlee, *The Historical Justification for Prohibiting Dangerous Persons from Possessing Firearms*, 20 Wyo. L. Rev. 249, 263 (2020).

### c.   *Revolutionary War*

Throughout the Revolutionary War, legislatures continued to pass disarmament laws targeting those who failed to show loyalty to the emerging American government. *See Perez-Garcia*, 96 F.4th at 1187.

A 1775 Connecticut law, for instance, said that any person convicted of "libel[ing] or defam[ing]" any acts or resolves of the Continental Congress or the Connecticut General Assembly "made for the defence or security of the rights and privileges" of the colonies "shall

33

be disarmed and not allowed to have or keep any arms."[9] In 1776, the Continental Congress recommended that colonial governments disarm those who were "notoriously disaffected to the cause of America" or who simply "have not associated" with the colonial governments in the war effort.[10] At least six colonies enacted legislation in this vein. *See Jackson*, 110 F.4th at 1126; *Perez-Garcia*, 96 F.4th at 1187.[11]

A common feature of these laws was to require oaths of loyalty to the government and to strip anyone who failed or refused to take the oath of the right to bear arms.[12] Many of those laws provided that failing or refusing to take the oath resulted in forfeiture of a bundle of additional

---

[9] The Public Records of the Colony of Connecticut From May, 1775 to June, 1776, at 193 (1890) (1775 Conn. Law).

[10] 4 Journals of the Continental Congress 1774-1789 at 205 (1906) (resolution of March 14, 1776).

[11] *See also* 5 The Acts and Resolves, Public and Private, of the Province of the Massachusetts Bay at 479-84 (1886) (1776 Mass. Law); 7 Records of the Colony of Rhode Island and Providence Plantations in New England at 566-68 (1862) (1776 R.I. Law); 1 The Public Acts of the General Assembly of North Carolina at 226-32 (1804) (1777 N.C. Law); Acts of the General Assembly of the State of New-Jersey at a Session Begun on the 27th Day of August, 1776 at 90 (1777); 9 The Statutes at Large of Pennsylvania from 1682 to 1801 at 112-13 (1903) (1777 Pa. Law); 9 The Statutes at Large; Being A Collection of All the Laws of Virginia at 282 (1821) (1777 Va. Law).

[12] *E.g.*, 1776 Mass. Law at 479-81; 1776 R.I. Law at 566-67; 1777 N.C. Law at 229-31; 1777 Pa. Law; at 111-13; 1777 Va. Law at 281-82.

34

political rights, including the rights to vote, serve on juries, and hold public office, further reinforcing the longstanding connection between these political rights and arms-bearing. North Carolina's and Pennsylvania's laws are especially informative because the year before they were enacted, these states adopted constitutional provisions protecting the individual right to bear arms. *Heller*, 554 U.S. at 601.[13]

#### d. *Ratification debates*

The history of the Second Amendment's adoption provides other persuasive evidence that the founders understood the right to keep and bear arms as compatible with legislative authority to disarm groups who could not be trusted to follow the law. *Perez-Garcia*, 96 F.4th at 1188-89.

This evidence includes the Pennsylvania Antifederalists' proposed constitutional amendment, which explicitly recognized that criminal activity and the concomitant risk of public injury provided grounds for disarmament: "no law shall be passed for disarming the people or any of them unless for crimes committed, or real danger of public injury from

---

[13] *See* N.C. Declaration of Rights of 1776 § XVII, in The Complete Bill of Rights: The Drafts, Debates, Sources, and Origins 277-78 (Neil Cogan ed., 2d ed., 2014); Pa. Declaration of Rights of 1776 § XIII, in The Complete Bill of Rights, *supra*, at 278.

individuals." *Medina v. Whitaker*, 913 F.3d 152, 158-59 (D.C. Cir. 2019) (explaining that the proposal reflected that "criminals . . . were proper subjects of disarmament" (citation omitted)).

Similarly, Samuel Adams at the Massachusetts convention proposed an amendment providing that the Constitution "never [be] construed . . . to prevent the people of the United States, who are *peaceable citizens*, from keeping their own arms." SCHWARTZ, *supra*, at 675, 681 (emphasis added); *Perez-Garcia*, 96 F.4th at 1188. And in New Hampshire, the convention recommended an amendment providing that "Congress shall never disarm any Citizen unless such as are or have been in Actual Rebellion." Schwartz, *supra*, at 758, 761.

> 3. *Section 922(g)(5)(A) fits within the historical traditions of disarming persons outside the political community or who are legally untrustworthy*

Section 922(g)(5)(A) derives from the historic exclusions described above. But even if it did not, the statute is still analogous enough to early gun restrictions to support a conclusion that the disarmament of undocumented noncitizens is part of this country's historical tradition and thus passes Second Amendment muster—as the district court found. DeBorba identifies no error in that finding. On appeal, as below, he

36

engages in the "divide-and-conquer approach to the historical evidence" that this Court has already rejected. *Perez-Garcia*, 96 F.4th at 1191.

The laws summarized above are "relevantly similar" and show that section 922(g)(5)(A) follows historically grounded "principles." *Rahimi*, 602 U.S. at 692. This modern statute "need not be a 'dead ringer' or a 'historical twin'" for an old law. *Id.* at 692 (quoting *Bruen*, 597 U.S. at 30). Section 922(g)(5)(A) facially satisfies the Second Amendment because the statute is analogous enough to historical traditions of disarming groups outside the political community and groups that could not be trusted to adhere to the law.

In arguing otherwise, DeBorba claims that section 922(g)(5)(A) fails the historical-analogue test because it is not "distinctly similar" to historical laws. But *Rahimi*, which clarified *Bruen*, did not apply or even mention the "distinctly similar" standard when assessing the constitutionality of 18 U.S.C. § 922(g)(8). *Rahimi*, 602 U.S. at 692. The majority instead used the "relevantly similar" formulation." *Id.*[14]

---

[14] Even Justice Thomas's *Rahimi* dissent, after mentioning the "distinctly similar" phrase, used the "relevantly similar" standard—despite concluding that section 922(g)(8) addressed a longstanding societal problem. 602 U.S. at 750, 953 (Thomas, J., dissenting).

Yet even if there were a heightened "distinctly similar" test that sometimes applies, it would apply only to a law addressing "a societal problem that has persisted since the Founding"—not to a statute that addresses a "more modern" problem, as here. *Wolford v. Lopez*, 116 F.4th 959, 977 (9th Cir. 2024). Section 922(g)(5)(A) addresses a modern problem and "unprecedented societal concerns" that, under *Bruen*, warrant a "more nuanced approach." 597 U.S. at 27.

Illegal immigration as a phenomenon began in the late 1800s. *See United States v. Muñoz-De La O*, 586 F. Supp. 3d 1032, 1036 (E.D. Wash. 2022), *aff'd*, No. 22-30100, 2024 WL 1873006 (9th Cir. Apr. 30, 2024) (recounting this history); 1-ER-53-54. When Congress enacted section 922(g)(5), it thus responded to a concern about the law-abidingness of unauthorized noncitizens that was not present at the founding. So too, by the 1960s, firearms' prevalence and technological advances presented dangers with which the founders simply did not have to contend. *See Huddleston*, 415 U.S. at 824. So even if a heightened "distinctly similar" test exists, it does not apply here. DeBorba errs by relying on it.

But even if the "distinctly similar" test exists *and* applies here, section 922(g)(5)(A) meets it. Like many historical analogues, section

922(g)(5)(A) categorically disarms individuals who lack membership in the political community and who refuse to comply with the law. Compared to those historical regulations, section 922(g)(5)(A) imposes the same burden on the right to armed self-defense. And that burden is "comparably justified." *Bruen*, 597 U.S. at 29; *Perez-Garcia*, 96 F.4th at 1181, 1184.

After all, unlawfully present aliens have, by definition, "already violated a law of this country" by remaining in the United States illegally. *United States v. Toner*, 728 F.2d 115, 128 (2d Cir. 1984); *see Latu*, 479 F.3d at 1158-59. They may also be less likely to comply with the identification and recordkeeping requirements associated with buying guns from licensed dealers, as they often live "largely outside the formal system of registration, employment, and identification" and can be "harder to trace and more likely to assume a false identity." *United States v. Huitron-Guizar*, 678 F.3d 1164, 1170 (10th Cir. 2012).

What's more, unlawfully present aliens "have an interest in eluding law enforcement"—just as DeBorba did for years—which creates a risk that they could misuse firearms against immigration authorities trying to apprehend them. *United States v. Meza-Rodriguez*, 798 F.3d 664, 673

39

(7th Cir. 2015); *cf.* 18 U.S.C. § 922(g)(2) (disarming fugitives); *see* 1-ER-57. Congress could thus reasonably conclude that the noncitizens who fall within section 922(g)(5)(A) should be disarmed.

History supports this conclusion. At the time of the founding, disarmament was considered necessary to protect against the danger to the civic community posed by those refusing to abide by its legal and social norms. *See* 1-ER-57-61; *United States v. Escobar-Temal*, No. 22-CR-393, 2023 WL 4112762, at *6 (M.D. Tenn. June 21, 2023); Churchill, *supra*, 25 L. & Hist. Rev. at 158. Section 922(g)(5)(A) is similarly justified by unlawfully present aliens' lack of membership in the political community and the challenges that their possession of firearms presents. Section 922(g)(5)(A) fits within a long tradition of restricting gun possession by "those who break the law." 1-ER-61.

