No. 24-3304
[NO. 3:22-cr-05139-DGE, USDC, W.D. Washington]

## IN THE UNITED STATES COURT OF APPEALS

## FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

v.

JOAO RICARDO DEBORBA,

Defendant-Appellant.

## SUPPLEMENTAL EXCERPTS OF RECORD

Appeal from the United States District Court
for the Western District of Washington at Tacoma
The Honorable David G. Estudillo
United States District Judge

TESSA M. GORMAN
United States Attorney
Western District of Washington

JONAS LERMAN
TANIA M. CULBERTSON
Assistant United States Attorneys
700 Stewart Street, Suite 5220
Seattle, Washington 98101
Telephone: 206-553-7970

# SUPPLEMENTAL EXCERPTS OF RECORDS

## Table of Contents

Transcript of Sentencing Hearing on May 17, 2024,
    Filed December 10, 2024
    Dkt. #99 ................................................................................. 3

Defendant's Sentencing Memorandum,
    Filed May10, 2024
    Dkt. #85 ................................................................................ 47

United States' Sentencing Memorandum,
    Filed May 10, 2024
    Dkt. #84 ................................................................................ 62

United States' Trial Submission,
    Filed February 5, 2024
    Dkt. #80 .............................................................................. 104

1

```
 1              UNITED STATES DISTRICT COURT

 2         WESTERN DISTRICT OF WASHINGTON AT TACOMA

 3   _____
                              )
 4   UNITED STATES OF AMERICA,  ) CR22-5139-DGE
                              )
 5              Plaintiff,      ) Tacoma, Washington
                              )
 6    v.                       ) May 17, 2024
                              ) 10:00 a.m.
 7   JOAO RICARDO DeBORBA,      )
                              ) Sentencing
 8              Defendant.      )
     _____
 9
               VERBATIM REPORT OF PROCEEDINGS
10        BEFORE THE HONORABLE DAVID G. ESTUDILLO
            UNITED STATES CHIEF DISTRICT JUDGE
11   _____

12

13   APPEARANCES:

14
      For the Plaintiff:     MAX B. SHINER
15                           U.S. Attorney's Office
                             1201 Pacific Ave., Suite 700
16                           Tacoma, WA 98402

17

18    For the Defendant:     REBECCA C. FISH
                             Federal Public Defender's Office
19                           1331 Broadway, Suite 400
                             Tacoma, WA 98402
20

21

22

23

24

25      Proceedings stenographically reported and transcript
             produced with computer-aided technology
```

Colloquy                                                        2

```
 1              MAY 17, 2024 - MORNING SESSION

 2                    *   *   *   *   *   *

 3         THE DEPUTY CLERK:  This is the matter of the United

 4    States of America versus Joao Ricardo DeBorba, Cause Number

 5    CR22-5139-DGE.

 6       Counsel for the government, please make an appearance.

 7         MR. SHINER:  Good morning, Your Honor.  Max Shiner

 8    appearing for the United States.

 9         THE DEPUTY CLERK:  And for the defense?

10         MS. FISH:  Good morning, Your Honor.  Rebecca Fish on

11    behalf of Mr. DeBorba, who's seated to my left.

12         THE DEFENDANT:  Good morning, Your Honor.

13         THE DEPUTY CLERK:  And probation?

14         MS. NEUMEISTER:  Good morning, Your Honor.  Kelley

15    Neumeister on behalf of U.S. Probation.

16         THE COURT:  Again, good morning to everyone here

17    today.  Let me just organize my things here.

18       So, Mr. DeBorba, we are here today to enter sentencing,

19    and I'm required to enter a judgment or sentencing that is

20    sufficient, but not greater than necessary to comply with the

21    purposes of sentencing.  There's a statute that outlines the

22    particular factors that I'm supposed to consider and take

23    into account, and I'll talk about those later.

24       But, first, I'm going to identify the crimes.  I'll

25    identify the documents I reviewed, confirm whether or not
```

Colloquy                                                   3

```
 1    there are any other documents I should have reviewed that
 2    maybe I don't have with me, identify any objections, of
 3    course, to any of the information that's been provided, make
 4    appropriate findings related to the Presentence Investigation
 5    Report, will hear the recommendations for sentencing from the
 6    government, from your attorney, from probation as well, and
 7    then, of course, you'll have an opportunity to offer any
 8    comments that you wish regarding anything that you hear today
 9    and what's being proposed as far as sentencing.
10         We'll probably take a recess after all of that to give me
11    a couple of minutes to kind of gather my thoughts and then
12    come out here and make a decision on what should be done.
13         Any questions?  Anything that you are uncertain about
14    today?
15              THE DEFENDANT:  No, Your Honor.
16              THE COURT:  I was going to say, if you do, feel free
17    to ask Ms. Fish at any time.  During the sentencing, as well,
18    if I say something or somebody says something and you want to
19    ask your attorney something, just say, "Hey, Judge, can I ask
20    my attorney something real quick?" something like that, okay?
21         All right.  The Superseding Indictment was filed on
22    September 6th, 2023.  It contains seven counts.  Counts 1 and
23    2 are the same type of counts: Unlawful possession of a
24    firearm and ammunition based on being unlawfully present in
25    the United States and in violation of a prior domestic
```

Colloquy

4

```
 1   violence no-contact order.  Those are filed under Statute
 2   18 U.S.C. 922(g)(5) and (8).
 3       Count 3 was also for unlawful possession of a firearm
 4   based on being unlawfully present in the United States, and
 5   that, again, was 922(g)(5) of the statute.
 6       Then, Counts 4 and 5 were for false statement during
 7   purchase of a firearm, and that's under 18 U.S.C. 922(a)(6).
 8       Count 6 was false claim to United States citizenship under
 9   18 U.S.C. 911, and then Count 7 is unlawful possession of a
10   firearm silencer under 26 U.S.C. 5861(d) and 5845(a)(7).
11       On February 5th, 2024, a stipulated facts bench trial was
12   conducted, and I found Mr. DeBorba guilty of all seven
13   counts.  I'm not going to go over the facts, because there
14   was a lengthy stipulated facts document that was provided,
15   and I'm assuming the parties are familiar with all the facts,
16   of course.
17       For today, I reviewed the Superseding Indictment that I
18   mentioned was filed on September 6th of 2023, the stipulated
19   facts presented at the bench trial, the Presentence
20   Investigation Report that was filed on May 3rd, followed by
21   the sentencing recommendation by probation filed on May 3rd.
22       I've reviewed the government's sentencing memorandum with
23   attachments and then the defendant's sentencing memorandum
24   with the defendant's statement and a report from Dr. April
25   Gerlock.  There was also a proposed judgment that was
```

Colloquy                                    5

```
1   provided that I reviewed.
2       Any documents that I am missing, something that maybe I
3   should have reviewed that the parties may have noted?
4           MR. SHINER:  There is, as to the matter of
5   forfeiture.  There is a motion for preliminary forfeiture,
6   and I believe the order is before you.
7           THE COURT:  Thank you.
8           MS. FISH:  Certainly, Your Honor.  We agreed on the
9   forfeiture order, and no additional documents relevant to
10  sentencing.
11          THE COURT:  Thank you.
12      All right.  With regard to the Presentence Investigation
13  Report, Mr. DeBorba, that's a report that was prepared by
14  probation.  Have you had a chance to review that with your
15  attorney, Ms. Fish?
16          THE DEFENDANT:  Yes.
17          THE COURT:  Do you need any more time?  Is there
18  anything in there that's maybe an uncertainty and you want to
19  ask your attorney, Ms. Fish, about?
20          THE DEFENDANT:  No.
21          THE COURT:  Ms. Fish, for the record, you did review
22  that with your client?
23          MS. FISH:  Yes, Your Honor.
24          THE COURT:  Thank you.
25      I'll note there were some objections identified in the
```

Colloquy                                                    6

1   report, and I will just go over those briefly here.  One of

2   the objections was as to a statement located at page 4,

3   paragraph 9:  "Based on a review of various records, law

4   enforcement believed DeBorba was in possession of fraudulent

5   immigrant documents and fraudulent Social Security

6   documents."

7       Defense indicated that alienage already has been

8   established, and this comment or allegation is irrelevant to

9   the charges.  The response from probation was: part of

10  discovery materials and constitutes relevant conduct.

11      I understand the objection, but I am going to overrule the

12  objection and keep that statement in there.

13      The second thing was at pages 6 through 7, paragraph 19.

14  The defense asked to modify the description of the silencer,

15  and from my review, it does appear to meet, technically, the

16  definition of silencer, so I am going to overrule the

17  objection.

18          MS. FISH:  Your Honor, may I be heard briefly on

19  that?

20          THE COURT:  Sure.

21          MS. FISH:  So I'm not -- my concern was that it was

22  sort of overstating the nature of how that item was found.

23  It was found in a state that indicated it had not been used.

24  One end was closed.  I do think that's relevant to the

25  seriousness of the offense versus, you know, finding an item

Colloquy

7

1  that has clearly been used.  So, you know, the information I

2  requested be clarified is in evidence, is in the photographs

3  and the stipulated-facts bench trial.

4       THE COURT:  So the statement was that a completed

5  silencer was found.  That's what I understood, and the

6  government's response was it meets the definition of a

7  completed -- or a silencer that basically is usable, and

8  that's why completed is not, at least from the government's

9  position, not objectionable.

10      MS. FISH:  Right, so it's usable versus used, so I

11 was essentially asking the probation department to add the

12 additional relevant facts that, as found, it was indicated it

13 had not been used, if that makes sense, versus, you know, the

14 legal debate about the definition of a silencer.

15      THE COURT:  So I don't think I understood that from

16 at least what I read here.  It doesn't say that you were

17 asking to add a sentence that says it was not used.

18      MS. FISH:  Well, because I'm asking to reflect the

19 evidence.  So the evidence indicates that one end was closed,

20 which would be consistent with it not being used.  For it to

21 be used, both ends would have holes, essentially, if that

22 makes sense.

23      THE COURT:  So I don't disagree right now, based on

24 what I'm reading here, with including something that says it

25 was not used or at least did not appear to be used, but I

Colloquy                                    8

```
 1  don't know if I agree with the contention that it's not

 2  complete, at least.

 3         MS. FISH:  Sure, and I apologize for my lack of

 4  clarity there.  I wasn't necessarily trying to -- I was

 5  trying to supplement the description, because the description

 6  as is, you know, suggests something that is, you know, in a

 7  final state.  And I understand the Court's legal conclusion

 8  that it's a completed, usable silencer, but I think there's

 9  additional evidence that's relevant that demonstrates that

10  nothing had been shot through that item.

11         THE COURT:  Okay.  So, Mr. Shiner, any objection to

12  an inclusion that says it appeared to have been unused?

13         MR. SHINER:  I think we can agree that, although it

14  is a completed silencer and folks use such, there is no

15  evidence that it had been fired, because it had a closed end

16  cap.  Normally, as I said, the first shot through a silencer

17  of that type would put a hole through the end cap.

18         THE COURT:  Right.

19         MR. SHINER:  So it is usable, but that had not been

20  done, at least in the state it was found.

21         THE COURT:  Right.  So, again, from my perspective,

22  it's a functional silencer, even if it had not been used, but

23  I'm okay with putting in the statement, if we can,

24  Ms. Neumeister, to identify that it had not been fired

25  through or used.
```

Colloquy

9

```
1        MS. NEUMEISTER:  Yes, Your Honor.  Would it be
2   sufficient to just say, "There is no evidence the silencer
3   had been used"?  Is that sufficient?
4        THE COURT:  That's fine, yes.
5        MS. FISH:  Or that there's evidence it had not been
6   used.
7        MS. NEUMEISTER:  Excuse me, yes.
8        THE COURT:  That's fine with me, so we will include
9   that.
10       Third objection was, the defense seeks the third point for
11  acceptance of responsibility.  It's pointed out that the
12  guidelines state that, for this to be applicable, it's upon
13  motion of the government, and so there is no motion present.
14       Also, it looks like the government identified this case,
15  U.S. v. Villasenor-Cesar, 114 F.3d 970, a Ninth Circuit 1997
16  case, that appears to indicate that the government's position
17  about not including this is appropriate or correct, so I am
18  going to overrule that, unless there's something else that
19  you think I'm missing.
20       MS. FISH:  Your Honor, nothing more than I provided
21  to probation, which is a separate case where the Ninth
22  Circuit approved it under similar circumstances.  Whether the
23  Court imposes a formal guideline production or otherwise
24  accounts for Mr. DeBorba's early notification that he was
25  willing to waive a jury trial and full presentation of
```

Colloquy

10

```
1   evidence, I think, is an important consideration for the
2   Court in recognizing his acceptance of responsibility.
3       THE COURT:  I appreciate the comments, but I'm going
4   to overrule the objection, because I don't think it's
5   appropriate at this point given where we're at under the
6   circumstances and, of course, the government's position as to
7   the guideline, so that objection is overruled.
8       Then, finally, the fourth objection that was identified
9   was at pages 10 through 11, paragraph 51.  The defense
10  asserts that 19 firearms rather than 20 firearms should be
11  identified.
12      My only basic question is -- I tried to find in the
13  record, at least what I could find, where there was actually
14  identified 20 and that only 19 were charged.  I looked at the
15  complaint at -- this is Document Number 2 at page 13,
16  paragraph 21.  The complaint says, "approximately 20
17  firearms," end quote.  Quote, "approximately 20 firearms,"
18  end quote, were seized.  So do we know it was 19 that were
19  actually -- or 20 that were actually located, or was it 19?
20      MR. SHINER:  There were 20, and 19 of them were
21  charged in the indictment.
22      THE COURT:  Okay.  I couldn't find it in the record,
23  so I wasn't sure where to verify it.
24      MR. SHINER:  It's reflected in the discovery and
25  exhibits that were attached to the stipulated facts, where,
```

Colloquy                                                                    11

1    in the actual report, it does itemize 20 firearms that were

2    seized from Mr. DeBorba.

3         THE COURT:  Got it.  Because what I looked at were

4    the reports you attached to your briefing, and I couldn't

5    find it in those, but I didn't go back and look at every

6    report that was part of the stipulated facts.

7         MR. SHINER:  If you look at Exhibit 2 to the

8    government's sentencing memorandum, that is the narrative

9    portion of the arrest report from that date, and on page 2,

10   toward the end of the narrative, it says that they did

11   collect 20 items from --

12        THE COURT:  Sorry, which exhibit again?

13        MR. SHINER:  Exhibit 2 to the government's sentencing

14   memo.

15        THE COURT:  Sentencing memo, all right, Exhibit 2.

16   And what page?

17        MR. SHINER:  Page 2.  Toward the end of the

18   narrative, it does state that they collected 20 firearms from

19   the gun safe, so rather than giving you pages and pages of a

20   log which also reflects that, I just included the narrative.

21        THE COURT:  There it is.  I looked at this, and for

22   some reason, when I read it, I don't know why I didn't see

23   that, but I did look at this.

24        So, Ms. Fish, comments on that, then?  It does say

25   "collected 20."

MS. FISH: Let me look, Your Honor.

Your Honor, if the Court finds that's sufficient evidence to include the fact -- I think there's a disparity in the related documents related to that incident here, so I would ask the Court to use the established, agreed, stipulated 19 that the Court found he possessed at that time.

THE COURT: All right. Thank you. I am going to overrule the objection and leave that language as is.

So those were the four identified objections, at least that were contained in the report.

Ms. Fish, any other objections at this point to what is contained in the Presentence Investigation Report?

MS. FISH: No, Your Honor.

THE COURT: All right. And any objections as to the guideline calculations for the guideline custody, basically?

MS. FISH: No, Your Honor. The one I think actually the government and myself agreed on was already adopted by the report.

THE COURT: Mr. Shiner, any objections from the government to the Presentence Investigation Report at this point?

MR. SHINER: No, Your Honor.

THE COURT: Okay. So I am going to adopt the Findings of Fact and Conclusions of Law contained in the Presentence Investigation Report, with the minor change that

Colloquy

13

1    we're making as already identified.

2        So I'm going to try to explain this briefly, and it may

3    not mean anything for anybody but me at this point.  The

4    counts were grouped into two groups.  Counts 1, 2, 3, 4, 5,

5    and 7 were grouped together, and that grouping had a base

6    offense level of 20, added six for the number of firearms,

7    giving us 26.  And then, Count 6, grouped separately, had an

8    eight base offense level, and it remains, then, at 26,

9    because the second group offense level is nine or more levels

10   less than group one.

11       So it's 26, minus two for acceptance of responsibility,

12   which yields a 24 final base offense level based on a

13   criminal history category of III.  The guideline range is 63

14   to 78 months of custody.  The maximum statutory penalties for

15   Counts 1, 2, 3, 4, 5, and 7, each one is 15 years, and Count

16   6 is a max of three years.

17       Supervised release, the first group maximum is three

18   years, and Count 6, a max of one year.  The basic guideline

19   range, when you put that all together, is one to three years.

20       Eligible for probation for one to five years and must

21   impose a fine or restitution or community service.  And then,

22   under the guidelines, though, he's not eligible, because it's

23   in Zone D of the sentencing table.

24       The fine range is basically a max of 250,000, but because

25   he's indigent, it's really not applicable, but the special

Argument by Mr. Shiner

14

1  assessment of $700 total, $100 for each count, is required.

2      So that's the basics with regards to the guideline

3  calculation and statutory possibility of sanctions or

4  statutory sanctions.

5      I understand the government is seeking 60 months, plus

6  three years of supervised release; probation, 52 months, with

7  three years of supervised release; and defense is asking for

8  five years of probation.

9      So let us hear from the government on its recommendation,

10  and then we'll hear from probation, and then, of course, the

11  defense.

12      MR. SHINER:  Thank you, Your Honor.

13      As the Court is likely aware from reviewing the stipulated

14  facts and the PSR, the defendant committed a series of

15  domestic violence incidents.  As documented in the reports

16  and the PSR, he punched, slapped, threatened, yelled at,

17  tried to restrain, and spat at his wife.  He tried to keep

18  her from leaving on a couple of occasions, and he injured her

19  arm in one, and because of that, he was convicted of fourth

20  degree domestic violence twice in state court, and also

21  because of that, his wife was frightened enough to seek

22  restraining orders against him.  There were actually four

23  hearings and two restraining orders in separate proceedings,

24  two separate proceedings in this case.

25      Based on the restraining order, the defendant was not just

Argument by Mr. Shiner                    15

1  prohibited, but ordered by a court to not possess any

2  firearms, to relinquish any firearms, and not to acquire any

3  firearms, but despite these repeated orders, the defendant

4  did not relinquish his firearms.  He continued over the

5  course of two and a half years to obtain firearms, even after

6  20 firearms were seized from him by police in November 2019.

7      He continued to procure these guns despite being

8  prohibited not just by a restraining order, but by his

9  immigration status.  He continued to post about having guns

10 in videos posted on social media and the internet, with him

11 shooting guns.  He grew his gun collection to large numbers

12 of firearms, accessories, and parts.  He appears to have

13 converted his bedroom into a makeshift firearms workshop.  He

14 just would not stop.

15     He threatened his roommates, because they knew him to

16 carry a rifle around in his backpack even after he had to

17 move out of his home with his family and after he had been

18 subject to the restraining orders.

19     He obtained ghost guns, which are unserialized firearms

20 that are untraceable to any particular purchase, gun parts,

21 which he was obviously in the process of assembling in his

22 home workshop.  And like I said, this was all done not just

23 while he was prohibited under federal law, but while he was

24 specifically ordered by courts not to possess firearms.

25     The danger inherent in this conduct is significant.  It's

Argument by Mr. Shiner

16

1 not just the fact that he'd engaged in violence and that's

2 what led the courts to say he should not have guns.  As we

3 know, the unfortunate link between domestic violence and

4 firearms possession, it is the defiance and, frankly, just

5 disregard for federal and state laws and orders of the courts

6 that is so troubling.

7 This is not a case where there's a question about the

8 defendant's knowledge that his conduct had required him to

9 relinquish and not obtain any firearms.  He had firearms

10 seized from him in 2019 for this very reason, but he went out

11 and got more.  And getting more of them required him not only

12 just to purchase guns or go on the internet and get guns, go

13 to the store and get guns, it required him to fill out

14 transaction forms which he had to knowingly falsify, which he

15 did.  It's not just the two that are reflected in the counts

16 of conviction, but the evidence reflects he purchased and

17 procured many firearms over the two and a half years of

18 conduct involved in this case: the 20 that were seized from

19 him during the seizure I mentioned; another from a traffic

20 stop where he was carrying, along with a falsely-procured

21 concealed carry license; but also the guns that were found in

22 the federal search warrant when he was arrested on this case.

23 So, despite federal law, despite the Court's orders,

24 Mr. DeBorba simply decided to -- told himself that he was

25 going to have guns anyway.  Don't know why, but it does

Argument by Mr. Shiner

17

1    appear he was somewhat obsessed with firearms ownership.

2        Like I said, this is an inherently dangerous and

3    disturbing situation.  Not only did he have handguns, he had

4    rifles, he had ghost guns, he had a 50-round drum magazine

5    for pistols, he had body armor, the silencer we discussed.

6        The pictures in the stipulation reflect a pamphlet for a

7    ghost gun milling machine, which means -- it's a machine that

8    you can use to mill out unfinished firearms or parts, meaning

9    you could purchase parts from anywhere, on the internet or

10   what have you, without any requirement or regulation showing

11   that you are eligible to possess a firearm.  You can assemble

12   it at home and have a completed, unserialized, essentially

13   untraceable, homemade, personally-made firearm, and that's

14   what it appears that he was on his way to doing.

15       It's also important to note, apart from the danger he

16   posed to his ex-wife, who was under the false impression at

17   one point that he had relinquished his firearms, that this

18   pattern of evading the law dated farther back than that, in

19   fact, back to the year 2000, approximately, when -- well,

20   back to November 2019, when the first protective order was

21   issued, but also back to the year 2000, when he began to

22   falsify documents in order to overstay his visa and remain in

23   this country.

24       So, essentially, while he is charged with two false

25   statements on firearms transaction records and one false

Argument by Mr. Shiner

18

```
 1   claimed U.S. citizenship on his concealed pistol license, the
 2   documents obtained during the search warrants and other
 3   investigation in this case indicate he was falsifying Social
 4   Security cards, must have made false statements on
 5   identification documents, employment documents, all
 6   throughout his presence since the expiration of his visa in
 7   2020 -- excuse me -- the year 2000.
 8       So this is a defendant who essentially exhibited a 20-year
 9   pattern of disregard for the laws of the United States.  He
10   was continuing defiance of specific court orders issued at
11   hearings where he was present for the purpose of assuring the
12   safety of specific people and members of the public based on
13   his specific actions.  For that reason, we are requesting the
14   prison sentence.
15       With regard to the defendant's request for probation, it's
16   hard for me to see how a request for probation makes sense,
17   since, one, Mr. DeBorba has been in custody for just over two
18   years now on this matter, so he's been earning time that
19   should be credited against his sentence today.  So not only
20   do the guidelines recommend disallowing probation, but
21   probation cannot, by law, include a term of imprisonment.
22       So what the defendant is doing is asking the Court that
23   his sentence not include that credit for the time he has
24   served in custody prior to the resolution of this case, but
25   instead, they're asking for a time-served sentence of -- or
```

Argument by Mr. Shiner                                19

```
 1   instead of asking for a time-served sentence of two years and
 2   three years supervised release, they're asking for a
 3   probationary sentence of no credit for time and five years of
 4   supervision on probation.  So it's hard to see why this
 5   proposed sentence makes sense.  It actually involves a more
 6   significant, longer period of supervision than what the
 7   government or probation is asking for, plus a sentence that
 8   does not give credit for the time he's served or accurately
 9   reflect the seriousness of the conduct.
10        I can only deduce that this is an attempt to make the
11   sentence appear less serious than it actually is in order to
12   benefit him in any collateral and separate and, I would say,
13   irrelevant immigration proceedings that may come after this
14   matter is concluded.  But the problem is, he has served two
15   years, and the probation office knows that 100 percent of
16   similarly-situated defendants with similar charges and
17   guidelines calculations -- 100 percent of them were sentenced
18   to a term of imprisonment.
19        What I would suggest to this Court, respecting the fact
20   that you have discretion to sentence as you wish, is we
21   should not be reducing the solemn way or process of imposing
22   sentence in an effort to obtain a favorable outcome in
23   collateral immigration proceedings.  They are a separate
24   system for upholding the immigration laws of the United
25   States and are not a part of the punishment that this Court
```

Argument by Mr. Shiner

20

```
 1   is considering here today.
 2        The fact that the defendant may have violated immigration
 3   laws in addition to gun laws is, I think, not a reason to
 4   give him a more favorable sentence than someone who committed
 5   similar offenses, but was not facing immigration crimes or
 6   was not unlawfully in the United States at the time of those
 7   offenses.  Instead, I submit we should be focused on
 8   evenhanded and consistent administration of justice in
 9   imposing sentences.
10        That evenhanded, consistent approach, I believe, based on
11   the guidelines, probation's calculations, data regarding
12   similarly-situated defendants, and the facts in this case
13   calls for a prison sentence.  We ask that, due to the nature
14   and seriousness of the offenses, which include all those
15   inherently-dangerous weapons, including the silencer, which
16   is, under federal law, so inherently dangerous that it's
17   highly regulated and unlawful for any person, even one who's
18   not prohibited from general firearms possession, to obtain
19   those without federal licensure -- these offenses are
20   serious, and there's a need for the sentence to reflect the
21   nature and seriousness of the offense and to promote respect
22   for the law and to protect the public, and that requires the
23   government's recommended sentence.
24        Unless the Court has any more questions, I will submit.
25             THE COURT:  No, I don't.  Thank you, Mr. Shiner.
```

Argument by Ms. Fish                          21

| | |
|---|---|
| 1 | Appreciate that. |
| 2 | Ms. Neumeister, do you have anything further to offer? |
| 3 | MS. NEUMEISTER:  I don't, Your Honor, unless you have |
| 4 | any questions. |
| 5 | THE COURT:  No, I don't have any questions, so we'll |
| 6 | hear from Ms. Fish. |
| 7 | MS. FISH:  Thank you, Your Honor.  I'd like to begin |
| 8 | by picking up on something that counsel said:  The Court is |
| 9 | to think about evenhanded and consistent administration of |
| 10 | justice.  In no case I've had has a court sentenced someone |
| 11 | on a gun charge to years of separation from their children. |
| 12 | In no case I've had has a court sentenced someone convicted |
| 13 | on a gun charge to permanent exile from the home they've |
| 14 | known for their whole adult life.  In no case I've had -- |
| 15 | THE COURT:  Although I will say, regardless of the |
| 16 | gun charge, per se, the false claim to citizenship, that, |
| 17 | really, is what's going to have the biggest impact on his |
| 18 | ability under the immigration laws to any kind of benefit, is |
| 19 | my understanding. |
| 20 | MS. FISH:  Your Honor, I believe both -- both have |
| 21 | significant -- limit his ability to seek relief. |
| 22 | THE COURT:  They will both, but under the Immigration |
| 23 | and Nationality Act, as I understand it, a false claim to |
| 24 | citizenship pretty much makes you ineligible for anything. |
| 25 | MS. FISH:  Yes, it makes you inadmissible -- well, |

Argument by Ms. Fish

22

```
 1    yes, it makes one inadmissible.
 2           THE COURT:  Makes you inadmissible; it makes you not
 3    able to adjust status; it makes you unable to apply for
 4    entry.
 5           MS. FISH:  Correct.
 6           THE COURT:  You're pretty much done.
 7           MS. FISH:  So a false claim to citizenship for the
 8    purpose of an immigration benefit is what makes you
 9    ineligible for cancellation of removal.  A false claim, which
10    is -- a false claim to citizenship for any benefit is what
11    makes a person ineligible for all the things the Court is
12    talking about: admission, adjustment, et cetera.  Certainly,
13    that has a significant impact.
14        My point is that the Court, I think, certainly can and
15    should consider the obvious collateral consequences that
16    Mr. DeBorba is going to face as punishment he is receiving
17    that many other people convicted of this crime do not
18    receive.  Typically, a person convicted on gun charges in
19    this district receives, you know, some term of imprisonment
20    or jail followed by supervision in this district where they
21    can continue with their community and family supports and try
22    to move forward with their life.
23        It is very rare for someone to -- and I've never seen a
24    court in Your Honor's position sentence someone to
25    banishment.  My point is that he is going to face an extreme
```

Argument by Ms. Fish

23

```
 1    punishment regardless of any decision the Court makes today,
 2    a punishment more severe than prison time, a punishment more
 3    severe than any period of supervision, a punishment more
 4    severe than any fine.  That is something that the Court
 5    absolutely can and should consider in deciding what further
 6    punishment, if any, is necessary by this Court to achieve the
 7    goals of sentencing.
 8         The government spoke at length about one of the sentencing
 9    factors: the seriousness of the offense.  It did not address
10    the many other factors that the Court is to consider, such as
11    Mr. DeBorba's personal history and characteristics.  In
12    examining that, it is clear that Mr. DeBorba is someone who,
13    for many years, worked very hard to overcome some significant
14    barriers.  For many years, he worked to support his family
15    and to manage anxiety that stemmed from very severe childhood
16    abuse that he suffered and to adapt to a new place.
17         I will say, personally, as a lawyer or not, I take some
18    issue with the government's characterization of, you know,
19    years of defying the law for using, allegedly, something not
20    established as part of the charges actually filed in this
21    case, for someone using documents to work and live and pay
22    taxes in this country.  Millions of people do that and often
23    are the backbone of our economy, of our communities, doing
24    some of the most essential and hardest work in our
25    communities.  So I think the Court should disregard that
```

Argument by Ms. Fish

1    claim that that reflects negatively on his character, as

2    opposed to a means of survival that millions of people must

3    resort to to simply provide for their families.

