No. 24-3304

IN THE UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

v.

JOÃO RICARDO DEBORBA,

Defendant-Appellant.

On Appeal from United States District Court
Western District of Washington at Tacoma
District Court Case No. 3:22-cr-05139-DGE-1

The Honorable David G. Estudillo
United States District Judge

**DEFENDANT-APPELLANT'S REPLY BRIEF**

REBECCA FISH
Attorney for João DeBorba
Federal Public Defender's Office
1331 Broadway, Suite 400
Tacoma, WA 98402
Phone: (253) 593-6710
Email: Becky_Fish@fd.org

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................ ii

INTRODUCTION ........................................................................1

STATUTORY AUTHORITIES ......................................................2

SUMMARY OF ARGUMENT ......................................................2

ARGUMENT ..............................................................................6

I.    Contrary to the government's arguments, immigrants are among "the people" protected by the Second Amendment. ...............................6

    A.    Guided by the Supreme Court, the Third Circuit correctly rejected the argument the government makes here that only "law-abiding, responsible citizens" have Second Amendment rights. ...........................8

    B.    At *Bruen*'s first step, the plain text of the Second Amendment covers noncitizens. ...........................................................................11

    C.    Most circuit courts to reach this issue have assumed without deciding that undocumented immigrants are among "the people" in the Second Amendment. ...........................................................................18

II.    The government fails to meet its burden to justify § 922(g)(5) under *Bruen*'s step two and ignores *Rahimi*'s admonition that vague supposed traditions are insufficient to justify modern regulations. ...............................24

III.    The government's argument that Congress should be allowed broad deference in matters "relating to citizenship and immigration" does not apply to restrictions of constitutional rights like § 922(g)(5)........................29

IV.    The government misreads the record to try to justify its § 922(g)(8) prosecutions. ...........................................................................31

V.    The government's mistaken and broad arguments do not defeat Mr. DeBorba's challenges to the remaining counts. ...........................................34

CONCLUSION ..........................................................................37

CERTIFICATE OF COMPLIANCE .............................................38

i

# TABLE OF AUTHORITIES

**CASES**                                                                 **Page(s)**

*Abramski v. United States,*
    573 U.S. 169 (2014) ........................................................... 35

*Al Haramain Islamic Foundation, Inc. v. U.S. Dep't of Treasury,*
    686 F.3d 965 (9th Cir. 2012) ............................................... 1

*American-Arab Anti-Discrimination Comm. v. Reno,*
    70 F.3d 1045 (9th Cir. 1995) ................................... 1, 14, 31

*Cabell v. Chavez-Salido,*
    454 U.S. 432 (1982) ..................................................... 15, 16

*District of Columbia v. Heller,*
    554 U.S. 570 (2008) ................................................... *passim*

*Dunn v. Blumstein,*
    405 U.S. 330 (1972) ........................................................... 16

*Fiallo v. Bell,*
    430 U.S. 787 (1977) ........................................................... 30

*Hampton v. Mow Sun Wong,*
    426 U.S. 88 (1976) ............................................................. 29

*Ibrahim v. Department of Homeland Security,*
    669 F.3d 983 (9th Cir. 2012) ............................................. 23

*McDonald v. City of Chicago,*
    561 U.S. 742 (2010) ................................................... 1, 8, 28

*New York State Rifle & Pistol Ass'n, Inc. v. Bruen,*
    597 U.S. 1 (2022) ..................................................... *passim*

*Plyler v. Doe,*
    457 U.S. 202 (1982) ........................................................... 1

*Range v. Att'y Gen. United States,*
    124 F.4th 218 (3d Cir. 2024) (en banc) ................. 3, 8, 9, 11, 17

*Underwager v. Channel 9 Australia,*
    69 F.3d 361 (9th Cir. 1995) ............................................... 14

*United States v. Carpio-Leon*,
   701 F.3d 974 (4th Cir. 2012) .............................................................. 20

*United States v. Combs*,
   No. 23-5121, 2024 WL 4512533 (6th Cir. Oct. 17, 2024) ................................ 33

*United States v. Flores*,
   663 F.3d 1022 (8th Cir. 2011) .............................................................. 20

*United States v. Huitron-Guizar*,
   678 F.3d 1164 (10th Cir. 2012) .................................................... 20, 21

*United States v. Jimenez-Shilon*,
   34 F.4th 1042 (11th Cir. 2022) .......................................... 12, 14, 21

*United States v. Latu*,
   479 F.3d 1153 (9th Cir. 2007) .............................................................. 28

*United States v. Mandujano*,
   425 U.S. 564 (1976) ........................................................................ 35

*United States v. Manney*,
   114 F.4th 1048 (9th Cir. 2024) .................................................... 35, 37

*United States v. Medina-Cantu,*
   113 F.4th 537 (5th Cir. 2024) .............................................................. 19

*United States v. Meza-Rodriguez*,
   798 F.3d 664 (7th Cir. 2015) ........................................................22, 23

*United States v. Muñoz-De La O,*
   586 F. Supp. 3d 1032 (E.D. Wash. 2022),
   *aff'd*, No. 22-30100, 2024 WL 1873006 (9th Cir. Apr. 30, 2024) .................. 10

*United States v. Patnaik,*
   125 F.4th 1223 (9th Cir. 2025) .................................................... 35, 36, 37

*United States v. Perez,*
   6 F.4th 448 (2d Cir. 2021) .............................................................. 22

*United States v. Portillo-Munoz,*
   643 F.3d 437 (5th Cir. 2011) .................................................... 19, 20

*United States v. Prasad,*
   18 F.4th 313 (9th Cir. 2021) .............................................................. 36

*United States v. Rahimi,*
   602 U.S. 680 (2024) ......................................................................*passim*

*United States v. Ramirez,*
   No. 22-14297, 2024 WL 3757080 (11th Cir. Aug. 12, 2024) ......................... 21

*United States v. Rangel-Tapia,*
   No. 23-1220, 2024 WL 966385 (6th Cir. Mar. 6, 2024) .................................. 21

*United States v. Singh*,
   979 F.3d 697 (9th Cir. 2020) ................................................................. 7

*United States v. Sitladeen*,
   64 F.4th 978 (8th Cir. 2023) ............................................................... 20

*United States v. Toner*,
   728 F.2d 115 (2d Cir. 1984) ................................................................ 28

*United States v. Torres*,
   911 F.3d 1253 (9th Cir. 2019) ....................................... 7, 20, 21, 23

*United States v. Verdugo–Urquidez*,
   494 U.S. 259 (1990) ...................................... 15, 16, 20, 22, 23

*Wong-Wing v. United States,*
   163 U.S. 228 (1896) ........................................................... 30

## FEDERAL CONSTITUTION AND LEGISLATION

U.S. Const. pmbl. ...............................................................17

U.S. Const. art. I, § 2 .........................................................17

U.S. Const. art. I, § 3 .....................................................12, 17

U.S. Const. art. II, § 1 .......................................................12

U.S. Const. art. III, § 2 ......................................................12

U.S. Const. art. IV, § 2 .......................................................12

U.S. Const. amend. I ............................................ 9, 14, 23, 31

U.S. Const. amend. II ....................................................... *passim*