These points also show that DeBorba is mistaken when he tries to excise the "law-abiding citizens" requirement from the Supreme Court's Second Amendment jurisprudence. He suggests that *Rahimi*'s rejection of an argument that non-"responsible" people may be disarmed should cause this Court to ignore as "statements of modern jurists" the Supreme Court's repeated admonition that the Second Amendment extends to

40

"law-abiding citizens." AOB-16, 23. But the Supreme Court—like this Court—has repeatedly referred to those within the Second Amendment's protections as "law-abiding citizens" precisely because law-abidingness and citizenship were well-established prerequisites to the right to bear arms at the founding, as discussed.

Other factors also support section 922(g)(5)'s constitutionality. For one, the statute's burden on Second Amendment rights is not necessarily permanent. *Cf. Rahimi*, 602 U.S. at 699 (discussing section 922(g)(8)). The characteristics that trigger disarmament—being both a noncitizen and unlawfully in this country—are not permanent conditions. Section 922(g)(5)(A) limits its prohibition on firearms possession only to undocumented noncitizens. Other noncitizens may lawfully possess firearms in some circumstances. *See* 18 U.S.C. § 922(y)(2). A process even exists for certain noncitizens to obtain an Attorney General waiver from the firearm prohibition. *Id.* § 922(y)(3).

A final point supports section 922(g)(5)'s constitutionality: Courts traditionally afford the political branches significant deference in matters relating to citizenship and immigration. *Mathews v. Diaz*, 426 U.S. 67, 81 (1976). In exercising that power, "Congress regularly makes

41

rules that would be unacceptable if applied to citizens." *Id.* at 80. And because Congress's "power over aliens is of a political character," its exercise of that power is "subject only to narrow judicial review." *Hampton v. Mow Sun Wong*, 426 U.S. 88, 101-02 n.21 (1976); *see also Shaughnessy v. United States ex rel. Mezei*, 345 U.S. 206, 210 (1953) ("largely immune from judicial control"). With section 922(g)(5), Congress had the right to determine that noncitizens who are unlawfully present in the United States, and are thus potentially subject to removal, should not possess guns while here.

Section 922(g)(5)(A) is a facially lawful regulatory measure, consistent with history and tradition, and satisfies the Second Amendment.

> 4. *Section 922(g)(5)(A) is constitutional as applied to DeBorba, who has repeatedly proven himself untrustworthy and dangerous*

DeBorba's as-applied challenge to section 922(g)(5)(A) fails for at least two reasons. First, *Bruen* and *Rahimi* require no such individualized assessment. Contrary to DeBorba's claim (AOB-32-35), the historical tradition instead supports Congress's ability to disarm *categories* of individuals—and disarmament need not be based on

42

individualized assessments of dangerousness. *See Jackson*, 110 F.4th at 1128; *Perez-Garcia*, 96 F.4th at 1189; *Kanter*, 919 F.3d at 464 (Barrett, J., dissenting).[15] Indeed, the Supreme Court has cast no doubt on "laws banning the possession of guns by *categories* of persons thought by a legislature to present a special danger of misuse." *Rahimi*, 602 U.S. at 698 (emphasis added). The relevant question is whether a certain *status* suggests that a group's members cannot be trusted to use guns responsibly—not whether each person can be individually trusted to.

Individualized assessments could also yield wildly disparate results and lead to "an arbitrary patchwork of decisions." *Atkinson*, 70 F.4th at 1027 (Wood, J., dissenting); *see United States v. Torres-Rosario*, 658 F.3d 110, 113 (1st Cir. 2011) (individualized exemptions would "obviously present serious problems of administration, consistency and fair warning"). And in the criminal context, the opportunity for pretrial factfinding is limited by Federal Rule of Criminal Procedure 12, which makes many as-applied challenges difficult to administer and resolve

---

[15] In *Rahimi*, the Supreme Court rejected the defendant's facial challenge to section 922(g)(8) because that statute was also constitutional as applied to him. 602 U.S. at 690-99. The Court thus treated individualized assessment as *sufficient* to reject the Second Amendment claim—not as *necessary*.

before trial. *See* Fed. R. Crim. P. 12(b)(3); *United States v. Pope*, 613 F.3d 1255 (10th Cir. 2010) (Gorsuch, J.).

Second, even if section 922(g)(5)(A) allowed for individualized as-applied challenges, DeBorba cannot show that this statute is unconstitutional as applied to him. Though he claims to be nondangerous and law-abiding, the record proves otherwise. For years, he knowingly violated the nation's immigration laws; falsified immigration forms and Social Security cards; lied on federal Firearms Transaction Records; repeatedly violated domestic-violence laws and restraining orders; lied when applying for a concealed-pistol license; and, by his own admission, "frightened people." SER-61; *see* 2-ER-85, 187-188; 3-ER-545-546 n.27; PSR¶¶8-20, 50-53; SER-62-63. Despite knowing that his immigration status and domestic-violence history barred him from possessing firearms, he amassed his arsenal anyway.

DeBorba had other options. He could have contested the constitutionality of section 922(g)(5)(A)—or any other gun law—through a declaratory-judgment action. But he elected not to. Instead, he "violated the law in secret and tried to avoid detection." *United States v. Gay*, 98 F.4th 843, 847 (7th Cir. 2024).

44

DeBorba is a far cry from the "law-abiding citizens" whom the Second Amendment protects. *Bruen*, 597 U.S. at 9, 29, 38, 60, 71. Thus, even if the Second Amendment imposed an individualized dangerousness test for as-applied section 922(g)(5)(A) claims, DeBorba could not pass it: The totality of circumstances makes clear that he "poses a clear threat of physical violence to another." *Rahimi*, 602 U.S. at 698. The Second Amendment permits his disarmament.

### E. As applied to DeBorba, 18 U.S.C. § 922(g)(8) satisfies the Second Amendment

DeBorba's as-applied challenge to section 922(g)(8) in Counts 1 and 2 also fails.[16] *Rahimi* forecloses the claim.

#### 1. Statutory background

"All too often, . . . the only difference between a battered woman and a dead woman is the presence of a gun." *United States v. Castleman*, 572 U.S. 157, 160 (2014) (cleaned up). Congress sought to address that problem in 18 U.S.C. § 922(g)(8) by disarming people subject to domestic-violence restraining orders. And Congress drafted the statute narrowly.

---

[16] DeBorba does not appear to assert a facial Second Amendment challenge to section 922(g)(8). But any such claim would fail for the same reasons his as-applied claim fails.

It applies only if a court, after notice and a hearing, issues an order that restrains the defendant "from harassing, stalking, or threatening an intimate partner" or child, "or engaging in other conduct that would place an intimate partner in reasonable fear of bodily injury to the partner or child." *Id.* § 922(g)(8)(A)-(B). A qualifying order must either (i) include a "finding" that the defendant "represents a credible threat to the physical safety of such intimate partner or child" or (ii) "explicitly prohibit[]" the defendant from using, attempting to use, or threatening to use physical force against the intimate partner or child "that would reasonably be expected to cause bodily injury." *Id.* § 922(g)(8)(C).

Unlike some gun laws, section 922(g)(8) does not permanently disarm covered persons. Instead, it disarms someone only as long as he "is subject to" the restraining order. *Id.* § 922(g)(8).

### 2. *DeBorba's restraining orders satisfy section 922(g)(8)(C)(i), so* Rahimi *forecloses his claim*

After DeBorba's sentencing, the Supreme Court held in *Rahimi* that section 922(g)(8)(C)(i) satisfies the Second Amendment on its face. The Court identified "two distinct legal regimes" that justified section 922(g)(8)(C)(i): The first regime was surety laws, which "authorized magistrates to require individuals suspected of future misbehavior to

post a bond." 602 U.S. at 695. The second regime was "going armed" laws, which "prohibited 'riding or going armed, with dangerous or unusual weapons, to terrify the good people of the land.'" *Id.* at 697 (cleaned up); *see* 1-ER-46-51.

The Supreme Court explained that "[t]aken together, surety and going armed laws confirm what common sense suggests: When an individual poses a clear threat of physical violence to another, the threatening individual may be disarmed." *Rahimi*, 602 U.S. at 698. The Court acknowledged that section 922(g)(8)(C)(i) "is by no means identical to these founding era regimes." *Id.* But it "does not need to be." *Id.* The law's "prohibition on the possession of firearms by those found by a court to present a threat to others fits neatly within the tradition the surety and going armed laws represent." *Id.*

Because the *Rahimi* Court found "ample evidence" to support section 922(g)(8)(C)(i)'s constitutionality, the Court did not "need [to] decide whether regulation under Section 922(g)(8)(C)(ii) is also permissible." 602 U.S. at 693. As will be discussed, section 922(g)(8)(C)(ii) is also constitutional for all the same reasons outlined in *Rahimi*. But this Court need not resolve that question, either, because when DeBorba

possessed the guns and ammunition charged in Counts 1 and 2, he was subject to domestic-violence restraining orders that meet all the requirements upheld in *Rahimi*—including section 922(g)(8)(C)(i)'s "credible threat" element.