4        And that's what Mr. DeBorba did for well over a decade.

5    He worked hard.  He used his skills as a machinist to find

6    work so he could put a roof over the heads of his then wife

7    and his children, to make sure they were fed, to make sure

8    his children could go to school and have all of the resources

9    and support that they needed.  All of his children were born

10   in the United States and are United States citizens, and he

11   wanted them to have the best that they could and all the

12   opportunities that he did not personally have.

13       What is clear also is that, in the time that this offense

14   occurred, Mr. DeBorba was dealing with increased anxiety.  He

15   was not able to manage his mental health as well as he

16   previously had been and was disconnected from the therapist

17   he'd initially connected with when he lived on the East Coast

18   in Massachusetts.  His family had moved to Washington at his

19   former wife's request, where she had connections and family

20   in the area.  He found a new job.  They developed a new home,

21   but soon, they started the process of separating, and very

22   soon thereafter, the COVID-19 pandemic began.

23       I believe these two crises were quite overwhelming for

24   Mr. DeBorba.  It's not to say that all of his actions were

25   justified, but I think, as Dr. Gerlock correctly reasoned,

Argument by Ms. Fish

25

1   this was a man who was struggling more and more to manage

2   that PTSD, that anxiety, those emotions he didn't know how to

3   deal with.

4       I hired Dr. Gerlock specifically because of her

5   experience.  As the Court can tell from her CV, she is not

6   someone who is new to domestic violence dynamics.  Rather,

7   it's been her career focus and a focus of treating folks who

8   have been involved in domestic violence situations for years

9   and trying to promote community safety.  She spoke of

10  Mr. DeBorba at length.  She reviewed the records, and she's

11  aware of everything going on in his case, and she opined that

12  she did not think that he indicated any symptoms that would

13  give her pause about him causing an imminent danger to

14  others.

15      Mr. DeBorba understands now why his actions caused others

16  fear, and he is incredibly sorry for that.  I think, at the

17  time, he certainly did not appreciate how much fear his

18  failure to rid himself of weapons caused to others.

19  Obviously, we've reviewed discovery in this case and

20  discussed the reasons, you know, for much of the policy

21  around the laws in question during the motions practice, and

22  Mr. DeBorba understands that his actions caused fear to some

23  of the people he cares most about in the world, and he is

24  incredibly sorry about that, as expressed in his own letter

25  to the Court.

Argument by Ms. Fish

26

He also recognizes that he needs to find or re-find the best way for him to manage his PTSD and anxiety going forward in a way that is healthy that does not cause harm or fear to others, and he has done what he can to do so while he's been detained over the past two years. He has worked with the psychologist at the FDC. Despite how difficult that can be given the understaffing, he has sought out help, and he has taken prescribed medications.

Unfortunately, their ability to engage in one-on-one counseling, which is also incredibly beneficial, is very limited, so he has sought out Bible study as another positive form of him having that kind of therapeutic environment to think through issues and to work through emotions.

Mr. DeBorba is not done, you know, with this work. He knows it will be lifelong, as expressed in his own letter, and the next steps for him are likely to continue to be very difficult. His time at the Federal Detention Center over the past two years has been more difficult than a similar amount of time would have been served in a typical post-conviction prison. This is partially due to, early on, some of the ongoing COVID restrictions and, more recently, due to the severe understaffing that the Federal Detention Center has experienced.

Because of this, people who are on pretrial units are not able to engage in programming and have very limited other

Argument by Ms. Fish                                            27

```
 1   opportunities, so it's been extremely difficult, hard time

 2   that I don't think is contemplated by the guideline range,

 3   and I think all the parties here recognize the guidelines

 4   here are rather higher than necessary for this case.

 5       The reason for my recommendation, Your Honor, is to

 6   address the primary concern that was raised by probation and

 7   the government, which was safety of the community, and I

 8   understand that concern.  So the reason for me recommending

 9   probation rather than supervised release is the Court can

10   have a longer time on probation after any sentence --

11            THE COURT:  Is it not related to immigration issues?

12            MS. FISH:  No, Your Honor.  The convictions here, as

13   they stand, you know, are going to preclude him from

14   cancellation of removal, period, and something he would

15   otherwise be eligible for due to --

16            THE COURT:  How old is his oldest child?

17            MS. FISH:  I believe his oldest is now 17, so in a

18   few years, under normal circumstances, he would be eligible

19   for adjustment.  However, the convictions here, should they

20   stand up with the Ninth Circuit, will preclude him from that

21   regardless of what sentence is imposed.  If the Ninth Circuit

22   reverses the convictions, similarly, you know, the sentence

23   would be reversed as well, so it doesn't make any impact one

24   way or the other, really, on his present status.  What makes

25   an impact is the judgment, itself.
```

Argument by Ms. Fish

28

1   The reason I proposed that is I anticipate he will spend a

2   long time in immigration custody in the best-case scenario.

3   In the best-case scenario, if he gets an immigration judge

4   who is willing to delay his removal hearing to allow his

5   criminal appeal to go forward and await the result of that,

6   he'll be in detention.  With the gun convictions in this

7   case, as I cited, he's likely, absent an extremely creative

8   argument that I cannot see at the moment from an attorney

9   helping him, he's likely to be detained and ineligible for

10  release due to the conviction and in immigration custody.

11      So, under the best-case scenario for Mr. DeBorba, if an

12  immigration judge is willing to allow him to wait for the

13  result of his criminal appeal, he'll be in custody for months

14  or years after today, and in a less-good scenario, he'll

15  still likely be in custody for months if a judge elects to

16  deport him promptly.  He'll still likely be in custody for

17  months awaiting a transport flight and then will be in a very

18  difficult place of having to learn to live a life he never

19  lived, really, to have to navigate a country he hasn't lived

20  in for decades, that he primarily knew only as a child and

21  where his father has passed away and his mother is in very

22  poor health.  He just doesn't have the kind of supports he

23  had when he lived there last.  So, in either scenario, he's

24  in for a difficult road.

25      My reasoning for recommending probation rather than time

Argument by Ms. Fish

```
 1   served in supervised release is that it gives the Court extra
 2   time should he, by some strange miracle, be successful in
 3   immigration court.  It would give the Court additional time
 4   with supervision to ensure the safety of the community, and
 5   it also gives the Court additional time where the Court would
 6   be notified should there be any unlawful entry or other
 7   police contact that would be of concern to the Court, so
 8   that's the reason.  It's to address -- because I recognize my
 9   custodial recommendation, whether on paper or practically, is
10   lower than that of probation and the government, but that
11   would give the Court additional time, essentially, with some
12   oversight of Mr. DeBorba.
13        Ultimately, I don't think that keeping him in custody for
14   an additional two or three years is going to substantially
15   further any of the goals of sentencing.  He takes this very
16   seriously.  It obviously has extremely serious consequences
17   for him regardless of any additional punishment this Court
18   imposes.
19        You know, I didn't mention, obviously, he left all of his
20   belongings.  He has nothing left.  He lost his home and all
21   of those things that frequently happen when a person is
22   arrested, in addition to the immigration consequences he
23   faces.  I think that, you know, certainly, two years in
24   difficult custody absolutely has impressed upon him, and
25   would impress upon anyone, why the government takes this
```

Argument by Ms. Fish

```
 1    conduct seriously and why it was harmful to the community and
 2    particularly to his family.
 3        Looking at the other goals of sentencing, at deterrence,
 4    at rehabilitation, at the safety of community big picture, I
 5    mean, those will best be advanced by Mr. DeBorba being able
 6    to engage with appropriate trauma and mental health
 7    treatment.  And I think that those also -- unfortunately, the
 8    staffing crisis at the FDC, while acute here, is still a
 9    problem nationwide.
10        I looked recently, and I think, as recently as February,
11    the Bureau of Prisons director was testifying to Congress
12    about the staffing shortages, and one of the issues that
13    comes up with the staffing shortages is that people who are
14    hired to be nurses, to be teachers, to be in roles that are
15    meant to provide programming, treatment, or enrichment to
16    people detained, are being asked to basically serve as patrol
17    officers because they're so short-staffed, so that
18    programming becomes less available.
19        So, while he might, I would hope, if he's sentenced to
20    additional time, receive some opportunity to engage in better
21    programming along the lines of what Dr. Gerlock recommended,
22    some other things she recommended just aren't available in
23    the BOP.  There's no victims panel.  There's no specific DV
24    or family relationship training.  Others -- there's CBT.
25    There's some other programs that are available, and I would
```

Argument by Ms. Fish

31

1    hope he'd get to engage in some of those, but the

2    availability is somewhat limited.

3         The best program for folks -- for men who have experienced

4    significant trauma, the Resolve Program, is of limited

5    availability.  This is anecdotal, not statistical, but when

6    I've tried and I have no one opposed and the Court has

7    recommended designation to a facility where my client can

8    participate in those programs, in the last few years, none

9    have been successful.

10        So, you know, I'm not sure what additional years in

11   custody would achieve for Mr. DeBorba, other than to increase

12   his depression and potentially make it harder for him in the

13   future to engage in appropriate treatment.  He's in a very --

14   particularly, given the circumstances he's facing, I think he

15   has the best outlook he can, which is recognizing what he

16   needs to do to make himself better and to be able to be a

17   support in any way that he can for his children going

18   forward, and that is his focus.  And he has held on to that,

19   you know, as a way to make sure that he's doing okay and that

20   he can do all the positive things he needs to do to manage

21   his mental health and think about the future, but three more

22   years in prison, I worry that he won't be able to hold on to

23   that resolve forever.

24        So I would ask the Court to fashion a sentence that

25   recognizes the immense, immense collateral consequences he is

Argument by Ms. Fish

1   dealing with and that really does focus on promoting the

2   goals of sentencing.  I think that the time he's served

3   already and the consequences he will face are more than

4   sufficient punishment for the conduct, which he recognizes is

5   serious, and he does understand and has really come to

6   appreciate through the course of this case why it was so

7   frightening to other people and something that should not

8   happen.

9       But looking to the other goals, I just don't see prison

10  time serving any of those, so I would ask the Court to

11  impose -- whether the Court wants to do a time-served

12  sentence followed by supervised release with a shorter time

13  for the Court to supervise Mr. DeBorba, or if the Court

14  follows my recommendation of a five-year probationary

15  sentence, I think that sentence that kind of allows him to

16  move forward from today with all the other consequences he

17  will face is appropriate.

18          THE COURT:  All right.  Thank you, Ms. Fish.

19      Mr. DeBorba, this is your opportunity to offer any

20  comments you wish, but before you do that, I just want to

21  Google something on my mind, so just give me one second.

22          MR. SHINER:  When it's appropriate, I have some

23  comments in response, if that's okay.

24          THE COURT:  Yes.

25          MR. SHINER:  Would you like me to proceed now, Your

Argument by Ms. Fish                    33

```
 1  Honor?

 2          THE COURT:  No, one second.

 3          MR. SHINER:  Okay.

 4          THE COURT:  I just wanted to look up the issue about

 5  false claim to citizenship and see if I can find the

 6  Immigration and Nationality Act statutes, and of course, I

 7  can find a summary, but not the actual statutes, so I don't

 8  know if I can rely on this.  But at least the summary says,

 9  "Inadmissibility:  Individuals who make a false claim to

10  citizenship on or after September 30th, 1996, for any benefit

11  or purpose under federal or state law are inadmissible," if

12  that's accurate.

13          MS. FISH:  I believe that's correct, Your Honor.

14  It's the false claim for immigration benefit that impacts

15  only cancellation eligibility.  So I agree with the Court on

16  the inadmissibility, which, obviously, would be another

17  avenue -- but for the judgment in this case -- he would have

18  to potentially pursue.

19          THE COURT:  Either way, there are undeniable

20  challenges to get cancellation or removal.  There's other

21  requirements, including establishing moral character, which I

22  don't know if that's really --

23          MS. FISH:  Yes, Your Honor, and I agree.  I believe

24  that the additional convictions in this case -- you know, the

25  false claim would be a CIMT, which would make him ineligible
```

Rebuttal Argument by Mr. Shiner                    34

1  for that -- the firearms charges would make him ineligible

2  for that.  But I agree with the Court that, for other

3  reasons, other criminal grounds, the convictions here make

4  him ineligible.

5          THE COURT:  Okay.  Mr. Shiner.

6          MR. SHINER:  Just briefly, and those comments lead

7  into what I was going to say, which is, I made my comments

8  about immigration not to say whether the Court should be able

9  to predict the outcome of the immigration proceedings, but

10 counsel, I think, maybe misunderstands or mischaracterizes my

11 position by saying she's never seen a court sentence someone

12 to exile from their family.  That is not what the Court is

13 doing.  The Court, itself -- and I glean from both the Court

14 and counsel's comments that we are all in agreement that the

15 immigration proceedings are going to be challenging for him.

16 The Court is imposing a sentence that is intended as

17 punishment for the crimes.  Immigration proceedings are not

18 punishment for these offenses.  They may affect his ability

19 to maintain residency here, but they are intended for the

20 administration of the U.S. Immigration Laws and who is

21 eligible and who is not to remain as a non-citizen.

22     So that is why I believe it should not be the primary

23 driver of the sentence in this case.  Rather, the primary

24 driver should be, as I think probation and the government

25 agree, the nature of the offenses and the seriousness of the

Rebuttal Argument by Ms. Fish                    35

```
 1    conduct.  This is not a case, like many that come before
 2    these courts, where a person's immigration status is, as
 3    counsel hinted at, the product of someone coming into this
 4    country because they had no ability to make a living in their
 5    home country.  There is no indication of that in the record,
 6    and the probation report does not seem to indicate that.
 7         The defendant came here with his mother and father as part
 8    of a ministry in 1999 on a temporary Visa.  His mother and
 9    father returned to Brazil.  The defendant could have done so,
10    as well.  There's no indication he could not have been living
11    back there with his parents and extended family.  Instead, he
12    made the conscious decision to stay through obtaining
13    fraudulent identity documents.
14         So I'm sure there are many people who could be considered,
15    as the term is phrased, "economic migrants."  There's no
16    indication that's the case here, so to the extent that his
17    status in immigration proceedings are weighing on the Court's
18    mind, this does not -- should not have the weight it would
19    have in the cases that counsel was describing.
20              THE COURT:  All right.  Thank you, Mr. Shiner.  I
21    appreciate those comments.
22         Ms. Fish.
23              MS. FISH:  Very briefly, Your Honor.  I would just
24    note, you know, certainly, people immigrate for various
25    reasons, but I think, as is clear from the various documents
```

Allocution of Defendant

36

```
1   we've submitted, you know, Mr. DeBorba and his family faced
2   discrimination in his home country based on their religion.
3   He had a lot of difficult things going on there for him
4   besides just work, which was hard to find, although he was
5   working and trying to make a living.  So I think there are
6   other reasons, including the desire to practice your religion
7   freely, to be free from that type of discrimination, that
8   people may not want to return.
9           THE COURT:  All right.  Thank you.
10      Okay.  Mr. DeBorba, as was mentioned earlier, at this
11  point, this is your opportunity to offer any comments that
12  you wish.  You don't have any obligation to do so, but I
13  certainly am open to hearing from you and any comments that
14  you wish to offer.
15          THE DEFENDANT:  Yes.  Thank you for the opportunity.
16          THE COURT:  And you are fine to sit down.  It's fine
17  to sit down.  Thank you.
18          THE DEFENDANT:  I want to talk to all of you, and
19  Mr. Shiner also.  I'm really, really sorry for the actions
20  that I took.  Never did I intend -- I know there's things
21  that I might not say or should say or not, but I never had
22  any intent to harm no one.
23      Mr. Shiner probably came from a background of law
24  enforcement.  I don't know if it is.  That's one thing, also.
25  Law enforcement, I don't have a grudge against them.  I never
```

Allocution of Defendant

37

```
 1   intended to hurt anyone.  I am actually thankful for them,
 2   because I know they keep the community safe, and my kids.  I
 3   just want -- I -- that's all that I can say.  Thank you.
 4             THE COURT:  All right.  Thank you, Mr. DeBorba.
 5        Okay.  I am going to go take a couple of minutes here and
 6   think about this a little bit more.  I will be back out here
 7   in a few minutes.
 8        Before I do that, though, I am going to go ahead and sign
 9   this preliminary order of forfeiture.  I am going to thumb
10   through and just see -- this is a standard order, right?
11   There's nothing weird about this particular order?  I've seen
12   them before.
13             MS. FISH:  Nothing I'm aware of.  Mr. Shiner allowed
14   me to review it beforehand.
15             MR. SHINER:  No, Your Honor.  And to be clear, it
16   reflects only those firearms that are cited in the offenses
17   of conviction.  We will be filing a separate agreement for
18   abandonment of other firearm-related items.
19             THE COURT:  All right.  So I will sign this order.
20        As I said, I'll be back in just a few minutes.
21                       (Recess.)
22             THE COURT:  Thank you, everyone.  Please be seated.
23        I forgot to ask:  All those standard conditions and
24   mandatory and special conditions, did you have a chance to
25   review all of those, Ms. Fish?
```

Court's Ruling

38

```
1      MS. FISH:  We did, Your Honor.  We reviewed those
2  prior to today's hearing.
3      THE COURT:  Do you have any objections to any of
4  those conditions?
5      MS. FISH:  I don't believe I did, Your Honor,
6  recognizing the potential, essentially, for supervision to be
7  limited if he is deported, but I think the conditions
8  contemplate that.
9      THE COURT:  Okay.  Thank you.
10     So, Mr. DeBorba, I think I mentioned earlier that there
11 are a number of factors that need to be considered in
12 arriving at sentencing, and the statute identifies those
13 factors.  That statute is 18 U.S.C. 3553(a), and that statute
14 indicates the Court is to impose a sentence that is
15 sufficient, but not greater than necessary to reflect the
16 seriousness of the offense, to promote respect for the law,
17 to provide just punishment for the offense, to afford
18 adequate deterrence to criminal conduct, to protect the
19 public from further crimes from the defendant, and to provide
20 the defendant with needed educational/vocational training,
21 medical care, or other correctional treatment in the most
22 effective manner.
23     The Court must also consider the nature and circumstances
24 of the offense and the history and characteristics of the
25 defendant, the kinds of sentences available, the sentencing
```

Court's Ruling

39

```
1   guidelines that we reviewed, of course, and then, also,
2   should be considering the need to avoid unwarranted
3   sentencing disparities among similarly-situated defendants.
4       First, the nature and circumstances of the offenses and
5   the seriousness of the offenses, there's no doubt these are
6   serious offenses.  In particular, I guess because of the
7   history with regard to the domestic violence and relationship
8   with your ex-spouse, you know, the record shows that there
9   were prior orders ordering you not to have any type of
10  firearms, and yet those orders were disregarded.
11      And of course, I don't know what the full range of the
12  history between you and your ex-spouse is or was, but based
13  on what was provided, it shows there was some volatility
14  there, and again, whose fault it is, I don't know, but in the
15  end, there definitely was some volatility between you and
16  your ex-spouse.  And when somebody has access to guns and
17  there is this volatility, even though individuals may not
18  have any intent to do any harm, it's just a bad mixture.  You
19  don't know.  You don't know.  And especially when somebody
20  might have some prior mental health issues that come into
21  play, that volatile situation can lead to who knows what.
22      And then, of course, with regards to some of these
23  firearms not having any type of -- I think they're considered
24  ghost guns, some of them.  You know, they get stolen,
25  something happens to them, they're transported and delivered
```

Court's Ruling

40

```
 1   to somebody else, they're in the community, they're not
 2   traceable, and that just makes it a very dangerous situation
 3   for the community as a whole, quite frankly.  So, again, no
 4   doubt these are serious offenses.
 5        You know, there's this debate between the government and,
 6   of course, you and your attorney about to what extent should
 7   the Court consider the collateral consequences.  There's no
 8   doubt in my mind there are collateral consequences for you as
 9   a result of these offenses, and forgive me if I'm sounding
10   harsh, but, honestly, I don't see much hope for your ability
11   to obtain some type of immigration benefit in the future
12   given, currently, the convictions.  And even without the
13   convictions, an immigration official may use the history of
14   your file and all of these reports -- again, please forgive
15   me for being harsh, but I really don't see much hope that you
16   will get a benefit from immigration officials at some point
17   in the future.  I could be wrong.  I definitely could be
18   wrong, but there are some serious challenges that you face
19   regardless of these convictions, quite frankly.
20        So should we consider those to some extent?  Arguably,
21   under the history and characteristics of the defendant
22   factor, those are some things to be considered and
23   identified, but should they be the defining factor?  I don't
24   know that they're the defining factor that the Court should
25   take into consideration, because some of these other factors,
```

Court's Ruling

41

1  of course -- there's the seriousness of the offense,

2  promoting respect for the law, and then these other factors,

3  such as adequate deterrence, and it's not just for yourself,

4  but adequate deterrence for others to make sure others are

5  aware, look, if you are ordered not to have firearms,

6  especially under a domestic violence order, and you continue

7  to have firearms, there needs to be consequences for that.

8  People should understand that they have to respect the law,

9  and not just yourself, but others that may view this at some

10  point in the future, to understand what the consequences are.

11      So I am taking all those things into consideration, and I

12  am considering also the immigration issues, as well.  And I

13  recognize, again, the challenges you face, but taking all

14  those factors into consideration, I believe an appropriate

15  sentence in this case would be 30 months of custody followed

16  by the three years of supervised release.

17      I'm required to impose a $700 special assessment, $100 for

18  each count.  I am not going to impose any fine, of course, in

19  light of your current indigency.  The $700, though, is due

20  immediately and should be paid to the Clerk of the United

21  States District Court for the Western District of Washington.

22      I do believe that this sentence I'm imposing is reasonable

23  and sufficient, but no more than necessary to carry out the

24  objectives of sentencing as required under 18 U.S.C. 3553(a).