U.S. Const. amend. IV ................................................ 4, 9, 14, 15, 22

U.S. Const. amend. IX ............................................................ 14

8 U.S.C. § 1326 .................................................................... 10

18 U.S.C. § 922 ............................................................ *passim*

18 U.S.C. § 1546 .................................................................. 36

26 U.S.C. § 5845 .................................................................. 34

Alien Enemies Act of 1798*, 1798 Laws, ch. 66, 1 Stat. 577 (1798)
(codified as amended at 50 U.S.C. § 21) ........................................10

An Act to Establish a Uniform Rule of Naturalization, Pub. L. 1-3,
1 State 103, ch. 3, 1st Cong. (1790) ...................................10

Sedition Act of 1798, 1798 Laws, ch. 74,
1 Stat. 596 (1798)...........................................................10

## OTHER AUTHORITIES

Ala. Const. of 1819 art. I, §§ 8, 22 ...................................... 14

Conn. Const. of 1818, art. I, §§ 5, 16 ................................... 14

Eugene Volokh, *State Constitutional Rights to Keep and Bear Arms*,
11 Tex. Rev. L. & Pol. 191, 203 (2006) .......................... 13

Ky. Const. of 1792, art. XII, §§ 7, 22 .................................. 14

Me. Const. of 1819, art. I, §§ 4, 15 .................................... 14

Miss. Const. of 1817, art. I, §§ 6, 22 .................................. 14

Ninth Cir. Rule 28-1(b) ................................................... 31

Pa. Const. of 1790, art. IX, §§ 7, 20 .................................. 14

## INTRODUCTION

The government asks this Court to discard its own analysis and to ignore the Supreme Court in order to deny a constitutional right to millions of people in our community who lack documented immigration status.[1] As this Court has recognized, "we are a nation founded by immigrants[.]" *American-Arab Anti-Discrimination Comm. v. Reno*, 70 F.3d 1045, 1064 (9th Cir. 1995), *limited on other grounds in Al Haramain Islamic Foundation, Inc. v. U.S. Dep't of Treasury*, 686 F.3d 965, 981 (9th Cir. 2012). Yet the Supreme Court has recognized that our country's treatment of undocumented immigrants risks "a permanent caste of undocumented resident aliens, encouraged by some to remain here as a source of cheap labor, but nevertheless denied the benefits that our society makes available to citizens and lawful residents." *Plyler v. Doe*, 457 U.S. 202, 218–19 (1982).

The government seeks to exclude this group from Second Amendment protections. AB-18–27. It does so despite the Second Amendment's fundamental purpose of protecting communities against oppression. *See McDonald v. City of Chicago*, 561 U.S. 742, 776 (2010) ("Disarm a community and you rob them of the means of defending life. Take away their weapons of defense and you take away

---

[1] OB-4 (estimating 10–11 million undocumented immigrants live in the United States).

1

the inalienable right of defending liberty.") (citation omitted). The Court should reject this attempt and find that 18 U.S.C. § 922(g)(5) is unconstitutional.

The Court should also reject the government's attempts to maintain its other convictions against Mr. DeBorba by stretching the record and over-extending case law. Because these charges do not comply with the Constitution, this Court should reverse Mr. DeBorba's convictions on all counts.

## STATUTORY AUTHORITIES

In addition to those included in the addendum to Mr. DeBorba's Opening Brief, relevant U.S. Constitution and state historic state constitution sections appear in the Addendum to this reply brief.

## SUMMARY OF ARGUMENT

Mr. DeBorba replies primarily to the government's argument that he is not among "the people" protected by the Second Amendment. Its argument rests primarily on its contention that the Supreme Court's use of the phrase "law-abiding, responsible citizens" in Second Amendment cases actually limits the scope of the right. He also replies briefly to the government's arguments on additional issues, more fully briefed in his Opening Brief.

First, this Court should conclude that noncitizens are among "the people." The Supreme Court in *United States v. Rahimi* made clear that passing language describing the litigants in its prior decisions did not define the scope of the right. 602 U.S. 680, 701–02 (2024).

2

Other courts have reaffirmed this point. Heeding the Court's warnings, the Third Circuit rejected an argument that non-"law-abiding" people were not part of "the people" protected by the Second Amendment. *Range v. Att'y Gen. United States*, 124 F.4th 218, 226 (3d Cir. 2024) (en banc). In doing so, that court reasoned that a contrary ruling would undermine the Supreme Court's reasoning in multiple cases that the Second Amendment may not be re-defined by later policy choices. *Id*. at 226–28.

This Court should faithfully apply the test articulated in *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, and find at the first step that Mr. DeBorba and his conduct are covered by the "plain text" of the Second Amendment. 597 U.S. 1, 17 (2022). The text of the Second Amendment, as well as its context and history, support the conclusion that "the people" meant just that, not some narrower subset of legal citizens, the "law-abiding," or the "responsible." The Supreme Court has repeatedly recognized the Second Amendment as enshrining a broad individual right that did not depend on political privilege or participation.

When previously addressing the question of whether undocumented immigrants were among "the people" protected by the Second Amendment, this Court assumed without deciding that they are. This Court's position is shared by multiple other circuit courts. The Seventh Circuit has gone a step farther and followed the Supreme Court's indication that "the people" in the Second

3

Amendment has the same meaning it does in the Fourth Amendment and includes noncitizens who "'are part of a national community or who have otherwise developed sufficient connection with this country to be considered part of that community.'" *District of Columbia v. Heller*, 554 U.S. 570, 580 (2008) (citation omitted). This Court should follow this guidance and find that Mr. DeBorba is among the people protected by the Second Amendment.

Second, at the second step of the *Bruen* test, the government's attempts to justify 18 U.S.C. § 922(g)(5) fall short of its burden. Under *Bruen*, the government must demonstrate a historic tradition of regulation that is "relevantly similar" to § 922(g)(5) in "how and why" it regulates the right to bear arms. 597 U.S. at 29. But the government puts forth only two vague purported traditions of regulation: disarming people "who were not members of the political community" or "who lawmakers believed could not be trusted to adhere to the law." AB-30.

These do not satisfy *Bruen*'s commands. For one, the proposals are equally as vague as the supposed tradition of disarming the irresponsible that the Supreme Court emphatically rejected. *See Rahimi*, 602 U.S. at 701.

For another, the proposed analogues lack a similar "why" or "how" to § 922(g)(5). They disarmed people *not* because they were viewed as dangerous, but because they were either vocal dissenters from the sitting government or were part of a disfavored religious or ethnic group. By contrast, § 922(g)(5) was enacted

4

to prevent gun violence and danger. Furthermore, the proposed analogues generally functioned by first presenting a loyalty test or oath and disarmed only those who did not pass. But § 922(g)(5) offers no opportunity to swear allegiance. Because the government fails to meet its burden, this Court should find § 922(g)(5) unconstitutional.

Third, this Court should reject the government's argument that § 922(g)(5) is not subject to constitutional review because the government has broad authority as a sovereign to expel or exclude immigrants from the country. Both the Supreme Court and this Court have rejected similar arguments that the government may invoke this sovereign authority to violate the constitutional rights of noncitizens within the United States.