On Count 2, as DeBorba has stipulated, the November 14, 2019 restraining order was in place when he possessed the firearms and ammunition charged in that count. 1-ER-78; 2-ER-115-16. And that order included all the findings the Supreme Court identified in *Rahimi* as satisfying section 922(g)(8), including an express "credible threat" finding under section 922(g)(8)(C)(i). 2-ER-115-116. Precedent thus forecloses DeBorba's Second Amendment challenge to section 922(g)(8) in Count 2.

DeBorba offers no colorable argument to the contrary. Although the November 14, 2019 restraining order named in Count 2 includes the express "credible threat" language, DeBorba complains that it is merely "a form finding . . . with no evidence that any threat was based on prior misuse of weapons." AOB-41. But DeBorba invents requirements found nowhere in *Rahimi*, the Second Amendment, or in section 922(g)(8).

Nothing in *Rahimi* suggests that this statute is constitutional only when a defendant's conduct or criminal history mirror *Rahimi*'s facts.

48

*Contra* AOB-11, 36-44 & n.22. Section 922(g)(8)'s constitutionality is not limited to situations involving "prior misuse of weapons" (AOB-41)— rather than, as here, a husband's punching his ex-wife. As for DeBorba's "form finding" argument (AOB-41-44), it also finds no support in *Rahimi*.[17] In a section of the November 14, 2019 restraining order titled "Findings of Fact," the state court made several findings "[b]ased upon the record both written and oral." 2-ER-116. Nothing more was needed to satisfy section 922(g)(8)(C)(i) and *Rahimi*.

DeBorba's challenge to Count 1 fares no better. That count cited two later restraining orders—an October 14, 2020 order (2-ER-137-138)

---

[17] DeBorba claims that Washington law "pushes courts to issue protection orders in any domestic violence case." AOB-42. Yet he offers no authority that supports his assertion and no grounds for distinguishing Washington law from the Texas law in *Rahimi*. Washington law is no outlier in recognizing "the likelihood of repeated violence directed at those who have been victims of domestic violence in the past." Wash. Rev. Code § 10.99.040(2)(a); *see* 12 R.I. Gen. Laws § 12-29-4(a)(1) (same); *Cespedes v. Lynch*, 805 F.3d 1274, 1275 (10th Cir. 2015) (quoting same language in a Utah statute). Nor does Washington law "push[] courts" (AOB-42) to issue such orders any more than Texas law does. In Washington, a court "may issue a no-contact order." Wash. Rev. Code § 10.99.040(2)(a). In Texas, a court "*shall* find whether family violence has occurred" and, if it has, "*shall* render" a protective order; in other circumstances, the court "may render" an order. Tex. Family Code § 85.001 (emphasis added); *see id.* §§ 85.021, 85.022 (requirements for orders). Like Texas law, Washington law satisfies the same requirements in section 922(g)(8) that the Supreme Court upheld in *Rahimi*.

49

and a January 31, 2022 order (2-ER-143-144). 3-ER-552. Those postconviction orders also satisfy section 922(g)(8)(C)(i) and *Rahimi*. They include findings that DeBorba "has been charged with, arrested, for, or convicted of a domestic violence offense" and that "to prevent possible recurrence of violence," DeBorba was "RESTRAINED" from three categories of activity: (1) "Causing or attempting to cause physical harm, bodily injury, assault, including sexual assault, and from molesting, harassing, threatening or stalking the protected person"; (2) "Coming near and from having any contact" with the protected person except through counsel; and (3) "Entering or knowingly coming within or knowingly remain[ing] within 1000 ft . . . of the protected person's residence, school, place of employment, [or] person." 2-ER-137, 143.

Given this language, the later restraining orders charged in Count 1 satisfy section 922(g)(8)(C)(ii). *See* pp. 51-52, *infra*. But these orders also satisfied section 922(g)(8)(C)(i)—the provision *Rahimi* upheld—because they "include[] a finding that [DeBorba] represents a credible threat to the physical safety of [an] intimate partner or child." 18 U.S.C. § 922(g)(8)(C)(i).

DeBorba again offers no persuasive argument to the contrary. He asserts that these later orders contained "no finding" to that effect. AOB-40. But any commonsense reading of the orders refutes his claim. These orders built on the earlier pretrial November 14, 2019 order just discussed, which included the express "credible threat" language. And these postconviction orders responded to the new domestic-violence violations that DeBorba committed (and was convicted of) after the state court had entered that pretrial order.

In other words, the state courts did not need to speculate about whether DeBorba might pose a credible threat to his ex-wife; he proved that he did. These postconviction restraining orders reflect findings that DeBorba continued to present "a clear threat of physical violence" toward his ex-wife. *Rahimi*, 602 U.S. at 698. *Rahimi* thus forecloses DeBorba's challenge to Count 1.

### 3. DeBorba's restraining orders also satisfy section 922(g)(8)(C)(ii)

The November 14, 2019 restraining order cited in Count 2 commanded DeBorba not to "cause, attempt, or threaten to cause bodily injury to, assault, sexually assault, harass, stalk or keep under surveillance the protected person"—DeBorba's ex-wife. 2-ER-115-116.

51

The postconviction orders cited in Count 1 did the same. 2-ER-137, 143. So all these orders satisfied section 922(g)(8)(C)(ii).

And that provision of the statute is constitutional for all the same reasons that the Supreme Court found section 922(g)(8)(C)(i) constitutional in *Rahimi*, 602 U.S. at 695-99. As the Sixth Circuit recently held, "the historical tradition of surety and going-armed laws recognized in *Rahimi* applies with equal force to Section 922(g)(8)(C)(ii)." *United States v. Combs*, No. 23-5121, 2024 WL 4512533, at *3 (6th Cir. Oct. 17, 2024). The Sixth Circuit's analysis of section 922(g)(8)(C)(ii) and *Rahimi* is sound, and this Court should follow it. *Cf. Perez-Garcia*, 96 F4.th at 1188-92 (upholding constitutionality of pretrial no-firearm bail conditions and citing surety laws as historical analogues).[18]

DeBorba has waived any contrary argument by not developing it in his opening brief. *See United States v. Perez-Silvan*, 861 F.3d 935, 938 (9th Cir. 2017). At no point does he even cite section 922(g)(8)(C)(ii).

---

[18] A pending appeal, *United States v. VanDyke*, No. 24-2861 (9th Cir.), concerns section 922(g)(8)(C)(ii)'s constitutionality after *Rahimi*. The government incorporates the points and authorities from its October 15, 2024 brief in *VanDyke* (Dkt. 11). *See United States ex rel. Robinson Rancheria Citizens Council v. Borneo, Inc.*, 971 F.2d 244, 248 (9th Cir. 1992) (Court may judicially notice proceedings with "a direct relation to matters at issue").

### 4. Even if an individualized dangerousness analysis were required, DeBorba's as-applied challenge fails

As discussed (pp. 42-44, *supra*), the Second Amendment permits disarmament of untrustworthy, dangerous, or otherwise non-law-abiding groups, without the need for individualized determinations. But DeBorba's as-applied challenge to section 922(g)(8) would fail in any event. DeBorba is a repeat domestic abuser who beat up his ex-wife in front of his children; amassed an arsenal of guns in violation of state restraining orders and federal laws; and lied about his citizenship to obtain guns and a concealed-carry license. DeBorba has proven that he is not a remotely "law-abiding citizen," *Bruen*, 597 U.S. at 9, and that he "poses a clear threat of physical violence to another," *Rahimi*, 602 U.S. at 698. Section 922(g)(8) is constitutional as applied to him.

### F. The unregistered-silencer statute facially satisfies the Second Amendment

As the district court correctly found, silencers are not covered by the Second Amendment. 1-ER-62 n.6. But even if they were, DeBorba had no right to possess an unregistered one. And the nation has a long tradition of analogous gun regulations. DeBorba's Second Amendment challenge to 26 U.S.C. § 5861(d) in Count 7 therefore fails.

1. *Statutory background*

The National Firearms Act of 1934 (NFA) makes it "unlawful for any person . . . to receive or possess a firearm which is not registered to him in the National Firearms Registration and Transfer Record." 26 U.S.C. § 5861(d); *see* 26 U.S.C. § 5841.

A "firearm" covered by the Act includes "any silencer (as defined in section 921 of title 18, United States Code)." 26 U.S.C. § 5845(a)(7). In turn, 18 U.S.C. § 921(a)(25) defines "firearm silencer" and "firearm muffler" as "any device for silencing, muffling, or diminishing the report of a portable firearm, including any combination of parts, designed or redesigned, and intended for use in assembling or fabricating a firearm silencer or firearm muffler, and any part intended only for use in such assembly or fabrication."

Receiving or possessing an unregistered silencer is publishable by up to ten years in prison. 26 U.S.C. §§ 845(a)(7), 5861(d), 5871.

2. *Silencers are not "arms" under the Second Amendment*

DeBorba's conduct—possessing an unregistered silencer—is not covered by the Second Amendment's plain text. 1-ER-62 n.6. Original meaning, Supreme Court precedent, and other courts' decisions all point

54

toward the same conclusion: Silencers are not "arms" but unnecessary accessories to arms.