25  You, of course, will get credit for the approximate two years

Court's Ruling                                           42

```
 1   now that you've been in custody.  So that leaves, you know,

 2   whatever that calculates out to, another five or six months,

 3   but again, I don't know what the official calculation is

 4   given the time line that you have been in custody.

 5       Mr. Shiner, do you have a judgment we can present to

 6   Ms. Fish for entry?

 7           MR. SHINER:  I do, Your Honor.

 8           MS. FISH:  Your Honor, for the record, I did review

 9   the judgment, and I believe it conforms with the Court's

10   ruling.

11           THE COURT:  Thank you.  So I've signed the Judgment.

12   It is going to be entered.

13       For the record, do either counsel have any objections not

14   previously voiced to the ultimate findings I've made today,

15   the guideline calculations, the sentence, or the manner in

16   which I have pronounced it?  If so, objections should be

17   identified at this time, or they may be considered to have

18   been waived.

19           MS. FISH:  No further objections, Your Honor.

20           MR. SHINER:  Nothing further, Your Honor.  Thank you.

21           THE COURT:  Thank you.

22       So, Mr. DeBorba, if you wish to appeal the sentence, which

23   I understand you will be, but it's very important that, of

24   course, you talk to your attorney and instruct her that is

25   what you want to do.  Your attorney, of course, can explain
```

43

```
 1    what issues are appealable.

 2         If you wish to appeal the sentence, but cannot afford the

 3    filing fee for the Court of Appeals, you can ask me to waive

 4    that fee, and the Clerk of the Court will prepare and file

 5    the notice of appeal upon your request.

 6         With few exceptions, any notice of appeal must be filed

 7    within 14 days of entry of judgment, and I have no reason at

 8    this time to doubt your attorney's effectiveness, but you

 9    also obtain the right to challenge your counsel's

10    effectiveness.

11         You also have the right to file an appropriate motion

12    pursuant to 28 U.S.C. 2241 to address the conditions of your

13    confinement or the decisions of the Bureau of Prisons

14    regarding the execution of your sentence.

15         Mr. DeBorba, do you have any questions at this time for

16    either myself or that you want to ask your attorney about

17    before we conclude today's proceedings?

18              THE DEFENDANT:  No, Your Honor.

19              THE COURT:  All right.  Mr. DeBorba, that concludes

20    today's proceedings.  I do sincerely wish you the best of

21    luck.  Although you may not agree with the sentence, of

22    course, please do know that this is not something that --

23    again, it's not a pleasure that I'm taking in any form or

24    fashion by entering today's judgment, so again, good luck to

25    you.  I wish you the best of luck.
```

44

```
 1              THE DEFENDANT:  Thank you, Your Honor.

 2              THE COURT:  Thank you.

 3                          (Adjourned.)

 4

 5

 6

 7                   C E R T I F I C A T E

 8

 9

10      I, Sheri L. Schelbert, RMR, CRR, do certify that the

11   foregoing is a correct transcript, to the best of my ability,

12   from the record of proceedings in the above-entitled matter.

13

14

15   /s/ Sheri Schelbert

16   Sheri Schelbert

17

18

19

20

21

22

23

24

25
```

CHIEF JUDGE DAVID G. ESTUDILLO

1
2
3
4
5
6
7
8

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

9
10
11
12
13
14

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) No. CR22-5139-DGE |
| Plaintiff, | ) |
| | ) |
| v. | ) JOÃO DEBORBA'S SENTENCING |
| | ) MEMORANDUM |
| JOÃO RICARDO DEBORBA, | ) |
| | ) |
| Defendant. | ) |

15    Mr. DeBorba is sincerely sorry for his conduct here. In his own words, Mr.

16  DeBorba affirms: "I feel terribly sorry for the mistakes that I did because I know they

17  affect, of course, my wife, my children, and the other loved ones. I understand that my

18  actions frightened people, and I'm so sorry for this." Ex. B. Mr. DeBorba understands

19  the seriousness of his conduct. And he has and will continue to suffer very serious

20  consequences because of it. Given the over two years he has spent in difficult pretrial

21  detention, the further time he will likely spend in immigration detention, and his

22  expected deportation and separation from his children as a result of the Judgment in this

23  case, no further custodial sentence is necessary. Instead, Mr. DeBorba, through counsel,

24  respectfully asks the Court to sentence him to five years of probation.

25
26

JOÃO DEBORBA'S SENTENCING MEMORANDUM
(*United States v. DeBorba*; CR22-5139-DGE) - 1

**FEDERAL PUBLIC DEFENDER**
**1331 Broadway, Suite 400**
**Tacoma, WA 98402**
**(253) 593-6710**

**I.      MR. DEBORBA'S HISTORY, THE FACTS OF THIS OFFENSE, AND THE COLLATERAL CONSEQUENCES THAT WILL RESULT FROM THE JUDGMENT IN THIS CASE ALL INDICATE A MITIGATED SENTENCE.**

Consideration of "the nature and circumstances of the offense and the history and characteristics of" Mr. DeBorba makes clear that a lengthier term of incarceration is not necessary. Mr. DeBorba is sincerely remorseful for his actions. Although he had no intent to harm or frighten anyone, he recognizes that he did just that.

Mr. DeBorba has long dealt with anxiety from adverse experiences in his childhood. For decades, he worked hard to support his family and to hold his anxiety at bay. At the time of this offense, his mental health was particularly strained following a separation from his spouse and later the COVID-19 pandemic. Since his arrest, Mr. DeBorba's anxiety has further increased as he has dealt with this case through difficult jail conditions. Mr. DeBorba litigated meritorious motions in his case in hopes of preserving any ability to see and support his children in the future. He has nonetheless accepted full responsibility for his conduct.

Following any sentence in this case, Mr. DeBorba will be brought to immigration detention. And absent (or until) a different resolution of his pretrial motions by the Court of Appeals, it is a virtual certainty he will be deported and separated from his children for the foreseeable future. These circumstances indicate no need for further incarceration beyond the approximately two years that Mr. DeBorba has already spent in custody.

**A.      Mr. DeBorba lives with significant anxiety from trauma in his youth.**

Mr. DeBorba remembers parts of his childhood with immense fondness. But other parts have haunted him for decades. Mr. DeBorba grew up in a small city in Brazil. He was the oldest of his parents' two children, and both of his parents worked hard to provide for him and his sister. Mr. DeBorba's mother worked in a pharmacy and

JOÃO DEBORBA'S SENTENCING MEMORANDUM
(*United States v. DeBorba*; CR22-5139-DGE) - 2

**FEDERAL PUBLIC DEFENDER**
**1331 Broadway, Suite 400**
**Tacoma, WA 98402**
**(253) 593-6710**

later a small office supply store. His father worked in a machine shop for most of his life, a career Mr. DeBorba would later follow.

Mr. DeBorba's parents were Pentecostal Christians, and he grew up in the church. Indeed, his father was the pastor of their church. While the church itself was generally a positive for Mr. DeBorba, Pentecostalism was a minority religion in Brazil, and Mr. DeBorba and his family faced discrimination due to their religion. *See* Pew Research Center, *Report: Brazil's Changing Religious Landscape* (July 18, 2013), https://www.pewresearch.org/religion/2013/07/18/brazils-changing-religious-landscape/ (among other statistics, in 1970, approximately 92 percent and in 2000, approximately 74 percent of Brazil's population were Catholic). Mr. DeBorba specifically was mocked and bullied because of his religion. He was small in stature, and became a favorite target of other children, experiencing frequent beatings, intimidation, and teasing from his peers.

While this bullying became a source of immense stress for Mr. DeBorba, he had bigger threats to worry about. Mr. DeBorba experienced serious abuse multiple times during his childhood.[1] Mr. DeBorba was too afraid to tell his parents. While he loves his parents, he also experienced some neglect at home, as well as emotional and physical abuse[2] by his mother, who struggled with her mental health. Mr. DeBorba tried instead to bottle up his emotions. Unfortunately, the type of trauma that Mr. DeBorba experienced cannot simply disappear or be willed away. He began to experience significant depression and anxiety. Indeed, he developed a serious ulcer at age 13. Mr. DeBorba has experienced suicidal ideations in his life, including prior attempts. These

---

[1] Described in further detail in Sealed Ex. A and the Pre-Sentence Report (PSR).

[2] As indicated in the PSR, Mr. DeBorba's experiences conform to those that the Adverse Childhood Experiences (ACE) metric characterizes as abuse or maltreatment, even though Mr. DeBorba himself did not view his mother's actions as abusive.

JOÃO DEBORBA'S SENTENCING MEMORANDUM
(*United States v. DeBorba*; CR22-5139-DGE) - 3

**FEDERAL PUBLIC DEFENDER**
**1331 Broadway, Suite 400**
**Tacoma, WA 98402**
**(253) 593-6710**

1 childhood traumas contributed to Mr. DeBorba's present severe Post-Traumatic Stress

2 Disorder (PTSD), extreme Depression, and Anxiety Disorder. *See* Sealed Ex. A at 11–

3 13.

4      Despite these challenges, Mr. DeBorba persevered. His fondest memories of

5 childhood are spending time with his father. He and his father went camping, hunting,

6 and sport-shooting together. These times engaged in outdoor activities with his greatest

7 supporter eased Mr. DeBorba's anxiety, even if temporarily. Mr. DeBorba worked hard

8 in school and followed in his father's footsteps once he reached adulthood, finding

9 work as a machinist.

10    **B.**   **In adulthood, Mr. DeBorba worked hard to provide and care for his**

11         **children.**

12      While Mr. DeBorba was still a young adult, he again followed in his father's

13 footsteps, this time to the United States. Mr. DeBorba's father was invited to help a

14 pastor in Massachusetts set up a new Pentecostal Church, and he asked Mr. DeBorba to

15 join. Mr. DeBorba intended only to stay a few months to help his father.

16      However, Mr. DeBorba found a community—one where he felt he fit in—in

17 Massachusetts. He was no longer the target of bullying, isolated by a minority religion.

18 He was part of a community building a Church together. Soon, Mr. DeBorba met his

19 ex-wife. He found steady work as a machinist, and the two started a family together.

20 Mr. DeBorba remained in Massachusetts, though his father returned to Brazil.

21      Mr. DeBorba continued to struggle with his mental health. While living in

22 Massachusetts, he was able to enroll in counseling and for the first time opened up

23 about his traumatic childhood experiences. He found this therapy immensely helpful.

24 And for many years, Mr. DeBorba lived the life he had always hoped for—a quiet life

25 focused on family.

26

**FEDERAL PUBLIC DEFENDER**
**1331 Broadway, Suite 400**
**Tacoma, WA 98402**
**(253) 593-6710**

1       Mr. DeBorba again followed his father's example—in parenting. His children

2  were and are his highest priority. He worked hard to ensure they had all the resources

3  they needed, and he also made sure to spend as much time as he could with them. He

4  tried to give them a wonderful childhood—one where they could enjoy the outdoors, be

5  supported in school, and have all the opportunities they wanted.

6       In 2018, Mr. DeBorba's life changed significantly. First, his then-wife decided

7  she wanted the family to move to Washington. She knew people in Washington, though

8  Mr. DeBorba did not. Nonetheless, he agreed to the move. This meant finding a new

9  place to live, a new job, and transitioning their children to new schools. Mr. DeBorba

10  worked hard to make the transition successful. But, with all these changes, Mr.

11  DeBorba was not able to continue his mental health counseling.

12       The same year, Mr. DeBorba lost his father. Mr. DeBorba had remained in

13  contact with his father despite living far apart. His father remained his greatest

14  supporter and a source of strength and calm. But toward the end of his life, Mr.

15  DeBorba's father was diagnosed with Alzheimer's. It was difficult for Mr. DeBorba to

16  support him from afar, but he did not stop trying. Then, months after his diagnosis, Mr.

17  DeBorba's father fell and suffered a fatal head injury. The loss devastated Mr. DeBorba

18  and remains a source of grief and guilt to this day.

19       Mr. DeBorba's mental health took a turn for the worse. He was prescribed

20  medication but did not receive sustained therapy. His marriage also began to

21  deteriorate, and he and his wife began divorce proceedings. During this time, Mr.

22  DeBorba was arrested on domestic violence charges and ultimately pled guilty to

23  misdemeanors. He and his wife separated and he lived in a separate apartment, with

24  limited time with his children.

25

26

JOÃO DEBORBA'S SENTENCING MEMORANDUM
(*United States v. DeBorba*; CR22-5139-DGE) - 5

**FEDERAL PUBLIC DEFENDER**
**1331 Broadway, Suite 400**
**Tacoma, WA 98402**
**(253) 593-6710**

**C.    Mr. DeBorba is very sorry for his conduct here—though he had no intent to harm anyone, he recognizes the alarm his actions caused.**

Mr. DeBorba is very sorry that he possessed guns. As is undisputed, he never used the firearms to harm or threaten anyone. He had no intent to do so. And, as experienced psychologist April Gerlock, Ph.D., explained, "Mr. DeBorba did not express any threats or anger towards his former wife. He did not make statements or behave in a manner that would suggest danger towards her." Sealed Ex. A at 14. Nonetheless, Mr. DeBorba recognizes that his actions caused alarm and fear, and he is truly remorseful for causing others this distress.

He also apologizes for letting his children down. Due to his arrest and incarceration here, Mr. DeBorba has been separated from his children. As Dr. Gerlock noted, Mr. DeBorba's mental health has deteriorated since his incarceration. Sealed Ex. A at 13. This has certainly been painful for Mr. DeBorba, but his concern remains focused on his children. He is sorry that he has not been able to support them and care for them due to his actions here.

**D.    Mr. DeBorba faces virtually certain deportation and separation from his children as a result of his convictions here.**

Mr. DeBorba litigated motions to dismiss the charges against him, which make him ineligible for relief from deportation. *See* Dkts. 36, 53, 56, 62. This decision is unsurprising, given the disproportionate stakes that conviction on these charges present for Mr. DeBorba. The Supreme Court has repeatedly held that "'[p]reserving the client's right to remain in the United States may be more important to the client than any potential jail sentence.'" *Padilla v. Kentucky*, 559 U.S. 356, 368 (2010) (quoting *I.N.S. v. St. Cyr*, 533 U.S. 289, 322 (2001)). Mr. DeBorba's Motions raised live constitutional issues, which the Ninth Circuit has recently recognized as a basis to reverse convictions. *See United States v. Duarte*, No. 22-50048, 2024 WL 2068016, at *2 (9th Cir. May 9, 2024) (reversing conviction under § 922(g)(1) while rejecting and

**FEDERAL PUBLIC DEFENDER**
**1331 Broadway, Suite 400**
**Tacoma, WA 98402**
**(253) 593-6710**

1  parsing many of the arguments relied on the government here). After this Court denied

2  Mr. DeBorba's Motions to Dismiss, he stipulated to facts and evidence and waived his

3  right to a jury trial, accepting full responsibility for his conduct.

4      To pursue his only chance of avoiding exile from his children for the foreseeable

5  future, Mr. DeBorba waited in jail for over two years. *See* Dkts. 2, 6 (Mr. DeBorba was

6  arrested on May 6, 2022). His arrest interrupted his albeit limited mental health

7  treatment, and he had to persevere without his needed medications for months. *See*

8  Ex. A at 5. Mr. DeBorba has not had access to meaningful programming during this

9  time and has had scant opportunities for mental health care beyond medication due to

10  the jail's severe understaffing. *See* Nina Shapiro, *SeaTac Federal Detainees Grow*

11  *Desperate Amid Lack of Medical Care*, Seattle Times (Feb. 26, 2024),

12  https://www.seattletimes.com/seattle-news/law-justice/seatac-federal-detainees-grow-

13  desperate-amid-lack-of-medical-care/. Mr. DeBorba also experienced harassment and

14  threats due to misinformation spread about the charges against him. Mr. DeBorba has

15  engaged in bible study to see his way through this exceedingly difficult period of

16  detention.

17      When the Court enters judgment in this case, Mr. DeBorba will become

18  ineligible for relief from deportation that might otherwise be an option for him. *See*

19  8 U.S.C. § 1101(a)(43)(C); 8 U.S.C. § 1227(a)(2)(E)(ii); 8 U.S.C. § 1182(a)(2)(A)(i)(I);

20  8 U.S.C. § 1182(a)(6)(C)(ii). Probation has confirmed that Immigration and Customs

21  Enforcement (ICE) has a detainer for Mr. DeBorba, so he will be brought to ICE

22  detention whenever he is released from custody on this case. And Mr. DeBorba will

23  likely spend months to years in ICE custody.

24      Indeed, even if an Immigration Judge were to promptly order Mr. DeBorba

25  deported, he would likely wait for months in custody for a deportation flight to Brazil.

26  And the best case scenario for Mr. DeBorba—if an Immigration Judge agrees to delay

JOÃO DEBORBA'S SENTENCING MEMORANDUM
(*United States v. DeBorba*; CR22-5139-DGE) - 7

**FEDERAL PUBLIC DEFENDER**
**1331 Broadway, Suite 400**
**Tacoma, WA 98402**
**(253) 593-6710**

1   proceedings to allow Mr. DeBorba's appeal here to proceed so he could *seek* relief from

2   deportation—means he would spend months or even years longer in ICE detention

3   awaiting proceedings. Mr. DeBorba would likely be deemed ineligible for bond from

4   ICE detention while awaiting deportation proceedings due to the convictions here. *See* 8

5   U.S.C. § 1226(c)(1) (requiring detention with very limited exceptions for people who

6   are removable due to convictions of crimes involving moral turpitude, firearms

7   offenses, and others).

8       In the more likely former scenario, or absent a reversal of the convictions here

9   on appeal, Mr. DeBorba will be deported to Brazil and inadmissible to the United

10  States—meaning ineligible for even a tourist visa to visit. In other words, the judgment

11  in this case is expected to lead to Mr. DeBorba's lifelong exile from this country—the

12  only home he has known for the past couple decades, and the home of his beloved

13  children. This severe consequence is of course frightening for Mr. DeBorba. But, as

14  always, he is sorriest to his children for the harm the separation will cause them.

15      Mr. DeBorba is truly remorseful for his actions here. He is sorry to anyone

16  frightened or harmed by his possession of guns. He has spent the past two years

17  regretting and reflecting on his decisions. And he hopes above all to do whatever he can

18  to support his children. He recognizes his options for doing so going forward will likely

19  be severely limited, and he is doing his best to prepare for this reality.

20  **II.     THE COURT SHOULD SENTENCE MR. DEBORBA TO FIVE YEARS**

21  **        OF PROBATION.**

22      After considering the full circumstances of this case—including the over two

23  years that Mr. DeBorba has already served in difficult pretrial detention and the

24  extreme collateral consequences he faces—the Court should conclude that further

25  custodial sanction is not necessary to advance the goals of sentencing. Instead, the

26  Court should impose a sentence that maximizes its term of supervision over Mr.

JOÃO DEBORBA'S SENTENCING MEMORANDUM
(*United States v. DeBorba*; CR22-5139-DGE) - 8

**FEDERAL PUBLIC DEFENDER**
**1331 Broadway, Suite 400**
**Tacoma, WA 98402**
**(253) 593-6710**

1 DeBorba so that Probation may monitor and support him in the event he is able to

2 remain in the United States.

      **A.**    **The over two years that Mr. DeBorba has already served in jail as well as his virtually certain deportation are more than enough punishment here.**

5       No further custodial sentence is needed here to "to reflect the seriousness of the

6 offense, to promote respect for the law, and to provide just punishment for the

7 offense[.]" 18 U.S.C. § 3553(a)(2)(A). Unlike in many cases charged under § 922(g),

8 Mr. DeBorba had no prior felony convictions, no history of using guns for criminal

9 activity, and no intent nor desire to do so. Mr. DeBorba's gun possession here had no

10 violent purpose and, as Dr. Gerlock recognizes, was evidently a poor form of coping.

11 Nonetheless, Mr. DeBorba recognizes now why his possession of firearms caused

12 others concern and he is truly sorry for that.

13       Two years in particularly difficult pretrial detention that will be followed by

14 months or years more in similarly difficult ICE detention and likely deportation are

15 more than enough punishment for Mr. DeBorba's conduct here. Detention without

16 programming, real outdoor space, or adequate staffing for protection against harassment

17 is certainly more painful and punitive than incarceration at a fully equipped prison. Mr.

18 DeBorba's harsh conditions of detention are expected to continue or worsen when he is

19 brought to ICE custody. *See, e.g.*, Grace Deng, *For-Profit Tacoma ICE Center Blocks*

20 *Health and Labor Inspections*, Cascade PBS, CrossCut (Feb. 5, 2024),

21 https://crosscut.com/news/2024/02/profit-tacoma-ice-center-blocks-health-and-labor-

22 inspections (reporting over 300 complaints lodged regarding the Northwest Detention

23 Center including foreign objects in food, insufficient food, dismissal of medical needs,

24 unlaundered clothes and linen, and mis-use of solitary confinement; as well as the

25 Center's refusal to allow Washington State health inspectors to enter).

26

JOÃO DEBORBA'S SENTENCING MEMORANDUM
(*United States v. DeBorba*; CR22-5139-DGE) - 9

**FEDERAL PUBLIC DEFENDER**
**1331 Broadway, Suite 400**
**Tacoma, WA 98402**
**(253) 593-6710**

1       Furthermore, Mr. DeBorba faces a collateral consequence here that is far worse

2 than any contemplated by the Sentencing Guidelines. With the entry of judgment in this

3 case, he faces virtually certain deportation and will be ineligible for otherwise possible

4 forms of relief from removal. The Supreme Court has "long recognized that deportation

5 is a particularly severe 'penalty[.]'" *Padilla*, 559 U.S. at 365 (2010) (quoting *Fong Yue*

6 *Ting v. United States*, 149 U.S. 698, 740 (1893)). This is especially so when deportation

7 means a person would be separated from their families, including U.S. citizen children.

8 *See United States v. Bonilla*, 637 F.3d 980, 984 (9th Cir. 2011). "As the Supreme Court

9 has often emphasized, deportation is a drastic measure that may inflict the equivalent of

10 banishment or exile, and result in the loss of all that makes life worth living." *Sun Il*

11 *Yoo v. Immigr. & Naturalization Serv.*, 534 F.2d 1325, 1329 (9th Cir. 1976) (cleaned

12 up) (internal quotations omitted). The sentencing guidelines here do not account for this

13 drastic punishment. But this Court may and should. This punishment alone, and

14 certainly in combination with the two years Mr. DeBorba has already served in jail, is

15 sufficient to reflect the seriousness of and to punish him for the offense here.

### B.    Further custodial time will impede rather than promote the goal of deterrence.

16
17
       Additional time in prison will not deter criminal conduct. *See* 18 U.S.C.

18
19 § 3553(a)(2)(B). The Department of Justice has long recognized that "[t]he *certainty* of

20 being caught is a vastly more powerful deterrent than the punishment." Dep't of J.,

21 Nat'l Inst. Of J., "Five Things About Deterrence," May 2016,

22 https://www.ojp.gov/pdffiles1/nij/247350.pdf. Indeed, "[s]ending an individual

23 convicted of a crime to prison isn't a very effective way to deter crime." *Id*. Research

24 demonstrates that prison sentences may actually increase, rather than decrease,

25 recidivism. *Id*. "[P]rison sentences (particularly long sentences) are unlikely to deter

26 future crime. Prisons actually may have the opposite effect: Inmates learn more

JOÃO DEBORBA'S SENTENCING MEMORANDUM
(*United States v. DeBorba*; CR22-5139-DGE) - 10

**FEDERAL PUBLIC DEFENDER**
**1331 Broadway, Suite 400**
**Tacoma, WA 98402**
**(253) 593-6710**

1  effective crime strategies from each other, and time spent in prison may desensitize

2  many to the threat of future imprisonment." *Id*.

3        Instead, appropriate mental health care, in addition to the arrest here, is far more

4  likely to deter Mr. DeBorba from future criminal conduct. Given the Bureau of Prisons

5  (BOP)'s current staffing crisis, Mr. DeBorba is unlikely to receive much more than

6  medication if sentenced to further custodial time—even if designated to a more

7  appropriate facility. *See, e.g.*, Jory Heckman, *Bureau of Prisons Understaffing Leads to*

8  *'Unprecedented Exodus' of Employees, Union Warns*, Federal News Network, Sept. 30,

9  2022, https://federalnewsnetwork.com/hiring-retention/2022/09/bureau-of-prisons-

10  understaffing-leads-to-unprecedented-exodus-of-employees-union-warns/; Glenn

11  Thrush, *Short on Staff, Prisons Enlist Teachers and Case Managers as Guards*, N.Y.

12  Times, May 1, 2023, https://www.nytimes.com/2023/05/01/us/politics/prison-guards-

13  teachers-staff.html.

14        Instead of further custodial time, Mr. DeBorba recommends a sentence that

15  maximizes the Court's available supervision time. Should Mr. DeBorba be allowed to

16  live in the United States, this sentence will allow the most time possible for Mr.

17  DeBorba to receive appropriate mental health care in the community and have the

18  structure and support of supervision to stay on this track.

19       **C.**    **A supervision-focused sentence will best promote community safety.**

20        Further time in custody is also not necessary to protect the community here. Mr.

21  DeBorba never used a firearm to hurt anyone nor was there any indication of an intent

22  to do so. Rather, community safety is best promoted by Mr. DeBorba receiving

23  appropriate trauma therapy and mental health care so that he can think clearly and live

24  his values.

25        Dr. Gerlock is very experienced in evaluating and treating both PTSD and

26  domestic violence behaviors. She noted that Mr. DeBorba did not exhibit symptoms

JOÃO DEBORBA'S SENTENCING MEMORANDUM
(*United States v. DeBorba*; CR22-5139-DGE) - 11

**FEDERAL PUBLIC DEFENDER**
**1331 Broadway, Suite 400**
**Tacoma, WA 98402**
**(253) 593-6710**

1  indicative of severe danger to others. *See* Sealed Ex. A at 14. Rather, his biggest risk is

2  suicide or self-harm. *Id.* And she recommends treatment that includes trauma therapy as

3  most effective for Mr. DeBorba going forward. *See id.* at 14–15. As noted above, the

4  practical likelihood of him receiving such treatment during a BOP-based sentence is

5  slim. Instead, a supervision-focused sentence would best support treatment in the event

6  Mr. DeBorba is allowed to remain in the United States.

7        Furthermore, to the extent the Court is concerned about Mr. DeBorba's

8  relationship or contacts with his ex-wife, a sentence of five years of probation will best

9  address those concerns. County No-Contact Orders are presently in place, and Mr.

10  DeBorba is respecting those orders. However, a five-year probation sentence gives the

11  Court additional assurances in the event that Mr. DeBorba is allowed to remain in the

12  United States. In that scenario, with the conditions recommended by Probation, Mr.

13  DeBorba would be supervised by a U.S. Probation Officer. Should the officer have

14  concerns about Mr. DeBorba's communications or co-parenting with his ex-wife after

15  the expiration of any No-Contact Orders, the Probation Officer could essentially issue

16  their own no-contact instruction. Probation could further encourage clarity and support

17  for any co-parenting plan to prevent the need to invoke that provision. A probationary

18  sentence allows the Court up to five years of supervision, as opposed to only three

19  allowed with supervised release. As such, Mr. DeBorba's proposed sentence will best

20  assure the Court of community safety.

21      **D.**    **Further custodial time will impede Mr. DeBorba's ability to get**
22            **needed mental health treatment.**

23        Additional custodial time will not further the goal of rehabilitating Mr. DeBorba.

24  *See* 18 U.S.C. § 3553(a)(2)(D). The types of integrated treatment that would most

25  improve Mr. DeBorba's mental health are of limited availability within the BOP.

26  Indeed, the only intensive trauma therapy available for men is the Resolve program,

JOÃO DEBORBA'S SENTENCING MEMORANDUM
(*United States v. DeBorba*; CR22-5139-DGE) - 12

**FEDERAL PUBLIC DEFENDER**
**1331 Broadway, Suite 400**
**Tacoma, WA 98402**
**(253) 593-6710**

1    available at only seven men's facilities. (Anecdotally, counsel's recent attempts to have

2    clients designated to facilities with such limited-availability programs have all been

3    unsuccessful, even with the Court's recommendation). The BOP does not offer the

4    types of inter-family relations treatment that Dr. Gerlock further recommends.

5         Furthermore, with Mr. DeBorba's likely deportation, effective rehabilitation also

6    means teaching him to live in a country that has become entirely foreign to him.

7    Prolonged time in an American prison will not teach Mr. DeBorba to navigate life in

8    Brazil, to regain language skills, or to parent his children from afar. It will simply

9    further entrench his anxiety and depression and impede the goal of rehabilitation.