Fourth, the government misconstrues the record to argue that Mr. DeBorba's convictions under § 922(g)(8) are constitutional. The statute disarms those who are subject to certain domestic violence restraining orders, and its constitutionality was upheld by the Supreme Court as applied in cases where an *individualized* finding of dangerousness underlies the restraining order. *See Rahimi*, 602 U.S. at 702.

The government asks this Court to find an individualized finding of dangerousness where none exists in the restraining orders underlying Count 1. Despite the text of those orders, the government claims that a "commonsense

reading" shows they "built on" an order issued in a different case nearly a year earlier. The record offers zero support for this claim.

The government similarly ignores the record in claiming that Mr. DeBorba waived his argument that the secondary means of liability under § 922(g)(8), beyond that upheld in *Rahimi*, was unconstitutional. But Mr. DeBorba clearly made this argument in his Opening Brief. The Court should reject these attempts by the government to skirt its burden under *Bruen*.

Fifth, the government fails to defeat Mr. DeBorba's challenges to the remaining counts of conviction. Contrary to the government's claim, Mr. DeBorba did not stipulate that he "knew" the device underlying Count 7 qualified as a silencer. The government additionally argues that case law indicates false statements are material even if the only basis for the supposed materiality is unconstitutional. These cases are more nuanced and do not support that broad position.

## ARGUMENT

### I.    Contrary to the government's arguments, immigrants are among "the people" protected by the Second Amendment.

The government primarily advances the dangerous argument that the Second Amendment—enshrined in the Bill of Rights—does not protect noncitizens. Although it briefly acknowledges that this Court has already declined to follow this argument, AB-19 (this Court assumed without deciding that undocumented

noncitizens enjoy Second Amendment Rights in *United States v. Singh*, 979 F.3d 697, 724-25 (9th Cir. 2020) and *Torres*, 911 F.3d at 1261), it asks this Court to upend its own reasoning without any compelling reason to do so. AB-19 ("this Court should no longer sidestep that threshold question after *Bruen* and *Rahimi*").

The Court should maintain its position and assume that Mr. DeBorba is among "the people." Or, the Court should look to the Supreme Court's further guidance on the subject in recent cases and find that Mr. DeBorba is among "the people," applying the Court's sufficient connection test. (A) This Court should follow the Third Circuit and the Supreme Court itself and reject the government's claim that passing references to litigants as "law-abiding, responsible citizens" limit the scope of the Second Amendment. (B) This Court should apply *Bruen*'s command that regulations that infringe on activity protected by the "plain text" of the Second Amendment are presumptively unconstitutional. The text, context, and history of the Second Amendment, as well as the Supreme Court's interpretation of it, affirm that Mr. DeBorba is protected by the plain text of the Second Amendment. (C) Contrary to the government's claim, the majority of circuit courts to reach this issue (including this Court) have either assumed without deciding that undocumented immigrants are among "the people" or have found an undocumented immigrant satisfied the sufficient connection test. This Court should do the same.

**A.    Guided by the Supreme Court, the Third Circuit correctly rejected the argument the government makes here that only "law-abiding, responsible citizens" have Second Amendment rights.**

This Court should reject the government's claim that "the people" protected by the Second Amendment does not include undocumented immigrants. Following *Rahimi*, the Third Circuit firmly rejected the same argument—that "'[t]he right to bear arms has historically extended [only] to the political community of law-abiding, responsible citizens'"—there applied to those with felony convictions. *Range*, 124 F.4th at 226 (quoting government's brief). There, the government relied on the use of the term "law-abiding citizens" in prior Supreme Court cases involving the Second Amendment. *Id*. It similarly relies on such passing references here. AB-18–21.

Rejecting that argument, the court correctly read the context and meaning of the phrase "law-abiding citizens" as used by the Supreme Court: "In isolation, this language seems to support the Government's argument. But *Heller* said more; it explained that 'the people' as used throughout the Constitution 'unambiguously refers to all members of the political community, not an unspecified subset.'" *Range*, 124 F.4th at 226 (quoting *Heller*, 554 U.S. at 580). *Heller*, *McDonald*, and *Bruen* involved litigants who happened to be "law-abiding, responsible citizens," and the Third Circuit recognized that these cases' "references to 'law-abiding, responsible citizens' were dicta." *Id*.

8

Besides finding the government's position unsupported by text or precedent, *Range* recognized multiple reasons "the people" protected by the Second Amendment is not limited to "law-abiding citizens." For one, the Constitution refers to "the people" with regard to other rights—including those delineated in the First and Fourth Amendments. Yet this limitation is not applied to "the people" in those Amendments. *Id*.

For another, *Range* highlighted a fundamental problem with the government's argument—it would allow the government to legislate away people's constitutional rights, in direct contravention of the Supreme Court's command that "'the enshrinement of constitutional rights necessarily takes certain policy choices off the table'" and is not subject to "'judicial deference to legislative interest balancing.'" *Id*. at 228 (quoting *Heller*, 554 U.S. at 636 and *Bruen*, 597 U.S. at 26). But that is what the government seeks when it argues that legislatively defined groups are excluded from the people: "[T]he Government's claim that felons are not among 'the people' protected by the Second Amendment, devolves authority to legislators to decide whom to exclude from 'the people.' We reject that approach because such extreme deference gives legislatures unreviewable power to manipulate the Second Amendment by choosing a label." *Id*. (cleaned up).

Just like what is or is not a crime, who is or is not an authorized immigrant is dictated by the legislature. The present-day United States was built on

9

immigration—as previously briefed, this began long before the ratification of the Second Amendment. OB-27.

There was significant immigration from Europe more than a century before ratification, and the nascent colonies responded by regulating the admission *and* exclusion of immigrants. OB-27 n.14; 3-ER-594. The federal government entered the arena with a racially exclusive naturalization law and politically focused laws limiting citizenship and enabling deportations. *See* Sedition Act, 1798 Laws, ch. 74, 1 Stat. 596 (1798); Alien Enemies Act*,* 1798 Laws, ch. 66, 1 Stat. 577 (1798) (codified as amended at 50 U.S.C. § 21); An Act to Establish a Uniform Rule of Naturalization, Pub. L. 1-3, 1 State 103, ch. 3, 1st Cong. (1790). The federal government later intensified its racially biased legislation of citizenship and immigration a century later. *See United States v. Muñoz-De La O*, 586 F. Supp. 3d 1032, 1036 (E.D. Wash. 2022), *aff'd*, No. 22-30100, 2024 WL 1873006 (9th Cir. Apr. 30, 2024) (recounting "this country's checkered past in immigration policies").[2]

---

[2] The government misleadingly relies on *Muñoz-De La O* for the proposition that "Illegal immigration as a phenomenon began in the late 1800s." AB-38. Instead, *Muñoz-De La O* reviewed *federal* (as opposed to state/colonial) regulation of immigration preceding 8 U.S.C. § 1326, which included passing the Chinese Exclusion Act.

Just as the food stamp fraud at issue in *Range* would not have been defined as a felony in the ratification era but is today, *see* 124 F.4th at 227, laws surrounding what immigration is legal or illegal have changed substantially over time. The legislature's ever-changing decisions on these questions do not define constitutional rights. The Constitution does. This Court should follow the Third Circuit's analysis and recognize that passing references to litigants do not exempt the government from its obligations under *Bruen*.