When the Second Amendment was ratified, the word "arms" was understood to mean "[w]eapons of offence, or armour of defence." *Heller*, 554 U.S. at 581 (quoting 1 Dictionary of the English Language 106 (4th ed. 1773) (alteration in original)); *see also* 1 A New and Complete Law Dictionary (1771) (defining "arms" as "any thing that a man wears for his defence, or takes into his hands, or useth in wrath to cast at or strike another"); N. Webster, American Dictionary of the English Language (1828) (defining "arms" as "[w]eapons of offense, or armor for defense and protection of the body" or "any thing which a man takes in his hand in anger, to strike or assault another").

Silencers are not "arms" under that definition. In so holding, the district court was in good company. The Tenth Circuit, for instance, has held that "a silencer is a firearm accessory" and "not a weapon in itself (nor is it 'armour of defence')," so "it can't be a 'bearable arm' protected by the Second Amendment." *United States v. Cox*, 906 F.3d 1170, 1186 (10th Cir. 2018). Other courts agree. *See*, *e.g.*, *United States v. Jernigan*, __ F. Supp. 3d __, 2024 WL 4294648, at *7 -*8 (E.D. Va. Sept. 25, 2024)

(joining "ample and well-reasoned" decisions of other courts to hold that "silencers are not 'arms' . . . nor are they proper accoutrements to firearms that receive Second Amendment protection"); *United States v. Saleem*, 659 F. Supp. 3d 683, 697-98 (W.D.N.C. 2023).

These courts are right. Silencers serve no offensive or defensive purpose unless attached to a gun. And a silencer is not a necessary or traditional component or accessory to an arm. A silencer is thus best understood as an optional accessory to an arm—not as an arm itself.

DeBorba cannot meet his burden to show that the Second Amendment's "plain text covers" his possession of an unregistered silencer. *Bruen*, 597 U.S. at 24. His cursory attempts to do so (AOB-50-52) lack merit. First, he asserts that silencers are "arms" "because their capabilities make them necessary for the safe and effective use of firearms" (AOB-50). Courts have consistently rejected this argument. *See, e.g.*, *Saleem*, 659 F. Supp. 3d at 698 ("[A] firearm can be used safely and effectively without a silencer.").

DeBorba cites a vacated, out-of-circuit decision to try to show that silencers are necessary to the use of firearms, *Kolbe v. Hogan*, 813 F.3d 160, 175 (4th Cir. 2016), *vacated on reh'g en banc*, 849 F.3d 114 (4th Cir.

2017). But that vacated decision had nothing to do with silencers; it concerned "detachable magazines," without which (according to the later-vacated opinion) citizens would lose "the ability to actually fire" their guns. *Id.* at 175.

Not so here. Firearms do not need silencers: "Unlike ammunition, a firearm does not require a silencer to operate, and without a silencer the right to bear arms would not be rendered meaningless." *Jernigan*, 2024 WL 4294648, at *7-*8 (distinguishing *Kolbe*); *see also, e.g.*, *Saleem*, 659 F. Supp. 3d at 697-98. Instead, "a silencer is simply a means to reduce sound [e]mitted from a firearm." *United States v. Royce*, No. 22-CR-130, 2023 WL 2163677, at *4 (D.N.D. Feb. 22, 2023). Everyday practices prove as much: Countless police officers, security guards, members of the military, and private citizens can and do use firearms without silencers.

DeBorba's other arguments fare no better. He claims that "[f]ederal law recognizes th[e] fact" that silencers are "arms" protected by the Second Amendment because federal law defines "'firearms' to include silencers." AOB-51 (citing 26 U.S.C. § 5845(a)(7); 18 U.S.C. § 921(a)(3)(C)). But constitutional questions are "not controlled by Congress's choice of label." *Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S.

57

519, 564 (2012). DeBorba's statutory argument also leads to absurd results: If silencers are "arms" under the Second Amendment because they fall within the statutory definition of "firearms," the same would hold true for explosive grenades, poison gas rockets, mines, machineguns, and missiles. After all, those devices, like silencers, fall within the statutory definition of "firearm." 26 U.S.C. § 5845(a)-(b), (e), (f).

As a fallback argument, DeBorba claims that even if silencers are not "arms," "the Second Amendment 'implies a corresponding' right to obtain items necessary to exercise the right to armed self-defense the Amendment protects"—a claim he supports with a citation to *Jackson v. City & County of San Francisco*, 746 F.3d 953, 958 (9th Cir. 2014). AOB-50. *Jackson* lends him no support. The case concerned ammunition; it has nothing to say about silencers, let alone silencer-registration requirements.

Relatedly, DeBorba claims that the Second Amendment's coverage extends to the "proper accoutrements" that make firearms "useful." AOB-51 (quoting *United States v. Miller*, 307 U.S. 174, 182 (1939)). As an example, he again cites ammunition. But even if ammunition and similar "accoutrements" fall within the scope of the right to keep and bear arms,

they are nothing like a silencer.[19] Again, ammunition is necessary for a gun to function. A silencer isn't.

For all these reasons, the unregistered-silencer statute regulates conduct not protected by the Second Amendment. This Court should reject DeBorba's Second Amendment challenge to Count 7 because silencers are not "arms."

> ### 3. Even if silencers were "arms," history and tradition show that Congress may require their registration

Even if silencers were "arms," DeBorba's Second Amendment challenge to Count 7 would fail because he had no constitutional right to possess an unregistered silencer. The Second Amendment right, like most rights, is not unlimited. *Rahimi*, 602 U.S. at 690-91. "From Blackstone through the 19th-century cases, commentators and courts

---

[19] *Miller* also mentions other accoutrements in connection with militia service—bayonets, belts, knapsacks, and canteens—but they are best categorized as items needed by militiamen going off to war. 307 U.S. at 181-82. Other potential accoutrements, such as gun-cleaning equipment, holsters, scabbards, and items used to keep firearms from decaying, are all used to properly care for the weapon so it keeps functioning. *See* David B. Kopel & Joseph G.S. Greenlee, *The Second Amendment Rights of Young Adults*, 43 S. Ill. U. L.J. 495, 521-22 (2019). A silencer, on the other hand, merely reduces the noise a gun makes; it is unlike those accoutrements. *See Jernigan*, 2024 WL 4294648, at *7-*8.

routinely explained that the right was not a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose." *Heller*, 554 U.S. at 626.

Section 5861(d)'s regulation of silencers fits within the "historical tradition of firearm regulation," *Rahimi*, 602 U.S. at 691 (quoting *Bruen*, 597 U.S. at 17), for two independent reasons. First, the statute aligns with historical restrictions on dangerous and unusual devices. Second, the registration and taxation requirements for silencers are analogous to historical laws regulating commerce in firearms.

     a.   *Regulating dangerous and unusual devices*

The nation has a robust tradition of regulating devices considered dangerous and unusual. Silencer regulation fits into that tradition.

An "important limitation on the right to keep and carry arms" is that "the sorts of weapons protected were those 'in common use at the time.'" *Heller*, 554 U.S. at 627 (quoting *Miller*, 307 U.S. at 179). The "traditional militia was formed from a pool of men bringing arms 'in common use at the time' for lawful purposes like self-defense." *Id.* at 624. And there was a corresponding "historical tradition of prohibiting the carrying of 'dangerous and unusual weapons.'" *Id.* at 627.

Congress has long recognized that silencers are unusual and especially dangerous. Section 5861(d) and 5871—the statutes charged in Count 7—were enacted under the National Firearms Act of 1934. The Act's "object" was "to regulate certain weapons likely to be used for criminal purposes." *United States v. Thompson/Ctr. Arms Co.*, 504 U.S. 505, 517 (1992). Congress's "intent" with the Act was "to cover . . . only such modern and lethal weapons . . . as could be used readily and efficiently by criminals and gangsters." H.R. Rep. No. 1337, 83d Cong., 2d Sess., A395 (1954). Such uncommon weapons receive no Second Amendment protection. *Bruen*, 597 U.S. at 21; *Heller*, 554 U.S. at 625.

Congress's power to restrict possession of such weapons is well established. "[C]olonial legislatures sometimes prohibited the carrying of 'dangerous and unusual weapons,'" *Bruen*, 597 U.S. at 47, a practice that dated to English common law, which prohibited "riding or going armed, with dangerous or unusual weapons." 4 W. Blackstone, Commentaries on the Laws of England 149 (10th ed. 1787) (emphasis omitted); *see also Heller*, 554 U.S. at 627. As early as 1686, the colony of New Jersey

61

prohibited the concealed carry of "unusual and unlawful weapons."[20] And colonial justice-of-the-peace manuals generally authorized justices to confiscate the arms of a person who "arm[ed] himself with dangerous and unusual weapons, in such a manner as will naturally cause a terror to the people."[21] Arming oneself in that way was an "affray," punished as early as the Statute of Northampton[22] and by several states in the founding era. *See Rahimi*, 602 U.S. at 697.