10   **III.   CONCLUSION**

11        Mr. DeBorba is truly sorry for his actions. He has already endured significant

12   punishment for these offenses over the past two years he has spent in detention. He will

13   further suffer a punishment worse than many could imagine—exile from his home and

14   separation from his children for the foreseeable future. A further custodial sanction is

15   not necessary. Instead, Mr. DeBorba, through counsel, asks the Court to sentence him

16   to five years of probation. In the event Mr. DeBorba is allowed to remain in the United

17   States, this will give the Court the greatest ability to supervise him and support his

18   rehabilitation and reentry.

19        DATED this 10th day of May 2024.

20        Respectfully submitted,

21

22        *s/ Rebecca Fish*
     Assistant Federal Public Defender

23        Attorney for Mr. João DeBorba

24

25

26

JOÃO DEBORBA'S SENTENCING MEMORANDUM
(*United States v. DeBorba*; CR22-5139-DGE) - 13

**FEDERAL PUBLIC DEFENDER**
**1331 Broadway, Suite 400**
**Tacoma, WA 98402**
**(253) 593-6710**

# Exhibit B

Dear Judge Estudillo,

First of all I want to thank you for the opportunity to address you. I feel terribly sorry for the mistakes that I did because I know they affect, of course, my wife, my children, and the other loved ones. I understand that my actions frightened people, and I'm so sorry for this.

And I know for a fact that I need medical-mental help for my issues with anxiety, depression that got me to the point that I made bad decisions. And I feel that as soon as I get the opportunity to be free, I want to seek this kind of help, so I know for a fact that I will be able to think clearly. This type of help I know will help me to have a good relationship with my children and to be able to co-parent them with my ex-wife for the good of all of us and others involved. I feel terribly guilty for the actions that I did. I fell most guilty because I'm not able to be there with my children to give all the support as a father that I can do for them. Also, I feel terrified just thinking about facing deportation when I am transferred for immigration. It will keep me away from my children. Everything that I'm doing right now, at this point, and planning for the future, is all for the best for my children.

I'm really really sorry about my actions.

Sincerely,

Joao DeBorba

Judge David G. Estudillo

UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>JOAO RICARDO DEBORBA,<br><br>Defendant. | NO. CR22-5139-DGE<br><br>UNITED STATES' SENTENCING MEMORANDUM |

The United States respectfully recommends the Court impose a sentence of 60 months' imprisonment, to be followed by a three-year term of supervised release, and a mandatory special assessment of $700. The defendant appears before this court for sentencing in the above-captioned case following the Court's February 5, 2024, guilty verdict on all seven counts of the Superseding Indictment.

## I.    BACKGROUND

### A.    Offense Conduct

#### 1.    DeBorba Engaged in Fraud to Remain in the United States for Over 20 Years

Joao Ricardo DeBorba, a citizen of Brazil, came to the United States in 1999 using a nonimmigrant B2 visitor's visa that allowed him to remain in the country temporarily for up to six months. PSR ¶ 9. Despite the restriction of his visa, which required that he

United States' Sentencing Memorandum - 1
*United States v. Joao Ricardo DeBorba*, CR22-5139-DGE

depart the United States by May 2000, DeBorba never left the county. He overstayed his visa and remained in the United States until his eventual arrest in May 2022. Dkt 77 at ¶¶ 4-6 (stipulated facts).

DeBorba was able to do this without detection in part by obtaining a Social Security card in 2001 after presenting a false I-94 entry document. Dkt. 2 at ¶ 9 (criminal complaint). DeBorba's Social Security card indicated that it did not permit his employment. But he falsified I-9 employment eligibility forms by claiming U.S. citizenship and presenting Social Security cards that had been forged or altered to remove the notation, "NOT VALID FOR EMPLOYMENT." In addition, the card that he used in connection with one successful employment application did not bear the seal of the Social Security Administration, but rather bore the seal of the Department of Health and Human Services, indicating it was a forgery. *Id.* at ¶ 11.

Because he was an alien unlawfully in the United States, DeBorba was at all relevant times prohibited from purchasing or possessing a firearm. Dkt. 77 at ¶ 6.

### 2. DeBorba Repeatedly Committed Domestic Violence Subjecting Him to Numerous Restraining Orders

On November 9, 2019, Vancouver Police responded to a domestic violence incident involving DeBorba and his then-wife A.D. DeBorba's 12-year-old son called 911 and said his father attacked his mother and punched and slapped her multiple times in the arms, legs, and face. A.D. told police that she was separated from DeBorba, who was home with the children when she came home from work. DeBorba was angry and asked to look in her phone, and when she refused, he took the phone from her, hit it on the counter, and threatened to hit A.D. as well if she didn't give him the password. When she did not, DeBorba slapped her in the face, and after she defended herself, DeBorba continued to punch, kick, and slap her. A.D. moved to the kitchen to prevent her children from seeing DeBorba hitting her, but DeBorba followed her into the kitchen, then into the children's room where he slapped her in front of the children. A.D. asked DeBorba to

United States' Sentencing Memorandum - 2
*United States v. Joao Ricardo DeBorba*, CR22-5139-DGE

UNITED STATES ATTORNEY
1201 PACIFIC AVE., SUITE 700
TACOMA, WASHINGTON 98402
(253) 428-3800

1 | follow her outside to sit in the car so they could talk away from the children, but while in

2 | the car with her DeBorba started the engine and began to drive away. A.D. was able to

3 | jump out of the car after DeBorba backed up and before he put the car in drive, and she

4 | went inside the residence and told one of the children to call police. *See* Exhibit 1,

5 | attached hereto.

6 | On November 12, 2019, a Washington District Court judge issued a Domestic

7 | Violence No-Contact Order restraining DeBorba from assaulting, threatening, harassing,

8 | or causing injury to A.D. Dkt. 77 at ¶ 14. The order also prevented DeBorba from owning

9 | or possessing any firearms or from possessing a concealed pistol license and required him

10 | to immediately surrender all firearms. *Id.* A replacement order with the same terms was

11 | issued after a hearing two days later. *Id.* at ¶ 15. DeBorba was present for both hearings.

12 | On November 16, 2019, A.D. went to a Vancouver Police station to report that

13 | DeBorba had been calling her and sending her messages in violation of the restraining

14 | order. Exhibit 2, attached. A.D.s phone had call logs showing 20 phone calls from

15 | DeBorba in a half-hour period and had multiple text and voice messages from him as

16 | well. A.D. stated she was afraid to go home because DeBorba said he was coming to her

17 | home to see the kids. A.D. knew that DeBorba had firearms, but stated she thought that

18 | DeBorba had turned them in as required by the restraining order. *Id.*

19 | Officers responded to DeBorba's residence for his violation of the restraining

20 | order. DeBorba was present and was told he was under arrest and to come out, but he did

21 | not, resulting in the response of additional units and a tactical vehicle. DeBorba

22 | eventually surrendered and admitted he had firearms in the house. Police collected 20

23 | firearms from inside the residence. *Id*; dkt. 77 at ¶ 16; PSR ¶¶ 14, 51.

24 | On December 7, 2019, A.D. again reported a restraining order violation by

25 | DeBorba. A.D. came home from picking up food for her children and found DeBorba in

26 | her apartment. She told him to leave multiple times, but he began yelling and punching

27 | himself, then grabbed A.D. around her waist in what A.D. believed was an attempt to

United States' Sentencing Memorandum - 3
*United States v. Joao Ricardo DeBorba*, CR22-5139-DGE

UNITED STATES ATTORNEY
1201 PACIFIC AVE., SUITE 700
TACOMA, WASHINGTON 98402
(253) 428-3800

1  stop her from taking her phone out to call police. A.D. kicked away from DeBorba and
2  ran outside screaming for help. DeBorba fled the scene. One of the children and a
3  neighbor corroborated A.D.'s statements to the police. Exhibit 3, attached.

4       On June 2, 2020, Vancouver Police responded to another report of a restraining
5  order violation. A.D. reported that DeBorba had been texting her and asking to come see
6  the children, and she allowed him to do so while she was at work but that he needed to
7  leave before she got home. When she returned from work, DeBorba was there and
8  approached her outside the apartment and pleaded with her that they needed to get back
9  together. A.D. told DeBorba she would not and asked him to leave, and he became angry
10  and started to yell, then grabbed both of A.D.'s arms. A.D. told DeBorba to let her go, but
11  he pushed her, causing her to fall backward onto a bicycle and injuring her arm. A.D.
12  immediately got up, grabbed the two youngest children, and ran into the apartment,
13  locking the door behind her. DeBorba knocked on the door multiple times, rang the
14  doorbell, and yelled loudly. The responding officer noted a half-inch abrasion on A.D.'s
15  left forearm and observed doorbell camera footage showing DeBorba knocking on the
16  door. DeBorba was later arrested at his apartment. PSR ¶ 51.[1] Exhibit 4, attached.

17       In October 2020, DeBorba was convicted of Assault in the Fourth Degree –
18  Domestic Violence and two counts of Domestic Violence Court Order Violations in
19  Clark County Superior Court. PSR ¶ 51. As part of sentencing, the court issued a new
20  domestic violence restraining order, which again required DeBorba to surrender any
21  firearms in his possession. Dkt. 77 at ¶ 19.

22       On August 21, 2022, DeBorba was again arrested for a restraining order violation
23  when, during an exchange of custody of his children, he had an argument with A.D.
24  during which he put his foot behind the wheel of her car to keep her from leaving.
25  A.D. began taking a video of DeBorba in the hope that he would leave her alone, but
26  DeBorba continued yelling at her and eventually spit at her. PSR ¶ 53.

27  _____

[1] The PSR incorrectly lists the date of this incident as June 20, 2020.

United States' Sentencing Memorandum - 4
*United States v. Joao Ricardo DeBorba*, CR22-5139-DGE

Based on this incident, on January 31, 2022, DeBorba was again convicted of fourth degree assault and of violating the October 2020 domestic violence restraining. *Id.* DeBorba was again notified in person that he could not possess any firearms. Dkt. 77 at ¶ 21.

**3.    DeBorba Repeatedly and Unlawfully Obtains and Possesses Firearms and Ammunition**

Despite being prohibited from doing so, both because he had unlawfully remained in the United States and later because his commission of domestic violence resulted in him being prohibited by court-issued restraining orders from possessing guns, DeBorba repeatedly made fraudulent statements to obtain and carry firearms.

DeBorba falsified information on a February 2019 application for a concealed pistol license, claiming to be a United States citizen. DeBorba knew that his answers to the citizenship and immigration questions on the form were false. Dkt. 77 at ¶ 8; PSR ¶ 10.

In March 2019, DeBorba bought a Savage Arms rifle in Portland, Oregon, by falsely claiming on the required Bureau of Alcohol, Tobacco, Firearms and Explosives Firearm Transaction Record (Form 4473) that he was a citizen of the United States, that he was not unlawfully in the United States, and that he had not been admitted under a nonimmigrant visa. Dkt. 2 at ¶ 14. Federal Firearms Licensed dealers are required to by federal law to document the sales of firearms using Form 4473, and false statements on the forms are material to the sale of firearms because federal law prohibits the transfer of firearms to person prohibited from possessing them under federal law. PSR ¶ 11.

On April 4, 2019, DeBorba purchased a .45 caliber Sig Sauer model 1911 pistol from a Cabela's store in Lacey, Washington, again providing the same false information on the Form 4473. Dkt. 77 at ¶ 10; PSR ¶ 11. Nine days later, on April 13, 2019, he again fraudulently bought a firearm (this time, a KelTec model Sub-2000 rifle) from a store in Lebanon, Oregon. Dkt. 2 at ¶ 16.

United States' Sentencing Memorandum - 5
*United States v. Joao Ricardo DeBorba*, CR22-5139-DGE

UNITED STATES ATTORNEY
1201 PACIFIC AVE., SUITE 700
TACOMA, WASHINGTON 98402
(253) 428-3800

The next day, April 14, 2019, DeBorba was driving a white SUV and was involved in a single- vehicle collision on State Route 500 in Clark County. PSR ¶ 12. The Washington State Patrol investigated and ultimately arrested DeBorba for driving under the influence. PSR ¶ 50, dkt. 2 at ¶ 17. Based on this arrest, DeBorba was convicted of negligent driving and placed on supervision, and later sentenced to five days' jail for failing to comply with treatment and attend a victims panel. PSR ¶ 50.

During the encounter with the Washington State Patrol, DeBorba admitted he was driving and told the officer he had a concealed pistol carry license. Dkt. 77 at ¶ 12. The officer located the fraudulently obtained concealed pistol license on DeBorba and found a Glock 26 type pistol in a black tactical backpack on the rear floorboard of the SUV. Dkt. 77 at ¶¶ 12-13; PSR ¶¶ 12, 50. DeBorba initially denied having the pistol, but later admitted the gun was in the backpack. Dkt. 2 at ¶ 17; dkt. 77 at ¶ 12.

The arrest did nothing to slow DeBorba's fraudulent and illegal acquisition of firearms—indeed, his presentation to the officer of the fraudulently obtained concealed carry license appears to have emboldened him. Less than a week later, on April 20, 2019, he purchased a Century Arms model RAS47 rifle from Keith's Sporting Goods in Gresham, Oregon, again falsifying information on the Form 4473. Dkt. 2 at ¶ 18. On May 8, 2019, he purchased a Rock Island Armory model M200 .38 special revolver from Brass Tacks Munitions in Vancouver, Washington, and made the same false statements on the Form 4473. PSR ¶ 11; dkt 77 at ¶ 11.

Ultimately, DeBorba illegally obtained many more firearms, as evidenced by the 20 firearms confiscated by police following his November 16, 2019, arrest for violation the domestic violence restraining order. Officers found at DeBorba's residence a variety of firearms which he had failed to surrender as required by the court order, including several pistols, ammunition, an AR-15 type rifle, and additional parts used to assemble

//

//

United States' Sentencing Memorandum - 6
*United States v. Joao Ricardo DeBorba*, CR22-5139-DGE

UNITED STATES ATTORNEY
1201 PACIFIC AVE., SUITE 700
TACOMA, WASHINGTON 98402
(253) 428-3800

1  AR-15 type rifles. PSR ¶¶ 14, 51; dkt. 77 at ¶ 16 and Exhibit 7; dkt 2 at ¶ 21. Some of the

2  firearms taken into police custody are pictured below:



18      In April 2021, police responded to a report of an assault by DeBorba at his

19  residence (where he was living apart from A.D. and the children). The roommates

20  reported that DeBorba still had firearms, despite DeBorba having been ordered three

21  times not to possess any firearms and to relinquish any firearms in his possession. Dkt 2

22  at ¶ 28; Exhibit 5, attached. The roommates stated that DeBorba had a bolt-action rifle

23  that he often carried in a backpack because it could be disassembled. *Id.*; PSR ¶ 16. The

24  roommates reported that they were afraid of being assaulted by DeBorba and that he had

25  pushed the male roommate in the chest then locked the door to the apartment and told the

26  roommates, "You're not going anywhere." The female roommate reported being terrified

27  that DeBorba would attack her and that she began crying in fear. Exhibit 5.

United States' Sentencing Memorandum - 7
*United States v. Joao Ricardo DeBorba*, CR22-5139-DGE

UNITED STATES ATTORNEY
1201 PACIFIC AVE., SUITE 700
TACOMA, WASHINGTON 98402
(253) 428-3800

SER-68

In August 2021, federal law enforcement received additional information that DeBorba continued to possess firearms and viewed a social media post on DeBorba's Instagram social media account of DeBorba firing a black AR-15 type rifle with a synthetic stock and optical sight. PSR ¶ 16; dkt. 2 at ¶ 23; dkt 77 at ¶ 22. The video was found to have been recorded on May 20, 2020, in Washougal, Washington, and thus showed DeBorba's continued violation of his domestic violence restraining order. Dkt. 2 at ¶ 23. Review of DeBorba's YouTube account showed additional videos of DeBorba firing a rifle at a shooting range. Dkt 77 at ¶ 22.

On May 6, 2022, federal law enforcement searched DeBorba's residence, suspecting his continued possession of firearms. PSR ¶ 17; dkt 77 at ¶ 23. Inside the apartment, agents found evidence of DeBorba's possession and manufacture of firearms, including three AR-15 type rifles, a Ruger 9mm handgun, and two Polymer80 Glock-type handguns with no serial numbers or manufacturer's marks (commonly referred to as "ghost guns" because of the lack of markings that would enable law enforcement to trace the firearms to their origin or possessor), and numerous rounds of ammunition. PSR ¶¶ 17-18; dkt 77 at ¶¶ 23-25. Several of the firearms appeared to be personally manufactured firearms assembled from constituent parts. The apartment also contained a workbench with a vice, a large amount of ammunition, firearms parts, firearms tools, assembly instructions, body armor, and a completed firearm silencer, as well as suppressor parts, rifle magazines including what appeared to be a 50-round drum magazine, and other firearms accessories. PSR ¶ 19; dkt. 77 at ¶¶ 23-25 and Exhibit 12. The firearm silencer met the definition of silencer under federal law and bore no serial number allowing it to be registered. *Id.*; dkt 77 at ¶ 27.

DeBorba admitted to possessing the firearms in the residence and to assembling them himself from parts that he purchased through the internet. DeBorba also admitted that he had lied on the forms he used to buy firearms and that he knew that it was illegal for non-citizens such as himself to possess firearms. PSR ¶¶ 20.

United States' Sentencing Memorandum - 8
*United States v. Joao Ricardo DeBorba*, CR22-5139-DGE

UNITED STATES ATTORNEY
1201 PACIFIC AVE., SUITE 700
TACOMA, WASHINGTON 98402
(253) 428-3800

A portion of the items seized at DeBorba's residence are pictured below:



United States' Sentencing Memorandum - 9
*United States v. Joao Ricardo DeBorba*, CR22-5139-DGE

UNITED STATES ATTORNEY
1201 PACIFIC AVE., SUITE 700
TACOMA, WASHINGTON 98402
(253) 428-3800

**B.     Procedural History**

DeBorba was arrested on May 6, 2022, and a criminal complaint was filed the same day. Dkt. 2. An indictment in six counts was issued on May 19, 2022, charging unlawful possession of firearms and ammunition, false statements during the purchase of a firearm, and false claim to United States citizenship. Dkt. 9. A superseding indictment was issued on September 6, 2023, charging an additional count of unlawful possession of a firearm silencer. On February 1, 2024, DeBorba waived his right to a jury trial, and a bench trial based on stipulated facts was held on February 5, 2024. This Court found DeBorba guilty on all counts. Dkt. 78.

## II.     BACKGROUND ON SENTENCING

Under 18 U.S.C. § 3553(a), the Court "shall impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in" 18 U.S.C. § 3553(a)(2). There are four sentencing purposes set forth in Section 3553(a)(2): (1) just punishment or retribution ("to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense"); (2) deterrence ("to afford adequate deterrence to criminal conduct"); (3) incapacitation ("to protect the public from further crimes of the defendant"); and (4) rehabilitation ("to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner"). *See Rita v. United States*, 551 U.S. 338, 348 (2007) (using these four terms); *see also Gall v. United States*, 552 U.S. 38, 50 n.6 (2007).

In determining a sentence that complies with these four sentencing purposes, a sentencing court must consider the "nature and circumstances of the offense and the history and characteristics of the defendant," the "kinds of sentences available," the Sentencing Guidelines range and Sentencing Commission's relevant policy statements, the "need to provide restitution to any victims of the offense," and the "need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." 18 U.S.C. § 3553(a)(1), (3)-(7). When considering these

United States' Sentencing Memorandum - 10
*United States v. Joao Ricardo DeBorba*, CR22-5139-DGE

UNITED STATES ATTORNEY
1201 PACIFIC AVE., SUITE 700
TACOMA, WASHINGTON 98402
(253) 428-3800

1  factors, the Sentencing Guidelines range "should be the starting point and the initial

2  benchmark." *Gall*, 552 U.S. at 49. Any deviation must be reasonable, and a "major

3  departure" from the Guidelines range "should be supported by a more significant

4  justification than a minor one." *Id.* at 50.

5                    **III.    SENTENCING GUIDELINES CALCULATIONS**

6  **A.    Offense Level**

7          **1.    The Base Offense Level**

8          Because DeBorba was a prohibited firearms possessor and the offense conduct

9  involved a firearm described in the National Firearms Act (26 U.S.C. § 5845), namely, a

10  silencer, the base offense level is 20, pursuant to USSG § 2K2.1(a)(4)(B)(i)(II) and (ii)(I).

11  PSR ¶ 27.

12          **2.    Specific Offense Characteristic**

13          Because the offense conduct involved 25 firearms or more, the offense level is

14  increased by six levels, pursuant to USSG § (b)(1)(B). PSR ¶ 28.

15          **3.    Adjustment for Acceptance of Responsibility**

16          The Probation Office calculated a two-level decrease in offense level for

17  acceptance of responsibility pursuant to USSG § 3E1.1(a), because DeBorba stipulated

18  to facts surrounding his offenses and participated in a bench trial. The government does

19  not object to the two-level decrease under subsection (a). *See* USSG § 3E1.1 cmt. n. 2.

20          As the Probation Office correctly noted in its Addendum to the Presentence

21  Report, the additional adjustment under USSG § 3E1.1(b) is available only upon

22  government motion "stating that the defendant has assisted authorities in the investigation

23  or prosecution of his own misconduct by timely notifying authorities of his intention to

24  enter a plea of guilty, thereby permitting the government to avoid preparing for trial and

25  permitting the government and the court to allocate their resources efficiently." The

26  government makes no such motion here.

27  //

United States' Sentencing Memorandum - 11
*United States v. Joao Ricardo DeBorba*, CR22-5139-DGE

UNITED STATES ATTORNEY
1201 PACIFIC AVE., SUITE 700
TACOMA, WASHINGTON 98402
(253) 428-3800

1    Here, DeBorba did not timely notify the government of his intention to enter a
2  guilty plea. Indeed, he did not enter guilty plea at all, but proceeded to a bench trial,
3  albeit on stipulated facts. This has neither the legal nor the practical effect of a guilty
4  plea. The bench trial neither provided the government the certainty of a negotiated
5  resolution with all the typical attendant benefits to the government (such as avoiding
6  contested issues at sentencing and on appeal, and avoiding an appeal of the guilty verdict,
7  the outcome of pretrial motions, or issues related to the sentence), nor did it preserve
8  government resources (the government made trial preparations, such as filing jury
9  instructions, witness and exhibit lists, and a trial memo, and subpoenaing witnesses) but it
10  required substantial effort to draft factual stipulations in preparation for presenting the
11  government's case to the judge. These are the type of "substantive preparations taken to
12  present the government's case against the defendant to a . . .  judge, in the case of a bench
13  trial" that Section 3E1.1(b) benefits defendants for allowing the government to avoid.

14    The Ninth Circuit has made it clear that a stipulated facts bench trial is not
15  equivalent to a guilty plea when it comes to Section 3E1.1(b). In *United States v.*
16  *Villasenor-Cesar*, 114 F.3d 970 (9th Cir. 1997), the Court directly addressed whether a
17  defendant may receive the third point for acceptance of responsibility after proceeding to
18  a stipulated facts bench trial and held that he cannot. *See also United States v. Espinoza-*
19  *Cano*, 456 F.3d 1126, 1136 (9th Cir. 2006) ("Espinoza-Cano argues that . . . the
20  government's decision not to file a motion in this case was arbitrary because he satisfied
21  the prerequisite of permitting the government to avoid trial preparation when he opted to
22  proceed by way of a stipulated bench trial. This contention, however, runs afoul of our
23  holding in *Villasenor-Cesar* that proceeding by way of a stipulated bench trial is
24  inconsistent with notifying authorities of an intent to plead guilty.")

25  **B.    Criminal History Category**

26    DeBorba has four criminal history points, resulting in a criminal history category
27  of III. PSR ¶¶ 50-56.

United States' Sentencing Memorandum - 12
*United States v. Joao Ricardo DeBorba*, CR22-5139-DGE

UNITED STATES ATTORNEY
1201 PACIFIC AVE., SUITE 700
TACOMA, WASHINGTON 98402
(253) 428-3800

**C.      Guidelines Range**

The total offense level is 24. PSR ¶ 28. This results in a guidelines imprisonment range of 63 to 78 months. PSR ¶ 100; USSG § Ch.5, Pt.A (Sentencing Table).

**IV.      FACTORS RELATED TO SENTENCING RECOMMENDATION**

The United States respectfully requests that the Court sentence the defendant to 60 months of confinement, followed by a three-year term of supervised release. The United States believes this sentence is appropriate in light of "the nature and circumstances of the offense," and the need for the sentence "to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense," and "to protect the public from further crimes of the defendant." 18 U.S.C. §§ 3553(a)(1), (a)(2)(A), and (a)(2)(C). A review of pertinent Section 3553(a) sentencing factors, below, supports the recommended sentence.

**A.      Nature and Circumstances, and Seriousness of the Offense**

DeBorba's criminal conduct was serious. He repeatedly committed domestic violence against his former wife and in front of his children. This resulted in a series of domestic violence restraining orders being issued protecting his wife from DeBorba. Notwithstanding the clear provisions of these orders, DeBorba continued to possess, and continued to acquire, large numbers of firearms, ammunition, and firearms accessories. When police searched his residence in May 2022, his bedroom was essentially an armory doubling as a firearms workshop. Particularly serious is DeBorba's possession of an illegal firearm silencer, body armor, and high-capacity magazines, along with the cache of firearms.

The prohibitions set out in § 922(g)(8) "seek to protect society in general, and the intimate partners of persons with a background of domestic violence in particular, by reducing the risk of violence that may result from the possession of guns by persons with a proven propensity for violence." *United States v. Rogers*, 371 F.3d 1225, 1229 (10th Cir. 2004). "'The dangerousness of guns and their adaptability [for] use in violent crime

United States' Sentencing Memorandum - 13
*United States v. Joao Ricardo DeBorba*, CR22-5139-DGE

UNITED STATES ATTORNEY
1201 PACIFIC AVE., SUITE 700
TACOMA, WASHINGTON 98402
(253) 428-3800

1   is why Congress has prohibited their possession' by individuals subject to a domestic

2   protection order . . . ." *Id.* (quoting *United States v. Dillard*, 214 F.3d 88, 94 (2d Cir.

3   2000)). "A defendant whose background includes domestic violence which advances to

4   either a criminal conviction or the imposition of a protection order has a demonstrated

5   propensity for the use of physical violence against others." *Id.*

6        Because of his propensity to violence, DeBorba's ex-wife feared him and resorted

7   to the courts to ensure he would not have access to guns. DeBorba ignored these

8   protections and nevertheless acquired a small arsenal, not only knowing it was illegal for

9   him to do so but having been specifically ordered not to. This is extremely troubling.

10  "Firearms contribute significantly to domestic violence in the U.S. — to threaten, to

11  coerce, to control, and to kill. Around 4.5 million women in the United States have been

12  threatened with a gun, and nearly 1 million women have been shot or shot at by an

13  intimate partner. Over half of all intimate partner homicides are committed with guns.