## B.     At *Bruen*'s first step, the plain text of the Second Amendment covers noncitizens.

The Court should apply the *Bruen* test faithfully. The first step of that test provides: "When the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct." *Bruen*, 597 U.S. at 24. That text is:

> A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed.

U.S. Const. amend. II. It protects the rights of "the people,"—not of citizens, not of rule-followers, not of the responsible. *Id.* This plain language reading is further supported by the context, the history, and the Supreme Court's interpretation of the Amendment.

First, the word choice in not only the Second Amendment but also in its context confirm that "the people" means just that, not some "unspecified subset."

*Heller*, 554 U.S. at 580. The use of the term "the people" is no accident. The framers demonstrated their familiarity with the idea of a narrower group of "citizens" that had distinct rights and opportunities from "the people" at large. But the framers chose—particularly in the Bill of Rights—to instead guarantee rights to "the people."

The Constitution, as ratified in 1787, used the term "citizen" in numerous places to define eligibility for certain federal government positions, U.S. Const. art. I, §§ 2, 3, art. II, § 1, to define diversity jurisdiction for federal courts, U.S. Const. art. III, § 2, and to ensure that citizens of each state receive the "Privileges and Immunities" of citizens in all states, U.S. Const. art. IV, § 2. These usages demonstrate the framers' recognition of citizenship as a legal concept, where citizens of the United States and/or of one of the individual states had additional rights or opportunities beyond those applicable to "the people." Although the legal concept of citizenship was well established, the framers did not limit the rights guaranteed in the Bill of Rights to "citizens."

Second, contemporaneous historic documents do not support a narrow reading of "the people." The government's citation to some state constitutions' use of the word "citizen" in their right-to-bear-arms clauses does not change the meaning of the Second Amendment. *See* AB-24–25 (citing *United States v. Jimenez-Shilon*, 34 F.4th 1042, 1049 (11th Cir. 2022), for its collection of state

constitutional provisions). The Court has not read these documents to narrow the rights enshrined in the U.S. Constitution to only "citizens" in the legal sense. Indeed, when the Supreme Court looked at Second Amendment equivalents in these early state constitutions generally, it did not read the word "citizen" in some as imposing a limitation. Instead, it recognized a consistent thread in enshrining an *individual* right to bear arms for self-defense (rather than only for organized militia/military service). *See Heller*, 554 U.S. at 584, 601–03 (also quoting contemporaneous constitutions or declarations from Pennsylvania, Ohio, Indiana, Vermont, North Carolina, and Massachusetts enshrining the right to bear arms to "the people"); *see also* Eugene Volokh, *State Constitutional Rights to Keep and Bear Arms*, 11 Tex. Rev. L. & Pol. 191, 203 (2006) (cataloguing state constitutional and similar Second Amendment analogues with a variety of language, including those protecting the right for "the freemen of this State" or for "every person," among other iterations). Although state constitutions were inconsistent with their descriptions of those who have the right to bear arms, they consistently recognized this as an individual right to bear arms. *See Heller*, 554 U.S. at 601–03. This focus on an individual as opposed to militia- or politically-based right confirms that the right is not limited to a politically defined subset of people.

Those state constitutions that did use the word "citizen" in their right-to-bear-arms provisions also used "citizen" in setting forth other constitutional rights. But this Court has not read the use of "citizen" in these documents to narrow those other rights in the U.S. Constitution. The state constitutions cited by *Jimenez-Shilon* as using "citizen" in their Second Amendment analogues all similarly used "citizen" in all or part of their First Amendment analogues.[3] Yet this Court has repeatedly recognized that noncitizens have First Amendment rights. *See Underwager v. Channel 9 Australia*, 69 F.3d 361, 365 (9th Cir. 1995); *American-Arab Anti-Discrimination Comm.,* 70 F.3d at 1056.

Third, the Supreme Court's interpretation of the Second Amendment confirms it is a broadly held individual right, not limited to legal citizens. The Court recognized the significance of the word "people"—made throughout the Bill of Rights—as enshrining individual rights for "the people" broadly:

> The first salient feature of the operative clause is that it codifies a "right of the people." The unamended Constitution and the Bill of Rights use the phrase "right of the people" two other times, in the First Amendment's Assembly–and–Petition Clause and in the Fourth Amendment's Search–and–Seizure Clause. The Ninth Amendment uses very similar terminology ("The enumeration in the Constitution, of certain rights, shall not be construed to deny or disparage others retained by the people"). All three of these instances unambiguously

---

[3] *See* Pa. Const. of 1790, art. IX, §§ 7, 20; Ky. Const. of 1792, art. XII, §§ 7, 22; Miss. Const. of 1817, art. I, §§ 6, 22; Conn. Const. of 1818, art. I, §§ 5, 16; Ala. Const. of 1819, art. I, §§ 8, 22; Me. Const. of 1819, art. I, § 4, *but see* § 15 (full text of these sections in Addendum).

14

refer to individual rights, not "collective" rights, or rights that may be
exercised only through participation in some corporate body.

*Heller*, 554 U.S. at 579.

The Court proceeded to quote its analysis of "the people" in the Fourth

Amendment, in which it decidedly did *not* limit "the people" to U.S. citizens:

> "'[T]he people' seems to have been a term of art employed in select
> parts of the Constitution . . . [Its uses] sugges[t] that 'the people'
> protected by the Fourth Amendment, and by the First and Second
> Amendments, and to whom rights and powers are reserved in the
> Ninth and Tenth Amendments, refers to ***a class of persons who are
> part of a national community or who have otherwise developed
> sufficient connection with this country to be considered part of that
> community***."

*Id.* at 580 (quoting *United States v. Verdugo–Urquidez*, 494 U.S. 259, 265 (1990))

(alterations in *Heller*) (emphasis added). Indeed, in *Verdugo-Urquidez*, the Court

held that "aliens receive constitutional protections when they have come within the

territory of the United States and developed substantial connections with this

country." 494 U.S. at 271.

The government seeks to avoid the Supreme Court's clear directive with

misleading excerpts of this analysis:

> In *Heller*, the Supreme Court explained that the term "the people" in
> the Second Amendment "unambiguously refers to . . . members of the
> political community." 554 U.S. at 580. And the Court has observed
> elsewhere that "citizenship" is a required part of "membership in the
> political community" and that "[a]liens are by definition . . . outside of
> this community." *Cabell v. Chavez-Salido*, 454 U.S. 432, 438-40
> (1982). Thus, after analyzing the phrase "right of the people," *Heller*
> determined that "the Second Amendment right is exercised

15

individually and belongs to . . . *Americans*." 554 U.S. at 581
(emphasis added).

AB-20. The government's argument is misleading and inconsistent with the

Supreme Court's actual decisions.

Rather than recognizing the Supreme Court's definition of "the people"

protected by the Bill of Rights in *Heller* as incorporating the *Verdugo-Urquidez*

analysis (quoted above), the government misleadingly quotes the Court's analysis

only of the phrase "political community" in an entirely different context—whether

a state has sufficient interest in defining its own state government agents to exclude

noncitizens. *See Cabell*, 454 U.S. at 438–40 (analyzing whether California could

require U.S. citizenship to serve in law enforcement); *see also Dunn v. Blumstein*,

405 U.S. 330, 343–44 (1972) (originating the phrase used in *Cabell* in determining

what residency requirements a state may impose for voter registration) ("An

appropriately defined and uniformly applied requirement of bona fide residence

may be necessary to preserve the basic conception of a political community, and

therefore could withstand close constitutional scrutiny.").