Courts in the early Republic understood and applied the "historical tradition of prohibiting the carrying of 'dangerous and unusual weapons'" in other ways, too. *Heller*, 554 U.S. at 627 (citations omitted).[23] As novel weapons arose with new inventions and technology, states often banned them if they were seen as dangerous and unusual. *See* Robert J. Spitzer,

---

[20] An Act Against Wearing Swords, ch. 9, in Aaron Leaming & Jacob Spicer, Grants, Concessions, and Original Constitutions of the Province of New Jersey 289-290 (2d ed. 1881).

[21] 1 R. Burn, *The Justice of the Peace, and Parish Officer* 13 (2d ed. 1756); 1 William Hawkins, *A Treatise of the Pleas of the Crown* 135 (1716) (same).

[22] 2 Edw. 3 c. 3 (1328).

[23] *See also Cockrum v. State*, 24 Tex. 394, 402 (1859); *Aymette v. State*, 2 Hum. 154, 156-59 (Tenn. 1840); *State v. Reid*, 1 Ala. 612, 620 (1840); *State v. Mitchell*, 3 Blackf. 229, 229 (Ind. 1833); *State v. Langford*, 3 Hawks 381, 383 (N.C. 1824).

*Understanding Gun Law History after* Bruen: *Moving Forward by Looking Back*, 51 Fordham Urb. L.J. 57, 88-98, 105-10 (2023).

That tradition continued when the silencer was invented in 1908, with states soon banning or regulating the device. *See* Robert J. Spitzer, *Gun Accessories and the Second Amendment: Assault Weapons, Magazines, and Silencers*, 83 Law & Contemp. Probs. 231, 245-49 (2020). By 1940, over 20 states or territories and the District of Columbia had either prohibited or regulated silencers.[24] Criminals and poachers were a primary concern, especially as news spread of crimes committed with

---

[24] *See* 1935 Ala. Laws 441, 485; Act of Mar. 18, 1929, ch. 84, § 14, 1929 Ariz. Sess. Laws 235, 246-247; Act of Mar. 27, 1933, ch. 39, 1933 Cal. Stat. 329, 329-330; Act of Apr. 10, 1917, ch. 105, 1917 Conn. Pub. Acts 2301; Act of Mar. 29, 1927, ch. 169, 1927 Del. Laws 516; § 12950, ch. 564, 1939 Iowa Acts 1928, 1929; Act of July 6, 1910, ch. 142, § 6, 1910 La. Acts 218, 219; Act of Apr. 16, 1926, ch. 261, 1926 Mass. Acts 256; Act of Mar. 24, 1909, ch. 129, 1909 Me. Laws 141; Act of May 7, 1913, no. 250, 1913 Mich. Pub. Acts 472; Act of Mar. 13, 1913, ch. 64, 1913 Minn. Laws 55; Act of Feb. 20, 1918, ch. 6, 1918 Mont. Laws 13; Act of Mar. 7, 1925, ch. 460, § 4, 1925 N.C. Sess. Laws 529, 530; Act of Apr. 7, 1911, ch. 128, 1911 N.J. Laws 185; Act of Apr. 6, 1916, ch. 137, 1916 N.Y. Laws 338; Act of Mar. 12, 1909, ch. 122, 1909 N.D. Laws 130; Act of June 6, 1919, § 3, 1919 Ohio Laws 577, 581-582; Act of Mar. 11, 1931, ch. 370, § 19, 1931 Or. Laws 684, 701; Act of May 5, 1921, no. 173, § 5, 1921 Pa. Laws 353, 365; Act of Apr. 22, 1927, ch. 1052, § 8, 1927 R.I. Pub. Laws 256, 259; Act of Nov. 14, 1912, no. 237, 1912 Vt. Acts & Resolves 310; Act of Feb. 18, 1921, § 97, ch. 83, 1921 Wyo. Sess. Laws 86, 112-113; Act of Jan. 9, 1934, act 26 § 7, 1934 Haw. Sess. Laws 35, 38-39; Supplement V The Code of the District of Columbia (to March 4, 1929) 43, 45 (1939).

silencers. *See, e.g.*, *Silent Gun Kills a Family of Four*, N.Y. Times, Feb. 1, 1915, at 1 (reporting triple murder and suicide with silencer in New York City); Spitzer, *Gun Accessories*, *supra*, at 247-48.

National laws followed. The federal government's regulation of silencers, which began in 1934, extended the tradition of regulating them as dangerous or unusual. *See* Spitzer, *Gun Accessories*, *supra*, at 248 n.125 (citation omitted); National Firearms Act: Hearings on H.R. 9066 Before the H. Comm. on Ways & Means, 73rd Cong., 2d Sess. 111 (1934).

Federal lawmakers, like their state counterparts, had good reason to view silencers as dangerous. Alongside their affiliation with criminal activity, silencers also threatened the public: "Anything that reduces the alert value of gunfire sound is an impediment to bystanders taking effective defensive action." Spitzer, *Gun Accessories*, *supra*, at 251; *see also, e.g.*, Lisa Marie Pane, *Did 'Silencer' Make a Difference in Virginia Beach Carnage?*, Associated Press, June 1, 2019 (describing mass-shooting in which shooter used silencer and witnesses were "caught off guard and initially puzzled by what was happening").[25] It was well within

---

[25] https://www.wwlp.com/news/top-stories/did-gunmans-silencer-make-a-difference-in-the-carnage.

Congress's purview to believe that silencers would prove dangerous and "specially adapted to unlawful uses." *Friedman v. City of Highland Park*, 577 U.S. 1039, 136 S. Ct. 447, 449 (2015) (Thomas, J., dissenting from denial of certiorari).

This historical regulation of silencers shows that section 5861(d) aligns "with the principles that underpin our regulatory tradition." *Rahimi*, 602 U.S. at 692. Because "silencers fall into the category of 'dangerous and unusual weapons,'" they "are outside the scope of the Second Amendment's protection." *Saleem*, 659 F. Supp. 3d at 698-99. Indeed, the "analogical reasoning requires only that the government identify a well-established and representative historical analogue, not a historical twin." *Bruen*, 597 U.S. at 30 (emphasis omitted). DeBorba's silencer is a device that many jurisdictions have long recognized as dangerous, unusual, and regulable. And while the 20th-century laws regulating silencers postdate the founding, this postenactment history still supports section 5861(d)'s constitutionality. *See Rahimi*, 602 U.S. at 738 (Barrett, J., concurring); *Bruen*, 597 U.S. at 27.

Yet even if jurisdictions' immediate regulation of silencers as soon as they appeared does not by itself prove the statute's constitutionality

as a historical matter, the Supreme Court has recognized that "cases implicating unprecedented societal concerns or dramatic technological changes may require a more nuanced approach." *Bruen*, 597 U.S. at 27. Analogical reasoning and understanding "how and why the regulations burden a law-abiding citizen's right to armed self-defense" guides this "more nuanced approach." *Id.* at 27, 29; *Rahimi*, 602 U.S. at 692.

Here, the "why" has always been the same: to keep people safe from dangerous and unusual weapons. The "how" also cuts against DeBorba. Dangerous and unusual weapons were typically banned outright. And when silencers first became prominent, as discussed, several states prohibited them completely. Others regulated their manufacture, possession, or sale.[26] The NFA took a narrower approach by merely requiring registration. If legislatures historically could prohibit possession of silencers altogether, then today's Congress can at least require their registration. *Cf. Rahimi*, 602 U.S. at 699 ("if imprisonment was permissible to respond to the use of guns to threaten the physical

---

[26] *E.g.*, 1935 Ala. Laws 441, 485 (imposing taxation and record-keeping requirements); Act of May 7, 1913, no. 250, 1913 Mich. Pub. Acts 472 (requiring silencer registration and the register "shall be open to the inspection of all peace officers at all times").

safety of others, then the lesser restriction of temporary disarmament" under 18 U.S.C. § 922(g)(8) "is also permissible").

DeBorba again offers nothing that would support a contrary conclusion. He asserts that, in his opinion, silencers are "not dangerous and unusual." AOB-52. Yet the only evidence he offers is a statistic that some 2.6 million silencers are registered with the federal government. *Id.* That statistic does not affect the constitutional analysis. For one thing, the number of silencers in this country pales in comparison to the roughly *400 million* privately owned firearms here.[27] For another, that statistic fails to show that *unregistered* silencers are in common use for lawful purposes. The statistics alone show that silencers—particularly unregistered silencers—are comparatively unusual.

Moreover, this Court has already recognized that—contrary to DeBorba's assertion—silencers are not "'in common use' today for self-defense." *Bruen*, 597 U.S. at 32 (quoting *Heller*, 554 U.S. at 627)). After *Heller*, this Court held in an unpublished opinion that "[s]ilencers . . . are

---

[27] *See* Harmeet Kauer, *What studies reveal about gun ownership in the US,* CNN, June 2, 2022, https://www.cnn.com/2022/06/02/us/gun-ownership-numbers-us-cec/index.html; Jennifer Mascia & Chip Brownlee, *How Many Guns Are Circulating in the U.S.?*, The Trace, Mar. 6, 2023, https://www.thetrace.org/2023/03/guns-america-data-atf-total.

not 'typically possessed by law-abiding citizens for lawful purposes,' and are less common than either short-barreled shotguns or machine guns." *United States v. McCartney*, 357 F. App'x 73, 76 (9th Cir. 2009) (quoting *Heller*, 554 U.S. at 625). And just last year, in a published opinion, this Court noted in dicta that the category of "dangerous and unusual weapons" that fall outside the Second Amendment's scope "might include ghost guns or silencers or armor-piercing ammunition." *Perez-Garcia*, 96 F.4th at 1180-81.