14  Indeed, a woman is five times more likely to be murdered when her abuser has access to

15  a gun." The Educational Fund to Stop Gun Violence, available at:

16  https://efsgv.org/learn/type-of-gun-violence/domestic-violence-and-firearms (last

17  accessed May 10, 2024).

18       Indeed, following his first reported domestic violence incident, DeBorba's conduct

19  only became more troubling. He increased his threatening conduct toward his wife. He

20  threatened his roommates, who feared him because they knew he was accustomed to

21  carrying a rifle with him. Despite having firearms seized from him, he replenished his

22  cache of weapons and ammo, and began to obtain ghost guns as well as a firearm

23  silencer, a highly restricted weapon under federal law.

24       The offenses DeBorba committed are serious and require a sentence that reflect

25  the nature of the firearms crimes he committed.

26  //

27  //

United States' Sentencing Memorandum - 14
*United States v. Joao Ricardo DeBorba*, CR22-5139-DGE

UNITED STATES ATTORNEY
1201 PACIFIC AVE., SUITE 700
TACOMA, WASHINGTON 98402
(253) 428-3800

**B.      History and Characteristics of the Defendant**

DeBorba's criminal history reflects his domestic violence, with two prior convictions for assault on his ex-wife, as well as a disorderly conduct conviction resulting from the assault involving his roommates. He also has a reckless driving conviction. Prior to that, he engaged in the creation of fraudulent documents to enable him to overstay his visa and reside and work in the United States without detection for over 20 years.

**C.      Need to Promote Respect for the Law, Provide Just Punishment for the Offense, and Afford Adequate Deterrence**

DeBorba's conduct epitomizes a lack of respect for the law; not just the nation's firearms laws, but specific orders from state judges requiring him not to possess firearms. DeBorba knowingly disregarded these legal obligations time and again. Deterrence requires that this conduct be treated seriously. The government's recommended sentence would reflect the seriousness of the offense, appropriately promote respect for the law, protect the community, and deter defendant and others who would seek to emulate his conduct.

**D.      Need to Avoid Unwarranted Sentence Disparity Among Similarly Situated Defendants**

Anchoring the sentence in the guidelines calculations has the added benefit of avoiding unwarranted sentencing disparities among similarly situated defendants. *Gall v. United States*, 552 U.S. 38, 54 (2007) ("[A]voidance of unwarranted disparities was clearly considered by the Sentencing Commission when setting the Guidelines ranges.").

//

//

United States' Sentencing Memorandum - 15
*United States v. Joao Ricardo DeBorba*, CR22-5139-DGE

UNITED STATES ATTORNEY
1201 PACIFIC AVE., SUITE 700
TACOMA, WASHINGTON 98402
(253) 428-3800

**V.    CONCLUSION**

For all of the reasons set forth above, the government respectfully recommends the Court impose a custodial sentence of 60 months, to be followed by a three-year term of supervised release, and a mandatory special assessment of $700.

DATED this 10th day of May, 2024.

Respectfully submitted,

TESSA M. GORMAN
United States Attorney

  */s/ Max B. Shiner*
MAX B. SHINER
Assistant United States Attorney
United States Attorney's Office
1201 Pacific Ave., Suite 700
Tacoma, Washington 98402
Phone: 253-428-3800
Fax: 206-553-3826
Email: max.shiner@usdoj.gov

United States' Sentencing Memorandum - 16
*United States v. Joao Ricardo DeBorba*, CR22-5139-DGE

UNITED STATES ATTORNEY
1201 PACIFIC AVE., SUITE 700
TACOMA, WASHINGTON 98402
(253) 428-3800

# Exhibit 1

Case 3:22-cr-05139-DGE   Document 84-1   Filed 05/10/24   Page 2 of 13



**Vancouver Police Department**

## Report Number 2019-018624 - *Offense / Incident - -GO~5374778 Report

| REPORT DATE / TIME | EVENT START DATE / TIME - EVENT END DATE / TIME | REPORT WRITER |
|---|---|---|
| Nov 9, 2019 23:50 | Nov 9, 2019 23:50 | Stephen Sloniker #1738 |

REPORT TAKEN LOCATION
VILLAGE ON SEVENTH APARTMENTS, ⬛⬛⬛⬛ VANCOUVER, WA 98683

### NARRATIVE

Document No: GO0053747780001
Subject: CASE SUMMARY AND RCW
Author: STEPHEN SLONIKER (231738)
Date:2019-11-10 04:40:00

[23RCW01 ] VPD CASE SUMMARY AND RCW v.150611_____ CASE
SUMMARY[ON 11/09/2019, AT APPROXIMATELY 2354 HOURS, I SELF-DISPATCHED TO 12800 ⬛⬛⬛ (VILLAGE ON SEVENTH
APARTMENTS) IN REGARD TO A REPORT OF A PHYSICALDISTURBANCE AT THIS LOCATION. BASED ON THE RESULTING INVESTIGATION,
PROBABLECAUSE WAS DETERMINED TO EXIST TO ARREST SUSPECT JOAO R. DEBORBA FOR DOMESTICVIOLENCE ASSAULT, 4TH DEGREE.
JOAO R. DEBORBA WAS TAKEN INTO CUSTODY.]ATTACHMENTS[NONE ]EVIDENCE SUBMITTED IN TRAQ: [X ]NONE[ ]PHYSICAL EVIDENCE [ ]
DIGITAL EVIDENCELIST OF CHARGES[ASSA - 9A.36.041-DV - ASSAULT IV - DV ][][ ][ ]RECOMMENDATIONS[FORWARD TO DOMESTIC
VIOLENCE CASE SUPERVISORFORWARD TO DVPC ]EXTERNAL DISTRIBUTION (Other than options available in Routing) [No ][ ] [ ] []Other
External Distribution:[ ]_____

Document No: GO0053747780002
Subject: NARRATIVE - DV ASSAULT 4TH
Author: STEPHEN SLONIKER (231738)
Date:2019-11-10 04:47:00

On 11/09/2019, at approximately 2354 hours, I self-dispatched to 12800 ⬛⬛⬛ . in regard to a report of a physical disturbance at this
location. Initial call notes the altercation was between a husband and wife, the call for service was placed by their son. I responded
with Officer Aldridge.
I arrived at the incident location. The suspect, Joao R. DeBorba, was outside of the apartment complex speaking to Officers Wilhelm and
Barnett
as I arrived. Officer Aldridge placed Joao in handcuffs for our safety due to the violent nature of the alleged offense.
I then entered the dispatch residence, apartment H3, and contacted Officer Mason, who was interviewing R D ⬛⬛⬛ R D
identified himself as the son of Joao and A D ⬛⬛ A D . R D gave a statement to Officer Mason, saying he had witnessed Joao hit
his mother, both in an open-handed and close-fist fashion, during a verbal altercation earlier inthe evening. R D stated he saw Joao hit
A D in the kitchen of
the residence multiple times. See Officer Mason's supplemental report for further detail regarding the alleged assault.
I then contacted Officer Tretta who wasinterviewing A D DeBorba, Joao's wife. I did not observe any visible injuries on A D
person upon my arrival. A D gave a statement that Joao had struck her multiple times in various rooms of the residence duringa
verbal altercation. A D said she then asked Joao to speak outside so the children could not witness their argument. A D
said she went outside and spoke to Joao while they both occupied his vehicle, at which time heattempted to leave the apartment complex
while she was inside the vehicle. A D stated she did not want to leave with Joao and "jumped out" of the vehicle as it was moving
before returning to the residence. During the interviewwith A D she stated she was in favor of a No Contact
Order against Joao, and she no longer wanted him to be in her house. See Officer Tretta's report for further detail regarding A D
statement.
I then took custody of Joao from Officers Wilhelm and Barnett. I advised Joao he was under arrest and searched his person incident to
arrest, with

| REPORTING OFFICER SIGNATURE / DATE | SUPERVISOR SIGNATURE / DATE |
|---|---|
| Stephen Sloniker #1738   Nov 9, 2019 23:50 (e-signature) | Kevin Barton #1551   Nov 10, 2019 00:00 (e-signature) |
| PRINT NAME | PRINT NAME |
| Stephen Sloniker #1738 | Kevin Barton #1551 |

**Vancouver Police Department**
*Mark43 RMS Form v2.0 generated by E. Boyle #1778 on Aug 24, 2021 01:13.*
*Imported Report.*

Pg 1 of 3
08771

SER-79

Report Number 2019-018624 · Offense / Incident · GO-5975778 Report (Vancouver Police Department)                                    Pg 2 of 3

no finds. I transported Joao to the Clark Country Sheriff's Office Jail and transferred him to the custody of jail staff with no incident. Based on the statements provided by R   D     and A   D       I determined there to be probable cause to arrest Joao for Domestic Violence Assault, Fourth Degree, pursuant to RCW 9A.46.041.

## OFFENSE-1

OFFENSE CODE
13130 | SIMPLE ASSAULT-MISD

| OFFENSE START DATE | OFFENSE END DATE | OFFENSE COMPLETION | DOES EVENT CONTAIN BIAS ELEMENTS? |
|---|---|---|---|
| Nov 9, 2019 00:00 | Nov 9, 2019 00:00 | ■ COMPLETED  □ ATTEMPTED | □ YES  ■ NO |

| DOMESTIC VIOLENCE | WAS METHOD OF ENTRY FORCED? |
|---|---|
| ■ YES □ NO | □ YES ■ NO |

### OFFENSE LOCATION

LOCATION NAME / STREET ADDRESS/LOCATION NAME / APT, UNIT, STE / DESCRIPTION
VILLAGE ON SEVENTH APARTMENTS,

| CITY | STATE | ZIP | COUNTRY CODE |
|---|---|---|---|
| VANCOUVER | WA | 98683 | US |

LOCATION CATEGORY
Residence/ Home

### VICTIMS-1

| VICTIMS-1 NAME (LAST, FIRST MIDDLE) | DOB / ESTIMATED AGE RANGE |
|---|---|
| V-1 A   D       O | 1980- |

| SEX | RACE / ETHNICITY | PHONE NUMBER |
|---|---|---|
| Female | White / Not Hispanic Or Latino | (360) 843-8789 (Mobile) |

HOME ADDRESS
VILLAGE ON SEVENTH APARTMENTS,                    , VANCOUVER, WA 98683

### WITNESS-1

| WITNESS-1 NAME (LAST, FIRST MIDDLE) | DOB / ESTIMATED AGE RANGE |
|---|---|
| W-1 R   D | 2007- |

| SEX | RACE / ETHNICITY | PHONE NUMBER |
|---|---|---|
| Male | White / Unknown | (360) 843-5477 (Mobile) |

HOME ADDRESS
VILLAGE ON SEVENTH APARTMENTS,                    , VANCOUVER, WA 98683

### INVOLVED OTHER-1

| INVOLVED OTHER-1 (PERSON) | DOB / ESTIMATED AGE RANGE |
|---|---|
| O-1 DEBORBA, JOAO R   D | 1975- |

| SEX | RACE / ETHNICITY | PHONE NUMBER |
|---|---|---|
| Male | White / Not Hispanic Or Latino | (978) 398-5793 (Mobile) |

HOME ADDRESS
VILLAGE ON SEVENTH APARTMENTS,                    , VANCOUVER, WA 98683

## ATTACHMENTS ADDENDUM

| FILE NAME | UPLOAD DATE/TIME | UPLOADED BY |
|---|---|---|
| 3530286.pdf | Nov 5, 2020 01:54 | L. Data Migration |
| 3530291.pdf | Nov 5, 2020 01:54 | L. Data Migration |
| 3530292.pdf | Nov 5, 2020 01:54 | L. Data Migration |
| 3530297.pdf | Nov 5, 2020 01:54 | L. Data Migration |

| REPORTING OFFICER SIGNATURE / DATE | SUPERVISOR SIGNATURE / DATE |
|---|---|
| Stephen Sloniker #1738   Nov 9, 2019 23:50 (e-signature) | Kevin Barton #1551   Nov 10, 2019 00:00 (e-signature) |
| PRINT NAME | PRINT NAME |
| Stephen Sloniker #1738 | Kevin Barton #1551 |

**Vancouver Police Department**                                                                                    Pg 2 of 3
Mark43 RMS Form v2.0 generated by E. Boyle #1778 on Aug 24, 2021 01:13.                                           08772
Imported Report.

Report Number 2019-018624 - Offense / Incident - GO-59747/8 Report (Vancouver Police Department)                           Pg 3 of 3

| | | |
|---|---|---|
| 3534648.pdf | Nov 5, 2020 01:54 | L. Data Migration |
| 3534651.pdf | Nov 5, 2020 01:54 | L. Data Migration |
| 3534652.pdf | Nov 5, 2020 01:54 | L. Data Migration |
| GO_2019_18624.pdf | Oct 28, 2020 15:29 | L. Data Migration |

This report was generated in Mark43 and the e-signature was affixed using the undersigned officer's unique login and password. I certify (or declare) under penalty of perjury under the laws of the State of Washington that the foregoing is true and correct to the best of my knowledge and belief.

| ELECTRONICALLY SIGNED | DATE | PLACE |
|---|---|---|
| Stephen Sloniker | 11/09/2019 | Vancouver Police Department, WA |

| REPORTING OFFICER SIGNATURE / DATE | SUPERVISOR SIGNATURE / DATE |
|---|---|
| Stephen Sloniker #1738   Nov 9, 2019 23:50 (e-signature) | Kevin Barton #1551   Nov 10, 2019 00:00 (e-signature) |
| PRINT NAME | PRINT NAME |
| Stephen Sloniker #1738 | Kevin Barton #1551 |

**Vancouver Police Department**
Mark43 RMS Form v2.0 generated by E. Boyle #1778 on Aug 24, 2021 01:13.
Imported Report.

Pg 3 of 3

08773

Report Number 2019-018624 – Supplement – FU~707947 Report (Vancouver Police Department)                    Pg 1 of 2

## Report Number 2019-018624 - Supplement - FU~707947 Report

| REPORT DATE / TIME | EVENT START DATE / TIME - EVENT END DATE / TIME | REPORT WRITER |
|---|---|---|
| Nov 10, 2019 04:04 | Nov 9, 2019 23:50 | Tim Tretta #1697 |

SUPPLEMENT TYPE

Patrol Supplemental

## NARRATIVE

Document No: FU0007079470001
Subject: SUPPLEMENTAL
Author: TIMOTHY TRETTA (231697)
Date:2019-11-10 04:03:00

On 11/9/19 at about 2350 hours, I responded to 12800 _____. (Village on Seventh Apartments _____) to assist Officer Sloniker concerning a physical disturbance. Upon my arrival at about 2359 hours, I met with A D _____.
A D _____ was sitting on the stairs that lead to her apartment. A D _____ was crying hysterically, which made communication difficult. I managed to calm A D _____ enough to begin a dialog. A D _____ reported that she came home from work and she met with her husband, Joao R D _____ who was already at her home watching their four, in-common children. A D _____ advised that Joao does not live with _____ and they are currently separated.

A D _____ reported that Joao was angry when she arrived, which he's been since A D _____ told him that she wants to get a divorce. A D _____ aexplained that Joao started arguing with A D _____ and he asked to look in her phone, which A D _____ did not allow. As a result, Joao took _____ phone from her however, it was password locked. A D _____ advised that she should still have her phone as of this interview.

A D _____ advised that Joao demanded that _____ provide him with the password to her phone, which she refused to give Joao. Joao threatened to damage A D _____ phone by hitting it on the counter and then also threatened to hit A D _____ if she did not provide him with its password. A D _____ explained that she did not say anything to Joao when he threatened to hit her. A D _____ advised that Joao then slapped A D _____ on the right side of her face.

A D _____ explained that she anticipated a second slap to the left side of her face so she put her arm in front of her face to block the upcoming slapand in doing so A D _____ hand hit Joao's face. In response, A D _____ was told by Joao (in Portuguese) you hit me now I'm going to hit you good and then Joao punched _____ on both of her arms, kicked her left leg and slapped the right side of her face. A D _____ advised that she did not want the children seeing Joao hitting her so she went to the kitchen to separate away from Joao however, Joao followed her into the kitchen. A D _____ explained thatshe believed that Joao would not hit A D _____ in-front of the children so she decided to go into the kid's room; Joao followed.

While in the kid's room, A D _____ reported that Joao slapped the left side of her face in-front of the kids.

A D _____ then asked Joao to come talk with her outside, he agreed and they went downstairs and sat in their car to talk. A D _____ reported that once they were in the car, Joao started the car and wanted to drive away. A D _____ advised that she did not want to go anywhere with Joao, which she told him several times. However, Joao backed the car out of a parking space anyhow. A D _____ explained that once the car backed up Joao went to put the car in drive, which provided _____ enough time to jump out of the car.

Once outof the car A D _____ went back to her apartment while Joao parked the car. Because of the delay, A D _____ was able to ask her child to all police. While _____ child was calling police, A D _____ went back and sat on the steps leading to her apartment where she was again met by Joao who was not aware that police were contacted.

A D _____ further advised that Joao has mental health issues that he takesmedication for, which she does not think he took prior to this incident. Furthermore, A D _____ advised that if Joao has redness on his face it is because when he gets angry he tends to hit himself. While speaking with A D _____ Idid not see any visible signs that she was injured. A D _____ allowed me to photograph her face and also advised that Joao is "black belt" and he knows how to hit her without leaving a mark.

A D _____ agreed to complete a Smith Affidavit. After A D _____ completed the affidavit I read her the perjury statement. After I read A D _____ the perjury statement she signed both pages of her two page statement with me as a witness. Lastly, I went over a safety planwith A D _____ prior to concluding my interview.
Corporal Lagerquist was notified as A D _____ statements added to athreat score of 25.
Recommend:
Attach to GO.

| REPORTING OFFICER SIGNATURE / DATE | SUPERVISOR SIGNATURE / DATE |
|---|---|
| Tim Tretta #1697   Nov 10, 2019 04:04 (e-signature) | Kevin Barton #1551   Nov 10, 2019 04:04 (e-signature) |
| PRINT NAME | PRINT NAME |
| Tim Tretta #1697 | Kevin Barton #1551 |

Vancouver Police Department                    Pg 1 of 2
Mark43 RMS Form v2.0 generated by E. Boyle on Aug 24, 2021 01:13.
Imported Report.                                                                08775

SER-82

Report Number 2019-018624 - Supplement - FD-161949 Report (Vancouver Police Department)                    Pg 2 of 2

This report was generated in Mark43 and the e-signature was affixed using the undersigned officer's unique login and password. I certify (or declare) under penalty of perjury under the laws of the State of Washington that the foregoing is true and correct to the best of my knowledge and belief.

| ELECTRONICALLY SIGNED | DATE | PLACE |
|---|---|---|
| Tim Tretta | 11/10/2019 | Vancouver Police Department, WA |

| REPORTING OFFICER SIGNATURE / DATE | SUPERVISOR SIGNATURE / DATE |
|---|---|
| Tim Tretta #1697   Nov 10, 2019 04:04 (e-signature) | Kevin Barton #1551   Nov 10, 2019 04:04 (e-signature) |
| PRINT NAME | PRINT NAME |
| Tim Tretta #1697 | Kevin Barton #1551 |

**Vancouver Police Department**
*Mark43 RMS Form v2.0 generated by E. Boyle #1778 on Aug 24, 2021 01:13.*
*Imported Report.*

Pg 2 of 2
08776

SER-83

Report Number 2019-018624 - Supplement - FU~707948 Report (Vancouver Police Department)          Pg 1 of 1

## Report Number 2019-018624 - Supplement - FU~707948 Report

| REPORT DATE / TIME | EVENT START DATE / TIME - EVENT END DATE / TIME | REPORT WRITER |
|---|---|---|
| Nov 10, 2019 05:54 | Nov 9, 2019 23:50 | Justin Mason #1712 |

SUPPLEMENT TYPE

Patrol Supplemental

### NARRATIVE

Document No: FU0007079480001
Subject: SUPPLEMENTAL - MASON
Author: JUSTIN MASON (231712)
Date:2019-11-10 05:42:00

On 11/9/2019 at approximately 2355 hours I was one of multiple Officers to respond to 12800 ▓▓▓▓▓ for a physical disturbance. Once I scene one of my responsibilities was to speak with the caller and
son of the suspect and victim, R D ▓▓▓▓▓ R D ▓▓ was the one who had called 911 and reported the disturbance. R D is 12 years old and said he, his younger brother and even younger sister were all in the apartment during the disturbance.
According the R D his father had been away for work in Seattle for a few days. He got to their apartment and he and his mother started arguing.
R D was not entirely sure what the argument was about but said it was heated. They stopped arguing for a while but it picked up again not long before R D called 911. He said that his parents started arguing again and "my dad had a lost it moment". R D said his father attacked his mother. **He observed him punch and slap her multiple times in the arms and legs.** R D said a couple of the slaps appeared to hit his mother in the face. R D said his mother kept telling his father to stop and swung at him acouple times as well.
R D said that his father said something about making a divorce difficult but he was not sure what exactly was said.
R D said that his parents both went outside and shortly after he
called 911. R D said that his parents had fought like this before at their old house in Massachusetts. He did not believe the incidents were reported. I collected his information and ended the interview.
For more information see the general and all associated supplemental reports.
Justin Mason 1712
East Graveyard Patrol
11/10/2019

This report was generated in Mark43 and the e-signature was affixed using the undersigned officer's unique login and password. I certify (or declare) under penalty of perjury under the laws of the State of Washington that the foregoing is true and correct to the best of my knowledge and belief.

| ELECTRONICALLY SIGNED | DATE | PLACE |
|---|---|---|
| Justin Mason | 11/10/2019 | Vancouver Police Department, WA |

| REPORTING OFFICER SIGNATURE / DATE | SUPERVISOR SIGNATURE / DATE |
|---|---|
| Justin Mason #1712    Nov 10, 2019 05:54 (e-signature) | Kevin Barton #1551    Nov 10, 2019 05:54 (e-signature) |
| PRINT NAME | PRINT NAME |
| Justin Mason #1712 | Kevin Barton #1551 |

**Vancouver Police Department**
Mark43 RMS Form v2.0 generated by E. Boyle #1778 on Aug 24, 2021 01:13.
Imported Report.

Pg 1 of 1
08777



**Vancouver Police Department**

## Report Number 2019-018624 - *Offense / Incident - -GO~5374778 Report

| REPORT DATE / TIME | EVENT START DATE / TIME - EVENT END DATE / TIME | REPORT WRITER |
|---|---|---|
| Nov 9, 2019 23:50 | Nov 9, 2019 23:50 | Stephen Sloniker #1738 |

REPORT TAKEN LOCATION
VILLAGE ON SEVENTH APARTMENTS, ⬛⬛⬛ VANCOUVER, WA 98683

## NARRATIVE

Document No: GO0053747780001
Subject: CASE SUMMARY AND RCW
Author: STEPHEN SLONIKER (231738)
Date:2019-11-10 04:40:00

[23RCW01 ] VPD CASE SUMMARY AND RCW v.150611_____ CASE SUMMARY[ON 11/09/2019, AT APPROXIMATELY 2354 HOURS, I SELF-DISPATCHED TO 12800 ⬛⬛⬛ (VILLAGE ON SEVENTH APARTMENTS) IN REGARD TO A REPORT OF A PHYSICALDISTURBANCE AT THIS LOCATION. BASED ON THE RESULTING INVESTIGATION, PROBABLECAUSE WAS DETERMINED TO EXIST TO ARREST SUSPECT JOAO R. DEBORBA FOR DOMESTICVIOLENCE ASSAULT, 4TH DEGREE. JOAO R. DEBORBA WAS TAKEN INTO CUSTODY.]ATTACHMENTS[NONE ]EVIDENCE SUBMITTED IN TRAQ: [X ]NONE[ ]PHYSICAL EVIDENCE [ ] DIGITAL EVIDENCELIST OF CHARGES[ASSA - 9A.36.041-DV - ASSAULT IV - DV ][][ ][ ]RECOMMENDATIONS[FORWARD TO DOMESTIC VIOLENCE CASE SUPERVISORFORWARD TO DVPC ]EXTERNAL DISTRIBUTION (Other than options available in Routing) [No ][ ] [ ] []Other External Distribution:[ ]_____

Document No: GO0053747780002
Subject: NARRATIVE - DV ASSAULT 4TH
Author: STEPHEN SLONIKER (231738)
Date:2019-11-10 04:47:00

On 11/09/2019, at approximately 2354 hours, I self-dispatched to 12800 ⬛⬛⬛ . in regard to a report of a physical disturbance at this location. Initial call notes the altercation was between a husband and wife, and the call for service was placed by their son. I responded with Officer Aldridge.
I arrived at the incident location. The suspect, Joao R. DeBorba, was outside of the apartment complex speaking to Officers Wilhelm and Barnett
as I arrived. Officer Aldridge placed Joao in handcuffs for our safety due to the violent nature of the alleged offense.
I then entered the dispatch residence, apartment H3, and contacted Officer Mason, who was interviewing R D ⬛⬛⬛ R D identified himself as the son of Joao and A D ⬛⬛⬛ . R D gave a statement to Officer Mason, saying he had witnessed Joao hit his mother, both in an open-handed and close-fist fashion, during a verbal altercation earlier inthe evening. R D stated he saw Joao hit A D in the kitchen of
the residence multiple times. See Officer Mason's supplemental report for further detail regarding the alleged assault.
I then contacted Officer Tretta who wasinterviewing A D DeBorba, Joao's wife. I did not observe any visible injuries on A D person upon my arrival. A D gave a statement that Joao had struck her multiple times in various rooms of the residence duringa verbal altercation. A D said she then asked Joao to speak outside so the children could not witness their argument. A D said she went outside and spoke to Joao while they both occupied his vehicle, at which time heattempted to leave the apartment complex while she was inside the vehicle. A D stated she did not want to leave with Joao and "jumped out" of the vehicle as it was moving before returning to the residence. During the interviewwith A D she stated she was in favor of a No Contact Order against Joao, and she no longer wanted him to be in her house. See Officer Tretta's report for further detail regarding A D statement.
I then took custody of Joao from Officers Wilhelm and Barnett. I advised Joao he was under arrest and searched his person incident to arrest, with

| REPORTING OFFICER SIGNATURE / DATE | SUPERVISOR SIGNATURE / DATE |
|---|---|
| Stephen Sloniker #1738   Nov 9, 2019 23:50 (e-signature) | Kevin Barton #1551   Nov 10, 2019 00:00 (e-signature) |
| PRINT NAME | PRINT NAME |
| Stephen Sloniker #1738 | Kevin Barton #1551 |

**Vancouver Police Department**
*Mark43 RMS Form v2.0 generated by E. Boyle #1778 on Aug 24, 2021 01:13.*
*Imported Report.*

Report Number 2019-018624  Offense / Incident - GO-2019-018624 Report (Vancouver Police Department)                    Pg 2 of 3

no finds. I transported Joao to the Clark Country Sheriff's Office Jail and transferred him to the custody of jail staff with no incident. Based on the statements provided by R D ██ and A D ██ I determined there to be probable cause to arrest Joao for Domestic Violence Assault, Fourth Degree, pursuant to RCW 9A.46.041.