Not only is that analysis inapplicable here, but the government's focus on

the "political community" rather than the "national community" ignores the

Second Amendment's place in the Constitution. As quoted above, the Court

reasoned that "the people" in the Bill of Rights "refers to a class of persons who

are part of a national community or who have otherwise developed sufficient

16

connection with this country to be considered part of that community." *Heller*, 554 U.S. at 580 (citation omitted). The Court reasoned that "the people" in the Preamble and other Articles of the Constitution "unambiguously refers to all members of the political community, not an unspecified subset." *Id*. at 579–81. The use of "national community" to describe "the people" in the Bill of Rights verses "political community" in the earlier body of the Constitution may reflect that the Bill of Rights refers to "the people" unadorned, while the Preamble and Articles refer to "the people of" identified political bodies (either the several states or the United States). *See* U.S. Const. pmbl., art. I, § 2. Thus the Preamble and Articles referred to political groups who may elect representatives or assign power to the federal government, while the Bill of Rights referred to "the people" *without qualification*, in order to protect individual rights. *See also* 3-ER-443–44 (Professor Pratheepan Gulasekaram discussing same).

This Court should reject the government's attempts to misconstrue Supreme Court precedent. The Court has repeatedly warned courts and litigants against such leaps. *Bruen* clarified that courts of appeals had derived "a 'two-step' framework for analyzing Second Amendment challenges" that was actually "one step too many." 597 U.S. at 17–19; *see also Range*, 124 F.4th at 224–25 (summarizing that "Many courts around the country, including this one, overread" the Court's

17

"passing comment" in response to a dissent to add the errant interest-balancing test).

Similarly in *Rahimi*, the Court explicitly rejected the government's arguments that references in *Heller* and *Bruen* to "law-abiding, responsible citizens" in any way limited the scope of the Second Amendment's protections:

> [W]e reject the Government's contention that Rahimi may be disarmed simply because he is not "responsible." . . . Nor does such a line derive from our case law. In *Heller* and *Bruen*, we used the term "responsible" to describe the class of ordinary citizens who undoubtedly enjoy the Second Amendment right. . . . But those decisions did not define the term and said nothing about the status of citizens who were not "responsible." The question was simply not presented.

*Rahimi*, 602 U.S. at 701–02 (citations omitted). Throughout its Answering Brief, the government has chosen to ignore these directives. This Court should not.

**C.    Most circuit courts to reach this issue have assumed without deciding that undocumented immigrants are among "the people" in the Second Amendment.**

This issue is not new to this Court or other circuit courts. Advancing its argument that undocumented immigrants are not among "the people," the government incorrectly claims that "Since *Bruen*, every court of appeals to reach the question has drawn the same conclusion." AB-19. But not all of the out-of-circuit cases the government cites actually so held, and those that did utilized reasoning this Court has already rejected. AB-19–20. In fact, most circuit courts to

18

reach the issue have taken the same position as this Court—assuming without deciding that undocumented immigrants are among "the people."

First, the few circuit courts that found undocumented immigrants were not among "the people" protected by the Second Amendment simply relied on their own pre-*Bruen* and *Rahimi* holdings based on the passing phrase "law-abiding citizens" in *Heller*. In *United States v. Medina-Cantu*, AB-19, the Fifth Circuit found that *Bruen* and *Rahimi* did not change the first step of Second Amendment analysis—what the "plain text" of the Second Amendment covers. 113 F.4th 537, 541–42 (5th Cir. 2024). Therefore, it upheld its own prior decision in *United States v. Portillo-Munoz*, 643 F.3d 437, 442 (5th Cir. 2011), *as revised* (June 29, 2011), that noncitizens were not among "the people" protected by the Second Amendment.

But the court "acknowledge[d] that there are reasonable arguments as to why *Portillo-Munoz* should be reconsidered post-*Bruen* and *Rahimi*," because it relied only on the Supreme Court's "law-abiding citizens" language in *Heller*. *Medina-Cantu*, 113 F.4th at 542. "And *Rahimi*'s discussion of the term 'responsible' provides some indication that the Supreme Court may, in future cases, reject other arguments that the Second Amendment's reference to "the people" excludes certain individuals." *Id*. The Fifth Circuit simply found the Court's warning in *Rahimi* did not "unequivocally abrogate" *Portillo-Munoz*. *Id*.

19

The Eighth Circuit adopted the Fifth Circuit's reasoning in *Portillo-Munoz* (above) without further reasoning. *Flores*, 663 F.3d at 1023. More recently it simply held that "*Flores* is undisturbed by *Bruen*, and we therefore remain bound by it[.]" *United States v. Sitladeen*, 64 F.4th 978, 987 (8th Cir. 2023). The Fourth Circuit relied on the same language in *Heller* to conclude it was unclear whether undocumented citizens were among "the people," but history supported the government's ability to "disarm individuals who are not law-abiding members of the political community." *United States v. Carpio-Leon*, 701 F.3d 974, 978–81, 980 (4th Cir. 2012). This Court examined the Fourth, Fifth and Eighth Circuits' decisions in *Torres*, but declined to adopt their reasoning. *See* 911 F.3d at 1259–61.

Most circuit courts have assumed without deciding that undocumented immigrants are among "the people" protected by the Second Amendment. This Court reached this position after examining the positions of its sister circuits and adopting the reasoning of the Tenth Circuit—to assume that noncitizens were part of the people absent proof to the contrary. *Torres*, 911 F.3d at 1260 (citing *United States v. Huitron-Guizar*, 678 F.3d 1164 (10th Cir. 2012)).

The Tenth Circuit in *Huitron-Guizar* reasoned that some noncitizens should be included in "the people," but was unclear where to draw the line. That court explained: "*Verdugo-Urquidez* teaches that 'People' is a word of broader content

than 'citizens,' and of narrower content than 'persons.'" 678 F.3d at 1168 (citations omitted). That court, though, lacked the historical evidence to determine which (if any) noncitizens may be excluded from "the people" protected by the Second Amendment. *Id*. at 1169. In the absence of such evidence, it assumed noncitizens were part of "the people," *see id*., and this Court followed, *Torres*, 911 F.3d at 1261.

In addition to the Ninth and Tenth Circuits, the Eleventh and Second Circuits have also adopted this position. The government incorrectly claims that the Eleventh Circuit held undocumented immigrants were not among "the people." AB-19–20 (citing *United States v. Ramirez*, No. 22-14297, 2024 WL 3757080, at *4 (11th Cir. Aug. 12, 2024), and *Jimenez-Shilon*, 34 F.4th at 1050).[4] The Eleventh Circuit did *not*, in fact, so hold.[5] Rather, it assumed without deciding that undocumented immigrants (and particularly the litigant before the Court) were part of "the people." *Jimenez-Shilon*, 34 F.4th at 1045. The Second Circuit too assumed

---

[4] The government also incorrectly claims the Sixth Circuit held undocumented immigrants were not part of "the people." AB-19–20. The unpublished Sixth Circuit case cited, *United States v. Rangel-Tapia*, No. 23-1220, 2024 WL 966385, at *3 (6th Cir. Mar. 6, 2024), simply disposed of a challenge to § 922(g)(5) under plain error, by finding *Bruen* did not make any potential error obvious or clear. It did not discuss who is part of "the people" at all. *Id*.