In sum, just as "there is no Second Amendment right to possess a machine gun," *United States v. Henry*, 688 F.3d 637, 640 (9th Cir. 2012)[28]—another unusual device whose registration the NFA requires—there is no Second Amendment right to possess an unregistered silencer.

b.   *Regulating commerce in firearms*

Section 5861(d)'s regulatory requirements independently place it within the distinct historical tradition of regulating the commerce surrounding firearms. *See Heller*, 554 U.S. at 626-27. Since colonial times, colonies and states have restricted firearms as items that travel in

---

[28] *Henry* remains good law after *Bruen*. *See United States v. Chan*, No. 22-CR-109, 2024 WL 4028019, at *5 & n.13 (D. Hawaii Sept. 3, 2024).

commerce. For example, to address arms and ammunitions trafficking in the colonies, New York outlawed trading of guns, gun powder, and lead by private persons in 1652.[29] Similarly, a 1631 Virginia law required the recording "of arms and munitions," along with all new arrivals to the colony.[30] A 1795 Pennsylvania law likewise required gunpowder stored in the public magazine to be proved and marked, and it prohibited importing, transferring, or selling any gunpowder not appropriately marked.[31] Massachusetts in 1805 adopted a law for appointing "provers of fire arms" to "prove all musket barrels and pistol barrels" presented to

---

[29] *See* Ordinance of the Director and Council of New Netherland Against Illegal Trade in Powder, Lead and Guns in New Netherland by Private Persons, 1652 N.Y. Laws 128.

[30] Robert J. Spitzer, *Gun Law History in the United States and Second Amendment Rights*, 80 Law & Contemp. Probs. 55, 76 (2017) (quoting Virginia Act of Feb. 27, 1631, Act LVI, reprinted in I The Statutes At Large; Being A Collection Of All The Laws Of Virginia, From The First Session Of The Legislature at 174-75 (William Waller Henning ed., 1823)).

[31] 3 Laws of the Commonwealth of Pennsylvania, from the Fourteenth Day of October, One Thousand Seven Hundred 240-44 (1810).

them in exchange for a set fee—a law meant to protect the public.[32] Maine adopted a similar law in 1821.[33]

Regulating firearms through taxation has a similar historical pedigree. An 1841 Mississippi law, for example, taxed Bowie knives.[34] Florida in 1835 passed a law stating that "it shall not be lawful for any person or persons . . . to vend dirks, pocket pistols, sword canes, or bowie knives, until he or they shall have first paid to the treasurer of the county in which he or they intend to vend weapons, a tax of two hundred dollars per annum."[35] Alabama adopted a similar law around the same time.[36]

States also implemented licensing requirements both before and after the founding. A 1651 Massachusetts statute, for instance, prohibited the transportation of "any Gun-powder out of this Jurisdiction, without license first obtained from some two of the

---

[32] Laws of the Commonwealth of Massachusetts from November 28, 1780 to February 28, 1807, at 259-60 (1807).

[33] Laws of the State of Maine 546 (1830).

[34] Act of Feb. 6, 1841, ch. 1, § 1, 1841 Miss. Laws 51, 52.

[35] Act of Jan. 30, 1835, 1835 Fla. Laws 36.

[36] Act of June 30, 1837, 1837 Ala. Laws 7.

Magistrates."[37] Connecticut outlawed the export of "gun-powder made and manufactured . . . out of the [Colony] without . . . license."[38]

Today's federal unregistered-silencer statute is similar. Like these early laws, section 5861(d) does not prohibit possession but imposes registration and taxation requirements to ensure that silencers do not fall into the wrong hands. The Supreme Court has not cast doubt on state laws "requir[ing] a [firearm-carry] license applicant to undergo fingerprinting, a background check, a mental health records check, and training in firearms handling . . . among other possible requirements." *Bruen*, 597 U.S. at 80 (Kavanaugh, J., concurring). A registration scheme for silencers is a form of license requirement. And section 5861(d) is no more onerous than those kinds of requirements.

In fact, the registration requirement is just the type of "objective[] and definite" licensing standard approved in *Bruen*, 597 U.S. at 38 n.9. And "a law-abiding citizen is equally able to defend themselves with a

---

[37] Colonial Laws of Massachusetts Reprinted from the Edition of 1672 at 126 (1890).

[38] 15 The Public Records of the Colony of Connecticut 191 (1890) (1775 statute); *see also* The Charter and Ordinances of the City of Providence, with the General Assembly Relating to the City 37 (1835) (1821 law) (requiring "a license therefor" to sell gunpowder).

firearm registered in the National Firearms Registration and Transfer Record . . . as they are with a firearm not so registered." *United States v. Serrano*, 651 F. Supp. 3d 1192, 1213 (S.D. Cal. 2023); *see Saleem*, 659 F. Supp. 3d at 699 n.9. Thus, even if silencers were protected by the Second Amendment, the registration requirement does not infringe on the right to possess them.

### 4. At a minimum, the unregistered-silencer statute has several constitutional applications that preclude facial invalidation

DeBorba asserts only a facial Second Amendment challenge to the silencer-registration law. Unlike with his challenges to sections 922(g)(5) and 922(g)(8), he does not argue in his opening brief that the silencer-registration law violates the Second Amendment as applied to him. Any such argument is thus "waived," *Perez-Silvan*, 861 F.3d at 938, and DeBorba "may not make new arguments" on reply, *United States v. Cox*, 7 F.3d 1458, (9th Cir. 1993).[39]

To succeed on a facial Second Amendment claim, DeBorba would need to establish that no set of circumstances exists under which section

---

[39] An as-applied Second Amendment challenge to Count 7 would fail for all the same reasons discussed here and in the previous sections discussing the section 922(g) counts.

5861(d) would be valid. *Rahimi*, 602 U.S. at 693. For the government to prevail, though, it need only show that section 5861(d) "is constitutional in some of its applications." *Id.* The statute no doubt is—including "as applied to the facts of [DeBorba's] own case." *Id.*

Unlawfully present aliens, as discussed, have no Second Amendment right to possess firearms, as they are not members of the "political community" it covers. *Medina-Cantu*, 113 F.4th at 542. Likewise, the Second Amendment permits Congress to disarm felons. *See, e.g.*, *United States v. Diaz*, 116 F.4th 458, 469-72 (5th Cir. 2024). Congress may also disarm domestic abusers subject to restraining orders. *Rahimi*, 602 U.S. at 693-72. Thus, the unregistered-silencer statute would unquestionably be constitutional as applied to persons in each of those categories. After all, if Congress may *disarm* those persons of silencers (and of firearms generally), Congress may require mere *registration* of silencers. For that reason alone, section 5861(d) does not violate the Second Amendment on its face.

## II. On Counts 4 through 6, the district court correctly rejected DeBorba's "materiality" challenge to the false-statement charges

As the district court found (1-ER-67-69), DeBorba's "materiality" defense to the false-statement charges in Counts 4 through 6 is groundless. DeBorba had no right to lie about his citizenship when buying guns or applying for a concealed-pistol license.

### A. Statutory background

Section 922(a)(6), the statute charged in Counts 4 and 5, makes it unlawful for anyone in connection with the acquisition or attempted acquisition of a firearm or ammunition from a licensed dealer to "knowingly . . . make any false or fictitious oral or written statement or to furnish or exhibit any false, fictitious, or misrepresented identification, intended or likely to deceive such . . . dealer . . . with respect to any fact material to the lawfulness of the sale." 18 U.S.C. § 922(a)(6). The statute criminalizes "the making of a false statement material to the lawfulness of a gun's transfer." *Smith v. United States*, 508 U.S. 223, 235 (1993); *see United States v. Manney*, 114 F.4th 1048, 1053 (9th Cir. 2024).

Section 911, the statute charged in Count 6, prohibits anyone from "falsely and willfully represent[ing] himself to be a citizen of the United

74

States." 18 U.S.C. § 911. That representation must have been made "to someone with good reason to inquire into the defendant's citizenship." *United States v. Romero-Avila*, 210 F.3d 1017, 1020 (9th Cir. 2000).

### B. DeBorba had no right to lie about his citizenship when buying guns or applying for a concealed-pistol license

Although DeBorba frames his challenge to Counts 4 through 6 in "materiality" terms, that is not his true claim. There is no serious dispute that his lies about being a U.S. citizen on the ATF firearm-purchase form and the state concealed-pistol application form were material in the normal sense—that is, having the propensity or capacity to influence the decisionmaking body to which the false statement was addressed. *See Neder v. United States*, 527 U.S. 1, 16 (1999).