## OFFENSE-1

OFFENSE CODE

13130 | SIMPLE ASSAULT-MISD

| OFFENSE START DATE | OFFENSE END DATE | OFFENSE COMPLETION | DOES EVENT CONTAIN BIAS ELEMENTS? |
|---|---|---|---|
| Nov 9, 2019 00:00 | Nov 9, 2019 00:00 | ▣ COMPLETED<br>☐ ATTEMPTED | ☐ YES ▣ NO |

| DOMESTIC VIOLENCE | WAS METHOD OF ENTRY FORCED? |
|---|---|
| ▣ YES ☐ NO | ☐ YES ▣ NO |

### OFFENSE LOCATION

LOCATION NAME / STREET ADDRESS/LOCATION NAME / APT, UNIT, STE / DESCRIPTION

VILLAGE ON SEVENTH APARTMENTS, ████

| CITY | STATE | ZIP | COUNTRY CODE |
|---|---|---|---|
| VANCOUVER | WA | 98683 | US |

LOCATION CATEGORY

Residence/ Home

### VICTIMS-1

| VICTIMS-1 NAME (LAST, FIRST MIDDLE) | DOB / ESTIMATED AGE RANGE |
|---|---|
| V-1 A D ██ O | 1980-██ |

| SEX | RACE / ETHNICITY | PHONE NUMBER |
|---|---|---|
| Female | White / Not Hispanic Or Latino | (360) 843-8789 (Mobile) |

HOME ADDRESS

VILLAGE ON SEVENTH APARTMENTS, ████, VANCOUVER, WA 98683

### WITNESS-1

| WITNESS-1 NAME (LAST, FIRST MIDDLE) | DOB / ESTIMATED AGE RANGE |
|---|---|
| W-1 R D ██ | 2007-██ |

| SEX | RACE / ETHNICITY | PHONE NUMBER |
|---|---|---|
| Male | White / Unknown | (360) 843-5477 (Mobile) |

HOME ADDRESS

VILLAGE ON SEVENTH APARTMENTS, ████, VANCOUVER, WA 98683

### INVOLVED OTHER-1

| INVOLVED OTHER-1 (PERSON) | DOB / ESTIMATED AGE RANGE |
|---|---|
| O-1 DEBORBA, JOAO R D ██ | 1975-██ |

| SEX | RACE / ETHNICITY | PHONE NUMBER |
|---|---|---|
| Male | White / Not Hispanic Or Latino | (978) 398-5793 (Mobile) |

HOME ADDRESS

VILLAGE ON SEVENTH APARTMENTS, ████, VANCOUVER, WA 98683

## ATTACHMENTS ADDENDUM

| FILE NAME | UPLOAD DATE/TIME | UPLOADED BY |
|---|---|---|
| 3530286.pdf | Nov 5, 2020 01:54 | L. Data Migration |
| 3530291.pdf | Nov 5, 2020 01:54 | L. Data Migration |
| 3530292.pdf | Nov 5, 2020 01:54 | L. Data Migration |
| 3530297.pdf | Nov 5, 2020 01:54 | L. Data Migration |

| REPORTING OFFICER SIGNATURE / DATE | SUPERVISOR SIGNATURE / DATE |
|---|---|
| Stephen Sloniker #1738   Nov 9, 2019 23:50 (e-signature) | Kevin Barton #1551   Nov 10, 2019 00:00 (e-signature) |
| PRINT NAME | PRINT NAME |
| Stephen Sloniker #1738 | Kevin Barton #1551 |

**Vancouver Police Department**
*Mark43 RMS Form v2.0 generated by E. Boyle #1778 on Aug 24, 2021 01:13.*
*Imported Report.*

Report Number 2019-018624         Offense / Incident - 480-5374778 Report (Vancouver Police Department)                    Pg 3 of 3

| | | |
|---|---|---|
| 3534648.pdf | Nov 5, 2020 01:54 | L. Data Migration |
| 3534651.pdf | Nov 5, 2020 01:54 | L. Data Migration |
| 3534652.pdf | Nov 5, 2020 01:54 | L. Data Migration |
| GO_2019_18624.pdf | Oct 28, 2020 15:29 | L. Data Migration |

This report was generated in Mark43 and the e-signature was affixed using the undersigned officer's unique login and password. I certify (or declare) under penalty of perjury under the laws of the State of Washington that the foregoing is true and correct to the best of my knowledge and belief.

| ELECTRONICALLY SIGNED | DATE | PLACE |
|---|---|---|
| Stephen Sloniker | 11/09/2019 | Vancouver Police Department, WA |

| REPORTING OFFICER SIGNATURE / DATE | SUPERVISOR SIGNATURE / DATE |
|---|---|
| Stephen Sloniker #1738   Nov 9, 2019 23:50 (e-signature) | Kevin Barton #1551   Nov 10, 2019 00:00 (e-signature) |
| PRINT NAME | PRINT NAME |
| Stephen Sloniker #1738 | Kevin Barton #1551 |

**Vancouver Police Department**
Mark43 RMS Form v2.0 generated by E. Boyle #1778 on Aug 24, 2021 01:13.
Imported Report.

Pg 3 of 3
08773

SER-87

Report Number 2019-018624 - Supplement - FU~707947 Report (Vancouver Police Department)                Pg 1 of 2

## Report Number 2019-018624 - Supplement - FU~707947 Report

| REPORT DATE / TIME | EVENT START DATE / TIME - EVENT END DATE / TIME | REPORT WRITER |
|---|---|---|
| Nov 10, 2019 04:04 | Nov 9, 2019 23:50 | Tim Tretta #1697 |

SUPPLEMENT TYPE

Patrol Supplemental

## NARRATIVE

Document No: FU0007079470001
Subject: SUPPLEMENTAL
Author: TIMOTHY TRETTA (231697)
Date:2019-11-10 04:03:00

On 11/9/19 at about 2350 hours, I responded to 12800 ███████. (Village on Seventh Apartments███) to assist Officer Sloniker concerning a physical disturbance. Upon my arrival at about 2359 hours, I met with ██ █ ████ ███.
██ █ ████ was sitting on the stairs that lead to her apartment. ██ █ ████ was crying hysterically, which made communication difficult. I managed to calm ██ █ ████ enough to begin a dialog. ██ █ ████ reported that she came home from work and she met with her husband, Joao ██ █ ███ who was already at her home watching their four, in-common children. ██ █ advised that Joao does not live with ██ ████ and they are currently separated.
██ █ ████ reported that Joao was angry when she arrived, which he's been since ██ █ ████ told him that she wants to get a divorce. ██ █ aexplained that Joao started arguing with ██ █ ████ and he asked to look in her phone, which ██ █ ████ did not allow. As a result, Joao took ██ █ ████ phone from her however, it was password locked. ██ █ ████ advised that she should still have her phone as of this interview.
██ █ ████ advised that Joao demanded that ██ █ ████ provide him with the password to her phone, which she refused to give Joao. Joao threatened to damage ██ █ ████ phone by hitting it on the counter and then also threatened to hit ██ █ ████ if she did not provide him with its password. ██ █ ████ explained that she did not say anything to Joao when he threatened to hit her. ██ █ ████ advised that Joao then slapped ██ █ ████ on the right side of her face.
██ █ ████ explained that she anticipated a second slap to the left side of her face so she put her arm in front of her face to block the upcoming slapand in doing so ██ █ ████ hand hit Joao's face. In response, ██ █ ████ was told by Joao (in Portuguese) you hit me now I'm going to hit you good and then Joao punched ██ █ ████ on both of her arms, kicked her left leg and slapped the right side of her face. ██ █ ████ advised that she did not want the children seeing Joao hitting her so she went to the kitchen to separate away from Joao however, Joao followed her into the kitchen. ██ █ ████ explained thatshe believed that Joao would not hit ██ █ ████ in-front of the children so she decided to go into the kid's room; Joao followed.
While in the kid's room, ██ █ ████ reported that Joao slapped the left side of her face in-front of the kids.
██ █ ████ then asked Joao to come talk with her outside, he agreed and they went downstairs and sat in their car to talk. ██ █ ████ reported that once they were in the car, Joao started the car and wanted to drive away. ██ █ ████ advised that she did not want to go anywhere with Joao, which she told him several times. However, Joao backed the car out of a parking space anyhow. ██ █ ████ explained that once the car backed up Joao went to put the car in drive, which provided ██ █ ████ enough time to jump out of the car.
Once outof the car ██ █ ████ went back to her apartment while Joao parked the car. Because of the delay, ██ █ ████ was able to ask her child to all police. While ██ █ child was calling police, ██ █ ████ went back and sat on the steps leading to her apartment where she was again met by Joao who was not aware that police were contacted.
██ █ ████ further advised that Joao has mental health issues that he takesmedication for, which she does not think he took prior to this incident. Furthermore, ██ █ ████ advised that if Joao has redness on his face it is because when he gets angry he tends to hit himself. While speaking with ██ █ ████ Idid not see any visible signs that she was injured. ██ █ ████ allowed me to photograph her face and also advised that Joao is "black belt" and he knows how to hit her without leaving a mark.
██ █ ████ agreed to complete a Smith Affidavit. After ██ █ ████ completed the affidavit I read her the perjury statement. After I read ██ █ ████ the perjury statement she signed both pages of her two page statement with me as a witness. Lastly, I went over a safety planwith ██ █ ████ prior to concluding my interview.
Corporal Lagerquist was notified as ██ █ ████ statements added to athreat score of 25.
Recommend:
Attach to GO.

| REPORTING OFFICER SIGNATURE / DATE | SUPERVISOR SIGNATURE / DATE |
|---|---|
| Tim Tretta #1697   Nov 10, 2019 04:04 (e-signature) | Kevin Barton #1551   Nov 10, 2019 04:04 (e-signature) |
| PRINT NAME | PRINT NAME |
| Tim Tretta #1697 | Kevin Barton #1551 |

Report Number 2019-018824 - Supplement 1 FU-787987 Report (Vancouver Police Department)                    Pg 2 of 2

This report was generated in Mark43 and the e-signature was affixed using the undersigned officer's unique login and password. I certify (or declare) under penalty of perjury under the laws of the State of Washington that the foregoing is true and correct to the best of my knowledge and belief.

| ELECTRONICALLY SIGNED | DATE | PLACE |
|---|---|---|
| Tim Tretta | 11/10/2019 | Vancouver Police Department, WA |

| REPORTING OFFICER SIGNATURE / DATE | SUPERVISOR SIGNATURE / DATE |
|---|---|
| Tim Tretta #1697   Nov 10, 2019 04:04 (e-signature) | Kevin Barton #1551   Nov 10, 2019 04:04 (e-signature) |
| PRINT NAME | PRINT NAME |
| Tim Tretta #1697 | Kevin Barton #1551 |

**Vancouver Police Department**
*Mark43 RMS Form v2.0 generated by E. Boyle #1778 on Aug 24, 2021 01:13.*
*Imported Report.*

Pg 2 of 2

Report Number 2019-018624 - Supplement - FU~707948 Report (Vancouver Police Department)                          Pg 1 of 1

## Report Number 2019-018624 - Supplement - FU~707948 Report

| REPORT DATE / TIME | EVENT START DATE / TIME - EVENT END DATE / TIME | REPORT WRITER |
|---|---|---|
| Nov 10, 2019 05:54 | Nov 9, 2019 23:50 | Justin Mason #1712 |

SUPPLEMENT TYPE

Patrol Supplemental

### NARRATIVE

Document No: FU0007079480001
Subject: SUPPLEMENTAL - MASON
Author: JUSTIN MASON (231712)
Date:2019-11-10 05:42:00

On 11/9/2019 at approximately 2355 hours I was one of multiple Officers to respond to 12800 ▓▓▓▓▓ for a physical disturbance. Once I scene one of my responsibilities was to speak with the caller and
son of the suspect and victim, ▓R D▓ ▓▓▓▓R D▓▓ was the one who had called 911 and reported the disturbance. ▓R D▓ is 12 years old and said he, his younger brother and even younger sister were all in the apartment during the disturbance.
According the ▓R D▓ his father had been away for work in Seattle for a few days. He got to their apartment and he and his mother started arguing.
▓R D▓ was not entirely sure what the argument was about but said it was heated. They stopped arguing for a while but it picked up again not long before ▓R D▓ called 911. He said that his parents started arguing again and "my dad had a lost it moment". ▓R D▓ said his father attacked his mother. He observed him punch and slap her multiple times in the arms and legs. ▓R D▓ said a couple of the slaps appeared to hit his mother in the face. ▓R D▓ said his mother kept telling his father to stop and swung at him acouple times as well.
▓R D▓ said that his father said something about making a divorce difficult but he was not sure what exactly was said.
▓R D▓ said that his parents both went outside and shortly after he
called 911. ▓R D▓ said that his parents had fought like this before at their old house in Massachusetts. He did not believe the incidents were reported. I collected his information and ended the interview.
For more information see the general and all associated supplemental reports.
Justin Mason 1712
East Graveyard Patrol
11/10/2019

This report was generated in Mark43 and the e-signature was affixed using the undersigned officer's unique login and password. I certify (or declare) under penalty of perjury under the laws of the State of Washington that the foregoing is true and correct to the best of my knowledge and belief.

| ELECTRONICALLY SIGNED | DATE | PLACE |
|---|---|---|
| Justin Mason | 11/10/2019 | Vancouver Police Department, WA |

| | |
|---|---|
| REPORTING OFFICER SIGNATURE / DATE | SUPERVISOR SIGNATURE / DATE |
| Justin Mason #1712   Nov 10, 2019 05:54 (e-signature) | Kevin Barton #1551   Nov 10, 2019 05:54 (e-signature) |
| PRINT NAME | PRINT NAME |
| Justin Mason #1712 | Kevin Barton #1551 |

# Exhibit 2



**Vancouver Police Department**

## Report Number 2019-019034 - *Offense / Incident - -GO~5378036 Report

| REPORT DATE / TIME | EVENT START DATE / TIME - EVENT END DATE / TIME | REPORT WRITER |
|---|---|---|
| Nov 16, 2019 17:17 | Nov 16, 2019 16:24 - 17:17 | Zachary Allred #1564 |

REPORT TAKEN LOCATION
VILLAGE PARK APARTMENTS, , VANCOUVER, WA 98661

## NARRATIVE

Document No: GO0053780360001
Subject: NCO VIO SUM 1564
Author: ZACHARY ALLRED (231564)
Date:2019-11-16 23:37:00

[23RCW01 ] VPD CASE SUMMARY AND RCW v.150611_____ CASE SUMMARY[A D ] CALLED TO REPORT HER HUSBAND, JOAO DEBORBA, WHO IS THERESPONDENT IN A VALID AND SERVED NO CONTACT ORDER HAD CALLED AND SENT HERMULTIPLE TEXT MESSAGES.]ATTACHMENTS[PHOTO/EVIDENCE:PHOTOGRAPHS OF MESSAGES AND CALL LOG20 FIREARMS COLLECTED FOR SAFEKEEPINGCONSENT TO SEARCH FORM SIGNED BY JOAO DEBORBA ORPHAN DOCS:COPY OF ORDERCOPY OF CONSENT TO SEARCH FORM]EVIDENCE SUBMITTED IN TRAQ: [ ]NONE [X ]PHYSICAL EVIDENCE[X ]DIGITAL EVIDENCELIST OF CHARGES[ORDE - 26.50.110(1) - VIOLATION OF ORDER - GM ][ ][][ ]RECOMMENDATIONS[FORWARD TO DV PC AND DV UNIT FOR REVIEW ]EXTERNAL DISTRIBUTION (Other than options available in Routing) [No ][ ] [ ] [ ]Other External Distribution:[]

_____

Document No: GO0053780360002
Subject: NCO VIO DV NAR 1564
Author: ZACHARY ALLRED (231564)
Date:2019-11-17 00:26:00

On 15 November 2019, at approximately 1820 hours, while on uniformed patrol in a marked patrol car in Vancouver, WA, I was dispatched to the Vancouver West Precinct located at 2800 NE Stapleton Road, in regards to a
restraining orderviolation. It was reported by [A D ] her husband, Joao Deborba, had been calling her and there was a served no contact order listing Joao as the respondent.
Upon arrival I contacted [A D ] who advised she had startedreceiving phone calls and text messages on the "WhatsApp" from Joao. [A D ] had the valid and served No Contact Order (921074494) which stated "do not contact the protected person, directly, indirectly, in person or through others, by phone, mail, or electronic means." [A D ] showed me her phone and the call log shows approximately 20 phone calls from 1624 hours
to 1651 hours. The messages in the WhatsApp show multiple text and voice messages from 1308hours to 1525 hours. I took photographs of both the
call logs and the messages in the app and have entered them into TraQ as evidence.
[A D ] stated she was afraid to go home; she lives at , as Joao stated he would come over to see the kids. Joao livesat , and [A D ] believed he was at his apartment at the time of sending the messages. [A D ] also advised
Joao possessed firearms, but she thought he had turned them in after he was arrested earlier in the week. She did not know how many or what types of firearms he had. I observed in the order it was stated Joao needed to surrender his weapons to comply with the order. [A D ] and I talked about options she had to feel safe and comfortable in her own residence and she stated she had friends coming over to stay with her. She also stated she would be changing the locks as soon as possible.
I conducted a criminal history check on Joao which returned with no prior violations of a no contact order. I spoke with CPL Henderson and advised him of the information about the provided by [A D ] I also advised him about thestatement of possibly having firearms and finding no indication the said firearms had been turned over to Law Enforcement. Me, CPL Henderson, and additional units changed location to Joao's apartment to attempt contact.
The lights were on in the unit and I attempted to call him via phone and have him exit the residence, there was no answer and we

| REPORTING OFFICER SIGNATURE / DATE | SUPERVISOR SIGNATURE / DATE |
|---|---|
| Zachary Allred #1564   Nov 16, 2019 17:17 (e-signature) | Brian Ruder #1423   Nov 17, 2019 00:00 (e-signature) |
| PRINT NAME | PRINT NAME |
| Zachary Allred #1564 | Brian Ruder #1423 |

**Vancouver Police Department**
*Mark43 RMS Form v2.0 generated by E. Boyle #1778 on Aug 24, 2021 01:15.*
*Imported Report.*

Pg 1 of 3
08781

SER-92

Report Number 2019-019094 - Offense / Incident - Case 3376036 Report (Vancouver Police Department)                              Pg 2 of 3

attempted to knock on the front door. This again resulted in no answer, Officer Merrill and Officer Mckenzie advised over the radio they had contact with Joao on the raised patio deck on the rear of the apartment. Joao was advised he was under arrest and to come out of the apartment. After spending a few

minutes speaking with us he stated he would exit out of the front of the apartment with nothing in his hands.

I returned to the front of the apartment to wait for Joao to exit; however, he did not. Additional units arrived on scene and a perimeter was set up. The Bearcat was also brought to scene to assist in doing PA announcements advising Joao to exit the residence as he was under arrest. For approximately 12 minutes there were multiple announcements advising Joao to exit the residence, eventually he did exit the apartment with nothing in

his hands. He complied with verbal commands and walked down the stairs

from his apartment and I placed him in handcuffs behind his back, checked the handcuffs for fit, and double locked them.

I escorted Joao to my patrol vehicle and placed him in the backseat. I advised Joao again that he was under arrest and read him the Miranda Warnings from my department issued card; I asked Joao if he understood his rights, and he said "yes." I then asked if he would still like to speak to me about what had happened, and he said "yes." I advised Joao he was under arrest for calling and sending messages to A D    Joao advised he thought the judge had stated he could call A D    in order to speak to their children. I advised that was not correct due to the No Contact Order he is not allowed contact with A D

I asked Joao if he had any firearms, and he advised he did. I asked if they were in the apartment and he confirmed they were. He also advised he attempted to turn the weapons in at the Vancouver East Precinct but came in after hours and was told to return between work hours Monday through

Friday. I asked Joao if he would be willing give Law Enforcement consent to enter the residence and collect the firearms in accordance to the order.

Joao stated he would give Police consent and I completed a Voluntary Consent To Search form with Joao. I released him from handcuffs and he signed the form and wrote down the combination for his gun safe where the firearms were located. After he completed the form and Officer Mckenzie

and I signed the form as witnesses. I then placed Joao in handcuffs using two sets of handcuffs behind his back, checked the handcuffs for fit, and double locked them.

As part of the consent to search form Joao was advised he could revoke his consent at any time during the search. CPL Henderson, Officer Epperson, Officer Merrill, and Officer Mckenzie entered the residence and using the information provided by Joao collected 20 firearms from Joao's gun safe. There was a combination of handguns and long rifles. All of the firearms have been entered into TraQ for safekeeping; I also have entered the Consent to Search Form into evidence as well.

Based on the statements provided by A D    and Joao about the exchange of messages and multiple phone calls; there is probable cause to arrest

Joao for Violation for No Contact Order DV RCW 26.50.110. I transported Joao to Clark County Jail where he was booked for the above listed charge.

RECOMMENDATION:

Forward to DV Unit and DV PC for review

## OFFENSE-1

OFFENSE CODE

50992 | PROTECTION ORDERS (WA)

| OFFENSE START DATE | OFFENSE END DATE | OFFENSE COMPLETION | DOES EVENT CONTAIN BIAS ELEMENTS? |
|---|---|---|---|
| Nov 16, 2019 00:00 | Nov 16, 2019 00:00 | ■ COMPLETED  ☐ ATTEMPTED | ☐ YES  ■ NO |

| DOMESTIC VIOLENCE | WAS METHOD OF ENTRY FORCED? |
|---|---|
| ■ YES  ☐ NO | ☐ YES  ■ NO |

*OFFENSE LOCATION*

LOCATION NAME / STREET ADDRESS/LOCATION NAME / APT, UNIT, STE / DESCRIPTION

VILLAGE PARK APARTMENTS,

| CITY | STATE | ZIP | COUNTRY CODE |
|---|---|---|---|
| VANCOUVER | WA | 98661 | US |

LOCATION CATEGORY

Residence/ Home

*VICTIMS-1*

| REPORTING OFFICER SIGNATURE / DATE | SUPERVISOR SIGNATURE / DATE |
|---|---|
| Zachary Allred #1564   Nov 16, 2019 17:17 (e-signature) | Brian Ruder #1423   Nov 17, 2019 00:00 (e-signature) |
| PRINT NAME | PRINT NAME |
| Zachary Allred #1564 | Brian Ruder #1423 |

**Vancouver Police Department**
*Mark43 RMS Form #1778 on Aug 24, 2021 01:15.*
*Imported Report.*

Pg 2 of 3

08782

# Exhibit 3



Vancouver Police Department

## Report Number 2019-020307 - *Offense / Incident - -GO~5387569 Report

| REPORT DATE / TIME | EVENT START DATE / TIME - EVENT END DATE / TIME | REPORT WRITER |
|---|---|---|
| Dec 7, 2019 20:16 | Dec 7, 2019 18:04 | Gunnar Skollingsberg #1533 |

REPORT TAKEN LOCATION
VILLAGE ON SEVENTH APARTMENTS, ⬛⬛⬛⬛ , VANCOUVER, WA 98683

## NARRATIVE

Document No: GO0053875690001
Subject: CASE SUMMARY
Author: GUNNAR SKOLLINGSBERG (231533)
Date:2019-12-07 20:33:00

[23RCW01 ] VPD CASE SUMMARY AND RCW v.150611_____ CASE
SUMMARY[PC AND BOLO FOR JOAO ON FILE. ]ATTACHMENTS[PC STATEMENTCOPY OF DV PACKET ]EVIDENCE SUBMITTED IN TRAQ: [ ] NONE
[ ]PHYSICAL EVIDENCE [X ]DIGITAL EVIDENCELIST OF CHARGES[BURG - 9A.52.025-DV - RESIDENTIAL BURGLARY-DV][INTE - 9A.36.150 -
INTERFERE W/REPORT OF DV ][ORDE - 26.50.110(1) - VIOLATION OF ORDER - GM ][RECOMMENDATIONS[FWD TO DV UNIT ]EXTERNAL
DISTRIBUTION (Other than options available in Routing) [No ][ ] [ ][]Other External Distribution:[ ]
_____

Document No: GO0053875690002
Subject: NARRATIVE
Author: GUNNAR SKOLLINGSBERG (231533)
Date:2019-12-07 20:35:00

CASE: 2319-20307
My information is derived from:
Suspect 1: Deborba, Joao R. DOB: ⬛⬛ /1975
Victim 1: A D ⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛ DOB: ⬛⬛ /1980
Witness 1: R.O. D. (Juvenile)
Witness 2: D. M. O. (Juvenile)
On 12/7/2019 at 1804 hours I was dispatched to a restraining order
violation which had occurred at 12800 ⬛⬛⬛⬛⬛⬛ in Vancouver, WA.
A D ⬛⬛ A D ⬛⬛ called 911 to report her husband Joao Deborba had just violated a DV order and was leaving. Dispatch confirmed
there was a served and valid order in which Joao was prohibited from contacting A D ⬛⬛ (9Z1074494).

I arrived and contacted A D ⬛⬛ in the residence. She was visibly scared as she was shaking, crying, and pacing back and forth.
A D ⬛⬛ reported that she had left the residence to get McDonalds for her four children's dinner,leaving her 12 year old son to watch
the other younger siblings. Upon her return Joao was in her apartment with the children. A D ⬛⬛ told Joao to get out and leave multiple times and he refused multiple times. At one point Joaobegan yelling and punching
himself in the head and face repeatedly. A D ⬛⬛ said he does this sometimes and went on to say he is bi-polar and depressed.
A D ⬛⬛ then said she was calling the police and reached for the cell phone in her pocket. Joao then grabbed her around her waist and
asked her not to call police. She was not hurt by being grabbed and she beleived itwas solely for the purpose of preventing her from
gettin gher phone out.
She then kicked away from him and ran outside screaming for help. Joao then fled the scene to the north and got into his vehicle, a dark
blue 2006 Chrysler PT Cruiser displaying Washington license plates BOU2669. The vehicle had been parked on the south side of SE 5th St
facing east, and
Joao drove east from the scene.
A D ⬛⬛ completed a sworn DV victim's statement and the threat
assessment score was 15. I notified Sgt. Viles of the score. I read her the perjury statement verbatim and she said she understood, then

| REPORTING OFFICER SIGNATURE / DATE | SUPERVISOR SIGNATURE / DATE |
|---|---|
| Gunnar Skollingsberg #1533   Dec 7, 2019 20:16 (e-signature) | Kevin Barton #1551   Dec 8, 2019 00:00 (e-signature) |
| PRINT NAME | PRINT NAME |
| Gunnar Skollingsberg #1533 | Kevin Barton #1551 |

**Vancouver Police Department**
*Mark43 RMS Form v2.0 generated by E. Boyle #1778 on Aug 24, 2021 01:16.*
*Imported Report.*

Report Number 2019-020397 - Offense / Incident - LEO-3307385 Report (Vancouver Police Department)                                           Pg 2 of 3

signed the form. I included this form in TRAQ as evidence.