[5] The Eleventh Circuit instead held that § 922(5)'s disarmament of undocumented immigrants was supported by historic regulations. *Id.* at 1049.

21

without deciding that the undocumented immigrant litigant before it was part of "the people" the year before *Bruen*, but upheld § 922(g)(5) under intermediate scrutiny using the now abrogated interest-balancing test. *United States v. Perez*, 6 F.4th 448, 453 (2d Cir. 2021).

The Seventh Circuit applied the *Verdugo-Urquidez* test in a Second Amendment case and found the undocumented immigrant litigant before it to be part of "the people." It correctly understood the Supreme Court's "passing references" to "'law-abiding citizens' and 'members of the political community,'" as just that, and not as "an attempt to define the term 'people.'" *Meza-Rodriguez*, 798 F.3d at 669. And it recognized that "[o]ther language in *Heller* supports the opposite result: that all people, including non-U.S. citizens, whether or not they are authorized to be in the country, enjoy at least some rights under the Second Amendment." *Meza-Rodriguez*, 798 F.3d at 669.

*Meza-Rodriguez* concluded: "Given our earlier conclusion that the Second and Fourth Amendments should be read consistently, we find it reasonable to look to *Verdugo–Urquidez* to determine whether Meza-Rodriguez is entitled to invoke the protections of the Second Amendment." *Meza-Rodriguez*, 798 F.3d at 670. Applying *Verdugo-Urquidez*'s rule that "aliens receive constitutional protections when they have come within the territory of the United States and developed substantial connections with this country[,]" *id.* (quoting *Verdugo-Urquidez*, 494

22

U.S. at 271), the Seventh Circuit easily found that Meza-Rodriguez had met this test when he had entered the United States voluntarily, resided here for over 20 years, had family and acquaintances here, and had sporadic work history here. *Id*. at 670–71.

If this Court finds this issue is dispositive—and must be decided rather than assumed—it should do, at a minimum, what this Court in *Torres* and the Supreme Court in *Heller* indicated: apply the *Verdugo-Urquidez* test. *Heller*, 554 U.S. at 580; *Torres*, 911 F.3d at 1259. Mr. DeBorba's connections to the United States are similar or stronger than the litigant's in *Meza-Rodriguez*, where the Seventh Circuit found he had sufficient connections to invoke Second Amendment rights. 798 F.3d at 670–71. Indeed, Mr. DeBorba entered the United States voluntarily, lived here for over 20 years, has a long work history here, engaged in his civic community (namely his church), and built his family here. *See* 3-ER-607. His connections are more significant than the litigant's in *Ibrahim v. Department of Homeland Security*, where this Court applied this test and found a "significant voluntary connection" with the United States that was sufficient to assert First Amendment claims. 669 F.3d 983, 997 (9th Cir. 2012). There, the litigant's only connections were that she "voluntarily established a connection to the United States during her four years at Stanford University while she pursued her Ph.D." *Id*. The government does not contest that Mr. DeBorba satisfies the *Verdugo-*

23

*Urquidez* test (nor even acknowledge the test's existence). This Court should find that Mr. DeBorba has significant connections to the United States that make him part of "the people" protected by the Second Amendment.

## II.    The government fails to meet its burden to justify § 922(g)(5) under *Bruen*'s step two and ignores *Rahimi*'s admonition that vague supposed traditions are insufficient to justify modern regulations.

Because Mr. DeBorba and his conduct are covered by "the Second Amendment's plain text[,] . . . the Constitution presumptively protects that conduct." *Bruen*, 597 U.S. at 24. Therefore, "[t]he government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation." *Id*. The government must establish a historical tradition that is at least "relevantly similar" to § 922(g)(5) in both "how and why the regulations burden" the right to bear arms. *Id*. at 29.

The government offers as historic analogues supposed traditions of disarming people "who were not members of the political community" or "who lawmakers believed could not be trusted to adhere to the law." AB-30. The government falls short of its burden under *Bruen*.

First and foremost, by putting forth these vague claims of historic traditions, the government ignores the Supreme Court's recent admonition that such claimed categories are insufficient. The Court explicitly rejected a similar argument in *Rahimi*, explaining: "[W]e reject the Government's contention that Rahimi may be

24

disarmed simply because he is not 'responsible.' 'Responsible' is a vague term. It is unclear what such a rule would entail." *Rahimi*, 602 U.S. at 701 (citation omitted).

So too here. The proposed categories are so vague they would empower the government to disarm anyone it disliked or disagreed with. The "political community" is not a definite term, and appears to be used by the government to mean the dominant ethnic or religious group, or the current political majority. *See* AB-30–36 (grouping historic regulations disarming Native Americans, religious minorities and political dissenters as ones disarming those outside the "political community"). And the latter proposed category—those "lawmakers believed could not be trusted to adhere to the law[,]" AB-30—is an invitation for the government to restrict anyone's rights. The government may believe that members of the opposing political party, a racial minority, particular gender, or religion, or anyone who drives over the speed limit cannot be trusted to follow the law. This supposed category is an even vaguer re-statement of the "irresponsible" tradition the government claimed and the Court rejected in *Rahimi*.

The government's claims are also unsupported by the historical record. Relevant historic regulations did not center on a "political community," citizenship, or ability to follow the law. Rather, its proposed "historical 'analogues' to § 922(g)(5) operate at a high level of generality, or require comparisons to

historical prohibitions created to exclude on the basis of racial, religious, or other animus forbidden by modern constitutional standards." 3-ER-434 (conclusion of Professor Gulasekaram). Indeed, the cited ratification-era restrictions more readily hinge on racial, religious, or other animus than on any concern about who was or was not part of the political community or trustworthy. *See generally* 3-ER-469–475 (reciting regulations). The historic regulations cited by the government targeted those who were disfavored—whom the government disagreed with or wanted to have fewer rights and opportunities—for reasons the Constitution prohibits, such as their religion or dissenting speech. *See* AB-31–34.

The government has not claimed that § 922(g)(5) was enacted due to animus toward immigrants or a particular racial or religious group. If it were, it would likely be unconstitutional on other grounds. Rather, the government asserts that the law was passed "to keep guns out of the hands of those who have demonstrated that they may not be trusted to possess a firearm without becoming a threat to society." AB-27 (cleaned up). But the government points to no analogues that focused on disarming people who had demonstrated they could not be trusted with firearms. Instead, it points to regulations whose "why" was political oppression, even acknowledging the laws were not motivated by a fear of danger. *See* AB-31 (recognizing a prohibition on gun ownership by Catholics "did not rest on a theory that all Catholics were in fact dangerous. . . . Instead, the categorical disarmament

26

stemmed from concerns about a group's propensity to disobey the sovereign and the risk that such disobedience presented to the social order." (citations omitted)) (also citing English disarmament of pacifist Quakers who presented no danger, but adhered to a different religion than the King); AB-32 (citing colonial Massachusetts's disarmament of an outspoken preacher's supporters was "not because those supporters had demonstrated a propensity for violence"); AB-33 (citing a 1775 Connecticut law disarming those who "libel[ed] or defam[ed]" the Continental Congress or Connecticut General Assembly).