And DeBorba has stipulated that his lies were material. He admits that his lies on the ATF forms "influenced" both gun dealers "into believing that" the firearms he bought from them "could be sold to [him] in compliance with" section 922(g)(5). 2-ER-75-76. And he admits that he lied about his citizenship to the state licensing agency "voluntarily and deliberately." 2-ER-74. He did so in response to agency questions "posed for the purpose of ensuring" that the state could issue the concealed-pistol

75

license to him in compliance with state law and that "possession of a firearm would comply with" section 922(g)(5). 2-ER-74.

DeBorba's true challenge to Counts 4 through 6 is merely a repackaging of his Second Amendment challenge to section 922(g)(5)(A) in Counts 1 through 3. Deborba contends that (1) because unlawfully present aliens have a Second Amendment right to possess guns (and apparently to obtain concealed-pistol licenses), (2) ATF and state concealed-pistol licensing agencies have no right to ask about citizenship or immigration status, and (3) unlawfully present aliens have the right to lie to those agencies.

DeBorba's Second Amendment challenge to section 922(g)(5) lacks merit, as discussed in Part I. But precedent makes clear that DeBorba had no right to lie on these forms regardless of the merits of that Second Amendment claim. As this Court recently explained, "the Second Amendment does not protect an individual's false statements." *Manney*, 114 F.4th at 1053. And "the Supreme Court has long held that defendants cannot avoid punishment for providing false information 'in feigned compliance with a statutory requirement' by 'challenging the validity of the requirement itself.'" *Id.* at 1053 n.7 (quoting *United States v. Knox*,

76

396 U.S. 77, 79 (1969); citing *Kay v. United States*, 303 U.S. 1, 7 (1938); *LaChance v. Erickson*, 522 U.S. 262, 267-68 (1998); *Dennis v. United States*, 384 U.S. 855, 867 (1966)).

Put another way, "it cannot be thought that as a general principle of law a citizen has a privilege to answer fraudulently a question that the Government should not have asked." *Bryson v. United States*, 396 U.S. 64, 72 (1969). Yet that is precisely the privilege DeBorba demands.

DeBorba tries to avoid some of this precedent—*Knox* and *Bryson*—based on irrelevant distinctions between the false-statement statutes charged there and those charged here. AOB-47-48. But he ignores the fundamental point that "[o]ur legal system provides methods for challenging the Government's right to ask questions—lying is not one of them." *Bryson*, 396 U.S. at 72.

Courts have long rejected DeBorba's approach. "'A citizen may decline to answer the question, or answer it honestly, but he cannot with impunity knowingly and willfully answer with a falsehood.'" *United States v. Holden*, 70 F.4th 1015, 1016 (7th Cir. 2023) (quoting *Bryson*, 396 U.S. at 72); *see Manney*, 114 F.4th at 1053 n.6 (citing *Holden*). For this reason, courts have "without exception allowed sanctions for false

statements or perjury" even when the defendant alleges "that the Government exceeded its constitutional powers in making the inquiry." *United States v. Mandujano*, 425 U.S. 564, 577 (1976) (plurality opinion). Someone who employs intentional lies "as a means of self-help may not escape the consequences by urging that his conduct be excused because the statute which he sought to evade is unconstitutional." *Dennis*, 384 U.S. at 867.

This rule applies regardless of the statute or constitutional provision in question. *See, e.g.*, *Kay*, 303 U.S. at 6; *United States v. Lawton*, 366 F.3d 550, 553-54 (7th Cir. 2004). And it applies even when Congress requires that, for conviction, a defendant's false statement must be "material." *See, e.g.*, *Bryson*, 396 U.S. at 65 & n.1; *United States v. Kapp*, 302 U.S. 214, 215-18 (1937); *Holden*, 70 F.4th at 1016-18. DeBorba's case falls well within this rule.

### C. Nothing about 18 U.S.C. §§ 922(a)(6) or 911 supports a different result

On Counts 4 and 5, DeBorba lied about being a U.S. citizen on the ATF forms when buying two guns. His lies tricked dealers into believing they could lawfully sell him those guns. On Count 6, he lied about his citizenship to a state agency when applying for a concealed-pistol license,

in response to questions designed to ensure the agency is issuing licenses in compliance with state and federal law.

Each time, DeBorba would have been free to "decline to answer the question[s], or answer [them] honestly"—and then to sue if he was denied a firearm or concealed-pistol license based on his responses or nonresponses. *Bryson*, 396 U.S. at 72; *Holden*, 70 F.4th at 1016. But DeBorba could not knowingly answer these questions falsely and, once caught, challenge the "propriety of the very question," *Dennis*, 384 U.S. at 867, based on his constitutional challenge to a different gun statute.

Nothing about the Second Amendment would justify granting DeBorba an exception to this rule. As the Supreme Court has made clear, the Second Amendment is subject to the same "body of rules" as "other Bill of Rights guarantees." *Bruen*, 597 U.S. at 70. A defendant charged with making a false statement cannot defend against the charge by claiming that the question violated other Bill of Rights guarantees like the First or Fifth Amendment. The Second Amendment should operate no differently.

Nor does anything in the text of 18 U.S.C. §§ 922(a)(6) or 911 allow DeBorba to bootstrap his Second Amendment challenge from Counts 1

79

through 3. He does not argue that the false-statement statutes charged in Counts 4 through 6 are themselves unconstitutional—only that these forms improperly ask about citizenship as it relates to section 922(g)(5). And in any event, the Second Amendment permits "presumptively lawful regulatory measures" designed to impose reasonable "conditions and qualifications on the commercial sale of arms." *Heller*, 554 U.S. at 626-27 & n.26; *see, e.g.*, *Teixiera v. County of Alameda*, 873 F.3d 670, 685 & n.18 (9th Cir. 2017) (discussing 17th-century colonial laws prohibiting residents from selling firearms to those outside the colony).

Thus, consistent with the Second Amendment, the government can presumptively maintain records of firearms sales and prosecute those who introduce material falsehoods into those records. Although the Second Amendment protects "'the right of law-abiding, responsible citizens to use arms for self-defense," *Bruen*, 597 U.S. at 26 (quoting *Heller*, 554 U.S. at 635), it does not give a person the right to lie to acquire a firearm. *Manney*, 114 F.4th at 1053-54. Nor does it give a person the right to lie to obtain a concealed-carry license for a pistol he has no right to possess in the first place.

### D. DeBorba's lies were material because truthful answers would have barred the gun sales and the concealed-pistol application

As the Seventh Circuit recently reiterated after reviewing Supreme Court precedent, "[t]he word 'material' in § 922(a)(6) does not create a privilege to lie, when the answer is material to a statute, whether or not that statute has an independent constitutional problem." *Holden*, 70 F.4th at 1017. This Court cited that decision approvingly in *Manney*, 114 F.4th at 1053 n.6. DeBorba's "materiality" claim fails for the same reasons that the defendants' claims failed in those cases.

Section 922(a)(6) defines materiality not by reference to the Constitution or some other external source but by "the provisions of this chapter"—Chapter 44 of Title 18. 18 U.S.C. § 922(a)(6); *see id.* §§ 921-934. The statute was "designed to ensure that the dealer can rely on the truthfulness of the buyer's disclosures in carrying out its obligations." *Abramski v. United States*, 573 U.S. 169, 174 (2014). A false statement is material if intended or likely to deceive a firearm dealer about a sale's lawfulness. *Id.* at 188-89; *Holden*, 70 F.4th at 1017. As for section 911, it contains no materiality requirement. But its "good cause to inquire" requirement, *Romero-Avila*, 210 F.3d at 1021, serves a similar function.

The Supreme Court has refused to bar false-statement prosecutions or consider underlying constitutional claims in at least two decisions involving similar "materiality" elements. *See Bryson*, 396 U.S. at 65 n.1; *Kapp*, 302 U.S. at 216. And for the reasons already discussed, DeBorba has no right to use "materiality" as a backdoor for his meritless Second Amendment challenge to a different statute.

With the constitutionality question off the table, DeBorba's admitted conduct of falsely answering citizenship questions proves his violations of sections 922(a)(6) and 911. Had he told the truth about being an unlawfully present alien, the gun sales and concealed-pistol application could not have gone forward. *See Manney*, 114 F.4th at 1053-54 & n.6; *Holden*, 70 F.4th at 1016-18. His lies were plainly material.

DeBorba lied to hide his prohibited status, and he thwarted section 922(a)(6)'s core purpose—"ensur[ing] that the dealer can rely on the truthfulness of the buyer's disclosures in carrying out its obligations." *Abramski*, 573 U.S. at 174. Had DeBorba truthfully answered ATF's questions, the gun sales "could not have proceeded," *id.* at 189, because Chapter 44 makes it unlawful to knowingly sell a firearm to an unlawfully present alien like DeBorba. Likewise, had DeBorba truthfully

82

answered the state agency's questions, he could not have received a concealed-pistol license. Indeed, it is difficult to "think of a misrepresentation any more material," *id.* at 174, than DeBorba's—lying to hide his prohibited status so he could buy and conceal guns that he knew he could not lawfully possess.