I spoke with R.O.D. who stated he was home and watching the children while his mother, A D ▓▓ went to get dinner. He heard a knock at the door
and thought it was his mother returning with food. He opened the door and saw Joao, who then walked in the residence. A D ▓▓ entered a few
minutes later and she told him to leave. He refused and she tried to call police. He got on his knees and grabbed her, begging her to not call
police.

A D ▓▓ told the children to go to the back bedroom and they did. R.O.D. then heard his mother call for "help" from outside and the children ran out because they thought she "was being kidnapped". A D ▓▓ then ran back inside and Joao drove away to the east.
Officers spoke with a neighbor (D. M. O.) who stated they heard screaming then saw A D ▓▓ who appeared scared, and one unknown
bald male wearing dark clothing run from apartment H3. The male then ran north and Alessandra ran south. The children came out of ▓
shortly afterwards and then went
back inside.

Based on the above I have probable cause to charge Joao R. Deborba with:
1- One count of violation of an order-domestic violence (RCW 26.50.110(1)) 2- One count of residential burglary domestic violence (RCW 9A.52.025)
3- One count of interfering with reporting of domestic violence (RCW 9A.36.150)
Attempts to locate and arrest Joao were unsuccessful. Recommend forward to DVPC for issuance of a warrant and charging of Joao.
During this incident Joao and A D ▓▓ children 12 year old R D ▓ 11 year old E D ▓ 5 year old G D ▓ and 4 year old D D ▓
were all present.

## OFFENSE-1

OFFENSE CODE

**22991 | BURGLARY-RESIDENCE**

| OFFENSE START DATE | OFFENSE END DATE | OFFENSE COMPLETION | DOES EVENT CONTAIN BIAS ELEMENTS? |
|---|---|---|---|
| Dec 7, 2019 00:00 | Dec 7, 2019 00:00 | ■ COMPLETED  ☐ ATTEMPTED | ☐ YES ■ NO |

| DOMESTIC VIOLENCE | WAS METHOD OF ENTRY FORCED? |
|---|---|
| ■ YES ☐ NO | ☐ YES ■ NO |

*OFFENSE LOCATION*

LOCATION NAME / STREET ADDRESS/LOCATION NAME / APT, UNIT, STE / DESCRIPTION

VILLAGE ON SEVENTH APARTMENTS, ▓▓

| CITY | STATE | ZIP | COUNTRY CODE |
|---|---|---|---|
| VANCOUVER | WA | 98683 | US |

LOCATION CATEGORY

Residence/ Home

*VICTIMS-1*

| VICTIMS-1 NAME (LAST, FIRST MIDDLE) | DOB / ESTIMATED AGE RANGE |
|---|---|
| V-1 A D ▓ O | 1980-▓ |

| SEX | RACE / ETHNICITY | PHONE NUMBER |
|---|---|---|
| Female | White / Not Hispanic Or Latino | ▓ (Mobile) |

HOME ADDRESS

VILLAGE ON SEVENTH APARTMENTS, ▓▓, VANCOUVER, WA 98683

*SUSPECTS-1*

| SUSPECTS-1 NAME (LAST, FIRST MIDDLE) | DOB / ESTIMATED AGE RANGE |
|---|---|
| S-1 DEBORBA, JOAO RICARDO | 1975-▓ |

| SEX | RACE / ETHNICITY | PHONE NUMBER |
|---|---|---|
| Male | White / Not Hispanic Or Latino | ▓ (Mobile) |

HOME ADDRESS

VILLAGE PARK APARTMENTS, ▓▓, VANCOUVER, WA 98661

*WITNESS-1*

| REPORTING OFFICER SIGNATURE / DATE | SUPERVISOR SIGNATURE / DATE |
|---|---|
| Gunnar Skollingsberg #1533   Dec 7, 2019 20:16 (e-signature) | Kevin Barton #1551   Dec 8, 2019 00:00 (e-signature) |
| PRINT NAME | PRINT NAME |
| Gunnar Skollingsberg #1533 | Kevin Barton #1551 |

**Vancouver Police Department**
Mark43 RMS Form #1778 on Aug 24, 2021 01:16.
Imported Report.

Pg 2 of 3
08797

Case 3:22-cr-05139-DGE   Document 84-3   Filed 05/10/24   Page 4 of 4

Report Number 2019-020307 - Offense / Incident - GO-3387585 Report (Vancouver Police Department)                    Pg 3 of 3

| WITNESS-1 NAME (LAST, FIRST MIDDLE) | | DOB / ESTIMATED AGE RANGE |
|---|---|---|
| W-1 R D O | | 2007- |

| SEX | RACE / ETHNICITY | PHONE NUMBER |
|---|---|---|
| Male | White / Unknown | (Mobile) |

| HOME ADDRESS |
|---|
| VILLAGE ON SEVENTH APARTMENTS, VANCOUVER, WA 98683 |

*WITNESS-2*

| WITNESS-2 NAME (LAST, FIRST MIDDLE) | | DOB / ESTIMATED AGE RANGE |
|---|---|---|
| W-2 OR , DA M | | 2005 |

| SEX | RACE / ETHNICITY | PHONE NUMBER |
|---|---|---|
| Female | Unknown / Hispanic Or Latino | (Mobile) |

| HOME ADDRESS |
|---|
| VANCOUVER, WA 98683 |

*INVOLVED OTHER-1*

| INVOLVED OTHER-1 (PERSON) | SEX | RACE / ETHNICITY |
|---|---|---|
| O-1 E D | Male | White / Not Hispanic Or Latino |

*INVOLVED OTHER-2*

| INVOLVED OTHER-2 (PERSON) | SEX | RACE / ETHNICITY |
|---|---|---|
| O-2 G D G D | Female | White / Not Hispanic Or Latino |

*INVOLVED OTHER-3*

| INVOLVED OTHER-3 (PERSON) | SEX | RACE / ETHNICITY |
|---|---|---|
| O-3 D D | Male | White / Not Hispanic Or Latino |

*INVOLVED OTHER-4*

| INVOLVED OTHER-4 (PERSON) | DOB / ESTIMATED AGE RANGE |
|---|---|
| O-4 OROZCO LOPEZ, ALVARO | 1982 |

| SEX | RACE / ETHNICITY | PHONE NUMBER |
|---|---|---|
| Male | Unknown / Hispanic Or Latino | (Mobile) |

| HOME ADDRESS |
|---|
| VILLAGE ON SEVENTH APARTMENTS, , VANCOUVER, WA 98683 |

## ATTACHMENTS ADDENDUM

| FILE NAME | UPLOAD DATE/TIME | UPLOADED BY |
|---|---|---|
| 3582324.pdf | Nov 5, 2020 01:54 | L. Data Migration |
| 3582336.pdf | Nov 5, 2020 01:54 | L. Data Migration |
| 3582337.pdf | Nov 5, 2020 01:54 | L. Data Migration |
| 3582338.pdf | Nov 5, 2020 01:54 | L. Data Migration |
| 3582341.pdf | Nov 5, 2020 01:54 | L. Data Migration |
| GO_2019_20307.pdf | Oct 28, 2020 15:29 | L. Data Migration |

This report was generated in Mark43 and the e-signature was affixed using the undersigned officer's unique login and password. I certify (or declare) under penalty of perjury under the laws of the State of Washington that the foregoing is true and correct to the best of my knowledge and belief.

| ELECTRONICALLY SIGNED | DATE | PLACE |
|---|---|---|
| Gunnar Skollingsberg | 12/07/2019 | Vancouver Police Department, WA |

| REPORTING OFFICER SIGNATURE / DATE | SUPERVISOR SIGNATURE / DATE |
|---|---|
| Gunnar Skollingsberg #1533   Dec 7, 2019 20:16 (e-signature) | Kevin Barton #1551   Dec 8, 2019 00:00 (e-signature) |
| PRINT NAME | PRINT NAME |
| Gunnar Skollingsberg #1533 | Kevin Barton #1551 |

**Vancouver Police Department**
*Mark43 RMS Form v2.0 generated by E. Boyle #1778 on Aug 24, 2021 01:16.*
*Imported Report.*

Pg 3 of 3

08798

# Exhibit 4

Vancouver Police Department

## Report Number 2020-008864 - *Offense / Incident - -GO~5461597 Report

| REPORT DATE / TIME | EVENT START DATE / TIME - EVENT END DATE / TIME | REPORT WRITER |
|---|---|---|
| Jun 2, 2020 20:47 | Jun 2, 2020 16:00 | Clinton Holbrook #1744 |

REPORT TAKEN LOCATION

VILLAGE ON SEVENTH APARTMENTS, 12800 SE 7TH ST, VANCOUVER, WA 98683

## NARRATIVE

Document No: GO0054615970001
Subject: CASE SUMMARY AND RCW
Author: CLINTON HOLBROOK (231744)
Date:2020-06-03 04:45:00

[23RCW01 ] VPD CASE SUMMARY AND RCW v.150611_____CASE SUMMARY[A D                    ] STATED THAT HER EX-HUSBAND, JOAO DEBORBA, TEXT MESSAGEDHER, CAME TO HER APARTMENT AND HAD ASSAULTED HER. THERE IS AN ACTIVE AND VALIDNO CONTACT ORDER (9Z1074494) WITH[A D          ] AS THE PETITIONER AND JOAO AS THERESPONDENT. PROBABLE CAUSE WAS FOUND TO CHARGE JOAO WITH VIOLATION OF ORDER(MISDEMEANOR), VIOLATION OF ORDER (FELONY) AND ASSAULT IV - DV. JOAO BOOKED TOCCSO JAIL.]ATTACHMENTS[-VPD DV SUPPLEMENTAL REPORT ]EVIDENCE SUBMITTED IN TRAQ: [ ]NONE [X ]PHYSICAL EVIDENCE[X ]DIGITAL EVIDENCELIST OF CHARGES[ORDE - 26.50.110(4) - VIOLATION OF ORDER W/ASSAULT - CLASS C FEL][ORDE - 26.50.110(1) - VIOLATION OF ORDER - GM ][ORDE - 26.50.110(1) - VIOLATION OF ORDER - GM ][ASSA - 9A.36.041-DV - ASSAULT IV - DV ]RECOMMENDATIONS[CLOSED BY ARREST. ]EXTERNAL DISTRIBUTION (Other than options available in Routing) [No ][ ] [ ] [ ]Other External Distribution:[]_____

Document No: GO0054615970002
Subject: VIOLATION OF ORDER NARRATIVE
Author: CLINTON HOLBROOK (231744)
Date:2020-06-03 04:52:00

DISPATCH:On 6-2-2020 I was working uniformed patrol for the City of Vancouver Police Department assigned as 2B44. At approximately 2050 hours I was dispatched to 12800 Se 7th St #H3, Vancouver, Clark County, WA for a reported restraining order violation. INFORMATION:I made telephonic contact with the RP, identified as[A D          ] [A D          ] informed me that her ex-husband, JOAO DEBORBA, had text messaged her earlier in the afternoon multiple times and had physically come to her apartment. [A D          ] further stated that JOAO had assaulted her and had caused injury while he had been at her apartment.[A D          ] is the petitioner in a served and valid No Contact Order with JOAO as the respondent (9Z1074494). The order states that JOAO is not to communicate with[A D          ] to include personal, written or telephonically. The order further states that JOAO is required to stay away from[A D          ] residence and that he is restrained from assaulting[A D          ] I made contact with[A D          ] ather apartment. I observed that[A D          ] had an approximately half inch abrasion to the underside of her left forearm. The abrasion appeared fresh due to its bright red coloration. The abrasion wasn't actively bleeding and[A D          ] stated that she didn't need any medical attention. I observed no other injuries to[A D          ] CONTACT WITH[A D          ] stated that on the afternoon of 6-2-2020 (approximately 1610 hours) she received multiple text messages from JOAO. The couple had separated the previous year and had four children together. JOAO texted[A D          ] he wanted to come to her apartment while she was at work and spend time with their children.[A D          ] stated that JOAO had constantly texted or called her since the No Contact Order had been served and he always contacted her stating that he wanted to see the children.[A D          ] had replied to JOAO'smessages several times and had allowed him to see the children but he would always bring up their relationship and how he wanted them to get back together.[A D          ] texted JOAO back and stated that he could go to her apartment while she was at work but that he needed to leave before she got home. At approximately 1930 hours,[A D          ] returned to her apartment complex in which JOAO was still present. JOAO made contact with[A D          ] outside of her apartment complex.[A D          ] [G D          ] stated that her two youngest children, (six years old) and[D D          ] (four years old), were also outside with JOAO.JOAO started to plead with[A D          ] that they needed to get back together for the children.[A D          ] told JOAO "no" multiple times and that he needed to leave. On being told no, JOAO became angry and started to yell loudly at[A D          ] JOAO then grabbed both of[A D          ] arms below the elbow and held

| REPORTING OFFICER SIGNATURE / DATE | SUPERVISOR SIGNATURE / DATE |
|---|---|
| Clinton Holbrook #1744    Jun 2, 2020 20:47 (e-signature) | Frank Gomez #1415    Jun 3, 2020 00:00 (e-signature) |
| PRINT NAME | PRINT NAME |
| Clinton Holbrook #1744 | Frank Gomez #1415 |

**Vancouver Police Department**                                                                                   Pg 1 of 3
*Mark43 RMS Form v2.0 generated by C. Sanderson #1739 on May 9, 2022 20:46.*
*Imported Report.*

08766

Report Number 2020-0088 | VPD/Vancouver Police Department Report Drafted | Vancouver Police Department                                    Pg 2 of 3

her stating that they needed to get back together. ████ told JOAO to let her go in which he then pushed her. The push caused ████ to fall backwards and lose her balance. ████ fell onto herdaughter's bicycle causing the injury to her left forearm. ████ immediately got to her feet, grabbed ████ and GABRIELLA and started to run towards their apartment in which JOAO followed. ████ was able to get inside of her apartment with her children and lock the door. ████ stated that her other two children, ████ (thirteen years old) and ████ (eleven years old), were already inside of the apartment. JOAO came to the apartment door and started to knock multiple times and ring ████ Ring doorbell (which recorded JOAO at the door of the apartment). JOAO continued to yell loudly as ████ but didn't attempt to enterthe apartment with force. JOAO eventually left the area.INFORMATION:I asked ████ if she would be willing to provide a written statement about the incident in which she stated that she would. ████ filled out the VPD Domestic Violence Victim Statement. Before writing her statement, I read verbatim the perjury statement to ████ stated she understood the perjury statement with an audible "yes". I took photographs of ████ The photographs were later uploaded to TraQ. ████ showed me the Ring Doorbell footage of JOAO at her apartment door. I observed JOAO enter the walkway towards ████ door and knock on her door several times. I positively identified JOAO on the footage from a recent booking photograph of him. ████ provided me with the footage in which I uploaded to TraQ. ████ showed me the text messages thatshe received from JOAO on 6-2-2020. The dialogue between the two was in Portuguese in which ████ translated that JOAO was asking her to come to the apartment in order to see their children. I took photographs of the text messages and uploaded them to TraQ. I made a copy of ████ written statement and attached it to this report as an orphan document. The original was placed into Property and Evidence as evidence.ACTION TAKEN:After my contact with ████ I made contact with JOAO at his apartment (3214 NE 62nd Ave #J6). JOAO's roommate answered the door and stated that he didn't know if JOAO was home but would check. JOAO came to the door shortly after. JOAO came to the door of the apartment and partially stuck his head and shoulders out of the door out onto the landing. I asked JOAO if he would speak with me in which he stated that he needed to get someshoes. I asked JOAO if I could come inside the apartment in which he stated that I could. I entered the apartment and placed JOAO into handcuffs (checked for fit / double locked). I moved JOAO to my patrol vehicle. I read toJOAO his Miranda Rights from a department issued, pre-printed card. JOAO stated that he understood his rights with an audible "yes" and that he wanted to answer questions in regards to the incident with ████ CONTACT WITH JOAO DEBORBA:JOAO stated that he did have a served no contact order and knew that he wasn't supposed to contact ████ JOAO stated that he was just trying to help ████ with child support and that was the reason why he made contact with her. JOAO informed me that he wanted to give ████ money for the children. JOAO stated that he had text messaged ████ earlier on 6-2-2020 and asked if he could come to the apartment. ████ replied to him that he could while she was at work. JOAO went to the apartment complex and stated that he played with the children outside. JOAO stated that his two of his children told him that their bicycles were covered in spider webs so he asked them to go and get a broom so he could sweep them off. JOAO cleaned off the bicycles and left them on the grassy area in front of the apartment complex. JOAO stated that ████ returned to the apartment complex and they started to talk. JOAO said that the conversation was nice between them and they talked about him supporting the children. At one point, ████ had gone inside her apartment and then returned. On returning, ████ had tripped on the children's bicycle and had fallen. JOAO stated that he and his children laughed at ████ falling over the bicycles and had done so light heartedly. ████ became angry, took the children and went inside the apartment. JOAO stated that at no time did he push ████ and didn't assault her. ACTION TAKEN:Probable cause was found to charge JOAO with one count of Violation of Order (RCW 26.50.110) for the text messages he sent to ████ early on the afternoon of 6-2-2020, one count of Domestic Violence Assault IV (RCW 9A.36.041) for assaulting ████ by pushing her and one felony count ofViolation of Order (RCW 26.50.110(4)) as JOAO had assaulted ████ while in violation of a served and valid No Contact Order at the apartment complex.I transported JOAO to CCSO Jail in which he was booked without incident. I informed Sgt GOMEZ of the incident.I made contact with CPS and informed them of the incident as the children had been present but not involved. I made contact with CPS agent MICHELLE WU. The intake number waslisted as 4371501.CASE STATUS:Closed by arrest.

## OFFENSE-1

OFFENSE CODE
50992 | PROTECTION ORDERS (WA)

| OFFENSE START DATE | OFFENSE END DATE | OFFENSE COMPLETION | DOES EVENT CONTAIN BIAS ELEMENTS? |
|---|---|---|---|
| Jun 2, 2020 00:00 | Jun 2, 2020 00:00 | ■ COMPLETED<br>☐ ATTEMPTED | ☐ YES ■ NO |

| DOMESTIC VIOLENCE | WAS METHOD OF ENTRY FORCED? |
|---|---|
| ■ YES ☐ NO | ☐ YES ■ NO |

*OFFENSE LOCATION*

LOCATION NAME / STREET ADDRESS/LOCATION NAME / APT, UNIT, STE / DESCRIPTION
VILLAGE ON SEVENTH APARTMENTS, 12800 SE 7TH ST, H3

| REPORTING OFFICER SIGNATURE / DATE | SUPERVISOR SIGNATURE / DATE |
|---|---|
| Clinton Holbrook #1744   Jun 2, 2020 20:47 (e-signature) | Frank Gomez #1415   Jun 3, 2020 00:00 (e-signature) |
| PRINT NAME | PRINT NAME |
| Clinton Holbrook #1744 | Frank Gomez #1415 |

**Vancouver Police Department**

Mark43 RMS Form v2.0 generated by C. Sanderson #1739 on May 9, 2022 20:46.
Imported Report.

Pg 2 of 3

08767

# Exhibit 5



**Vancouver Police Department**

## Report Number 2021-007757 - *Offense / Incident Report

| REPORT DATE / TIME | EVENT START DATE / TIME - EVENT END DATE / TIME | REPORT WRITER |
|---|---|---|
| Apr 15, 2021 21:32 | Apr 15, 2021 18:48 | Christopher Douville #1517 |

ASSISTING PERSONNEL / TYPE(S)
Timothy Lear #1233 (Investigative Assistance)

VILLAGE PARK APARTMENTS, [redacted], VANCOUVER, WA 98661

## NARRATIVE

### Synopsis

Defendant allegedly assaulted victim [J.M.] by using pushing him with a two handed shove to his upper chest, causing him pain, as he stood between the victims and the exit of the residence. Defendant and both victims lived together at the listed address on the listed date and time. Victims [J.M.] and Wesley said they were afraid of being assaulted after the defendant allegedly said, "You aren't going anywhere." I later attempted to contact the defendant via telephone, but he refused to meet with me in person. Defendant is outstanding.

### Narrative

I responded to an "assault just occurred" call for service at [redacted], on 04152201 at about 1902 hours after the complainant [T.W.] called to report that he room mate, whom I later identified from [T.W.] 's statement and premise history at the residence as Joao Deborba, assaulted her room mate, [J.M.] . I later learned that [T.W.] , Deborba, and [J.M.] were all room mates at the residence together, and that [T.W.] and [J.M.] were involved in a significant dating relationship.

On the listed date and time the City of Vancouver employed me as a state certified police officer, empowered to enforce state law and local ordinance. I wore full uniform and operated a marked patrol vehicle on this date and time, responding to radio call sign 2S21.

I arrived on scene shortly after Ofcs. Lear and Suarez. Please see their reports for further information. When I arrived, I spoke with [T.W.] and [J.M.] , who were waiting for me in the parking lot of the apartment complex. Wesley and [J.M.] appeared calm and sober when I spoke with them. [T.W.] told me that she had been sitting with [J.M.] on the couch in the living room of the apartment, when Deborba entered. [T.W.] told me that Deborba said, "hi," to the two of them, and while [J.M.] said, "hi," back to him, [T.W.] admitted that she said, "bye," to him, in a dismissive tone. [T.W.] said that there had been tensions between the three of them, and she alleged that Deborba had been pocketing money that she and [J.M.] had given to him to pay the rent, and that she discovered recently to this report that they owed the apartment management nearly $4,000 in back rent.

[T.W.] said that Deborba went to his room, but returned to the living area about five minutes later and said words to the effect of, "That's fine, I don't have to speak to you." [T.W.] said that she told him, "I don't want to talk to you," or, "I wasn't speaking to you," and when she said this Deborba exited the residence for about five minutes, but that when he returned about five minutes later, he said that he was calling the police.

I asked [T.W.] why Deborba would call the police, and she told me that he was trying to get her and [J.M.] in trouble, and that in the past he had alleged that [J.M.] was armed with a knife and had participated in at least one road range incident. [T.W.] said that she told Deborba, "Fine, I can call the police too!" She said that she told Deborba that she knew that he had been violating the terms of a served No Contact Order with the mother of his children, and that she knew that he had been harassing the apartment management.

[T.W.] said that this infuriated Deborba, and both she and [J.M.] said that he walked to where the two stood in the living room and came "within inches," according to [T.W.] , of their faces. She said that he began screaming at them about talking with the apartment manager, and [T.W.] said that she cut Deborba off by saying, "We're done living with you, go talk to the manager."

| REPORTING OFFICER SIGNATURE / DATE | SUPERVISOR SIGNATURE / DATE |
|---|---|
| Christopher Douville #1517   Apr 16, 2021 00:38 (e-signature) | Clesson Werner #1494   Apr 16, 2021 02:55 (e-signature) |
| PRINT NAME | PRINT NAME |
| Christopher Douville #1517 | Clesson Werner #1494 |

**Vancouver Police Department**
Mark43 RMS Form v2.0 generated by E. Boyle #1778 on Aug 24, 2021 01:20.

Pg 1 of 5
08806

SER-102

Report Number 2021-0079745 - Offense / Incident Report (Vancouver Police Department)                                                                Pg 2 of 6

J.M.   said that Deborba was scaring him, because he was getting so loud and angry, and he told me, "I knew it was my time to leave." He said that he attempted to walk around Deborba, but that Deborba pushed him with a two handed shove to his upper chest, causing him mild pain and discomfort. He said that although Deborba did not knock him down, he did fall back several feet. J.M.   said that after Deborba pushed him back, he turned and locked the door to the apartment, and said words to the effect of, "You're not going anywhere!"

I asked J.M.   what he thought would happen after Deborba locked the door, and he said, "I thought I was about to get hit. I thought about running out the back sliding door." I asked T.W.   what she thought about Deborba locking the door, and she told me that she was terrified that she would be attacked; T.W.   said that she began crying in fear, and that about 15 seconds later Deborba opened the door and left, screaming in the parking lot, "They're trying to kill me!"

I asked T.W.   why Deborba would scream such a thing, and she told me that she believed Deborba was trying to frame the confrontation to make himself appear the victim. I asked her if she or J.M.   ever retaliated against him, but she and J.M.   both said that they did not. T.W.   and J.M.   told me that Deborba got into his black Volkswagen Jetta and left the area.

I asked T.W.   and J.M.   if Deborba had any access to firearms. Both nodded vehemently, and said that Deborba worked at a firearms retailer, though he was not allowed to possess firearms. The two thought that Deborba was a convicted felon, but when I asked CRESA to check his status, the operator told me that while he was not a convicted felon, he was the respondent in an NCO that prohibited him from possessing weapons. J.M.   said that Deborba had turned in his weapons after a recent SWAT search warrant at the residence, but said that he still had a bolt action rifle chambered in 7.62 x 39, capable of being dismantled into several parts. J.M.   said that Deborba often carried the rifle in a backpack, and described it as a black rifle with a synthetic stock, but a gold barrel and a scope or similar optic. J.M.   said that he last saw Deborba with the rifle about four weeks prior to my response, and maintained that the rifle was not involved in this call for service. I did not believe I had PC to petition the Court for a search warrant for Deborba's bedroom based on the information that I had at the time.

I asked J.M.   to complete a written statement, which he did. I provided J.M.   and T.W.   a DV resource sheet. I completed a risk assessment for J.M.   and T.W.  , and the threat score was "increased." J.M.   and T.W.   agreed to go to their friend's residence that evening to maintain separation from Deborba, who was still outstanding.

Shortly after I cleared the call, I received a phone call from Ofc. Suarez stating that Deborba was calling into 911, asking to speak with an officer. I called Deborba from my work phone and asked him what had happened. He told me that there had been a heated argument at his residence, and he had left the area. I asked him if anyone had pushed anyone locked anyone inside the residence. He told me that nothing of the kind had happened. I asked him what caused the disagreement. He told me that he had been upset because J.M.   and T.W.   had allegedly been using his things, and that the two had agreed to leave his apartment on the last day of April.

Deborba told me that he had entered the residence and that T.W.   sarcastically said, "hi," to him, but then quickly escalated to screaming. Deborba said, "I lost it," and said he started screaming as well. He said that he exited the residence and began yelling for help. I asked him why he would yell for help if there had been mere shouting in the residence, and he told me, "I felt trapped." I asked him if anyone restrained him or curtailed his movements. He said, "no." He said that he thought that J.M.   was going to stab him. I asked him why he thought that, and he told me, "I don't know."