Furthermore, the "how" of the proposed historic analogues, as the government acknowledges, generally "require[d] oaths of loyalty to the government and to strip anyone who failed or refused to take the oath of the right to bear arms." AB-34. That is not the case for § 922(g)(5). The modern law includes no provision to test the loyalty of the people it disarms through an oath or otherwise. Indeed, Mr. DeBorba happily would swear his allegiance to the United States if given the opportunity to do so, 3-ER-607, as likely would many undocumented immigrants.

The government's alternate claim—that § 922(g)(5) targets undocumented immigrants because they "already broke the law," AB-39—neither makes it analogous to the proposed historic analogues nor is applicable to § 922(g)(5)'s actual scope. The analogues offered by the government on appeal were not based

27

on a person's law-breaking, but rather on their religious or ethnic group or statements of disloyalty or dissent.[6] And, § 922(g)(5) disarms people who committed no crimes, including those brought to the United States as children, those who overstayed visas, and even certain lawfully admitted non-immigrants. OB-29.[7] Disarming those who broke the law was not the "why" behind the historic analogues (discussed above). Nor was it the "why" behind § 922(g)(5). *See* AB-27 (reciting § 922(g)(5)'s purpose as keeping guns away from those who pose a danger)

Finally, the government's attempt to turn dicta into binding precedent fares no better at this second step of the *Bruen* analysis than it fared at the first step. The government argues "the Supreme Court—like this Court—has repeatedly referred to those within the Second Amendment's protections as 'law-abiding citizens' precisely because law-abidingness and citizenship were well-established

---

[6] Mr. DeBorba previously explained why this would not be relevantly similar to § 922(g)(5) in any event. OB-14–35.

[7] The sources cited by the government merely recognize the very broad scope of those impacted by § 922(g)(5). *See* AB-39–40. *United States v. Latu*, 479 F.3d 1153, 1159 (9th Cir. 2007), interpreted § 922(g)(5) to cover anyone who did not have a recognized immigration status that would prevent their deportation, including someone with an application pending. *Toner*, 728 F.2d at 128–29, upheld § 922(g)(5) on rational basis review well before *Heller* or *McDonald*, reasoning: "No one would dispute that the statute strikes broadly—that was the expressed Congressional intention—and that not all illegal aliens (or ex-felons, for that matter) are disreputable, or unworthy of society's trust."

28

prerequisites to the right to bear arms at the founding, as discussed." AB-41. The Supreme Court has now made crystal clear that its prior use of the phrase "law-abiding, responsible citizens" was not intended to limit the scope of the Second Amendment. *Rahimi*, 602 U.S. at 701–02 (quoted at p.18).

The government has not met its burden to justify § 922(g)(5)'s restriction of the Second Amendment's right to bear arms. The statute is unconstitutional, and Mr. DeBorba's convictions under it should be dismissed.

## III. The government's argument that Congress should be allowed broad deference in matters "relating to citizenship and immigration" does not apply to restrictions of constitutional rights like § 922(g)(5).

The government alternatively seeks to avoid the Supreme Court's commands regarding Second Amendment analysis by adding an argument that "Courts traditionally afford the political branches significant deference in matters relating to citizenship and immigration." AB-41. It argues that "Congress's 'power over aliens is of a political character,' [so] its exercise of that power is 'subject only to narrow judicial review.'" AB-42 (quoting *Hampton v. Mow Sun Wong*, 426 U.S. 88, 101 n.21 (1976)). It thus concludes it may violate constitutional rights so long as it does so through a law relating to citizenship and immigration. AB-42 ("With section 922(g)(5), Congress had the right to determine that noncitizens who are unlawfully present in the United States, and are thus potentially subject to removal, should not possess guns while here.").

29

Though courts "have long recognized the power to expel or exclude aliens" is "largely immune from judicial control," *Fiallo v. Bell*, 430 U.S. 787, 792 (1977) (citations omitted), §922(g)(5) does not involve expelling or excluding noncitizens. Rather, it creates criminal liability for conduct within our nation's border— specifically, conduct protected by the Second Amendment.

The Supreme Court made clear the inquiry is different for such a law when it addressed a similar situation in *Wong-Wing v. United States.* There, a Chinese national was sentenced to sixty days hard labor by an immigration official for his unlawful presence in violation of civil immigration laws. 163 U.S. 228, 229 (1896). The government argued that such matters were part of the sovereign's plenary immigration powers. *Id.* at 235. The Supreme Court found that a bridge too far. *See id.* at 238.

While the Court acknowledged that Congress can "forbid aliens . . . from coming within their borders, and expel aliens . . . from their territory," to declare unlawful residence a crime to be punished without judicial trial would "pass out of the sphere of constitutional legislation," would be "not consistent with the theory of our government," and would violate the Fifth and Sixth Amendments. *Id.* at 237–38.

Similarly, this Court held that the broad power to exclude or expel noncitizens does not allow the government to deny noncitizens constitutional

rights. *See American-Arab Anti-Discrimination Comm.*, 70 F.3d at 1056 ("Contrary to the Government's suggestion, the foreign policy powers which permit the political branches great discretion to determine which aliens to exclude from entering this country do not authorize those political branches to subject aliens who reside here to a fundamentally different First Amendment associational right."). While Congress may have broad power to exclude and expel as an immigration function, its actions outside this specific niche are still subject to constitutional limitations.

## IV.   The government misreads the record to try to justify its § 922(g)(8) prosecutions.

The government seeks to defeat Mr. DeBorba's challenges to his convictions under § 922(g)(8) by misconstruing the record and ignoring Mr. DeBorba's arguments.[8]

First, the government claims that, despite their actual text, the restraining orders underlying Count 1 contain an individualized finding of dangerousness. The government argues that a "commonsense reading of the orders," shows they "built on the earlier pretrial November 14, 2019 order . . . , which included the express

---

[8] The government also attempts to "incorporate" its arguments related to § 922(g)(8) from its brief filed in a separate case. AB-52 n.18. But this Court's rules expressly prohibit such "incorporation" of arguments on the merits from filings in other cases. Ninth Cir. Rule 28-1(b) (2000).

'credible threat' language." AB-51. The government includes no citation to the record for this argument.

Nor could it. The record makes clear that the 2020 and 2022 orders charged in Count 1 did not "build on" the 2019 order. The October 14, 2020, order was entered in Case No. 2020-1-01294-06. 2-ER-137–38. The January 31, 2022, order was entered in Case No. 2021-1-01539-06. 2-ER-143–44. Both are post-conviction orders. The orders do not even reference the pretrial orders in their actual cases' numbers,[9] let alone an order issued in a different case. The orders incorporate no prior findings of fact and never reference any restraining order issued in Case No. 9Z1074494—the only case where an order contained even a form-based individualized finding. *See* 2-ER-115–16. "Common sense" does not indicate the 2020 and 2022 orders depended on some prior individualized finding. The Court should not indulge the government's stretched logic.