Finally, the Supreme Court's decision in *Abramski* makes clear that materiality is not limited to answers on the ATF form that would reveal a firearm purchaser to be a prohibited person. Because "the statute's record-keeping provisions . . . are also designed to aid law enforcement in the investigation of crime," *Abramski*, 573 U.S. at 190, lying about other information such as one's birthdate or address also violates the statute— even though a buyer's birthdate or address would not bar him from buying the gun. Likewise, citizenship and immigration information, if accurately recounted on the form, could help law enforcement in the future if they needed to find a gun purchaser. *See id.* at 180 ("The twin goals of this comprehensive scheme are to keep guns out of the hands of criminals and others who should not have them, and to assist law enforcement authorities in investigating serious crimes."). So even if unlawfully present aliens had a Second Amendment right to possess

firearms, lying about citizenship and immigration information on the ATF form and when applying for a concealed-carry license would still violate 18 U.S.C. §§ 922(a)(6) and 911, respectively.

At any rate, DeBorba has stipulated to facts that establish the materiality of his lies. 3-ER-74-76. Based on those facts and binding precedent, his challenge to Counts 4 through 6 must fail.

## III. On Count 7, the district court correctly rejected DeBorba's vagueness challenge to the statutory definition of "silencer"

As the district court found, the statutory definition of "silencer" is not unconstitutionally vague as applied to DeBorba. 1-ER-62-69. Once again, DeBorba identifies no error in the court's ruling.

### A. DeBorba may assert only an as-applied vagueness claim

As the district court recognized (1-ER-62-64), DeBorba may not assert a facial vagueness challenge to the definition of "silencer"—only an as-applied challenge.

The Fifth Amendment's Due Process Clause bars enforcement of a statute on vagueness grounds only if the statute "fails to provide a person of ordinary intelligence fair notice of what is prohibited, or is so standardless that it authorizes or encourages seriously discriminatory

enforcement." *United States v. Williams*, 553 U.S. 285, 304 (2008). In evaluating a vagueness claim not involving the First Amendment, courts consider whether a statute is vague as applied to the case's facts, since a defendant who engages in "clearly proscribed" conduct "cannot complain of the vagueness of the law as applied to the conduct of others." *United States v. Szabo*, 760 F.3d 997, 1003 (9th Cir. 2014) (citation and quotation marks omitted). In such cases, this Court "do[es] not consider whether the statute is unconstitutional on its face." *United States v. Purdy*, 264 F.3d 809, 811 (9th Cir. 2001) (citation omitted). Instead, "[s]o long as the challenged terms are clear in their application to [the defendant's] conduct," his "vagueness challenge must fail." *Szabo*, 760 F.3d at 1003.

The Supreme Court has carved out only one narrow exception to this rule, based on "exceptional circumstances" in categorical crime-of-violence cases. *Kashem v. Barr*, 941 F.3d 358, 375-77 (9th Cir. 2019) (citing *Sessions v. Dimaya*, 584 U.S. 148 (2018); *Johnson v. United States*, 576 U.S. 591 (2015)). But here, as the district court found, no such "exceptional circumstances" exist. 1-ER-64. Rather, this Court's longstanding "general rule" governs: "a defendant who cannot sustain an as-applied vagueness challenge to a statute cannot be the one to make a

facial vagueness challenge to the statute." *Kashem*, 941 F.3d at 375. And *Sessions* and *Johnson* "did not alter" that general rule. *Id.* at 376; *see also United States v. Kuzma*, 967 F.3d 959, 970-71 & n.10 (9th Cir. 2020).

The Court should decline DeBorba's invitation to import the narrow crime-of-violence exception into the Second Amendment. On appeal, as below, he identifies no "exceptional circumstances" that would permit him to assert a facial challenge to the unregistered-silencer statute. *Kashem*, 941 F.3d at 377. Thus, to defeat his Count 7 conviction on void-for-vagueness grounds, he must show that the definition of "silencer" is unconstitutionally vague as applied to him. He cannot.

## B.   As applied to DeBorba's admitted conduct, the definition of "silencer" is anything but vague

At the bench trial, after losing his motion to dismiss, DeBorba stipulated that he knew his device was an unregistered silencer under the statutory definition. 2-ER-84. That stipulation alone should doom his vagueness claim. But even before he stipulated to that fact, his claim lacked merit. As the district court found pretrial, the "silencer" definition is not vague as applied here. 1-ER-62-67. DeBorba identifies no error in the court's careful analysis. Nor does he present any meaningful argument that the "silencer" definition is vague as applied to his conduct.

He challenges the definition only facially. AOB-4, 55-59. He has thus "waived" any as-applied vagueness claim. *United States v. Briones*, 35 F.4th 1150, 1158 (9th Cir. 2021); *see also Maldonado v. Morales*, 556 F.3d 1037, 1048 n.4 (9th Cir. 2009) ("Arguments made in passing and inadequately briefed are waived.").

DeBorba complains about how the "silencer" definition is worded. Yet he cites no case from any court finding the definition unconstitutionally vague. Moreover, "a law is not unconstitutionally vague simply because it is difficult to determine whether it has been violated in a particular case." *United States v. Lucero*, 989 F.3d 1088, 1101 (9th Cir. 2021). And no such difficulty existed here.

After all, DeBorba possessed his silencer inside a box labeled "Suppresser," in a firearm workbench near other guns. 2-ER-84. He also knows more about guns than the average person, as shown by his home workshop and the many guns, gun parts, gun tools, and gun accessories he possessed. ATF's examination of this item confirmed that it is in fact a completed and fully functional silencer. 2-ER-84, 173-185; PSR¶19. Someone in DeBorba's position would know that this device, found in a gun workbench in his home, functioned to "silence, muffle, or diminish"

87

a firearm and thus qualified as a silencer. *See United States v. Alexander*, 480 F. Supp. 3d 988, 997-1000 (N.D. Cal. 2020). DeBorba knew that his silencer was a silencer. *See* 2-ER-83-84.

This is no edge case. DeBorba's conduct falls within the heartland of what the unregistered-silencer law prohibits. So he cannot complain of the law's supposed vagueness as applied to others. *Szabo*, 760 F.3d at 1003; *United States v. Dang*, 488 F.3d 1135, 1141 (9th Cir. 2007).

But even if a facial vagueness challenge were available, DeBorba's claim would fail. *See United States v. Hudson*, 986 F.3d 1206, 1214 n.3 (9th Cir. 2021) (because vagueness claim failed "whether facial or as applied," Court did not need to decide whether facial claim was available). Even for laws that restrict First Amendment expressive activity—unlike here—no "perfect clarity and precise guidance" is required. *Williams*, 553 U.S. at 304. And courts must apply the vagueness doctrine sparingly: It "does not invalidate every statute which a reviewing court believes could have been drafted with greater precision." *Rose v. Locke*, 423 U.S. 48, 49-50 (1975). Thus, in assessing whether a statute is impermissibly vague, the "'touchstone is whether the statute, either standing alone or as construed, made it *reasonably clear*

88

at the relevant time that the defendant's conduct was criminal.'" *Kuzma*, 967 F.3d at 967 (citation omitted) (emphasis added).

The statutory definition of "silencer" easily meets that low threshold. In *Kuzma*, this Court rejected a facial vagueness challenge to the definition of "machinegun." *Id.* at 967-72. DeBorba's claim fails for similar reasons.

DeBorba again offers no authority that would support a different conclusion. And he repeats an incorrect argument he unsuccessfully made below. Based on a 2017 ATF technical bulletin, he asserts that ATF once exempted devices marketed as "solvent traps" from the definition of "silencer," then reversed course in a 2022 rule. AOB-59. But as the government showed below (3-ER-234-236), DeBorba is wrong: ATF did not change the statutory definition of "silencer" between 2017 and 2022. The statutory definition is not void for vagueness.

89

## CONCLUSION

DeBorba's seven convictions should be affirmed.

January 13, 2025

Respectfully submitted,

TESSA M. GORMAN
United States Attorney
Western District of Washington

*s/ Jonas Lerman*
JONAS LERMAN
TANIA CULBERTSON
Assistant United States Attorneys

## STATEMENT OF RELATED CASES

Under Circuit Rule 28-2.6(b), the government knows of two relevant

appeals pending in this Court:

- *United States v. VanDyke*, No. 24-2861 (Second Amendment and 18 U.S.C. § 922(g)(8)(C)(ii)).

- *United States v. Vazquez-Ramirez*, No. 24-3544 (Second Amendment and 18 U.S.C. § 922(g)(5)(A)).

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

## Form 8. Certificate of Compliance for Briefs

*Instructions for this form:* http://www.ca9.uscourts.gov/forms/form08instructions.pdf

**9th Cir. Case Number(s)** | 24-3304

I am the attorney or self-represented party.

**This brief contains** | 17,582 | **words,** including | 0 | words

manually counted in any visual images, and excluding the items exempted by FRAP

32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

◯ complies with the word limit of Cir. R. 32-1.

◯ is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

◯ is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

◯ is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

◯ complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:

☐ it is a joint brief submitted by separately represented parties.
☐ a party or parties are filing a single brief in response to multiple briefs.
☐ a party or parties are filing a single brief in response to a longer joint brief.

◯ complies with the length limit designated by court order dated [               ].

◉ is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** | s/Jonas Lerman | **Date** | January 13, 2024

*(use "s/[typed name]" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at* forms@ca9.uscourts.gov

**Form 8** | *Rev. 12/01/22*