I asked Deborba if he would meet with me, and he refused. We ended the call shortly thereafter.

I later compiled a BOLO and a PC declaration, as I believe PC exists to charge Deborba for Assault IV/ DV and Unlawful Imprisonment / DV. Please see other officers' respective reports for further details.

**Attachments**

PC Declaration

Photo

BOLO to CRESA

**Recommendation**

Forward to DV Unit

Douville/1517

| REPORTING OFFICER SIGNATURE / DATE | SUPERVISOR SIGNATURE / DATE |
|---|---|
| Christopher Douville #1517   Apr 16, 2021 00:38 (e-signature) | Clesson Werner #1494   Apr 16, 2021 02:55 (e-signature) |
| PRINT NAME | PRINT NAME |
| Christopher Douville #1517 | Clesson Werner #1494 |

**Vancouver Police Department**                                                                                                                 Pg 2 of 6
Mark43 RMS Form v2.0 generated by E. Boyle #1778 on Aug 24, 2021 01:20.                                                                        08807

The Honorable David G. Estudillo

1

2

3

4

5

6

7 UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF WASHINGTON
8 AT TACOMA

9

10 UNITED STATES OF AMERICA,          NO. CR22-5139-DGE

Plaintiff,

11                                        UNITED STATES' TRIAL SUBMISSION

12          v.

13

14 JOAO RICARDO DEBORBA,

Defendant.

15

16        During its trial presentation at the February 5, 2024, stipulated facts and bench

17 trial, the United States presented the following slides, which the government is filing per

18 the Court's order.

19        DATED this 5th day of February, 2024.

20                                     Respectfully submitted,

21                                     TESSA M. GORMAN
                                       United States Attorney
22

23                                      s/Max B. Shiner
                                       _____
24                                     Max B. Shiner
                                       Amanda McDowell
25                                     Assistant United States Attorneys
                                       United States Attorney's Office
26

27

United States' Trial Submission - 1                  UNITED STATES ATTORNEY
*United States v. DeBorba*, CR22-5139-DGE            1201 PACIFIC AVENUE, SUITE 700
                                                     TACOMA, WASHINGTON 98402
                                                     253- 428-3800

# United States
# v.
# Joao Ricardo DeBorba

# Count 1: Unlawful Possession of Firearms and Ammunition (5/6/2022)

✓DeBorba knowingly possessed firearm and ammo

- ¶ 23 & Ex. 12 (photos): SW of apartment
- ¶ 30 & Ex. 17 (SA Taylor Report): reviewed pictures and "admitted that the firearms in the picture were his"

 

Ex. 12, Bates 08948; 08960

# Count 1: Unlawful Possession of Firearms and Ammunition (5/6/2022)

✓Interstate Nexus
- ¶ 28: ATF SA Grigore determined nexus
- ¶ 28: DeBorba stipulates

✓DeBorba knew he was a non-citizen illegally and unlawfully in United States, (g)(5)
- ¶ ¶ 2-6, 30: DeBorba admits that "he was aware at all times relevant to this case that he did not have legal status in the United States." ¶ 6

# Count 1: Unlawful Possession of Firearms and Ammunition (5/6/2022)

✓Subject to a court order meeting the requirements of 18 U.S.C. § 922(g)(8)(A)-(C)

- ¶¶ 18-19 & Ex. 9: Oct. 14, 2020 NCO
  - Expired 10/14/2022
- ¶¶ 20-21 & Ex. 11: Jan. 31, 2022 NCO
  - Expires 1/31/2027
- ¶¶ 19, 21: "A.D. is DeBorba's "intimate partner."



# Count 2: Unlawful Possession of Firearms and Ammunition (11/16/2019)

✓DeBorba knowingly possessed firearm and ammo
- ¶ 16 & Ex. 7 (VPD Allred report): Consent to search apartment; combo to gun safe
- *Id.* "DeBorba stated he did [possess firearms] and confirmed they were located in his apartment."
- *Id.* Firearms and ammo listed in Ct. 2 were located

# Count 2: Unlawful Possession of Firearms and Ammunition (11/16/2019)

✓Interstate Nexus
- ¶ 17: ATF SA Grigore determined nexus
- *Id.*: DeBorba stipulates

✓DeBorba knew he was a non-citizen illegally and unlawfully in United States, (g)(5)
- ¶ ¶ 2-6, 30: DeBorba admits that "he was aware at all relevant times relevant to this case that he did not have legal status in the United States."

# Count 2: Unlawful Possession of Firearms and Ammunition (11/16/2019)

✓Subject to a court order meeting the requirements of 18 U.S.C. § 922(g)(8)(A)-(C)

- ¶¶ 14-15 & Ex. 6: Nov. 14, 2019 NCO
- *Id.* Expires 11/12/2024



# Count 3: Unlawful Possession of a Firearm (4/14/2019)

✓DeBorba knowingly possessed firearm
- ¶¶ 12-13: WSP traffic stop
- *Id.* "DeBorba told Officer … that his Glock 26 handgun was in the backpack … Officer … found the Glock 26."

✓ Interstate Nexus
- ¶ 13: ATF SA Grigore determined nexus
- *Id.*: DeBorba stipulates

✓DeBorba knew he was a non-citizen illegally and unlawfully in United States, (g)(5)
- ¶ ¶ 2-6, 30: DeBorba admits that "he was aware at all relevant times relevant to this case that he did not have legal status in the United States."

# Count 4: False Statement During Purchase of Firearm (5/8/2019)

✓Brass Tacks Munitions = licensed firearms dealer
- ¶ 11

✓In connection with acquiring a Rock Island Armory model M200 .38 special caliber handgun, DeBorba made a false statement
- ¶ 11; Ex. 4 (4473; Firearms Transaction Record)

Case 3:22-cr-05139-DGE　　Document 80-1　　Filed 02/05/24　　Page 10 of 20

**U.S. Department of Justice**
Bureau of Alcohol, Tobacco, Firearms and Explosives

OMB No. 1140-0020

### Firearms Transaction Record

**WARNING:** You may not receive a firearm if prohibited by Federal or State laws. The information you provide will be used to determine whether you are prohibited from receiving a firearm. Certain violations of the Gun Control Act, 18 U.S.C. 921 et. seq., are punishable by up to 10 years' imprisonment and/or up to a $250,000 fine.

Read the Notices, Instructions, and Definitions on this form. Prepare in original only at the licensed premises ("licensed premises" includes business temporarily conducted from a qualifying gun show or event in the same State in which the licensed premises is located) unless the transaction qualifies under 18 U.S.C. 922(t). All entries must be handwritten in ink. **"PLEASE PRINT."**

Transferor's/Seller's Transaction Serial Number (if any)

1020149 48
BTM 191

#### Section A - Must Be Completed Personally By Transferee/Buyer

1. Transferee's/Buyer's Full Name (if legal name contains an initial only, record "IO" after the initial. If no middle initial or name, record "NMN".)

| Last Name (including suffix (e.g., Jr, Sr, II, III)) | First Name | Middle Name |
|---|---|---|
| DE BORBA | JOAO | RICARDO |

2. Current State of Residence and Address (U.S. Postal abbreviations are acceptable. Cannot be a post office box.)

| Number and Street Address | City | County | State | ZIP Code |
|---|---|---|---|---|
| 12800 SE 7th, Apt#E1 | VANCOUVER | CLARK | WA | 9868~ |

| 3. Place of Birth | | 4. Height | 5. Weight (Lbs.) | 6. Sex | 7. Birth Date | | |
|---|---|---|---|---|---|---|---|
| U.S. City and State | -OR- Foreign Country: BRAZIL | Ft. 5 In. 7 | 190 | ☒ Male ☐ Female | Month | Day | Year |

8. Social Security Number (Optional, but will help prevent misidentification)

9. Unique Personal Identification Number (UPIN) if applicable (See Instructions for Question 9.)

10.a. Ethnicity
☐ Hispanic or Latino
☒ Not Hispanic or Latino

10.b. Race (In addition to ethnicity, select one or more races in 10.b. Both 10.a. and 10.b. must be answered.)
☐ American Indian or Alaska Native
☐ Asian
☐ Black or African American
☐ Native Hawaiian or Other Pacific Islander
☒ White

11. Answer the following questions by checking or marking "yes" or "no" in the boxes to the right of the questions.

| | Yes | No |
|---|---|---|
| a. Are you the actual transferee/buyer of the firearm(s) listed on this form? Warning: You are not the actual transferee/buyer if you are acquiring the firearm(s) on behalf of another person. If you are not the actual transferee/buyer, the licensee cannot transfer the firearm(s) to you. Exception: If you are picking up a repaired firearm(s) for another person, you are not required to answer 11.a. and may proceed to question 11.b. (See Instructions for Question 11.a.) | ☒ | ☐ |
| b. Are you under indictment or information in any court for a felony, or any other crime for which the judge could imprison you for more than one year? (See Instructions for Question 11.b.) | ☐ | ☒ |
| c. Have you ever been convicted in any court of a felony, or any other crime for which the judge could have imprisoned you for more than one year, even if you received a shorter sentence including probation? (See Instructions for Question 11.c.) | ☐ | ☒ |
| d. Are you a fugitive from justice? (See Instructions for Question 11.d.) | ☐ | ☒ |
| e. Are you an unlawful user of, or addicted to, marijuana or any depressant, stimulant, narcotic drug, or any other controlled substance? Warning: The use or possession of marijuana remains unlawful under Federal law regardless of whether it has been legalized or decriminalized for medicinal or recreational purposes in the state where you reside. | ☐ | ☒ |
| f. Have you ever been adjudicated as a mental defective OR have you ever been committed to a mental institution? (See Instructions for Question 11.f.) | ☐ | ☒ |
| g. Have you been discharged from the Armed Forces under dishonorable conditions? | ☐ | ☒ |
| h. Are you subject to a court order restraining you from harassing, stalking, or threatening your child or an intimate partner or child of such partner? (See Instructions for Question 11.h.) | ☐ | ☒ |
| i. Have you ever been convicted in any court of a misdemeanor crime of domestic violence? (See Instructions for Question 11.i.) | ☐ | ☒ |

12.a. Country of Citizenship: (Check/List more than one, if applicable. Nationals of the United States may check U.S.A.)
☒ United States of America (U.S.A.)　☐ Other Country/Countries (Specify):

| | Yes | No |
|---|---|---|
| 12.b. Have you ever renounced your United States citizenship? | ☐ | ☒ |
| 12.c. Are you an alien illegally or unlawfully in the United States? | ☐ | ☒ |
| 12.d.1. Are you an alien who has been admitted to the United States under a nonimmigrant visa? (See Instructions for Question 12.d.) | ☐ | ☒ |
| 12.d.2. If "yes", do you fall within any of the exceptions stated in the instructions? | ☒ N/A | ☐ |

13. If you are an alien, record your U.S.-Issued Alien or Admission number (AR#, USCIS#, or I94#):

Previous Editions Are Obsolete　　　**Transferee/Buyer Continue to Next Page**　　　ATF Form 4473 (5300.9) 00488

---

I certify that my answers in Section A are true, correct, and complete. I have read and understand the Notices, Instructions, and Definitions on ATF Form 4473. I understand that answering "yes" to question 11.a. if I am not the actual transferee/buyer is a crime punishable as a felony under Federal law, and may also violate State and/or local law. I understand that a person who answers "yes" to any of the questions 11.b. through 11.i and/or 12.b. through 12.c. is prohibited from purchasing or receiving a firearm. I understand that a person who answers "yes" to question 12.d.1. is prohibited from receiving or possessing a firearm, unless the person answers "yes" to question 12.d.2. and provides the documentation required in 18.c. I also understand that making any false oral or written statement, or exhibiting any false or misrepresented identification with respect to this transaction, is a crime punishable as a felony under Federal law, and may also violate State and/or local law. I further understand that the repetitive purchase of firearms for the purpose of resale for livelihood and profit without a Federal firearms license is a violation of Federal law. (See Instructions for Question 14.)

| 14. Transferee's/Buyer's Signature | 15. Certification Date |
|---|---|
| | 5/8/19 |

#### Section B - Must Be Completed By Transferor/Seller

16. Type of firearm(s) to be transferred (check or mark all that apply):
☒ Handgun　☐ Long Gun　☐ Other Firearms (frame, receiver, etc. See Instructions for Question 16.)
☐ shotguns

17. If transfer is at a qualifying gun show or event:
Name of Function:
City, State:

#### Section D - Must Be Completed By Transferor /Seller Even If The Firearm(s) Is Not Transferred

| 24. Manufacturer and Importer (If any) (If the manufacturer and importer are different, the FFL must include both.) | 25. Model (If Designated) | 26. Serial Number | 27. Type (See Instructions for Question 27.) | 28. Caliber or Gauge |
|---|---|---|---|---|
| 1. Rock Island Armory | M200 | RIA1999506 | revolver | 38sp/ |
| 2. | | | | |
| 3. | | | | |
| 4. | | | | |

Ex. 4

SER-114

# Count 4: False Statement During Purchase of Firearm (5/8/2019)

✓ DeBorba knew the statement was false
- ¶ ¶ 2-6, 30: DeBorba admits that "he was aware at all relevant times relevant to this case that he did not have legal status in the United States."

✓ False statement was material
- ¶ 11: "DeBorba's statements regarding his citizenship and legal status influenced Brass Tacks Munitions into believing that the firearm could be sold to DeBorba in compliance with Title 18, United States Code, Section 922(d)(5)."

# Count 5: False Statement During Purchase of Firearm (4/4/2019)

✓Cabela's= licensed firearms dealer
- ▪ ¶ 10

✓In connection with acquiring a Sig Sauer model 1911 STX .45 auto caliber handgun, DeBorba made a false statement
- ▪ ¶ 10; Ex. 3 (4473; Firearms Transaction Record)

Case 3:22-cr-05139-DGE    Document 80-1    Filed 02/05/24    Page 13 of 20

**U.S. Department of Justice**
Bureau of Alcohol, Tobacco, Firearms and Explosives

Gun ID#: 8331337

**Firearms Transaction Record**

Phone Number: 978-398-5793

OMB No. 1140-0020

Double Check: *MS*

Transferor's/Seller's Transaction Serial Number (If any)

**200558**

WARNING: You may not receive a firearm if prohibited by Federal or State law. The information you provide will be used to determine whether you are prohibited from receiving a firearm. Certain violations of the Gun Control Act, 18 U.S.C. 921 et. seq., are punishable by up to 10 years imprisonment and/or up to a $250,000 fine.

Read the Notices, Instructions, and Definitions on this form. Prepare in original only at licensed premises ("licensed premises" includes business temporarily conducted from a qualifying gun show or event in the same State in which the licensed premises is located) unless the transaction qualifies under 18 U.S.C. 922(c). All entries must be handwritten in ink. "PLEASE PRINT."

**Section A - Must Be Completed Personally By Transferee/Buyer**

1. Transferee's/Buyer's Full Name (If legal name contains an initial only, record "IO" after the initial. If no middle initial or name, record "NMN".)

| Last Name (Including suffix (e.g., Jr, Sr, II, III)) | First Name | Middle Name |
|---|---|---|
| **DEBORBA** | **JOAO** | **RICARDO** |

2. Current State of Residence and Address (U.S. Postal abbreviations are acceptable. Cannot be a post office box.)

| Number and Street Address | City | County | State | ZIP Code |
|---|---|---|---|---|
| **12800 SE 7TH STREET APT# E1** | **VANCOUVER** | **CLARK** | **WA** | **98633** |

| 3. Place of Birth | 4. Height | 5. Weight | 6. Sex | 7. Birth Date |
|---|---|---|---|---|
| U.S. City and State -OR- Foreign Country **BRAZIL** | Ft. **5** In. **7** | (Lbs.) **190** | ☒ Male ☐ Female | Month ▮ Day ▮ Year ▮ |

8. Social Security Number (Optional, but will help prevent misidentification)

9. Unique Personal Identification Number (UPIN) if applicable (See Instructions for Question 9.)

| 10.a. Ethnicity | 10.b. Race (In addition to ethnicity, select one or more race in 10.b. Both 10.a. and 10.b. must be answered.) |
|---|---|
| ☐ Hispanic or Latino ☒ Not Hispanic or Latino | ☐ American Indian or Alaska Native ☐ Asian ☐ Black or African American ☐ Native Hawaiian or Other Pacific Islander ☒ White |

11. Answer the following questions by checking or marking "yes" or "no" in the boxes to the right of the questions.

|  | Yes | No |
|---|---|---|
| a. Are you the actual transferee/buyer of the firearm(s) listed on this form? Warning: You are not the actual transferee/buyer if you are acquiring the firearm(s) on behalf of another person. If you are not the actual transferee/buyer, the licensee cannot transfer the firearm(s) to you. Exception: If you are picking up a repaired firearm(s) for another person, you are not required to answer 11.a. and may proceed to question 11.b. (See Instructions for Question 11.a.) | ☒ | ☐ |
| b. Are you under indictment or information in any court for a felony, or any other crime for which the judge could imprison you for more than one year? (See Instructions for Question 11.b.) | ☐ | ☒ |
| c. Have you ever been convicted in any court of a felony, or any other crime for which the judge could have imprisoned you for more than one year, even if you received a shorter sentence including probation? (See Instructions for Question 11.c.) | ☐ | ☒ |
| d. Are you a fugitive from justice? (See Instructions for Question 11.d.) | ☐ | ☒ |
| e. Are you an unlawful user of, or addicted to, marijuana or any depressant, stimulant, narcotic drug, or any other controlled substance? Warning: The use or possession of marijuana remains unlawful under Federal law regardless of whether it has been legalized or decriminalized for medicinal or recreational purposes in the state where you reside. | ☐ | ☒ |
| f. Have you ever been adjudicated mentally defective OR have you ever been committed to a mental institution? (See Instructions for Question 11.f.) | ☐ | ☒ |
| g. Have you been discharged from the Armed Forces under dishonorable conditions? | ☐ | ☒ |
| h. Are you subject to a court order restraining you from harassing, stalking, or threatening your child or an intimate partner or child of such partner? (See Instructions for Question 11.h.) | ☐ | ☒ |
| i. Have you ever been convicted in any court of a misdemeanor crime of domestic violence? (See Instructions for Question 11.i.) | ☐ | ☒ |

12.a. Country of Citizenship (Check/List more than one, if applicable. Nationals of the United States may check U.S.A.)
☒ United States of America (U.S.A.)    ☐ Other Country/Countries (Specify):

|  | Yes | No |
|---|---|---|
| 12.b. Have you ever renounced your United States citizenship? | ☐ | ☒ |
| 12.c. Are you an alien illegally or unlawfully in the United States? | ☐ | ☒ |
| 12.d.1. Are you an alien who has been admitted to the United States under a nonimmigrant visa? (See Instructions for Question 12.d.) 12.d.2. If "yes", do you fall within any of the exceptions stated in the instructions? | ☐ N/A | ☐ ☐ |

13. If you are an alien, record your U.S.-Issued Alien or Admission number (AR#, USCIS#, or I94#):

| Previous Editions Are Obsolete | Transferee/Buyer Continue to Next Page STAPLE IF PAGES BECOME SEPARATED | ATF I-Form 4473 (5300.9) Revised October 2016 |
|---|---|---|
| Page 1 of 6 | | |

I certify that my answers in Section A are true, correct, and complete. I have read and understand the Notices, Instructions, and Definitions on ATF Form 4473. I understand that answering "yes" to question 11.a. if I am not the actual transferee/buyer is a crime punishable as a felony under Federal law, and may also violate State and/or local law. I understand that a person who answers "yes" to any of the questions 11.b. through 11.i and/or 12.b. through 12.c. is prohibited from purchasing or receiving a firearm. I understand that a person who answers "yes" to question 12.d.1. is prohibited from receiving or possessing a firearm, unless the person answers "yes" to question 12.d.2. and provides the documentation required in 18.c. I also understand that making any false oral or written statement, or exhibiting any false or misrepresented identification with respect to this transaction, is a crime punishable as a felony under Federal law, and may also violate State and/or local law. I further understand that the repetitive purchase of firearms for the purpose of resale for livelihood and profit without a Federal firearms license is a violation of Federal law. (See Instructions for Question 14).

| 14. Transferee's/Buyer's Signature | 15. Certification Date |
|---|---|
| *[signature]* | **04/04/2019** |

**Section B - Must Be Completed By Transferor/Seller**

**Section D - Must Be Completed By Transferor/Seller Even If The Firearm(s) Is Not Transferred**

| | 24. Manufacturer and Importer (If any) (If the manufacturer and importer are different, the FFL should include both.) | 25. Model (If Designated) | 26. Serial Number | 27. Type (See Instructions for Question 27.) | 28. Caliber or Gauge |
|---|---|---|---|---|---|
| 1. | **SIG SAUER** | **1911 STX** | **54E026501** | **PISTOL** | **.45 AUTO** |
| 2. | | | | | |
| 3. | | | | | |
| 4. | | | | | |

Ex. 3

# Count 5: False Statement During Purchase of Firearm (4/4/2019)

✓DeBorba knew the statement was false
- ¶ ¶ 2-6, 30: DeBorba admits that "he was aware at all relevant times relevant to this case that he did not have legal status in the United States."

✓False statement was material
- ¶ 10: "DeBorba's statements regarding his citizenship and legal status influenced Cabela's into believing that the firearm could be sold to DeBorba in compliance with Title 18, United States Code, Section 922(d)(5)."

# Count 6: False Claim to United States Citizenship (2/25/2019)

✓DeBorba directly and falsely represented himself to be a U.S. citizen
- ▪ ¶ 8 & Ex. 2 (Concealed Pistol License)

**WASHINGTON STATE DEPARTMENT OF LICENSING**

## Concealed Pistol License Application

**PRINT or TYPE all information.**

Office use only
ID number
DID number
FBI number
CPL number
Expiration date

Application type
☒ Original application ☐ Renewal of license ☐ Late renewal of license ☐ Replacement license
CPL number, if applicable

Name (Last, First, Middle): **DE BORBA    JOAO    RICARDO**
Driver license number
State: **WA**

Other names by which you have been known (for example, maiden name):

Physical address—required: **12800 SE 7th STREET**
City: **VANCOUVER WA**
State: **WA**
ZIP code: **98083**

Mailing address (if different):
City:
State:
ZIP code:

Date of birth:
Birthplace (City, State/Province, Country): **JOINVILLE, SC.  /  BRAZIL**
(Area code) Telephone number: **(978) 398-5793**
Gender: ☒ Male ☐ Female

Height: **5 feet 7 inches**
Weight: **190 pounds**
Eyes (color): **BROWN**
Hair color: **NONE**
Ethnicity: ☐ Hispanic or Latino ☐ Not Hispanic or Latino

Race (Check all that apply)
☐ Black or African American ☐ American Indian or Alaska Native ☒ White ☐ Asian ☐ Native Hawaiian or Other Pacific Islander

List type and location of all marks, scars, and tattoos

EMAIL ADDRESS: **KOLINHO2005@ynhoc...**

**Residency**

1. Are you a U.S. citizen? ........................................................... ☒ Yes ☐ No
   If no, enter country of citizenship _____

2. Are you a permanent resident alien? .............................................. ☐ Yes ☒ No
   If yes, enter your permanent resident card number _____

3. Are you a legal alien temporarily residing in Washington? ......................... ☐ Yes ☐ No
   If yes, enter your alien registration/I-94 number _____ and;
   Enter your alien firearms license number: _____ Expiration date: _____

**Answer the following**

1. Have you ever been convicted in adult court or adjudicated in a juvenile court of the following crimes when committed by one family or household member against another, on or after July 1, 1993: assault in the fourth degree, coercion, stalking, reckless endangerment, criminal trespass in the first degree, or violation of the provision of a protection order or no-contact order restraining the person or excluding the person from a residence? .... ☐ Yes ☒ No

2. Are you now or on bond or personal recognizance pending trial, appeal or sentence for any serious offense as defined in RCW 9.41.010 or for a felony for any crime where the judge can imprison you for more than one year? ............................................. ☐ Yes ☒ No

3. Have you been convicted of 3 or more violations of Washington's firearms laws within any 5-year period? .. ☐ Yes ☒ No

4. Are you an unlawful user of, or addicted to, marijuana, or any depressant, stimulant, or narcotic drug, or any other controlled substance? .................................. ☐ Yes ☒ No

5. Have you ever been adjudicated mentally defective (which includes having been adjudicated incompetent to manage your own affairs) or have you ever been committed to a mental institution? ...... ☐ Yes ☒ No

6. Have you been discharged from the Armed Forces under dishonorable conditions? .................. ☐ Yes ☒ No

7. Are you subject to a court order restraining you from harassing, stalking, or threatening your child or an intimate partner or child of such partner? ............................... ☐ Yes ☒ No

8. Have you been convicted in any court of a misdemeanor crime of domestic violence? .............. ☐ Yes ☒ No

9. Have you ever renounced your United States citizenship? ............................ ☐ Yes ☒ No

10. Are you an alien illegally in the United States? ................................ ☐ Yes ☒ No

Signing this application authorizes the Department of Social and Health Services, as well as mental-health institutions and other health-care facilities, to release information relevant to your eligibility for a concealed pistol license to an inquiring court or law-enforcement agency.

I certify under penalty of perjury under the laws of the state of Washington that the foregoing is true and correct.

Date and place signed: **02/25/2019**
X _____

Ex. 2

# Count 6: False Claim to United States Citizenship (2/25/2019)

✓DeBorba was not a citizen at that time
- ¶ ¶ 2-6, 30: DeBorba admits that "he was aware at all times relevant to this case that he did not have legal status in the United States."

✓DeBorba made the false representation willfully (voluntarily and deliberately)
- ¶ 8: "DeBorba knew that his answers … were false… and thus made [them] voluntarily and deliberately."

# Count 6: False Claim to United States Citizenship (2/25/2019)

✓False representation was made to someone who had good reason to inquire into citizenship

- ¶ 8: "These questions on the Washington State Department of Licensing form were posed for the purpose of ensuring that the Concealed Pistol License could be issued to DeBorba in compliance with Revised Code of Washington 9.41.070 and 9.41.173 and that DeBorba's possession of a firearm would comply with Title 18, United States Code, Section 922(g)(5).

# Count 7: Unlawful Possession of Firearm Silencer (5/6/2022)

✓ **Defendant knowingly possessed a firearm silencer**
  ▪ ¶¶ 23-25, Ex. 13 (photo), & Ex. 15: ATF Officer Jason Armstrong concluded it meets the definition of "firearm silencer"




# Count 7: Unlawful Possession of Firearm Silencer (5/6/2022)

✓DeBorba was aware the device was a firearm silencer
- ¶ 27: DeBorba stipulates

✓DeBorba had not registered the firearm silencer with the National Firearms Registration and Transfer Record
- ¶ 26: Firearms Specialist Elicia Elkins confirmed
- ¶ 27: DeBorba stipulates