Second, the government incorrectly claims Mr. DeBorba did not raise, and therefore waived, any challenge to the constitutionality of § 922(g)(8) beyond the individualized finding prong under which a conviction was deemed constitutional in *Rahimi*. AB-52. This is not true. Mr. DeBorba clearly argued that the Supreme Court's holding in *Rahimi* upheld § 922(g)(8) convictions only when the

---

[9] Furthermore, the pretrial orders in these cases also did not include an individualized finding that Mr. DeBorba presented a credible threat to another person. 2-ER-134–35, 140–41.

restraining order was based on an individualized finding that the person posed a credible threat to the safety of another. OB-36–40. Mr. DeBorba detailed the Supreme Court's reasoning in *Rahimi*, *id.*, and argued that the alternative basis for liability—a protection order that prohibits the use, attempted use, or threatened use of physical force—"is not justified by the historic analogues in *Rahimi* because it requires no individualized finding of an actual risk of danger." OB-40.[10]

The government puts forth no additional historic analogues to justify this latter prong of § 922(g)(8). Instead, it points to an unpublished out-of-circuit decision concluding that a "reasonable inference" could be drawn that a person posed a danger to others from the fact that they were subject to a restraining order, but did not address *Rahimi*'s strong reliance on the individualized finding as the "how" of the historic analogues. *See United States v. Combs*, No. 23-5121, 2024 WL 4512533, at *3 (6th Cir. Oct. 17, 2024) (cited at AB-52). This logical leap does not satisfy the government's burden.

---

[10] Mr. DeBorba continued the analysis as applied in his case, explaining the historic tradition centered on a "how" with an individualized finding of dangerousness, yet his conviction under the latter prong of § 922(g)(5) was supported by no such finding. OB-41.

V.    **The government's mistaken and broad arguments do not defeat Mr. DeBorba's challenges to the remaining counts.**

The government raises flawed arguments to counter Mr. DeBorba's challenges to the remaining counts.

First, the government claims Mr. DeBorba's vagueness challenge to Count 7—charging him with possessing an unregistered silencer—must fail because "DeBorba stipulated that he knew his device was an unregistered silencer under the statutory definition." OB-86. He did no such thing.

At trial, Mr. DeBorba stipulated to a device being found in his home, that the government's expert opined the device qualified as a silencer under 26 U.S.C. § 5845(a)(7), and that this opinion would establish that element for trial. 2-ER-83–84. But he never stipulated that he personally knew the device would be deemed a "silencer" under the statute or was aware of this status or the duty to register. *See id.* While an expert with the Bureau of Alcohol, Tobacco and Firearms may form opinions of what is or is not a silencer, the statute fails to put ordinary people on notice of which items are proscribed. This Court should sustain Mr. DeBorba's vagueness challenge.

Second, the government paints with a broad brush, divorcing reasoning from context, in an effort to defeat Mr. DeBorba's challenges to his convictions in Counts 4–6, charging him with various false statements related to the purchase and possession of firearms. It argues that constitutional concerns do not ever bear on or

34

defeat materiality elements of false statement charges. But the cases it relies upon are more nuanced and do not establish such a broad principle.

The government cites to *United States v. Manney*, 114 F.4th 1048, 1053 (9th Cir. 2024), reasoning "the Second Amendment does not protect an individual's false statements." AB-76. But that was a straw purchaser case where the false statement pertained to the true purchaser of the firearm. As such, it was controlled by *Abramski v. United States*, 573 U.S. 169 (2014), which established the materiality of true purchaser information. *Manney*, 114 F.4th at 1053–54. *See* OB-46.

The government also relies on *United States v. Mandujano*, 425 U.S. 564 (1976) (plurality), for the proposition that false statement charges should be sustained "even when the defendant alleges 'that the Government exceeded its constitutional powers in making the inquiry.'" AB-78 (quoting *Mandujano*, 425 U.S. at 577). But *Mandujano* concerned a question of the admissibility of evidence of a false statement—not the materiality of a false statement. *Id*. at 582 (denying motion to suppress under *Miranda*). The quote recited by the government is not controlling.

Finally, the government's supplemental argument, relying on *United States v. Patnaik*, 125 F.4th 1223 (9th Cir. 2025), is no more persuasive. Government's Citation of Supplemental Authority (Feb. 4, 2025), Dkt. 35.1. In *Patnaik*, this

Court resolved a question of whether false statements on H-1B visa applications—that workers would fill in-house positions, when in fact they were contracted out to other companies—were material. *Id.* at 1227. This Court did not examine what renders a statement material or immaterial under the statutes of conviction here.

The visa fraud statute charged there—18 U.S.C. § 1546(a)—included a materiality element that was met if a statement "could have affected or influenced the government's decision to grant the petition." *Id.* at 1227 (cleaned up). The indictment's allegations met this standard because "[b]y law, H-1B petitioners must 'establish that the H-1B beneficiary employees would fill specific, bona fide positions that were available at the time [the petitioner] filed the petitions, and that there was, or would be, a legitimate employer-employee relationship between [the petitioner] and the H-1B beneficiaries.'" *Id.* (quoting *United States v. Prasad*, 18 F.4th 313, 316 (9th Cir. 2021)). As such, "[a]ccurate information on where and for whom the H-1B beneficiaries will work *could* affect or influence the decision to grant the H-1B visa petition" and "a jury could find Defendants' alleged false statements material." *Id.* (citation omitted). Given this holding, *Patnaik* merely re-affirms that a person is not shielded from liability from a material false statement if there was some other reason they should not have been asked the question eliciting the false statement.

36

Here, however, the government makes no real argument that the false statements at issue were material. It simply argues the statements were relevant to laws denying a constitutional right based on immigration status. AB-75. By contrast, in *Patnaik*, this Court found the false information material to evaluating the valid legal standard of whether "employees would fill specific, bona fide positions that were available at the time" and whether there was "a legitimate employer-employee relationship[.]" 125 F.4th at 1227. Similarly in *Manney*, this Court held that the straw purchaser false statement was material because valid law regarding in-person purchase and revelation of the true purchaser of the firearm was undisturbed by *Bruen*. 114 F.4th at 1052–53. But the government offers no such basis for the materiality of Mr. DeBorba's false statements here, besides the unconstitutional restrictions on immigrants' right to bear arms. *See* AB-75–76.

## CONCLUSION

This government has not met its burden to justify its restrictions on Mr. DeBorba's Second Amendment rights here. This Court should reverse the convictions against Mr. DeBorba in this case.

Dated this 17th day of March 2025.

<div style="margin-left: 40%;">

s/ *Rebecca Fish*
Assistant Federal Public Defender
Attorney for João DeBorba

</div>

## CERTIFICATE OF COMPLIANCE

I am the attorney of record. This brief contains 8,612 words, excluding the items exempted by Fed. R. App. P. 32(f). The brief's type size and typeface comply with Fed. R. App. P. 32(a)(5) and (6).

I certify this brief is accompanied by a motion to file an overlength reply brief pursuant to Cir. R. 32-2(a).

Dated this 17th day of March 2025.

s/ *Rebecca Fish*
Assistant Federal Public Defender
Attorney for João DeBorba